UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————————

DEANDRE WILLIAMS,

                          Plaintiff,

                                                          9:11-CV-379
v.                                                        (NAM/TWD)

BRIAN FISHER, CHERYL V. MORRIS, OMEGA B.
ALBTON, D. ROCK, M. LIRA, J. HAWK,
DON HAUG, KAREN BELLAMY, KENNETH S.
PEARLMANN, and ALEC H. FRIEDMANN,

                          Defendants.

———————————————————————————————

APPEARANCES:                          OF COUNSEL:

DEANDRE WILLIAMS
Plaintiff *pro se*
#99-A-0052
Upstate Correctional Facility
P.O. Box 2001
309 Bare Hill Road
Malone, NY 12953

HON. ERIC T. SCHNEIDERMAN            KEVIN P. HICKEY, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## <u>REPORT AND RECOMMENDATION</u>

In this *pro se* civil rights action commenced under 42 U.S.C. § 1983, Plaintiff Deandre

Williams claims that Defendants violated his First Amendment right to practice his chosen

religion, his Eighth Amendment right to be free from cruel and unusual punishment, and his

Fourteenth Amendment right to equal protection under the law. (Dkt. No. 1 at ¶¶ 6 and 7.)

Plaintiff's Complaint has also been construed to allege violations of the Religious Land Use and

Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*.[1] Plaintiff's claims all arise

out of Defendants' alleged deliberate refusal to acknowledge his faith as a Nazarite Jew and

failure to provide him with a sufficiently nutritious alternative diet in accordance with the dietary

laws of his faith.[2] (*See generally* Dkt. No. 1.) Defendants are Brian Fisher, Commissioner of the

Department of Corrections and Community Supervision ("DOCCS"); Cheryl V. Morris,

DOCCS Director of Ministerial, Family, and Volunteer Services; Omega B. Albton, DOCCS

Assistant Director, Ministerial Family and Volunteer Services; D. Rock, Superintendent at

Upstate Correctional Facility ("Upstate"); M. Lira, Deputy Superintendent at Upstate; Timothy

Hawk (incorrectly sued as J. Hawk), Chaplain at Upstate; Don Haug, Food Administrator at

Upstate; Karen Bellamy, DOCCS Director, Inmate Grievance Program; Kenneth Pearlmann,

DOCCS Deputy Commissioner of Program Services; and Alec H. Friedman, Jewish Chaplain at

Upstate Correctional Facility. *Id*. at ¶ 2 and pp. 3-4.[3])

---

[1] Plaintiff alleged violations of the Religious Freedom Restoration Act ("RFRA") in his Complaint. (Dkt. No. 1 at ¶ 7.) The District Court previously noted that the RFRA was invalidated by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997) and, in deference to Plaintiff's *pro se* status, has construed his Complaint as alleging a claim under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, which was enacted by Congress to rectify the perceived infirmity of RFRA. *See Pugh v. Goord*, 571 F. Supp.2d 477, 504 n. 11 (2008). (Dkt. No. 11 at p. 2 n. 2.)

[2] This action was initially referred to Magistrate Judge George H. Lowe for Report and Recommendation by District Court Judge Norman A. Mordue, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). (Dkt. No. 2, April 6, 2011 text entry.) Upon Magistrate Judge Lowe's retirement on February 9, 2012, the case was reassigned to me. (Dkt. No. 51.)

[3] Page numbers in citations to filed documents refer to the page numbers assigned by the Court's CM/ECF system rather than to the page number in the original document.

On August 11, 2011, District Court Judge Norman A. Mordue issued a Decision and Order granting Plaintiff's application to proceed *in forma pauperis*. (Dkt. No. 11.) After finding that Plaintiff had acquired three strikes for purposes of 28 U.S.C. §1915(g), the Court considered whether this action falls within the "imminent danger" exception in Section 1915(g) and made a preliminary finding that the exception applied based upon Plaintiff's claim that Defendants' ongoing refusal to provide him sufficient food within the dietary laws of his Nazarite faith was causing him to suffer severe health consequences, and that he had lost considerable weight. *Id*. at pp. 4-5. The District Court cautioned that Plaintiff's *in forma pauperis* status would be revoked if "as the case progresses, the Court concludes that he did not face imminent danger of serious physical injury when he commenced this action or is otherwise not entitled to proceed *in forma pauperis*." *Id*. at p. 5.

Defendants have now moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff's claims are barred under the doctrines of *res judicata* or collateral estoppel. (Dkt. No. 36) Defendants also seek to have Plaintiff's *in forma pauperis* status revoked and the action conditionally dismissed on the grounds that Plaintiff has failed to satisfy the imminent danger exception under the three strike rule set forth in Section 1915(g). (Dkt. No. 36-1 at p. 16.) Plaintiff has opposed the motion. (Dkt. Nos. 41, 44, and 47.) For the reasons set forth below, the Court recommends that Defendants' motion be **DENIED**.

## I.    BACKGROUND[4]

Plaintiff is an inmate at Upstate.  (Dkt. No 1 at ¶ 2.)  He professes to be a Nazarite of the

Jewish religion.  *Id.* at ¶ 6.   According to Plaintiff, he took his vows of abstinence as a Nazarite

Jew in the latter part of 1990.  *Id.* at p. 10, ¶ 8.  Sometime in 2001 or 2002, Plaintiff informed the

Rabbi at Upstate that he followed the Torah, which Plaintiff has alleged recognizes the Nazarites.

*Id*. at p. 10, ¶ 9.  In February of 2003, Plaintiff learned of the International Prison Yeshiva Jewish

Outreach Congregation ("Prison Yeshiva") and began corresponding with the Director, Rabbi

Jacob Fineberg.  *Id.* at p. 11, ¶ 13 and p. 35.  Plaintiff became an official member of the Prison

Yeshiva in October of 2004 and thereafter engaged in regular correspondence with Rabbi

Fineberg about religious matters.  *Id*. at p. 35.  In an undated letter from Rabbi Fineberg to a

prison chaplain, the Rabbi wrote that Plaintiff had demonstrated his understanding of Jewish

beliefs and his dedication to Jewish practice, and it was obvious to the Rabbi that Plaintiff was

sincerely trying to follow the statutes and teachings of Judaism.  *Id.*

Plaintiff has described the vow taken by him as a Nazarite as prohibiting him from eating

anything that grows from the vine, including grapes and vinegar, and also from eating anything

dead, i.e., meat and fish.  *Id*. at p. 12, ¶ 20.  Plaintiff claims to have been a vegetarian since

October of 1987, well prior to the time he became a Nazarite Jew.  *Id*.  Plaintiff has alleged that

---

[4]  The background facts set forth herein are taken from the Plaintiff's Complaint and are
presumed to be true for purposes of Defendants' Rule 12(b)(6) motion.  *See Hernandez v.
Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) ("In reviewing a
complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in
the complaint as true and construe all reasonable inferences in the plaintiff's favor.") (citation
omitted).

he has been provided with the Cold Alternative Diet ("CAD") since approximately March of 2002, in accordance with the Upstate policy of providing the CAD to Jewish inmates because it contains Kosher items. *Id*. at p. 11, ¶¶ 18-19.

According to Plaintiff, the typical breakfast under the CAD diet includes alternating hot and cold cereal, along with bread, and eggs or peanut butter, juice, and coffee. *Id*. at p. 36. Lunch typically consists of tuna, peanut butter or cheese, bread, vegetable, and on some days macaroni salad and fruit. *Id*. Dinner is some type of meat or fish, bread, vegetable, and soup. *Id*. Because of his religious dietary restrictions, Plaintiff is unable to drink the grape juice serviced as part of the CAD diet and cannot eat the macaroni salad, which has vinegar. He is also unable to eat the meat, fish, and cheese served at lunch and dinner and claims that when a meal includes salmon, juice from the fish gets all over the other food on his plate so that he cannot eat any of it. *Id*. at p. 15, ¶¶ 45-46, and 26. The CAD diet meals are repeated week after week without change. *Id*. at p. 12, ¶ 22. A milk allergy, which has now been acknowledged by DOCCS, prevents Plaintiff from having milk with his cold cereal at breakfast. *Id*. at p. 12, ¶ 26, and p. 44. No substitute for the milk is provided so Plaintiff has to eat the cereal dry.[5] *Id*. at p. 54.

In about October of 2003, Plaintiff began complaining to Defendants that the CAD was in contravention of the dietary laws of the Nazarite Jewish faith, and that he could not eat enough of the food being served to him to sustain him in good health. *Id*. at p. 14, ¶¶ 39-40. In December of 2003, Rabbi Fineberg wrote to Defendants informing them that Plaintiff had taken a Nazarite vow a number of years ago and as a Nazarite abstained from anything that grows from the fruit of

---

[5]Plaintiff's claim of a milk allergy is supported in the denial of Plaintiff's December 29, 2010 grievance requesting that hot cereal be substituted for cold cereal. The determination notes that "per medical [grievant] has an allergy to milk only." *Id*. at p. 54.

the vine and meat of any type. *Id.* at p. 38. Plaintiff continued to complain and requested that an alternative be provided to him to supplement for the meat and dairy products he could not eat because of his religious beliefs and milk allergy. *Id.* at p. 15, ¶ 43.

In January and June of 2010, Plaintiff complained to the mess hall supervisors and requested that they stop putting salmon on his plate and give him peanut butter and jelly as a substitute. *Id.* at p. 15, ¶¶44-45. Plaintiff claims that the contamination of other food on his plate from the salmon juice made him nauseous and forced him to eat fruits and vegetables given to him by other prisoners or to go hungry. *Id.* at pp. 15-16, ¶¶ 48-49. Plaintiff continued to complain about the salmon and submitted a grievance in July of 2010. His complaints were disregarded. *Id.* at p. 16, 38.

Plaintiff filed a series of grievance complaints relating to his religious and dietary concerns during the latter part of 2010 and early 2011, all of which were denied.[6] *Id.* at pp. 17-18, 41-44, 49-51, 54-58. Plaintiff also suggested solutions such as giving him hot cereal or peanut butter and jelly instead of the food he could not eat. *Id.* at p. 22, ¶¶ 89 and 91. The denial of Plaintiff's October 14, 2010 grievance stated that:

> The grievant receives a CAD (kosher) meal, the NYSDOCS does
> not have a vegetarian CAD (kosher) diet; they do have an
> alternative diet plan available. If grievant would like the
> alternative diet they must fill out the S-Block Meal form available
> on your housing unit.
>
> The grievant has an allergy to milk, per the medical department per
> the Regional Dietician milk is not replaced for the breakfast meal.

*Id.* at p. 44. According to Plaintiff, he could not have the S-Block meal because it is not kosher

---

[6] It appears that Plaintiff had also grieved his religious dietary concerns without success in the latter part of 2009. *See* Dkt. No. 1 at p. 50.

and eating a kosher diet is a central tenet of Nazarite Judaism.[7] *Id*. at p. 28, ¶¶ 133-34.

The Central Office Review Committee also denied Plaintiff's October 14, 2010 grievance, writing in part:

> CORC notes that the grievant's dietary concerns were addressed in its prior decisions UST-39582-09 and UST-39897-09, dated 9/2/09 and 10/7/09, respectively. CORC also notes that the grievant's Religion of Record is designated as "Jewish", and that he is receiving the Cold Alternative Diet and grape juice and matzo. CORC asserts that the Department does not offer a vegetarian diet, and advises the grievant that he may refrain from eating those food items which are contrary to his religious beliefs. No approval has been granted to alter the CAD to accommodate Nazarites.[8] CORC advises the grievant to address medical concerns via the sick call mechanism.

*Id.* at p. 50.

At the time Plaintiff commenced this action, he was being held in the Special Housing Unit ("SHU") without the benefit of food from the commissary or food packages to supplement his diet to make up for the CAD diet food he is unable to eat because of his religious beliefs and milk allergy. *Id*. at p. 11, ¶ 17. According to Plaintiff, he will be in SHU until 2014. *Id.*

Plaintiff has alleged that as a result of the lack of adequate nutrition, he has sustained significant weight loss, and his health has dramatically declined, with pre-existing illnesses exacerbated as his body is starved for the nutrients it needs. *Id.* at p. 28, ¶ 137. Plaintiff also claims to have contracted severe gum and sinus infections from dietary deficiencies, to suffer from severe stomach pains as a result of being starved, and to have been hospitalized on two

---

[7] Plaintiff claims that Defendants have failed to acknowledge or recognize him as a Nazarite Jew. *Id*. at p. 19.

[8] Plaintiff has attempted without success to have Nazarite Judaism recognized as a religion by DOCCS. *Id.* at p. 17, ¶¶ 57-59.

occasions for internal stomach pains and bleeding because his health was failing due to malnutrition and inadequate diet.  *Id*. at ¶¶ 88, 99, and 111.  Plaintiff contends that his request to see a dietician was denied.  *Id*. at ¶112.

## II.   ANALYSIS OF DEFENDANTS' ARGUMENT THAT PLAINTIFF'S CLAIMS ARE BARRED UNDER THE DOCTRINES OF *RES JUDICATA* OR COLLATERAL ESTOPPEL

Defendants seek dismissal of Plaintiff's Complaint on *res judicata* or collateral estoppel grounds based upon Magistrate Judge Peebles' Report and Recommendation in *Williams v. Senkowski,* No. 9:00-CV-1580 (N.D.N.Y. Aug. 20, 2003). (Dkt. No. 36-2.)  Dismissal under Rule 12(b)(6) based upon a *res judicata* or collateral estoppel defense is appropriate if it is clear from the face of the complaint or the public record that a plaintiff's claims are barred as a matter of law.  *Conopco, Inc. v. Roll Intern*., 231 F.3d 82, 86-87 (2d Cir. 2000).

### A.   *Res Judicata*

#### 1.   The Doctrine of *Res Judicata*

"Under the doctrine of *res judicata*, or claim preclusion, [a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.*"  EDP Medical Computer Systems, Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (citation and internal quotation marks omitted).  To prove that a claim is precluded under the doctrine of *res judicata,* a party must show that "(1) the previous action involved an adjudication on the merits;  (2) the previous action involved the parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  *Murtaugh v. New York*, 810 F. Supp. 2d 446, 485 (N.D.N.Y. 2011) (citing, *inter alia*, *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 285 (2d Cir.

2000), *cert. denied*, 531 U.S. 1035 (2000)).  The party seeking to invoke *res judicata* has the burden of proving that the doctrine is applicable.  *Computer Assocs. Intern., Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997).

Relevant considerations in determining whether the claims were or could have been considered in the prior action include whether the same evidence is needed to support both claims, and whether the facts essential to the second action were present in the first.  *See NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983) ("Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.").  To be barred by *res judicata*, the second suit must involve the same claim or nucleus of operative facts as the first suit. *Interoceanica v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir. 1997) ("To ascertain whether two actions spring from the same transaction or claim, we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations.") (citations and internal quotation marks omitted).

2.      *Senkowski*[9]

Plaintiff commenced the *Senkowski* action in 2000 while he was an inmate at Clinton Correctional Facility ("Clinton").  (Dkt. No. 36-2 at p. 2.)  The *pro se* civil rights action, brought

---

[9]  The papers filed by the parties in *Senkowski* are not available on the N.D.N.Y. CM/ECF system, and the Defendants have submitted only Magistrate Judge Peebles' Report and Recommendation on the defendants' summary judgment motion in that case in support of their motion to dismiss.  Therefore, the *Senkowski* facts set forth herein have been taken solely from Magistrate Judge Peebles' Report and Recommendation.

under 42 U.S.C. § 1983, included claims for violation of Plaintiff's First and Eighth Amendment rights. *Id.* More specifically, Plaintiff claimed that he was denied a diet consistent with his medical needs and religious beliefs and was not provided with prescribed medicine while confined in Clinton. *Id.* The defendants in *Senkowski* included D. Senkowski, the Superintendent of Clinton; Annetts, First Deputy Superintendent; Dr. Ellen, a physician at Clinton; J. McCloud, Food Service Manager at Clinton; R. Couture, a civilian cook; and J. Mitchell, a nurse administrator. *Id.* at p. 4.

Plaintiff's Eighth Amendment claim in *Senkowski* included a complaint that the defendants knowingly offered a diet that included foods to which Plaintiff was allergic.[10] *Id.* at p. 12. The foods were fish, eggs, soy and soy products, and milk and milk products. *Id.* at p. 15. The summary judgment record in *Senkowski* was found to have established that while Plaintiff might have suffered from an intolerance to certain foods, he did not suffer from any food allergies. *Id.* at p. 17. The record was also found to have revealed that Plaintiff had remained generally healthy during his stay at Clinton, and that his weight had remained stable. *Id.* at pp. 19-20. Based upon the evidence, Magistrate Judge Peebles concluded that Plaintiff had failed to establish a serious medical need for purposes of an Eighth Amendment medical indifference claim with regard to his diet.[11] *Id.* at p. 20.

_____

[10] Plaintiff also alleged that he was not given Dilantin, a medication prescribed for his seizures. *Id.* at pp. 12-13. That claim has no relevance to the motion before the Court.

[11] To succeed on an Eighth Amendment medical indifference claim, a plaintiff must satisfy an objective and subjective requirement – "the conditions must be 'sufficiently serious' from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with 'deliberate indifference.' *Farmer [v. Brennan*, 511 U.S. 825, 834 (1994)] . . ." *Id.* at 14. (Dkt. No. 36-2 at pp. 13-14.)

Plaintiff's First Amendment claim in *Senkowski* also related to his diet. Plaintiff claimed that he was prohibited from eating meat and meat products by his religious beliefs. *Id*. at p. 23. Plaintiff's amended complaint in *Senkowski* did not identify the religion whose tenets imposed the claimed restriction, but in later pleadings Plaintiff identified himself as a Rastafarian. *Id*. There is nothing in Magistrate Judge Peebles' Report and Recommendation suggesting that Plaintiff claimed his religious beliefs required him not only to refrain from eating meat but to keep a kosher diet, thereby further restricting his diet as is alleged in this case.

The court in *Senkowski* acknowledged that under the First Amendment, prison inmates have the right "to receive diets consistent with their religious scruples" but noted that the right was not without bounds – that it was subject to the same scrutiny as other conduct by a prison official encroaching on an inmate's First Amendment free exercise rights, namely "one of reasonableness taking into account whether the particular [act] affecting [the] right . . . is reasonably related to legitimate penological interests." *Id*. at p. 25 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)).

Magistrate Peebles applied the fact intensive four factor test set forth in *Turner v. Safley*, 482 U.S. 78, 84 (1987) to determine whether the failure to provide Plaintiff with a vegetarian diet was rationally related to legitimate penological interests. *Id*. at pp. 26-31. Those factors were identified in *Senkowski* as: "1) whether there is a 'valid rational connection" between the regulation and the legitimate penological interest asserted; 2) whether the inmate has alternate means of exercising the right; 3) what impact accommodation of the right will have on guards, other inmates and the allocation of prison resources in general; and 4) whether alternative methods for accommodating the right exist at *de minimis* cost to the penological interest

asserted." *Id.* at p. 26.

In its analysis, the court in *Senkowski* found that the record showed that Plaintiff had alternative means available to refrain from eating meat because he could eat items available in any of the four diets[12] offered by the Department of Correctional Services (now DOCCS). In addition, Plaintiff was supplied with Ensure on a daily basis to make certain he received proper nutrition." *Id.* at p. 2. Therefore, Plaintiff could refrain from meat and still maintain a nutritious diet. *Id.* The court also noted in its *Turner* analysis that Plaintiff had not suggested any alternatives to the diet provided by Defendants that would accommodate his First Amendment rights at a *de minimis* cost to legitimate penological interests. *Id.* at p. 30.

Concluding that based upon the evidence before it, the diet provided Plaintiff was reasonable under the *Turner* analysis, Magistrate Judge Peebles recommended dismissal of Plaintiff's First Amendment claim in *Senkowski.* (Dkt. No. 36-2 at p. 35.)

3.      *Res Judicata* Analysis

Defendants correctly assert that the grant of summary judgment against Plaintiff in *Senkowski* constituted a final adjudication on the merits of the claims asserted by him in that lawsuit. Therefore, the first *res judicata* requirement is satisfied in this case. (Dkt. No. 36-1 at 6.) *See Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 271 (2d Cir. 1977) (summary judgment is a final judgment on the merits for *res judicata* purposes).

As to the second requirement, Plaintiff, against whom *res judicata* is asserted in this

---

[12]   The four diets available at that time were identified as "1) general population diet; 2) the Cold Alternative Diet ("CAD") which is kosher; 3) the religious alternative diet ("RAM"), designed for Muslims and members of other religious groups; and 4) a medical diet, which is a low fat/low cholesterol/low sodium diet." *Id.* at p. 20, n. 14.

action, was also the plaintiff in *Senkowski*. However, it appears that *Senkowski* had a completely different group of defendants. (Dkt. No. 36-2 at p. 4.) The principle of privity has been broadened to some extent in the application of *res judicata*, and has been found to bar relitigation of the same cause of action against a new defendant where the newly named defendant has a close or significant relationship with a previously sued defendant, when the claims in the two actions are essentially the same, and the new defendant's existence and participation in the relevant events was known to plaintiff at the time of the first action. *See Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370, 381 (S.D.N.Y. 1999), *aff'd* 207 F.3d 105 (2d Cir. 2000).

There are no facts before the Court regarding whether the Plaintiff knew of the Defendants in this action at the time of *Senkowski* and elected not to name them as defendants in that case, or that any of the Defendants in this action have a close or significant relationship with the defendants in *Senkowski*. Thus, Defendants have failed in their burden of establishing that *Senkowski* involved the same defendants or defendants with whom the Defendants in this action are in privity. *See Computer Assocs.,* 126 F.3d at 369 (party seeking *res judicata* has the burden of showing the doctrine applies).

Furthermore, Defendants have failed to establish that the claims asserted in this action were raised, or could have been raised, in *Senkowski*. Although both involve claims that Plaintiff's religious beliefs prohibit him from eating meat, this lawsuit and *Senkowski* do not spring from the same transaction or claim or involve the same nucleus of operative facts. The facts essential to this lawsuit were largely not present in *Senkowski,* which involved dietary claims from nearly a decade ago when Plaintiff was a follower of the Rastafarian faith, and when present day DOCCS food policies could not possibly have been known. *See United Techs.*

13

*Corp.*, 706 F.2d at 1260 (preclusive effect of first judgment will depend on whether the second action involves the same transaction, whether the same evidence is needed, and whether facts essential to the second were present in the first). Therefore, the evidence needed to support the claims and defenses in this lawsuit will likely be different from that in *Senkowski.*

The extremely fact specific First Amendment analysis undertaken in *Senkowski*, which led the Court to conclude that Plaintiff was able to refrain from eating meat and still maintain a nutritious diet because he could eat from any of the four diets offered and was also given Ensure, supports the conclusion that the claims in the two lawsuits do not involve the same nucleus of operative facts. *See Interoceanica*, 107 F.3d at 90.[13] As a Nazarite Jew, Plaintiff is not only a vegetarian, he is required to eat a kosher diet which, as alleged in his Complaint, significantly limits his options since the only kosher diet available to him includes a substantial amount of meat and fish and other foods and beverages he is precluded from eating. In *Senkowski,* the evidence disputed Plaintiff's claim that he was allergic to milk, whereas in this case, the grievance determination annexed to Plaintiff's complaint acknowledges that Plaintiff is, in fact, allergic to milk. *Id*. at p. 44. Furthermore, Plaintiff has alleged that in SHU he as no access to the commissary as a food source and cannot receive food packages to supplement his diet, leaving him more dependent on the CAD food diet than might otherwise be the case.

Plaintiff claims that the denial of nutritionally adequate food presents an immediate

_____

[13] The Court recognizes that it may very well be more than a coincidence that Plaintiff's initial claim that his diet was restricted by his Nazarite Jewish faith came directly on the heels of Magistrate Judge Peebles' recommendation that summary judgment be granted in Defendants' favor in *Senkowski,* and Judge McAvoy's adoption of that recommendation. Nonetheless, Plaintiff has allegedly followed the teachings of the Nazarite Jewish faith for a number of years since *Senkowski*, including eating a kosher diet, giving rise to a distinct set of operative facts in this case.

danger to his health. (Dkt. No. 1 at p. 14, ¶¶ 39-40.) *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (Eighth Amendment prohibition on cruel and inhuman treatment requires "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") While Plaintiff was found to be in general good health in *Senkowski*, he has alleged in detail in his Complaint in this action a number of ways in which his health has declined as a result of inadequate nutrition.[14] Furthermore, because in this action Plaintiff identifies as a Nazarite Jew, his equal protection claim could not have been determined in *Senkowski*.

Plaintiff's Complaint has also been construed as alleging violations of RLUIPA, 42 U.S.C. § 2000cc-1(a)(1)-(2), in this lawsuit.[15] RLUIPA provides in part: "'No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the burden furthers 'a compelling governmental interest,' and does so by 'the least restrictive means.'" *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005). RLUIPA has been construed to impose duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir. 2009), *cert. denied*, ___ U.S. ___, 130

---

[14]  For purposes of this Rule 12(b)(6) motion, the Court must accept Plaintiff's factual allegations concerning the impact of his allegedly nutritionally inadequate diet. *Hernandez*, 18 F.3d at 136.

[15]  Magistrate Judge Peebles' Report and Recommendation in *Senkowski* makes no mention of Plaintiff having asserted a claim under RLUIPA in that case. (Dkt. No. 36-2)  That is not altogether surprising given that RLUIPA did not become effective until September 22, 2000, and Plaintiff filed his Amended Complaint in *Senkowski* less than five months later on February 14, 2001, long before a body of case law on RLUIPA was developed.  Even if a RLUIPA claim arising from the same set of operative facts as those in *Senkowski* would be barred by *res judicata* because it could have been raised in that action, Plaintiff's RLUIPA claim in this case, being unrelated in time, space, and origin, is not.  *See Interoceanica*, 107 F.3d at 90.

S.Ct. 2111 (2010).  Plaintiff's RLUIPA claim could not have been determined in *Senkowski* because he did not claim to be a Nazarite Jew in *Senkowski*.  Furthermore, the question of whether Plaintiff is, as he claims, being forced to choose between adhering to the tenets of his Nazarite faith and malnutrition, could not have been determined in *Senkowski*.  (Dkt. No. 1 at p. 28,

¶ 135.)

Under RLUIPA, a plaintiff has the burden of demonstrating that the state has imposed a substantial burden on the exercise of his religion.  *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010).  RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Whether Plaintiff's particular beliefs as a Nazarite Jew are entitled to protection under RLUIPA will depend on whether they are found to be sincerely held and in Plaintiff's own way of looking at things, are religious.  *See Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999). Whether beliefs are sincerely held is often a question of fact.  *See Smith v. Artus*, No. 9:07-CV-1150 (NAM/ATB), 2010 WL 3910086, at *10, 2010 U.S. Dist. LEXIS 104660, at *30 (N.D.N.Y. Sept. 30, 2010) (Mordue, C.J.)  Plaintiff's sincerity could not have been decided in *Senkowski*. Plaintiff must also demonstrate that his sincerely held beliefs are substantially burdened by Defendants' conduct.  *Smith*, 2010 WL 3910086, at *11, 2010 U.S. Dist. LEXIS 104660, at *32 . The issue of substantial burden could not have been decided in *Senkowski*.

If Plaintiff is found to have a claim under RLUIPA, Defendants may overcome the claim by demonstrating that the DOCCS dietary policies and actions with regard to Plaintiff's diet further a compelling governmental interest and are the least restrictive means of furthering that

interest.  *Redd*, 597 F.3d at 536.  DOCCS present dietary policies and procedures for the handling of inmate's religious dietary restrictions, and the governmental interest in those policies, are unlikely to be identical to those in 2000 when the defendants moved for summary judgment in *Senkowski*.[16]  *See Interoceanica*, 107 F.3d at 90 (courts look at whether claims are related in time in determining whether they spring from the same transaction for purposes of *res judicata*).

In addition, the question of whether Defendants are now using the least restrictive means of furthering any compelling governmental interest in the way they are handling Plaintiff's dietary restrictions as a Nazarite Jew, as is required under RLUIPA, could not have been raised or decided many years ago in *Senkowski*.  In *Senkowski,* the Court noted that Plaintiff had offered no alternatives to the diet provided by the defendants that would have accommodated his First Amendment rights at a *de minimis* cost to legitimate penological interests.  In this case, Plaintiff has suggested that he be given hot cereal and peanut butter and jelly to supplement the CAD diet. (Dkt. No. 1 at ¶¶ 89 and 91.)

Based on the foregoing, the Court concludes that Defendants have failed in their burden of establishing that this action is barred under the doctrine of *res judicata* on this motion and recommends that Defendants' Rule 12(b)(6) motion to dismiss on *res judicata* grounds be denied.

### B.  Collateral Estoppel

"The fundamental notion of the doctrine of collateral estoppel, or issue preclusion, is that

---

[16]  Defendants filed their motion for summary judgment in *Senkowski* in September of 2002.  (No. 9:00-CV-1580, Dkt. No. 54.)  Plaintiff's opposition papers were filed in October of 2002.  *Id.* at Dkt. No. 65.  Copies of unreported decisions will be provided to the *pro se* Plaintiff.

an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies." *Ali v. Mukasey*, 529 F.3d 478 489 (2d Cir. 2008) (citation and internal quotation marks omitted). Collateral estoppel applies when: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issues previously litigated were necessary to support a valid and final judgment on the merits." *Id*. (citation and internal quotation marks omitted).

Defendants' collateral estoppel argument is limited to the assertion that if *res judicata* does not apply, collateral estoppel must because each of the issues raised in this case was fully and fairly litigated in *Senkowski*. (Dkt. No. 36-1 at p. 15.) Although *Senkowski* and this lawsuit involve some of the same legal issues, *i.e.*, whether Plaintiff's First and Eighth Amendment rights have been violated, the facts that will have to be analyzed to determine the manner in which the legal issues will be resolved are different. Plaintiff clearly did not have a full and fair opportunity to litigate his present day claims which are based upon present day facts back in 2002.

Defendants have failed to satisfy their burden of showing that there are issues in this case which should be barred under the doctrine of collateral estoppel, and the Court recommends that Defendants' Rule 12(b)(6) motion for dismissal on collateral estoppel grounds be denied.

## III. APPLICABILITY OF THE "IMMINENT DANGER" EXCEPTION TO THE THREE STRIKE RULE

Judge Mordue made a preliminary finding that Plaintiff had sufficiently alleged that he

was "under imminent danger of serious physical injury," for purposes of coming within the "imminent danger" exception to the three strikes rule in 28 U.S.C. § 1915(g).  (Dkt. No. 11 at p. 5.)  Courts, including the District Court in this case, "maintain a singular focus on the facts alleged in the complaint" in deciding whether a prisoner qualifies for the imminent danger exception.  *Andrews v. Cervantes*, 493 F.3d 1047, 1053 (9th Cir. 2007); *see also Henderson v. Clover Field*, No. 5:08-CV-00504 (NPM/GHL), 2008 WL 2405705, at *3 n. 2, 2008 U.S. Dist. LEXIS 123643, at *5-6 n. 2 (N.D.N.Y. June 11, 208) (McCurn, S.D.J./Lowe M.J.) (collecting cases).  Because Plaintiff is proceeding *pro se*, Judge Mordue construed Plaintiff's Complaint "to raise the strongest arguments that [it] suggest[s], *Harris v. New York*, 607 F.3d 18, 24 (2d Cir. 2010)."  (Dkt. No. 11, at p. 5.)  In making his preliminary finding of imminent danger, Judge Mordue  noted Plaintiff's allegations that Defendant's ongoing refusal to provide him with "sufficient food to sustain him in good heath in accordance with the dietary laws of the Nazarite faith," was resulting in serious adverse health consequences, including a significant weight loss resulting from his inability to eat a large percentage of the food served to him.  *Id.*

As acknowledged by Judge Mordue, the Second Circuit has cautioned that:

> . . . although the feared physical injury must be "serious," "we should not make an overly detailed inquiry into whether the allegations qualify for the exception," because § 1915(g) "concerns only a threshold procedural question," while "[s]eparate PLRA provisions are directed at screening out meritless suits early on." *Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007); *see also Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). "[Section] 1915(g) is not a vehicle for determining the merits of a claim . . . . [T]o fine-tune what is 'serious enough to qualify for the exception . . . would result in a complicated set of rules about what conditions are serious enough, all for a simple statutory provision governing when a prisoner must pay the filing fee for his claim. This is not required . . . .").

*Chavis v. Chappius*, 618 F.3d 162, 169-70 (2d Cir. 2010).  (Dkt. No. 11, at pp. 4-5.)

Defendants are asking this Court to make the "overly detailed inquiry into whether the allegations [in Plaintiff's Complaint] qualify for the exception" that has been cautioned against by the Second Circuit, not only challenging the allegations in Plaintiff's Complaint that go to the issue of the serious health consequences resulting from Plaintiff's diet, but attacking Plaintiff's claims on the merits.  (Dkt. Nos. 36-1 at pp. 14-20 and 42.)  This Court is disinclined to recommend disturbing the District Court's preliminary finding of imminent danger made based upon the allegations in Plaintiff's Complaint when the suit has yet to move beyond the pleading stage.

As the District Court has already made clear, if, as the case progresses, the District Court concludes that Plaintiff did not face imminent danger of serious physical injury, his *in forma pauperis status* will be revoked.  (Dkt. No. 11 at p. 5)  At this juncture, however, the Court recommends that Plaintiff's motion to revoke Plaintiff's *in forma pauperis* status be denied without prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 36) pursuant to Federal Rule of Civil Procedure 12(b)(6) be **DENIED**; and it is further

**RECOMMENDED** that Defendant's motion pursuant to 28 U.S.C. § 1915(g) seeking the conditional dismissal of Plaintiff's Complaint on the grounds that Plaintiff has failed to satisfy the imminent harm exception to the three strike rule be **DENIED** without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: January 29, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge