UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DEANDRE WILLIAMS,

                              Plaintiff,

                                                          9:11-CV-379
v.                                                        (NAM/TWD)

BRIAN FISHER, CHERYL V. MORRIS, OMEGA B.
ALBTON, D. ROCK, M. LIRA, J. HAWK, DON
HAUG, KAREN BELLAMY, KENNETH
S. PERLMAN, ALEC H. FRIEDMANN,

                              Defendants.

_____

APPEARANCES:                              OF COUNSEL:

DEANDRE WILLIAMS
Plaintiff *pro se*
#99-A-0052
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

HON. ERIC T. SCHNEIDERMAN             KEITH J. STARLIN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## ORDER AND REPORT AND RECOMMENDATION

In this *pro se* civil rights action commenced under 42 U.S.C. § 1983,[1] Plaintiff DeAndre

_____

[1] Plaintiff's Complaint also contains conclusory reference to 42 U.S. C. §§ 1981, 1982,
1985, and 1986. Defendants have addressed only Plaintiff's civil rights claims under § 1983.
The Court has concluded, nonetheless, for reasons discussed below, that Defendants are entitled
to judgment dismissing any claims Plaintiff may have intended to assert under §§ 1981, 1982,
1985, and 1986.

Williams claims that Defendants violated his First Amendment right to practice his chosen religion, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth amendment right to equal protection under the law. (Dkt. No. 1 at ¶¶ 6 and 7.) Plaintiff's Complaint has also been construed to allege violations of the Religious Land Use and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*.[2] Plaintiff's claims all arise out of Defendants' alleged deliberate refusal to acknowledge his faith as a Nazarite Jew and failure to provide him with a sufficiently nutritious alternative diet in accordance with the dietary laws of his faith. (*See generally* Dkt. No. 1.) Defendants, all named in their official and individual capacities, *id*. at ¶ 140, are Brian Fischer, Commissioner of the Department of Corrections and Community Supervision ("DOCCS"); Cheryl V. Morris, DOCCS Director of Ministerial, Family, and Volunteer Services; Omega B. Alston, incorrectly sued as Omega B. Albton, DOCCS Assistant Director, Ministerial, Family and Volunteer Services; D. Rock, Superintendent at Upstate Correctional Facility ("Upstate"); M. Lira, Deputy Superintendent at Upstate; Timothy Hawk (incorrectly sued as J. Hawk), Chaplain at Upstate; Don Haug, Food Administrator at Upstate; Karen Bellamy, DOCCS Director, Inmate Grievance Program; Kenneth S. Perlman, DOCCS Deputy Commissioner of Program Services; and Alec H. Friedmann, Jewish Chaplain at Upstate Correctional Facility. *Id*. at ¶ 2 and 3-4.[3] Plaintiff seeks

---

[2] Plaintiff alleged violations of the Religious Freedom Restoration Act ("RFRA") in his Complaint. (Dkt. No. 1 at ¶ 7.) The District Court previously noted that the RFRA was invalidated by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997) and, in deference to Plaintiff's *pro se* status, construed his Complaint as alleging a claim under RLUIPA, which was enacted by Congress to rectify the perceived infirmity of RFRA. *See Pugh v. Goord*, 571 F. Supp.2d 477, 504 n.11 (2008). (Dkt. No. 11 at 2 n.2.)

[3] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system.

both monetary and injunctive relief.  *Id*. at  8.

Presently before the Court is Defendants' motion seeking the revocation of Plaintiff's preliminary  *in forma pauperis* status under 28 U.S.C. § 1915(g) and for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 113.)  Plaintiff has opposed the motion.  (Dkt. No. 118.)  For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted, and their request for revocation of Plaintiff's preliminary *in forma pauperis* status be denied as moot.

## I.  FACTUAL BACKGROUND

### A.  Plaintiff's Religious Beliefs and Practices

At all times relevant to the claims asserted in his Complaint, Plaintiff was an inmate confined in the Special Housing Unit ("SHU") at Upstate.  (Dkt. No 1 at ¶ 2.)  He professes to be a Nazarite, which he describes as, in his case, a sect of the Jewish religion.  *Id*. at ¶ 6; Dkt. No. 113-3 at 20-21.  Plaintiff believes in the "most high creator," whom he calls Yahweh.  (Dkt. No. 113-3 at 69.)  According to Plaintiff, he and other Nazarites in the DOCCS system are not under the teachings of rabbis or priests but are teachers unto themselves and take orders directly from God.  *Id*. at 22-23, 27.

Plaintiff's parents and sister are also Nazarites, as was his brother until his passing.  *Id*. at 30.  Plaintiff initially took the vows of abstinence as a Nazarite Jew in 1986.  *Id*. at 30.  He has described the vow taken by him as a Nazarite as prohibiting him from eating fruit from the grape vine, from touching or eating anything dead, including  animals, and requiring that he grow his hair long and not comb it.  *Id*. at 13, 15-16.  Plaintiff broke the vow in 1996 but took it again before he entered prison and claims that he has been continuously under it since that time.  *Id*. at

30.  According to Plaintiff, the permanence of the vow depends upon the person   whatever he or she can offer to the Most High.  *Id*. at 17.  Plaintiff believes his vow will be life-long unless he violates it.  *Id.* at 83.

Plaintiff has been largely a vegetarian since about 1976, and a vegan since he took the Nazarite vow before being imprisoned.  *Id*. at 13-14, 83.  In addition to refraining from eating meat, fish, and foods that come from the grape vine, Plaintiff does not have milk products because he is either allergic to dairy or lactose intolerant.  *Id*.  at 23-24, 52; Dkt. No. 313-4 at 6-7.  Plaintiff also refrains from eating eggs.  *Id* at 52.  Plaintiff claims he has not violated his dietary vow since being imprisoned.  *Id*. at 87.

According to Plaintiff, at some point in 2001 or 2002, he informed the Rabbi at Upstate that he followed the Torah, which Plaintiff believes recognizes the Nazarites.  (Dkt. No. 1 at ¶ 9.)  In February of 2003, Plaintiff learned of the International Prison Yeshiva Jewish Outreach Congregation ("Prison Yeshiva") and began corresponding with the Director, Rabbi Jacob Feinberg ("Rabbi Feinberg" or "Feinberg").  *Id.* at ¶ 13 and 35.  Plaintiff became an official member of the Prison Yeshiva in October of 2004 and thereafter engaged in regular correspondence with Feinberg about religious matters.[4]  *Id*. at 35.  The Prison Yeshiva is described in an undated letter from Feinberg to "Dear Chaplin" in which he identified himself as Rabbi at Congregation Bet Shalom Israel in Norman, Oklahoma, and director of the

_____

[4]  Plaintiff testified at his deposition that he had not communicated with Rabbi Feinberg in a while and believes he has passed.  (Dkt. No. 113-3 at 61); *see also* Dkt. No. 113-9 at ¶ 6 regarding Feinberg's passing.  Plaintiff has not taken on a new spiritual leader since Feinberg's death.  (Dkt. No. 113-3 at 94.)

Congregation's Jewish Outreach Organization, "The Prison Yeshiva."[5]  *Id*. at 35; Dkt. No. 113-4

at 21.  According to Rabbi Feinberg, the Prison Yeshiva was composed of incarcerated men and

women studying to convert to the Jewish faith.  *Id*.  Feinberg wrote that he had been engaged in

outreach to Jewish prisoners and serving their personal needs for over fifteen years, serving as

personal religious and spiritual guide for over four hundred prisoners, giving them instruction in

all facets of Jewish observance and overseeing conversions.  *Id*.

In the "Dear Chaplin" letter,  Feinberg wrote:

> David Williams #99A0052 became an official member of The
> Prison Yeshiva on October 9th 2004. I have been in regular
> correspondence with him, advising him on religious matters.  In
> this time he has demonstrated to me his understanding of Jewish
> beliefs and dedication to Jewish practice.  David has shown
> progress in his study of Jewish scriptures, including completing
> regularly the Correspondence Course lessons that I have sent to
> him and passing my examinations with excellent marks.  It is
> obvious he is sincerely trying to follow the statutes and teachings
> of Judaism, and I fully support and endorse all of the requests that
> he is making.[6]

*Id*.  In an undated and unauthenticated "to whom it may concern" letter, Feinberg wrote that

plaintiff had taken a number of correspondence courses with him, and during his studies, Plaintiff

had said nothing that had led him to believe other than that he had taken the Nazarite vow.  *Id*. at

37.  He wrote that Plaintiff "abstains from anything that grows from the fruit of the vine, does not

---

[5]  In his Complaint, Plaintiff has alleged that Feinberg sent the letter in or about
December of 2003.  (Dkt. No. 1 at ¶ 41.)  However, since the letter states that Plaintiff became a
member of the Prison Yeshiva in October of 2004, it would not have been sent before that date.
Plaintiff appears to have sent a copy of the letter to Rabbi Friedman on April 12, 2006, indicating
that the letter had been received at Upstate prior to that time.  (Dkt. No. 113-4 at 60, 62.)

[6]  Feinberg used the exact same language in a letter written on behalf of the plaintiff
inmate in *Perkins v. Booker*, No. 2:08-cv-97, 2009 WL 2058780, at *10, 2009 U.S. Dist. LEXIS
64092, *27-28 (W.D. Mich, N.D. May 29, 2009).

cut his hair, and states that he is a vegetarian and will not eat meat of any kind or type." *Id*.

According to Feinberg, his courses were designed to weed out those who were not really trying to

convert to Judaism but only trying to get extra food or days off or not cut their hair or shave. *Id*.

Plaintiff claims he sent copies of Feinberg's letters to "everybody" so they could see he was

asking for help. (Dkt. 113-3 at 61-62.)

When Defendant Alec H. Friedmann ("Rabbi Friedmann" or "Friedmann"), Rabbi at

Upstate during Plaintiff's incarceration there, informed Plaintiff he was his Rabbi, Plaintiff

responded that he was not. *Id*. at 26. According to Plaintiff, Rabbi means master and teacher,

and it is a personal relationship. *Id*. Plaintiff explained that whereas Rabbi Friedmann would

talk and laugh with the white inmates and provide them with religious books, he had done

nothing to teach Plaintiff or try to help him with his religion. *Id*. at 25-26. Plaintiff claims that

when he told Friedmann he was not his Rabbi, Friedmann responded by calling Plaintiff a

"nigger." *Id*. at 26. Friedmann has denied doing so, but has acknowledged he has not played a

role as Plaintiff's Rabbi since Plaintiff explicitly rejected him for that role. (Dkt. No. 113-4 at

59-60.) Plaintiff claims that people at Upstate showed him disrespect by saying that his religion

was not recognized. *Id*. at 69-70. Plaintiff also believes that he was prejudiced against because

he is Black. *Id*. at 70.

According to Defendant Cheryl V. Morris ("Morris"), DOCCS Director of Ministerial,

Family, and Volunteer Services ("Ministerial Services"), Plaintiff has written to Ministerial

Services on several occasions asking that his religion as a Nazarite Jew be recognized by

DOCCS. (Dkt. No. 113-9 at ¶ 4.) Morris has explained in her Declaration that DOCCS would

have to contact and consult with a reliable religious resource or clergy person outside of DOCCS,

who could advise them of the requirements for the Nazarite Jewish religion and how DOCCS could appropriately accommodate the religion within the confines of a correctional institution. *Id; see also* DOCCS Directive #4202, as revised 10/07/2009 [7] ("Directive #4202") (Dkt. 113-10 at 10.)

Plaintiff was also advised of the requirement for consultation with a reliable religious resource by now retired Deputy Commissioner of Program Services, Defendant Kenneth S. Perlman ("Perlman"), and Defendant Omega B. Alston ("Alston"), retired DOCCS Assistant Director of Ministerial Services. (Dkt. Nos. 113-9 at ¶ 5; 113-10 at 23, 29, 32.) In a December 16, 2010, letter to Plaintiff, Perlman, to whom Defendant Brian Fischer ("Fischer") had referred a letter from Plaintiff complaining of denial of his religious rights, wrote:

> In order to provide you with an advisor to assist you in meeting your spiritual needs, Department Directive #4202, <u>Religious Programs and Practices</u>, states clearly, "For religions not represented by certified Chaplains, the Department will seek advice on matters of religious doctrine, practice, and tradition from recognized religious authorities in the outside community." Therefore, to best accommodate your religious practices as a Nazarite of the Jewish Faith, please write to your religious mentor and ask him to write directly to the Division of Ministerial, Family and Volunteer Services to potentially become a volunteer.

(Dkt. No. 113-10 at 23.)

Plaintiff provided Ministerial Services with Rabbi Feinberg's name. (Dkt. No. 113-9 at ¶ 6.) However, when Ministerial Services attempted to contact Feinberg, they were advised that he was deceased. *Id.* According to Morris, no other outside resources for the Nazarite Jewish

---

[7] The Court takes judicial notice that DOCCS Directive # 4202 (Dkt. No. 113-10 at 10, *et seq.*), as revised 10/07/09, has now been superseded by DOCCS Directive # 4202, dated 07/24/14.

faith have come forward. *Id.*

Defendants have submitted the Declaration of Rabbi Joseph Potasnik ("Rabbi Potasnik" or "Potasnik"), Executive Vice President of the New York Board of Rabbis, in support of their motion. (Dkt. No. 113-11.) Rabbi Potasnik, who advises and assists DOCCS on issues implicating the Jewish faith and the potential administrative implications of various religious practices, has made his Declaration based upon his familiarity with Jewish dietary laws. *Id.* at ¶¶ 2-3. Potasnik states that a Nazarite vow can technically be of any religion, that it is a personal choice, and that he has no cause to question Plaintiff's sincere beliefs. *Id.* at ¶ 5. However, he notes that the Nazarite vow is discouraged by most modern day Jewish scholars and societies and prohibited by others. *Id.* Potasnik describes the primary restrictions on a person taking the Nazarite vow as: (1) not cutting his hair; (2) not drinking wine; and (3) not coming into contact with dead bodies. *Id.* at ¶ 6. He opines that the prohibition against coming into contact with dead bodies derives from the book of Numbers, chapter 6, and applies only to human corpses. *Id.* ¶ 7. Under Jewish law, it does not apply to animals, particularly those slaughtered in accordance with Jewish Dietary Laws, and members of the Jewish faith are not required to abstain from meat and become vegetarians. *Id.* at ¶¶ 7, 22, 23.

According to Rabbi Potasnik, DOCCS prisoners who wish to maintain a kosher diet may eat the Cold Alternative Diet ("CAD"), which has been approved as kosher because the meats and other animal products served have been prepared in accordance with Jewish Dietary Laws. *Id.* at ¶ 15. Inmates whose religion prohibits them from eating meat or flesh can choose the meatless alternative entrées on the general confinement menu. *Id.* at ¶ 21.

**B.** **Upstate's Alleged Failure to Accommodate Plaintiff's Right to Receive a Diet Consistent with his Sincerely Held Religious Beliefs**

Plaintiff was housed in Clinton Correctional Facility ("Clinton") before being moved to Upstate. *Id.* at 42. According to Plaintiff, while he was at Clinton, the same Rabbi as at Upstate helped him receive a Rastafarian diet of rice or beans, vegetables, and fruit.[8] *Id.* at 42, 50. When Plaintiff was moved to Upstate he expressed a desire to properly follow his religion of Judaism and contends there were no problems until he refused to accept Rabbi Friedmann as his Rabbi. *Id.*

According to Plaintiff, he has been provided with the CAD since approximately March of 2002, in accordance with the Upstate policy of providing the CAD to Jewish inmates because it contains Kosher items.[9] (Dkt. Nos. 1 at ¶¶ 18-19; 113-3 at 43-44.) Plaintiff has described the

---

[8] Clinton does not appear to have been as accommodating to Plaintiff's religious dietary restrictions as he now claims. In 2000, Plaintiff brought an unsuccessful civil rights action against the superintendent of Clinton arising in part out of Clinton's refusal to eliminate soy and soy products, milk and milk products, eggs, and fish from his diet and to provide him with a vegetarian diet to accommodate his Rastafarian religious beliefs. *See Williams v. Senkowski*, No. 9:00-CV-1580 (TJM/DEP) (N.D.N.Y.) ("*Senkowski*"). The Hon. David E. Peebles, M.J., recommended that the defendants be granted summary judgment on Plaintiff's claim that his First Amendment rights were violated by the defendants failure to accommodate his religious beliefs by providing him with a vegetarian diet. (*Senkowski*, Dkt. No. 66.) The Hon. Thomas J. McAvoy, Senior D.J., adopted Judge Peeble's Report-Recommendation in *Senkowski* and granted the defendants summary judgment. (*Senkowski*, Dkt. No. 68.)

[9] Plaintiff filed a grievance in 2002 requesting a vegetarian diet. (Dkt. No. 113-4 at 65.) Denial of the grievance was upheld by the Central Office Review Committee after full investigation on the grounds that meals were provided in accordance with a state-wide menu, and DOCCS did not offer a vegetarian diet. *Id.* Grievance records from June of 2004 show that Plaintiff's religious designation at that time was Mohammedan. (Dkt. No. 113-4 at 66.) In a June 14, 2004, decision, the Central Office Review Committee denied Plaintiff's request for the CAD on the grounds that it was only available to those who proclaimed themselves to be Jewish. *Id.* at 66. Based upon the foregoing documentary evidence, it appears that Plaintiff did not begin

typical breakfast under the CAD diet includes alternating hot and cold cereal, along with bread, and eggs or peanut butter, juice, and coffee. (Dkt. No. 1 at 36.) Lunch typically consists of tuna, peanut butter or cheese, bread, vegetable, and on some days macaroni salad and fruit. *Id*. Dinner is some type of meat or fish, bread, vegetable, and soup.[10] *Id.* Because of his religious dietary restrictions, Plaintiff is unable to drink the grape juice served as part of the CAD diet and cannot eat the macaroni salad, which has vinegar.[11] He is also unable to eat the meat, fish, and cheese served at lunch and dinner. *Id*. at ¶¶ 45-46, and 26; Dkt. No. 113-3 at 50. The CAD diet meals are repeated week after week without change. (Dkt. No. 1 at ¶ 22.) Since no substitute for milk is provided at breakfast, Plaintiff has to eat the cereal dry. (Dkt. No. 113-3 at 54.) Plaintiff also claims that he was unable to use the alleged kosher hot water for his hot cereal at Upstate because was it heated in the area of the building used to store mops, brooms, and other cleaning supplies, rendering it non-kosher and unsanitary. (Dkt. No. 1 at ¶¶ 30-34.)

Plaintiff has alleged in his Complaint that in about October of 2003, he began complaining to Defendants that the CAD was in contravention of the dietary laws of the Nazarite Jewish faith, and that he could not eat enough of the food being served to him to sustain him in good health. (Dkt. No. 1 at ¶¶ 39-40.) Since Plaintiff was not allowed the CAD diet until mid-

---

receiving the CAD diet until some time in 2004.

[10] Defendants have submitted the weekly CAD diet menu, which provides more detail regarding what is included in the meals. (Dkt. No. 113-5.) Defendants have also submitted the eight week general confinement menu which shows the meatless alternative entrées available to prisoners regardless of religious persuasion. (Dkt. Nos. 113-6; 113-9 at ¶ 7.)

[11] While Plaintiff claims that he cannot eat the macaroni salad because it has vinegar, which may or may not be grape vinegar, in the mayonnaise, in his Grievance No. UST-45070-11, Plaintiff complained that he could not eat the macaroni salad because the mayonnaise made him pass blood. (Dkt. No. 113-4 at 5.)

2004 at the earliest, his complaints could not have begun until then. Plaintiff continued to

complain over time and to request that an alternative be provided to him to supplement for the

meat and dairy products he could not eat because of his religious beliefs and dairy allergy/

intolerance. *Id*. at ¶ 43.

At various times in 2010, Plaintiff complained to the mess hall supervisors and requested

that they stop putting salmon on his plate. *Id*. at ¶¶ 44-45; Dkt. No. 113-3 at 99-100; Dkt. No.

113-4 at 28. Plaintiff claims that the contamination of other food on his plate from the salmon

juice made him nauseous and forced him to eat fruits and vegetables given to him by other

prisoners or go hungry. (Dkt. Nos. 1 at ¶¶ 48-49; 113-3 at 50.) He contends his complaints were

disregarded. (Dkt. No. 1 at ¶ 55 and 38.) Plaintiff also suggested solutions such as giving him

hot cereal or peanut butter and jelly instead of the food he could not eat. *Id*. at ¶¶ 89 and 91.

From 2009 through 2011, Plaintiff filed a series of largely repetitive grievance complaints

relating to his religious recognition and dietary concerns, all of which were denied. *Id*. at ¶¶ 60-

62, 113 and 41-44, 49-51, 54-58, 63; *see also* Dkt. No. 113-4 at 3-17, 29-36, 42-49, 63-65, 72-

78, 81, 85-88. In its August 18, 2009, decision on Plaintiff's Grievance No. UST-39897-09,

grieving the failure by DOCCS to recognize the Nazarite Jewish faith and provide him with a

nutritionally adequate diet that accommodated his religious beliefs, the Upstate Internal

Grievance Resolution Committee ("IGRC") wrote:

> In accordance with Directive #4040, 701.5(d)(2)(ii): CORC
> decisions have the effect of directives. The CORC decision for
> UST-22390-05 states that it should be clearly understood that the
> Department takes no position "acknowledging" any particular
> religion within its inmate population. The department merely
> attempts to identify faiths within the inmate population in an effort
> to accommodate the legitimate spiritual needs of its inmates as

> reasonably as possible in a manner which is commensurate with its legitimate correctional interests and the safety and security of its respective facilities.
>
> The CORC decision for CL-51228-05 states that CORC notes that inmates may refrain from eating those food items that are contrary to their religious beliefs.
>
> The CORC decisions for A-43756-02 states that CORC asserts that the Department does not offer a vegetarian menu.
>
> The grievant's religious designation is listed as Jewish since 7/26/04. As such, the grievant has requested and receives the Cold Alternative Diet as well as Grape Juice and Matzah crackers.
>
> According to the Messhall, no substitutions are made to the CAD unless the inmate receiving it has an allergy to the items served. Then substitutions are made on a case by case basis.
>
> The grievant is advised that any concerns he has regarding the CAD, or being removed from the CAD/Grape Juice & Matzah list, or his religious designation should be addressed directly to the Chaplain's Office.[12]

(Dkt. No. 113-4 at 47.)

The decision on the appeal to the superintendent of the denial of Plaintiff's October 14, 2010, Grievance No. UST-44053-10 requesting a nutritionally adequate diet accommodating his religious beliefs, stated in part that:

> The grievant receives a CAD (kosher) meal, the NYSDOCS does not have a vegetarian CAD (kosher) diet; they do have an alternative diet plan available. If grievant would like the alternative diet they must fill out the S-Block Meal form available on your housing unit.

(Dkt. No. 1 at 44.) According to Plaintiff, he could not have the alternative diet because it is not

---

[12] The language of the decision is taken from the report of an investigation of the grievance which identifies Defendants Don Haug and Timothy Hawk as the investigative sources. (Dkt. No. 113-4 at 49.)

kosher and eating a kosher diet is a central tenet of Nazarite Judaism. *Id*. at ¶¶ 133-34.

However, in a July 22, 2009, memorandum to the IGRC, Rabbi Friedmann wrote:

> Williams receives the Cold Alternative Diet, which meets all the standards for a 'Real kosher meal' and is nutritionally sound. He receives an adequate diet. However, he chooses to not eat many of the items which are provided. In the past I have suggested the Religious Alternative Menu which would solve most of his vegetarian problems. He has insisted that he want (sic) the Cold Alternative Diet.

(Dkt. No. 113-4 at 59.)

The Central Office Review Committee ("CORC") also denied Plaintiff's October 14, 2010 grievance, writing in part:

> CORC notes that the grievant's dietary concerns were addressed in its prior decisions UST-39582-09 and UST-39897-09, dated 9/2/09 and 10/7/09, respectively. CORC also notes that the grievant's Religion of Record is designated as "Jewish", and that he is receiving the Cold Alternative Diet and grape juice and matzo. CORC asserts that the Department does not offer a vegetarian diet, and advises the grievant that he may refrain from eating those food items which are contrary to his religious beliefs. No approval has been granted to alter the CAD to accommodate Nazarites. CORC advises the grievant to address medical concerns via the sick call mechanism.

*Id*. at 50.

At his deposition, Plaintiff testified that all he had to eat on a daily basis at Upstate was a cup-a-soup, juice, fruits and vegetables served with his meals or traded for with other inmates, and bread, which he used to make "apple pies." (Dkt. No. 113-3 at 14, 33, 54-57, 60.) According to Plaintiff, requests for Ensure, which he was given at Clinton, were denied at Upstate. *Id*. at 59.

When Plaintiff commenced this action, and at the time of his deposition in November of 2013 (Dkt. No. 113-3), because he was being held in SHU, he was without the benefit of food from the commissary or food packages to supplement his diet to make up for the CAD diet food he was unable to eat because of his religious beliefs and his dairy allergy or intolerance. (Dkt. Nos. 1 at ¶ 17; 113-3 at 58.)

## C. Health Problems Claimed By Plaintiff to Have Resulted From An Inadequate Diet

Plaintiff has alleged that as a result of the lack of adequate nutrition, he has sustained significant weight loss, and his health has dramatically declined, with pre-existing illnesses exacerbated as his body is starved for the nutrients it needs. (Dkt. Nos. 1 at ¶ 137; 113-3 at 36.) Plaintiff also claims to have contracted severe gum and sinus infections from dietary deficiencies, to suffer from stomach pains as a result of being starved, and to have been hospitalized on two occasions for stomach pains and internal bleeding because his health was failing due to malnutrition and an inadequate diet. (Dkt. No. 1 at ¶¶ 88, 99, and 111; 113-3 at 36-39.) Plaintiff contends that his request to see a dietician was denied. *Id*. at ¶112.

David Karandy, M.D. ("Karandy"), employed as a medical doctor with DOCCS and currently assigned to Great Meadow where Plaintiff is presently confined, performed a physical examination of Plaintiff on April 28, 2014. (Dkt. No. 113-7 at ¶¶ 2, 5.) Karandy's examination found Plaintiff to be in good health, with his vital signs normal. *Id*. at ¶¶ 6, 7. Plaintiff's weight was 130 pounds. *Id*. at ¶ 7. Based on his weight and measured height of 5'7.5", Plaintiff's Body Mass Index ("BMI") was calculated to be 20.1. *Id*. at ¶ 8. A BMI between 18.5 and 24.9 is considered normal; accordingly, Plaintiff is in what Karandy describes as "the healthy range and consistent with appropriate nutrition." *Id.* at ¶ 9. Plaintiff's total protein and albumin levels,

determined by a blood test on June 22, 2013, were found in the normal range. *Id*. at ¶¶ 10-11. Plaintiff's normal blood levels were also found consistent with good nutrition. *Id*.

Plaintiff's medical records reveal his weights during the time period from December 16, 2010, to March 28, 2011, as: December 16, 2010    weight 134 pounds; January 20, 2011   weight 134 pounds; February 7, 2011    weight 139 pounds; and March 28, 2011    weight 138 pounds. *Id*. at ¶ 13; Dkt. No 115 at 5-6, 8, 10.[13]  Plaintiff's BMI during that time period ranged from 20.7 to 21.4, which, according to Karandy, is in the healthy range. *Id*. at ¶ 14.  Plaintiff's recorded weights for the time period April 30, 2012, to March 13, 2013, were: April 30, 2012    151 pounds; August 22, 2012    145 pounds; September 13, 2012    145 pounds; November 29, 2012    148 pounds; February 13, 2013    148 pounds; March 3, 2013    145 pounds; March 10, 2013    145 pounds; and March 13, 2013    146 pounds. *Id*. at ¶ 15; Dkt. No. 15 at 12, 14, 15-19. Plaintiff's BMI during that time period ranged from 22.4 to 23.3, which according to Karandy was within the healthy range.  Id. at ¶ 16.  Plaintiff refused to be weighed by the staff on August 20, 2010, November 4, 2010, and August 13, 2012.  *Id.* at ¶ 17.  Karandy has opined that in his professional medical opinion, Plaintiff did not suffer from malnutrition and was not in imminent physical danger between December 10, 2010 and March 13, 2013, and is not currently suffering from malnutrition, nor is he currently in physical danger.  *Id*. at ¶ 18.

Plaintiff's medical records reveal that on a number of occasions between November of 2010 and March of 2011, he complained of blood in his stool, abdominal pain and an upset stomach, and that he was prescribed medication for his upset stomach at various times from

---

[13]  There is no evidentiary support in the record for Plaintiff's conclusory assertion that he was not properly weighed at Upstate. *See* Dkt. No. 133-3 at 37.

November of 2010 to March of 2011. (Dkt. No. 115 at 2, 4, 6-10.) However, Plaintiff refused to have a colonoscopy on more than one occasion during that time period. *Id*. at 8-10. In February of 2011, Plaintiff attributed his digestive system problems to Crohn's disease. *Id*. at 9. There is no evidence in the medical records contained in the summary judgment record supporting Plaintiff's conclusory assertion that his digestive system problems were related to his diet. There is also no evidence in the record supporting Plaintiff's claim of gum disease or sinus problems resulting from malnutrition.

### D. DOCCS Food Service

The duties of Robert Schattinger ("Schattinger"), DOCCS Director of Correctional Food and Nutritional Services for the past five years, and a DOCCS employee for approximately twenty-five years, include the development of menus, overseeing the operation of the Food Production Center (FPC") located at the Mohawk Correctional Facility, training staff, and managing personnel issues. (Dkt. No. 113-8 at ¶¶ 2-3.) In his Declaration in support of Defendant's motion, non-party Schattinger sets forth reasons why he believes what he describes as the vegetarian kosher diet being requested by Plaintiff should not and cannot be accommodated by DOCCS. *Id*. at ¶ 4.

According to Schattinger, the menus of specific food items provided to inmates at the DOCCS correctional facilities are not decided at the facility level but are solely designed and implemented by the DOCCS Central Office Department of Nutritional Services in consultation with nutritionists, including Schattinger, and other specialists. *Id*. at ¶ 5. The diets are designed to be nutritionally sufficient and varied, and absent an emergency, no facility level administrator, including the Superintendent, the Food Service Administrator, the Deputy Superintendent, or any

of the facility Defendants, has the authority to alter or override the menus without prior approval of the Office of Nutritional Services, or create menus of their choosing.[14]  *Id*. at ¶¶ 6, 11.  The DOCCS Office of Nutritional Services falls under the Supervision of the Deputy Commissioner in charge of Administration and is responsible for providing all food services to inmates incarcerated at correctional facilities maintained by DOCCS.  *Id*. at ¶ 7.  The FPC produces the food for all fifty-eight of DOCCS' general confinement facilities for meals provided to the general inmate population, as well as food used in the CAD and the hot kosher program at Green Haven Correctional Facility.  *Id*. at ¶ 8.  The correctional facilities house approximately 55,000 inmates.  *Id*. at ¶ 9.

### 1.    The General Confinement Menu

The general confinement menu, a statewide menu prepared by the Office of Nutritional Services, has been served for breakfast, lunch, and dinner in each general confinement facility since the early 1990's.  *Id*. at ¶ 10.  In developing the general confinement menu, which contains an entrée, side dishes, a beverage, and dessert with lunch and dinner, the Office of Nutritional Services has attempted to provide a variety of nutritious, palatable meals at a reasonable expense to taxpayers.  *Id*. at ¶¶ 12-13.

### 2.    The "Religious Alternative Menu"

In the early 1990s, after instituting the general confinement menu, the Office of Nutritional Service began to look for reasonable means to accommodate dietary preferences for

---

[14]  The Upstate messhall response in an investigation of one of Plaintiff's grievances over the failure to provide a diet that accommodated his religious believes, states that "[t]here are no substitutes for meat or fish unless it is medically indicated . . . ."  (Dkt. No. 113-4 at 14.)

inmates who had food allergies, had religious objections to certain foods, or were vegetarians.[15] *Id*. at ¶ 16. In 1993, the Office of Nutritional Services determined that the best way to meet variable dietary preferences was to add a nutritionally adequate alternative entrée, known as the "religious alternative menu," to the general confinement menu as a substitute for meals that contain a meat entrée. *Id*. at ¶ 19. Schattinger explains that "religious alternative menu" ("RAM") is a misnomer because the alternative entrée is available to all inmates who choose it. *Id.* at ¶ 20. It is not intended to be kosher or halal or compliant with any other religious dietary rules, and the name was recently changed to "alternative entrée." *Id*. An alternative entrée is available for each lunch and dinner that includes a meat entrée, but not those meals where the lunch and dinner entrées are non-meat. *Id* at ¶ 24. Of the twenty-one meals fed to the general population during a seven-day cycle, on average, nineteen meals include an alternative meatless entrée. *Id*. at ¶ 27.

One alternative entrée per week is halal chicken. *Id*. at ¶ 31. DOCCS considered making every alternative entrée meatless but decided not to do so because the purpose of the program was not only to accommodate vegetarians but inmates who had religious objections to certain foods or had food allergies. *Id*. at ¶ 29. On the day that the alternative entrée is chicken, an inmate who consumes just the side dishes, dessert, and a beverage, would receive enough food to satisfy him or her. *Id*. at ¶ 37. According to Schattinger, catering to the dietary preferences of

---

[15] Schattinger acknowledges that the inmate population includes vegetarians of varying degrees and vegans. *Id*. at ¶ 17. He includes as vegetarians inmates who eat fish and poultry but not red meat or pork and those who do not eat any type of animal flesh or eggs. *Id.*

each inmate would pose an unreasonable financial burden on taxpayers and an impossible administrative burden on DOCCS.  *Id*.

      3.     <u>The CAD</u>

Because with the exception of Green Haven, the DOCCS correctional facilities do not have kosher kitchens or facilities to prepare on-site kosher meals, Jewish inmates who request a kosher diet are served the CAD, which typically consists of a sandwich made with kosher meat or cheese, condiments, chips, a cookie or cake, and juice.  *Id*. at ¶¶ 40-41.  Some CAD items, including juices, salads, cold cuts and cheese, are prepared and packaged at the FPC in kosher compliant conditions, under rabbinical supervision.  *Id* at ¶ 41.

      4.     <u>The Green Haven Program</u>

In the early 1980s, as an experimental pilot program, DOCCS built and began operating a kosher food service facility at Green Haven.  *Id*. at ¶ 42.  The menu, compiled by the Green Haven Food Administrator and Jewish Chaplain, is not vegetarian.  *Id*. at ¶ 43.  The menu parallels the menu offered to the general inmate population but contains no alternative to the meat entrées on the Green Haven hot kosher food menu.  *Id*.  DOCCS has learned from its experience with Green Haven that such an accommodation is extremely expensive and administratively burdensome.  *Id*.  at ¶ 44.  Therefore, while DOCCS has chosen to maintain the kosher service at Green Haven, which is limited to Jewish inmates with good disciplinary records, it has determined that the service cannot be provided statewide.

      5.     <u>Considerations Regarding a Kosher Vegetarian Menu</u>

The CAD is not a vegetarian diet, and the meatless alternative entrées may or may not be kosher.  *Id*. at ¶ 45.  All fresh vegetables received by FPC are processed and used as ingredients

in other dishes.  *Id*. at ¶ 46.  Although the FPC can prepare and package kosher food for inclusion in the CAD to a limited extent, because DOCCS' only kosher kitchens are at FPC and Green Haven, maintaining the integrity of kosher at the facility level is problematic.  *Id*. at ¶ 47.  Kosher vegetarian meals would have to be sealed in individual packets to keep the food safely preserved and transportable, requiring DOCCS to provide the FPC with new equipment.  *Id*. at ¶ 49.  Even if DOCCS had sufficient equipment, it would not be able to manage the production because the preparation and packaging of kosher vegetarian meals would require a dedicated kosher production line, involving staff, work areas, and packaging equipment DOCCS does not currently have.  *Id*. at ¶ 50.

A kosher vegetarian menu would bring challenges beyond designating and providing a kosher vegetarian food line.  For instance, a vegetarian kosher menu would have to provide adequate protein to fulfill the nutritional needs of inmates demanding kosher vegetarian meals.  *Id*. at ¶ 51.  DOCCS would have to bear the expense of purchasing items such as soy, increased legumes and other foods.  *Id*. at ¶ 51.

According to Schattinger, in light of what DOCCS provides in its current menus, and the fact that there is no established dietary stricture requiring vegetarianism, DOCCS has determined that providing a kosher vegetarian meal plan would be exceedingly burdensome to staff and facility resources and is not financially feasible.  *Id*. at ¶ 52.

## II.      PROCEDURAL BACKGROUND

Plaintiff filed his Complaint and an application to proceed *in forma pauperis* on April 6, 2011.  (Dkt. No. 1 and 2.)  Plaintiff also filed the first of multiple motions for the appointment of counsel and injunctive relief, all of which, with the exception of pending motion for a

preliminary injunction (Dkt. No. 124), have been denied.[16] (*see* Dkt. Nos. 4, 5, 10-11, 20, 22, 32, 56, 58, 60, 62, 67. 69, 73, 82, 87, 89, 92, 100, 103, 119-120.)

In reviewing Plaintiff's application to proceed *in forma pauperis*, the Hon. Norman A. Mordue, Senior D.J., noted that the three strikes rule of 28 U.S.C. § 1915(g) had been enforced against Plaintiff in the Northern District of New York. (Dkt. 11 at 3.) However, based upon Plaintiff's allegations that Defendants' ongoing refusal to provide him with "sufficient food to sustain him in good health in accordance with the dietary laws of the Nazarites faith" was causing him to suffer serious adverse health consequences, the Court made a preliminary finding that Plaintiff had sufficiently alleged "imminent danger" and allowed him to commence the action *in forma pauperis*, subject to revocation if, during the course of the litigation the Court concluded that Plaintiff did not face imminent danger of serious physical injury when he commenced the lawsuit, or was otherwise not entitled to proceed *in forma pauperis*. *Id*. at 5.

Defendants moved to dismiss Plaintiff's Complaint on *res judicata* and collateral estoppel grounds pursuant to Federal Rule of Civil Procedure 12(b)(6) and pursuant to the three strike rule under 28 U.S.C. § 1915(g). (Dkt. No. 36.) This Court recommended denial of the motion (Dkt. No. 65), and the recommendation was adopted by Judge Mordue and the motion

---

[16] Plaintiff has, on more than one occasion in this litigation, sought a mandatory injunction directing Defendants to provide him with a "sufficiently nutritional alternative kosher diet that conforms to plaintiff's religious dietary requirements." (Dkt. Nos. 5 at 2; 56 at 4.) Specifically, Plaintiff requested an order directing meal substitutes of "whole fruits[,] hot cooked vegetables[,] rice, beans, nuts, kosher cereals, peanut butter & jelly [,] juices or donuts" in lieu of the CAD he was currently receiving. *Id.* In its March 26, 2012, Decision and Order denying Plaintiff's first motion for a preliminary injunction, the District Court concluded that Plaintiff had failed to make the requisite "clear" or "substantial" showing of a likelihood of success on the merits on his First Amendment, RLUIPA, and Eighth Amendment inadequate medical care claims. (Dkt. No. 56.)

denied on February 20, 2013.[17]  (Dkt. No. 66.)  Defendants thereafter filed an Answer to the

Complaint (Dkt. No. 70), and discovery ensued.

### III.    APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d

at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See

Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

---

[17]  Defendants' motion pursuant to 28 U.S.C. § 1915(g) seeking conditional dismissal of
Plaintiff's Complaint on the grounds that Plaintiff failed to satisfy the imminent harm exception
to the three strike rule was denied without prejudice.  (Dkt. No. 68.)

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[18] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[19] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   ANALYSIS

### A.   Deficiencies in Plaintiff's Opposition Papers

Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y.  L.R.  7.1(a)(3) in his opposition to Defendants' summary

---

[18]  Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746.  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

[19]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

judgment motion.[20] His response is limited to "I hereby deny & Object to Each & Every Allegation Set Forth by the Defendants in Opposing My Claims Under *Williams v. Fischer Et. Al -911-CV-379* As Either 'Untrue, Misleading & Vacuous." (Dkt. No. 118 at ¶ 2 .) While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[21] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[22] *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to

_____

[20] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[21] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[22] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 113-12.)

consider what the parties fail to point out in their [local rule statements of material facts], it may

in its discretion opt to conduct an assiduous review of the entire record even where one of the

parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d

Cir. 2001) (citation and internal quotation marks omitted).  In deference to Plaintiff's *pro se*

status, the Court has opted to review the entire summary judgment record.

###   B.     New Claims Raised by Plaintiff in his Opposition Papers

Plaintiff was transferred to Great Meadow Correctional Facility ("Great Meadow") in

December of 2013.  (Dkt. No. 118-1 at 8.)  Plaintiff's opposition to Defendants' summary

judgment motion deals almost entirely with complaints about medical treatment and failure to

accommodate his physical and hearing impairments at Great Meadow.  (Dkt. No. 118-1 at 7-54,

59-66, 72-93.)[23]  Plaintiff has also complained of the refusal to provide him with hot water for his

hot cereal and cup-a-soup and discontinuance of his CAD meals during Passover at Great

Meadow, claiming that he is intentionally being starved.  *Id*. at 11, 57-58, 68-70.  Plaintiff

contends that his transfer to Great Meadow, the lack of proper medical care and

accommodations, and the refusal to give him hot water for his soup, are all in retaliation for his

filing of grievances and lawsuits and for the sole purpose of causing him harm.  *Id*. at 8,12-13,

---

[23]  Plaintiff's complaints regarding his medical care and failure to provide
accommodations for his physical impairments at Great Meadow relate generally to: (1) problems
with his legs, including damage from a gun-shot wound to the knee; (Dkt. No. 118-1 at 7-11); (2)
drop-foot and his need for a leg brace, *id*. at 10, 42, 76-79; (3) denial of physical therapy for his
leg problems and reasonable accommodations such as being allowed to use the elevator, that he
was given at Upstate, *id*. at 8-9, 30, 33-34, 69; (4) denial of appropriate pain medication for
excruciating pain, *id*. at 9-11; (5) the prescribing of medications for worsening spinal stenosis
with the sole intention of causing him harm, pain, and possibly death, *id*. at 8, 10, 51-55, 65; (5)
vomiting blood, *id.* at 12; and (6) failure to provide the accommodations for his hearing
impairment that were provided at Upstate.  *Id*. at 8, 20-24, 60-61.

33.  Plaintiff has alleged in his opposition papers that at Great Meadow he is being subjected to cruel and unusual punishment; discrimination on account of his race, color, and religion; deliberate indifference to his serious medical needs; and retaliation for filing grievances and lawsuits.  *Id*. at 8.

A plaintiff cannot, as a general rule, raise new claims in papers in opposition to a motion for summary judgment.  (Dkt. No. 22 at 4-5.)  *See, e.g., Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment); *Jones v. Fischer*, No. 9:10-cv-1331 (GLS/ATB), 2013 WL 5441353, at *15, n.23, 2013 U.S. Dist. LEXIS 140318, at *47, n.23 (N.D.N.Y. Sept. 27, 2013) ("Generally a party may not raise new claims in his or her response to a motion for summary judgment.") (collecting cases); *Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense.  Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (citations and internal quotation marks omitted); *Jackson v. Onondaga Cnty.,* 549 F. Supp. 2d 204, 219-20 (N.D.N.Y. 2008) (in an action filed in November of 2005, where discovery had closed in December of 2006, the court concluded that new factual allegations raised by plaintiff in opposition to summary judgment motion should not be considered, where "the four new allegations [were] not made in response to a motion to dismiss (which typically occurs relatively

early in an action, before discovery has occurred) . . . [and] the net effect of permitting Plaintiff to so change the landscape of his claims at this late stage of the action would be to deprive Defendants of the fair notice envisioned by Fed.R.Civ.P. 8.").

In light of the foregoing, and given that the newly raised claims regarding Plaintiff's medical care, failure to accommodate physical impairments, refusal to provide hot water for Plaintiff's cereal and cup-a-soup, and discontinuance of the CAD diet during Passover at Great Meadow, are not asserted against Defendants herein, the Court recommends that the District Court disregard the factual allegations and claims relating to Plaintiff's alleged transfer to, and treatment at, Great Meadows.

### C. Plaintiff's Official Capacity Claims For Money Damages Against Defendants Under 42 U.S.C. § 1983

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants. (Dkt. No. 1 at ¶ 140.) The Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 92-100 (1984). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)), and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

27

Therefore, the Court recommends that Defendants be granted summary judgment dismissing Plaintiff's § 1983 claims for money damages against Defendants in their official capacity on Eleventh Amendment grounds.[24]

### D. Plaintiff's Claim for Money Damages under RLUIPA

Plaintiff's Complaint has been construed to state a possible claim under RLUIPA.  (Dkt. No. 11 at 2 n.1.)  RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person
>
> > (1) is in furtherance of a compelling governmental interest; and
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. ¶ 2000cc-1(a) (2012).

In *Sossamon v. Texas*, ___ U.S. ___, 131 S.Ct. 1651 (2011), the Supreme Court held that RLUIPA does not authorize claims for money damages against state officials acting in their official capacities.  After the commencement of this lawsuit, the Second Circuit, in *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013), held that RLUIPA does not create a private right of action against state officials in their individual capacity.  Thus, Plaintiff cannot pursue claims for

---

[24]  The Eleventh Amendment allows declaratory and prospective injunctive relief from violations of the Constitution and federal law.  *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974) ("federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief."); *see also Ex parte Young*, 209 U.S. 123 (1908) (Eleventh Amendment immunity does not preclude suits for injunctive and declaratory relief from continuing violations of federal law brought against state officers in their official capacities) .

money damages against Defendants in their official capacities and has no claim against Defendants in their individual capacities under RLUIPA.

Therefore, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's RLUIPA claim for money damages against Defendants in their official and individual capacities.

**E.    Legal Standards for First Amendment Free Exercise and RLUIPA Claims**

      1.    <u>First Amendment</u>

It is well-established that prisoners do not forfeit all of their constitutional rights by reason of incarceration. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Those rights include the right to free exercise of religion. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *accord Moorish Science Temple of America, Inc. v. Smith*, 693 F.2d 987, 990 (2d Cir. 1982) ("[A] prisoner retains those First Amendment guarantees, including the right to participate in practices which are an integral part of his religious faith . . . .").

The Second Circuit has held that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975). "Deny[ing] prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004). However, courts are reluctant to grant dietary

requests "where the cost is prohibitive," or "the accommodation is administratively unfeasible." *Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990).

Because the free expression rights of prisoners must be balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system," free exercise claims brought by inmates are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to infringements of fundamental constitutional rights." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (quoting *O'Lone*, 482 U.S. at 349). A prisoner's sincerely held religious beliefs must yield if they are contrary to prison regulations that are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone*, 484 U.S. at 351-52 (Constitution does not require a prison to sacrifice legitimate penological objectives in order to satisfy an inmate's desire to exercise his religion as long as the inmate is not deprived of all forms of religious exercise); *Singh v. Goord*, 520 F. Supp. 2d 487, 507 (S.D.N.Y. 2007) ("Policies and practices which serve legitimate penological interests do not offend the Free Exercise clause.").

The Second Circuit recently examined the standard for analyzing a First Amendment freedom of religious expression claim in *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014). In *Holland*, the court noted that it has yet to be decided in this Circuit whether, to state a First Amendment claim, "a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). The court did not decide the issue in *Holland*, rather it assumed, without deciding, the continued validity of the substantial burden test and analyzed the case accordingly. *Id*. The Court will follow *Holland*.

If a substantial burden is found, courts must evaluate four factors set forth in *Turner* in determining if the regulation or governmental action are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Those factors are: "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin*, 467 F.3d at 274 (citing *Turner*, 482 U.S. at 90-91).

When prison officials are able to state a legitimate penological interest to justify their actions, the burden shifts to the plaintiff to show that the defendants' concerns are "irrational." *Weathers v. Rock*, No. 9:12-CV-1301 (NAM/ATB), 2014 WL 4810309, at *4, 2014 U.S. Dist. LEXIS 140422, at *11-12 (N.D.N.Y. Sept. 23, 2014) (citing *Ford*, 352 F.3d at 595). "Given the difficult judgments attendant to prison operation . . . a generally applicable policy even one that burdens an inmate's free exercise will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Holland*, 758 F.3d at 222 (citation and internal quotation marks omitted).

2.      RLUIPA

While a plaintiff has no claim for money damages under RLUIPA, injunctive and declaratory relief are permitted against defendants in their official capacities.[25] *See Williams v.*

---

[25] In his Complaint, Plaintiff requests a temporary restraining order and preliminary injunction compelling Defendants to provide him with a sufficient alternative religious diet. (Dkt. No. 1 at 8.) Although Plaintiff has not specifically requested permanent injunctive relief, the Court has liberally construed his *pro se* Complaint to seek permanent injunctive relief. Generally, when an inmate is transferred to another facility during the pendency of a lawsuit

*Leonard*, No. 9:11-CV-1158 (TJM/TWD), 2013 WL 5466191, at *6, 2013 U.S. Dist. LEXIS

142051, at *18-19 (N.D.N.Y. Sept. 30, 2013) (denying defendants' motion to dismiss inmate's

RLUIPA claims for injunctive relief regarding family participation in a religious meal); *Singh,*

520 F. Supp. 2d at 508 (allowing claim for declaratory judgment under RLUIPA to proceed to

trial).

Under RLUIPA, Plaintiff has the burden of showing that his religious exercise is

burdened and that the burden is substantial. *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010).

The government may overcome a RLUIPA claim by demonstrating that the challenged policy or

action furthers a compelling state interest and that it is the least restrictive means of furthering

that interest. *Id.*

RLUIPA defines "religious exercise" to include "any exercise of religion whether or not

compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (2000). A

"substantial burden" is one that places "substantial pressure on an adherent to modify his

behavior and to violate his beliefs." *Singh*, 520 F. Supp. 2d at 498 (citing, *inter alia, Jolly v.

Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)).

---

seeking injunctive relief, the request for injunctive relief is deemed moot. *See Shepherd v.
Goord*, 662 F.3d 603, 610 (2d Cir. 2011) ("in this circuit, an inmate's transfer from a prison
facility generally moots claims for declaratory and injunctive relief.") (citation and internal
quotation marks omitted). However, as pointed out in the Schattinger Declaration, inmate menus
are controlled on a DOCCS-wide, not facility basis. Therefore, Plaintiff's claim for injunctive
relief with respect to his diet are not mooted by his transfer to another facility in the DOCCS
system. *See Pugh v. Goord*, 571 F. Supp. 2d 477, 488 (S.D.N.Y. 2008) ("there is an exception to
the mootness doctrine for challenged actions that are 'capable of repetition, yet evading review.'"
(quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

**F.      Analysis of Plaintiff's First Amendment Free Exercise and RLUIPA Claims**

   1.      Personal Involvement in the Alleged Violation of Plaintiff's First
           Amendment Free Exercise and RLUIPA Rights

Defendants retired DOCCS Commissioner Fischer; DOCCS Director of the Inmate

Grievance Program, Karen Bellamy; Upstate Superintendent D. Rock; Upstate Deputy

Superintendent M. Lira; Upstate Chaplain Timothy Hawk; Upstate Food Administrator Don

Haug; and Upstate Rabbi Friedman, all seek judgment dismissing Plaintiff's First Amendment

claims against them on the grounds that they were not personally involved in the alleged

violation of his right to free expression of his religious beliefs.  (Dkt. No. 113-13 at 9-11.)

The law is clear that "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each government-official defendant, through the official's own

individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials

may not be held liable for the unconstitutional conduct of their subordinates under a theory of

*respondeat superior*.").  "Holding a position in a hierarchical chain of command, without more,

is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-

1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y.

Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431,

435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate

a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d

205, 210 (2d Cir. 1985)).  Therefore, "a plaintiff must . . . allege a tangible connection between

the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[26]

### a.    Fischer

Plaintiff wrote to Fischer on November 21, 2010, and January 14, 2011, alleging religious discrimination and requesting that he take action with regard to providing Plaintiff with a diet that accommodated his Nazarite religious beliefs. (Dkt. Nos. 1 at ¶¶ 80-83, 106-109; 113-10 at 24, 26-27.)  Plaintiff claims that Fischer failed to take any effective action to protect Plaintiff's religious rights or ensure that he received a sufficiently nutritious alternate religious diet to sustain him in good health.  (Dkt. No. 1 at ¶¶ 83, 109.)

Fischer referred both of Plaintiff's letters to Perlman, under whose jurisdiction Ministerial Services fell.  *Id*. at 23, 25; Dkt. No 113-10 at 1.  Perlman responded to Plaintiff's letters on December 16, 2010, and February 7, 2011, respectively.  (Dkt. No. 113-10 at 23, 25.)  In his

---

[26] The Second Circuit has thus far found it unnecessary to decide whether *Iqbal* eliminated any of the *Colon* bases for liability.  *See, e.g., Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

December 16, 2010, letter, Perlman disclosed that Fischer had referred Plaintiff's letter alleging religious discrimination to him for response. *Id*. at 25. Perlman recommended that Plaintiff contact Defendant Deputy Superintendent for Program Services at Upstate, M. Lira ("Lira"), regarding his discrimination concerns, and that in order to assist him in meeting his spiritual needs, Plaintiff write to his religious mentor and ask him to write directly to Ministerial Services to potentially become a volunteer. *Id*. In his February 7, 2011, letter to Plaintiff, Perlman indicated that Fischer had asked him to respond to Plaintiff's letter regarding a request for special dietary considerations particular to the vow of the Nazarite. *Id*. at 25. Perlman noted that the issue had been addressed several times, most recently in Perlman's letter of December 10, 2010, to which he referred Plaintiff. *Id.* Perlman informed Plaintiff that the issue was considered closed. *Id*.

When asked about his claim against Fischer at his deposition, Plaintiff testified "[h]e just dealt with malfeasance and putting it off to somebody else. And then telling me, you know what I'm saying, that I have to deal with the religious advisor here and in Albany. I got to write to them. I   you just putting it off." (Dkt. No. 113-3 at 97.) According to Plaintiff, Fischer failed to recognize his religion and passed it off to someone else. *Id*. at 98.

A supervisory official is not deemed to have been personally involved solely by virtue of referring a letter or complaint from a prisoner to the appropriate department for investigation. *See, e.g., Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (affirming dismissal on summary judgment for lack of personal involvement where the deputy commissioner received letters from the plaintiff and forwarded them to others for investigation); *Rush v. Fischer*, 923 F. Supp. 2d 545, 552 (S.D.N.Y. 2013) ("[P]ersonal involvement has not been shown where a

35

supervisor's only response to an inmate's complaint is to refer the complaint to the appropriate staff for investigation.") (citation and internal quotation marks omitted); *Josey v. Rock*, No. 9:11-CV-0028 (NAM/TWD), 2013 WL 1500435, at *11, 2013 US. Dist. LEXIS 51989, at *29 (N.D.N.Y. Mar. 19, 2013) ("A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement.")

Accordingly, Fischer's referral of Plaintiff's letters to Perlman for handling does not constitute personal involvement under any of the *Colon* factors, and the Court recommends that Fischer be granted summary judgment on Plaintiff's First Amendment claim against him.

b.      Karen Bellamy

Defendant Karen Bellamy ("Bellamy") has been sued as Director of the DOCCS Inmate Grievance Program.  (Dkt. No. 1 at  4.)  Plaintiff has alleged in his Complaint that in October of 2010, he appealed to CORC from the denial of his appeal of an IGRC decision by Defendant Lira, as Acting Superintendent at Upstate.  *Id*. at ¶ 67.  According to Plaintiff, he "inform[ed] the DOCS grievance director that the Response from the Committee & the Acting Superintendent failed to Address the issues in his grievance and that Upstates (sic) policy was in Contravention of DOCS directive #4202 And that the plaintiff was being starved which was affecting his overall health." *Id*. at ¶ 67.

Plaintiff has also alleged in his Complaint that on December 29, 2010, Bellamy rendered a decision reiterating the IGRC and Superintendent's reasons for denying Grievance No. UST-44053-10 and denying the appeal.  According to Plaintiff, Bellamy categorized his faith as "Jewish" in the decision and made no attempt to investigate whether Plaintiff could be afforded a substitute for the foods he was prohibited from eating under his sect of the Jewish faith.  *Id*. at

¶ 87 and 50.

Plaintiff also claims that Bellamy affirmed the actions of the other Defendants on his appeal from Defendant Upstate Superintendent D. Rock's ("Rock") January 10, 2011, denial of Grievance No. UST-44809-10, and a January 18, 2011, grievance complaining that he was passing blood and experiencing stomach pains due to the improper religious diet he was receiving. *Id*. at ¶¶ 101-102, 113.

All of Plaintiff's allegations against Bellamy deal with grievances appealed to, and decided by, CORC. There is no evidence in the record that Bellamy, as Director of the DOCCS Inmate Grievance Program, had any personal involvement whatsoever in the investigation, review, or determination by CORC of any of Plaintiff's grievance appeals. At most, the allegations in Plaintiff's Complaint regarding Bellamy, the memorandum from Bellamy simply acknowledging receipt of Plaintiff's Grievance No. UST-44053-10, *id*. at 49, and her signature, as Director, on CORC's determination denying Plaintiff's appeal on Grievance No. UST-44053, *id*. at 50, show that she was performing her administrative duties as Director. Therefore, the Court recommends that Bellamy be granted summary judgment on Plaintiff's First Amendment claim against her based upon her lack of personal involvement.

c.     Rock and Lira

In his Complaint, Plaintiff has alleged that he appealed an IGRC decision to Rock on October 20, 2010, and that on October 28, 2010, Lira, as Acting Superintendent, denied his appeal and suggested the RAM as an alternative to CAD, since DOCCS does not have a vegetarian CAD diet. (Dkt. No. 1 at ¶¶ 65-66 and 44.) Plaintiff has also alleged that he

appealed the IGRC's denial of his December 9, 2010, grievance requesting hot cereal to Rock, and that Rock denied the appeal on January 10, 2011. *Id*. at ¶¶ 96, 101 and 51-54.

Although there is some dispute among district courts in the Second Circuit,[27] a superintendent's mere affirmance of an IGRC denial of a grievance has generally been found insufficient to show personal involvement for purposes of liability under § 1983. *Keitt v. Schun*, No. 11-CV-438 (RTA/JJM), 2014 WL 347053, at *8, 2014 U.S. Dist. LEXIS 184557, at *23-24 (W.D.N.Y. Jan. 30, 2014) (affirmance of denial of plaintiff's grievance is insufficient to establish personal involvement under § 1983); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 503 (S.D.N.Y. 2012); ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights."); *White v. Sears*, No. 9:10-CV-0721 (MAD/GHL), 2011 WL 2728443, at *8, 2011 U.S. Dist. LEXIS 74689, at *21 (N.D.N.Y. June 20, 2011) (merely denying a plaintiff's grievance is insufficient to establish personal involvement); *Henry v. Lempke*, 680 F. Supp. 2d 461, 464 (W.D.N.Y. 2010) (affirmance of denial of an inmate's grievances alone is insufficient to establish personal involvement).

The evidence in the summary judgment record reveals no personal involvement by Rock and Lira in the alleged non-recognition of Plaintiff's Nazarite Jewish faith, or DOCCS' alleged failure to accommodate his religious dietary restrictions. DOCCS Directive # 4202, provides that "[i]t should be clearly understood that [DOCCS] takes no position 'acknowledging any particular

---

[27] *See, e.g., Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (finding that where the grievance involves an ongoing violation that can be directly remedied by the supervisory official affirming denial of the grievance, personal involvement can be found for purposes of § 1983).

religion within its inmate population." (Dkt. No. 113-10 at 10.)  The Directive places the responsibility on Ministerial Services to provide inmates spiritual assistance and provide such opportunities as are feasible for inmates to work with approved religious volunteers from the outside when an inmate's faith is not represented by a chaplain at his facility.[28] *Id*.

Furthermore, as explained in the Schattinger Declaration (Dkt. No. 113-8), menus are designed and implemented by the DOCCS Central Office Department of Nutritional Services, and absent an emergency, no facility level administrator, including the Superintendent and Deputy Superintendent, has the authority to alter or override the menus without prior approval of the Office of Nutritional Services, or to create menus of their choosing. *Id.* at ¶¶ 5-6, 11.)  Thus, Rock and Lira were without authority to direct that Plaintiff be provided the diet he requested.

Therefore, the Court concludes that none of the *Colon* factors apply to Plaintiff's First Amendment free expression claims against Rock and Lira and recommends that they be granted summary judgment on Plaintiff's First Amendment claims based upon their lack of personal involvement.

d.    Don Haug

Defendant Don Haug ("Haug"), is the Food Administrator at Upstate.  (Dkt. No. 1 at  3.) Plaintiff claims that Haug denied his request to stop putting salmon on his tray.  (Dkt. Nos. 1 at ¶¶ 44-45; 113-3 at 99-100; 113-4 at 28.)  Inasmuch as the CAD meals were packaged at the FPC, and the Food Administrator at a correctional facility has no authority to alter or override the menus created by the DOCCS Central Office Department of Nutritional Services, or to create

---

[28]  The outside sponsor requirement has been upheld by the Second Circuit.  *See Benjamin v. Coughlin*, 905 F.2d 571, 577 (2d Cir. 1990).

menus of his or her own choosing, (Dkt. No. 113-8 at ¶¶ 5-6, 11), Haug was without authority to comply with Plaintiff's request to alter the meals containing salmon or provide the diet Plaintiff claimed would that accommodate his Nazarite Jewish faith. Therefore, the Court recommends that Haug be granted summary judgment on Plaintiff's First Amendment claim based upon a lack of personal involvement.

e.     Timothy Hawk

Timothy Hawk ("Hawk") was Chaplain at Upstate during the time period relevant to Plaintiff's Complaint. (Dkt. No. 1 at  3.) In his Complaint, Plaintiff alleges that on September 22 and 27, 2010, he wrote to Defendant Hawk explaining that Defendant Alston had advised him to contact the Upstate Chaplain regarding the procedures Plaintiff had to follow to have his Nazarite Jewish religion recognized by DOCCS. *Id*. at ¶¶ at 57-58. Hawk sent Plaintiff a responsive memorandum on October 7, 2010, informing him that he had received his request for recognition of his religion by DOCCS, explaining the correct procedure to be followed, and directing Plaintiff to contact Defendant Morris because only Central Office could create a designation for a specific religious tradition. *Id*. at ¶ 68 and  45.

There is no evidence of Hawk's personal involvement in Plaintiff being denied a diet that he believed accommodated his Nazarite Jewish faith. Hawk was not authorized to alter or override the menus created by the DOCCS Central Office Department of Nutritional Services. (Dkt. No. 113-8 at ¶¶ 5-6, 11.) Furthermore, under Directive # 4202(C), the authority to identify particular faiths in the inmate population by DOCCS in an effort to accommodate the inmates' legitimate spiritual needs, resides in the first instance in Ministerial Services, to whom Hawk directed Plaintiff, rather than the facility Chaplain. (Dkt. No. 113-10 at 10.)

40

In light of the foregoing, the Court recommends that Defendant Hawk be granted summary judgment on Plaintiff's First Amendment claim based upon his lack of personal involvement.

f.    Rabbi Friedmann

Defendant Rabbi Friedmann was the Jewish Chaplain at Upstate during the time relevant to Plaintiff's First Amendment and RLUIPA claims. (Dkt. No. 113-4 at 59-60.) According to Plaintiff, Friedmann called him a "nigger" when Plaintiff rejected him as his Rabbi. (Dkt. No. 113-3 at 26.) A July 6, 2006, memorandum from Friedmann to the IGRC regarding Plaintiff's Grievance No. UST-27003-06, describes a meeting he had with Plaintiff on May 18, 2006, regarding a Change of Religious Designation Form, approved by Rabbi Feinberg, in which Plaintiff certified that he professed to be of the "Nazarite faith of the Orthodox Judaism Adhering to the Ancient Hebrew law. (Dkt. No. 113-4 at 60-62.) The memorandum also describes a letter dated May 15, 2006, from Plaintiff to Friedmann, that accompanied the Form, in which Plaintiff indicated he had sent Friedmann documents from Rabbi Feinberg on April 12, 2006, which Friedmann had sent back without acknowledgment, and had asked Friedmann when his rights as a Nazarite would be respected and he would be afforded his religious rights. *Id*.

In the memorandum, Rabbi Friedmann noted that if Rabbi Feinberg were an orthodox rabbi, he would not accept the "Nasserite" distinction as Judaism has not practiced it for approximately two-thousand years. *Id*. at 60. According to Friedmann, at the meeting, he informed Plaintiff that because Rabbi Feinberg was not a DOCCS chaplain, the Change of Religious Designation Form was not valid. *Id*. Friedmann denied using the "N Word" and denied being a racist, claiming that he had referred to Jewish practice according to Jewish law,

and not to racial distinctions. *Id*. In a July 22, 2009, memorandum to IGRC regarding Plaintiff's Grievance No. UST-3971909, Friedmann noted that he had suggested to Plaintiff in the past that the RAM would solve most of his vegetarian problems. (Dkt. No. 113-4 at 59.) In a September 2, 2009, memorandum to Lira, Friedmann wrote that since Plaintiff had demanded three years ago that he have nothing to do with him as he was not his Rabbi, Friedmann had acceded to Plaintiff's request and had not seen him since July of 2006. *Id*. at 101.

The evidence establishes that Rabbi Friedmann had no authority to override or alter menus or create menus of his own choosing. (Dkt. No. 113-8 at ¶¶ 6, 11.) Furthermore, there is no evidence in the record suggesting that acknowledgment of Plaintiff's Nazarite sect of Judaism by Friedmann would have resulted in the desired changes in Plaintiff's diet. To the contrary, the Schattinger Declaration provides strong evidence it would not. (Dkt. No. 113-8.)

Because the evidence does reveal personal involvement by Friedmann with respect to the refusal to recognize Plaintiff's Nazarite Jewish religion, the Court recommends that summary judgment based upon lack of personal involvement be granted Friedmann only as to that part of Plaintiff's First Amendment claim regarding the failure to provide him with a diet that accommodated his Nazarite Jewish religious beliefs.

### g. Morris, Perlman, and Alston

Defendants Morris, Perlman, and Alston are not specifically seeking summary judgment based upon a lack of personal involvement in the alleged violation of Plaintiff's First Amendment free exercise rights, and the evidence establishes that they were personally involved in the alleged failure to recognize Plaintiff's Nazarite Jewish faith. However, the undisputed evidence in the Schattinger Declaration supports the conclusion that even if Plaintiff's Nazarite

Jewish religion and the dietary restrictions it required had been acknowledged by Ministerial Services, the diet he seeks would not have been made available to him. (Dkt. No. 113-8 at ¶¶ 45-51.) Therefore, the Court recommends that, as with Friedmann, summary judgment based upon lack of personal involvement be granted Morris, Perlman, and Alston only as to that part of Plaintiff's First Amendment claim regarding the failure to provide him with a diet that accommodated his Nazarite Jewish religious beliefs.

### h. Conclusion

The Court recommends that Defendants Fisher, Bellamy, Rock, Lira, Haug, and Hawk be granted summary judgment on Plaintiff's entire First Amendment free exercise claim based upon a lack of personal involvement. The Court has also recommends that Defendants Friedmann, Morris, Perlman, and Alston be granted summary judgment as to that part of Plaintiff's First Amendment free exercise claim regarding the failure to accommodate is religious dietary requirements based upon a lack of personal involvement.

If the District Court were to adopt this Court's recommendations, the only remaining First Amendment free exercise claim remaining for consideration on the merits would be Plaintiff's claim for the failure to recognize his Nazarite Jewish religion by Defendants Friedman, Morris, Perlman, and Alston. This Court will nonetheless consider whether, if personal involvement were found as to Plaintiff's entire First Amendment free exercise claim, Defendants would be entitled to summary judgment on the merits.

### 2. Sincerity of Plaintiff's Religious Beliefs

In determining whether an inmate's religious beliefs are entitled to free exercise protection, "the relevant inquiry is not whether as an objective matter, the belief is 'accurate or

logical.'" *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (citing *Jolly,* 76 F.3d at 476).

Rather, the inquiry is whether the plaintiff's beliefs are "*sincerely held* and whether they are, in

his own scheme of things, religious." *Id*. (emphasis in original) (citation and internal quotation

marks omitted). A sincerity analysis "seeks to determine an adherent's good faith in the

expression of his religious belief." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984).

Recognizing that they are "singularly ill equipped to sit in judgment on the verity of an

adherent's religious beliefs," courts have rejected an objective, content-based approach in favor

of a more "subjective definition of religion, which examines an individual's inward attitudes

towards a particular belief system." *Ford*, 352 F.3d at 588 (citations and internal quotation

marks omitted). The Second Circuit has adopted an "expansive" definition of "religion" as "the

feelings, acts, and experiences of individual men in their solitude, so far as they apprehend

themselves to stand in relation to whatever they may consider the divine." *Patrick*, 745 F.2d at

158 (quoting *United States v. Moon,* 718 F.2d 1210, 1227 (2d Cir. 1983)) (quoting W. James,

*The Varieties of Religious Experience* 31 (1910)).

The subjective test does not require that a plaintiff be a member of a particular religious

organization. *Ford*, 352 F.3d at 589. *See also Jackson*, 196 F.3d at 321 (holding that the

question of whether a plaintiff's beliefs are entitled to free exercise protection turns upon

whether the beliefs were "sincerely held," not on the "ecclesiastical question" of whether the

plaintiff was in fact a Jew under Judaic Law); *Ford,* 352 F.3d at 590-91 ("[T]he opinion of

DOCS religious authorities cannot trump the plaintiff's sincere belief"). A court may not deny

First Amendment protection simply because it finds that the inmate's sincere belief is

"objectively incorrect" according to the tenets of his religion. *Ford*, 352 F.3d at 590-91.

Defendants do not appear to be challenging the sincerity of Plaintiff's religious beliefs for purposes of their summary judgment motion, questioning only whether his beliefs regarding the vow of the Nazarite are objectively correct. They have submitted the Declaration of Rabbi Potasnik who, while disagreeing with Plaintiff's beliefs as to what is required to abide by the vow of the Nazarite, has specifically acknowledged that he has no cause to question Plaintiff's sincere beliefs. (Dkt. No. 113-11 at ¶ 5.)

The evidence in the record is, in any event, sufficient for the Court to assume for purposes of this motion that Plaintiff's Nazarite religious beliefs are sincerely held and therefore entitled to protection under the First Amendment free exercise clause and RLUIPA. Plaintiff testified at his deposition that his parents and sister are Nazarites, as was his brother before his death. (Dkt. No. 113-3 at 30.) He also testified as to his clear understanding of the Nazarite vow as prohibiting him from eating or drinking anything from the vine, touching dead animals, and cutting his hair. (Dkt. No. 113-3 at 13-16.) According to Plaintiff, he initially took the Nazarite vow in 1986 and, after breaking the vow in 1996, took it again before entering prison, where he has continued to adhere to the vow, including the dietary restrictions imposed by the vow, throughout his incarceration. *Id.* at 30-31. In addition, Plaintiff appears to have been engaged in an ongoing effort to obtain recognition of his law of the Nazarite Jewish faith from DOCCS, as well as a diet that accommodates his religious beliefs, through correspondence and grievances since at least May of 2006. (Dkt. No. 113-4 at 62.)

### 3. Substantial Burden

A substantial burden on sincerely held religious beliefs occurs when "the state puts substantial pressure on an adherent to modify his behavior and violate his beliefs." *Jolly*, 76 F.3d

at 477 (internal quotation marks and alterations omitted).  Plaintiff claims that his free exercise rights under the First Amendment and his rights under RLUIPA are being substantially burdened by Defendants failure to recognize his religion and provide him a nutritionally adequate diet accommodating his Nazarite Jewish beliefs.

An inmate who adheres to a minority religion must be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to the conventional religious precepts."  *See Cruz v. Beto*, 405 U.S. 319, 322, n.2 (1972).  Reasonable opportunities, however, are not the same as identical treatment.  As the Supreme Court explained in *Cruz,* ["w]e do not suggest . . . that every religious sect or group within a prison    however few in number    must have identical facilities or personnel.  A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent or the demand."  *Id*. at 322.

Plaintiff has not complained of the need for a special place of worship.  Nor, in light of Plaintiff's expressed belief that the Nazarites in DOCCS are separate unto themselves, are not under rabbis or priests, and are teachers unto themselves (Dkt. No. 113-3 at 22, 27), have Plaintiff's religious beliefs been substantially burdened by the absence of a spiritual leader or opportunities for formal worship in accordance with Nazarite practices.  Although Plaintiff expressed concern at his deposition that he may at some point in the future be required to cut his hair, there is no evidence in the record that has occurred.  *Id*. at 72-74.

The Court does conclude, however, that the evidence supports a finding for purposes of this motion that DOCCS' failure to provide Plaintiff a diet that conforms with his understanding of his Nazarite vow, does substantially burden his sincerely held religious beliefs.  Defendants

contend that Plaintiff is not spiritually burdened by the lack of a vegetarian diet because under Jewish authorities' interpretation of the Nazarite vow, a person under the vow is not required to refrain from eating meat. (Dkt. No. 113-13 at 14.) However, what matters in the Court's analysis is whether Plaintiff's sincerely held belief that under the Nazarite vow he is not allowed to eat meat is substantially burdened, not whether Jewish authorities find his belief "objectively incorrect" according to the tenets of the Jewish faith. *Ford*, 352 F.3d at 590-91.

At his deposition, Plaintiff testified that he has been a vegan since he became incarcerated in the DOCCS system. (Dkt. No. 113-3 at 13.) The nutritionally adequate diet that Plaintiff claims necessary to accommodate his Nazarite Jewish religious beliefs, as well as his dairy allergy/intolerance, is one that does not include meat, fish, any food that comes from the grapevine, eggs, or dairy. (Dkt. No. 113-3 at 13-14, 23-24, 52, 87.) Plaintiff has rejected the suggestion of Rabbis Friedmann and Potasnik that he eat the RAM, which is almost entirely meat free, rather than the CAD, because it is not kosher. (Dkt. No. 1 at ¶¶ 133-34.) He has described the foods he believes should be substituted for the CAD as including "whole fruits[,] hot cooked vegetables[,] rice, beans, nuts, kosher cereals, peanut butter & jelly [,] juices or donuts." (Dkt. Nos. 5 at 2; 56 at 4.)

4. First Amendment Free Exercise and RLUIPA Claims

Even assuming that Plaintiff's religious beliefs regarding his diet are sincerely held and substantially burdened, the Court concludes for the reasons explained below that the DOCCS' dietary policies and practices, which do not allow for the diet Plaintiff is seeking, are "reasonably related to legitimate penological interests," and for purposes of Plaintiff's RLUIPA claim, that

the challenged policies and practices, as described in the Schattinger Declaration, further a compelling state interest and provide the least restrictive means of furthering that interest.

a.     Rational Connection of DOCCS Food Service Practices to a Legitimate Governmental Objective

In *O'Lone*, the Supreme Court explained that under the first *Turner* factor, the Court accorded great deference to the judgments of prison officials "charged with the formidable task of running a prison." *O'Lone*, 482 U.S. at 353; *see also Shaw v. Murphy*, 532 U.S. 223, 230 (2001) ("[U]nder Turner and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management.").

Recently, in *Smith v. Perlman*, No. 9:11-cv-00020 (MAD/CFH), 2014 WL 7333229, at * 11, 2014 U.S. Dist. LEXIS 175341, at * 34 (N.D.N.Y. Dec. 19, 2014), in which Defendants were granted summary judgment on Plaintiff's First Amendment/RLUIPA claim for a diet that conformed to both his therapeutic needs and religious beliefs, the District Court noted that "it is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups." (quoting *Majid v. Fischer*, No. 07-CV-4585, 2009 U.S. Dist. LEXIS 71616, at *18-19 (S.D.N.Y. July 31, 2009)). In an earlier decision in *Hamilton v. Smith*, No. 9:06-CV00805, 2009 WL 3199520, at * 4, 2009 U.S. Dist. LEXIS 91039, at *13 (N.D.N.Y. Sept. 30, 2009), Defendants were granted summary judgment on Plaintiff's First Amendment/RLUIPA claim regarding the failure to provide him a low sodium kosher diet. The District Court accepted the DOCCS defendants' argument that they had a "legitimate penological interest in carrying out their responsibility for daily preparation of meals for all inmates within their control," and that it was "not a reasonable demand that prison officials supply every inmate with their personal diet request for every meal." In *Tafari v. Brown*, No. 10-CV-1065

48

(GTS/DRH), 2012 WL 1085852, at *19, 2012 U.S. Dist. LEXIS 45054, at *57-58 (N.D.N.Y. Mar. 6, 2012), *report-recommendation adopted in part and rejected in part on other grounds*, 2012 WL 1098447, 2012 U.S. Dist. LEXIS 45055 (N.D.N.Y. Mar. 30, 2012), the Court found the same to be true where the plaintiff claimed that his religious beliefs required that he be provided with a kosher vegetarian diet, and the DOCCS defendants argued, as in this case, that "such a diet was extremely expensive and administratively burdensome and thus was not a feasible alternative." *Id*.

The Schattinger Declaration (Dkt. No. 113-8) describes the additional employees and facilities that would be required, the logistical and administrative burdens, and the expense of preparing vegetarian kosher meals for transport to the fifty-eight individual DOCCS confinement facilities housing around 55,000 inmates. (Dkt. No. 113-8 at ¶¶ 8-9.) The Court finds Defendants have established that the DOCCS practice of providing standard menus, i.e., the general confinement menu, the RAM, and the CAD to meet the dietary preferences and religious needs of inmates to the extent reasonably possible, has a rational connection to legitimate governmental objectives. The Court further finds that Plaintiff has failed to submit evidence showing that DOCCS' administrative and financial concerns are irrational.

> b.     Alternative Means for Plaintiff to Exercise his Free Exercise
>         Rights

The second *Turner* factor also weighs in favor of Defendants. In *O'Lone*, the Supreme Court construed the second factor, whether a prisoner had alternative means to exercise his religious beliefs, as not whether the inmate had an alternative means of engaging in the particular religious practice at issue, but whether the inmate has been denied "all means of expression." *O'Lone*, 482 U.S. at 352. *See also Furnace v. Arceo*, No. C 06-4609 MMC (PR), 2008 WL

618907, at *8, 2008 U.S. Dist. LEXIS 16172, at *23 (N.D. Cal. Mar. 3, 2008) (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon") (citation and internal quotation marks omitted).

In *Tafari*, the court found that the second *Turner* factor weighed in favor of the defendants, who, as in this case, argued that the provision of a vegetarian kosher diet would be extremely expensive and administratively burdensome. *Tafari*, 2012 WL 1085852, at 15. The court noted that Tafari was able to practice his Jewish faith in that he was provided the kosher CAD meals three times a day, which complied with Tafari's religious tenets even though it was not the diet he felt would fully comply with his beliefs. *See also Hamilton*, 2009 WL 3199520, at *5.

In this case, Plaintiff receives the CAD diet but claims that Nazarites are a sect of the Jewish religion which imposes dietary restrictions in addition to those imposed by a kosher diet. As in *Tafari*, while the CAD diet is not the diet that Plaintiff feels complies most fully with his beliefs, it is adequate in that it provides him a kosher diet. Furthermore, Plaintiff has what is likely the even better option of the RAM diet, which is almost entirely meatless and was recommended to him by Rabbi Friedmann as a way to solve most of his vegetarian problems. (Dkt. No. 113-4 at 59.) In his Declaration, Rabbi Potasnik explains that fruits and vegetables are kosher unless infected with insects or worms that may not be eaten and notes that inmates whose religion prohibits them from eating meat or flesh can choose the meatless alternative. (Dkt. No. 113-11 at ¶ 13.) Potasnik points out that not all members of the Jewish faith follow strict kosher guidelines and some have opted for the alternative entrée menu.

50

In addition to having adequate dietary alternatives, which although not perfect in Plaintiff's mind, have been shown to be adequate by his healthy weight and BMI and satisfactory nutritional state after many years on the CAD, Plaintiff has also been allowed to keep his hair long as required under his Nazarite vow. (Dkt. No. 113-3 at 72-73.) There is no evidence that suggests Plaintiff has been prevented from studying his faith, praying, or attending Jewish religious ceremonies and rituals. *See Hamilton*, 2009 WL 3199520, at *5. The evidence does reveal that it was Plaintiff who decided that Rabbi Friedmann was not his Rabbi (before Friedmann allegedly called Plaintiff a racially derogatory name), and Plaintiff who claims that because he is his own religious teacher, he needs no spiritual leader. It is also Plaintiff who has not provided Ministerial Services with the identity of a living religious resource who could advise them of the requirements for a Nazarite Jew and how DOCCS could best accommodate the religion within the confines of a correctional institution, despite having been requested to do so. *Id*. at 22-23, 26-27; Dkt. Nos. 113-9 at ¶¶ 5-6; 113-10 at 10, 23, 29, 32.

   c.  Impact on Guards, Inmates, and Prison Resources of Providing Plaintiff a Diet Accommodating his Religious Beliefs

The third *Turner* factor also militates in favor of Defendants. The evidence clearly establishes that making a kosher vegetarian diet available to inmates would have a detrimental financial and administrative impact on DOCCS. (Dkt. No. 113-8 at ¶¶ 45-52.) It would require the purchase of additional equipment for the FPC for creation of a dedicated kosher vegetarian production line and packaging for the meals, additional staff to run the line, and increased food costs. *Id.* "Even where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Smith*, 2014 WL 7333229, at

*12 (quoting *Hamilton*, 2009 WL 3199520, at *5) (quoting *Arceo*, 2008 WL 618907, at *8). In this case, the Schattinger Declaration establishes that the cost and administrative burden would be far greater than small or negligible.

In addition, the evidence reveals that even if DOCCS were to make a kosher vegetarian meal available to inmates as one of its standard meal choices, it would not satisfy Plaintiff's religious beliefs and dairy allergy/intolerance. Based upon the foods requested in his preliminary injunction motions and deposition testimony, Plaintiff would require a vegan diet prepared especially for him.[29] (Dkt. Nos. 5 at 2; 56 at 4; 113-3 at 13-14, 23-24, 52, 83.)

As in *Hamilton*, providing Plaintiff with a meal option outside of the established DOCCS-wide menus could have "a significant 'ripple effect' on fellow inmates, *Turner*, 482 U.S. at 90, in that such accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs." *Hamilton*, 2009 WL 3199520, at *6.

The Court finds nothing in the record showing that DOCCS position is unreasonable. *See Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995) ("The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable.").

---

[29] According to Schattinger, DOCCS looked into the feasibility of providing additional or variant kosher programs after the implementation of the program at Green Haven and concluded that it would be extremely expensive and administratively burdensome. (Dkt. No. 113-8 at ¶¶ 43-44.)

d.      Alternative Means of Facilitating Plaintiff's Right that Have
a De Minimis Effect on Valid Penological Interests

The fourth *Turner* factor requires the Court to consider the existence of alternative means

of facilitating Plaintiff's right to a diet that accommodates his religious beliefs which impose

only a de minimis effect on DOCCS' valid penological interests.  The burden is on Plaintiff,

rather than DOCCS officials, to show that there are "obvious, easy alternatives" to the

established DOCCS-wide menu plan.  *See O'Lone*, 482 U.S. at 350.  Plaintiff has failed to put

forth any alternative to the DOCCS-wide menu plan that would accommodate his religious

beliefs and dairy allergy/intolerance at a minimal cost or with minimal disruption of the

administration and operation of the DOCCS food service.  Plaintiff contends that the RAM does

not meet his needs because it is not kosher (Dkt. No. 1 at ¶¶ 133-34).  He claims that the CAD,

which is kosher, does not meet his needs because it contains meat, fish, cheese, and grape

products, and is nutritionally inadequate if he eats only those foods that are not prohibited and do

not contain dairy.  (Dkt. Nos. 1 at ¶¶ 43, 45-46, 88, 89, 137; 113-3 at 23-24, 52, 87; 113-3 at 14,

33, 36, 54-57, 60.)

Plaintiff testified at his deposition that DOCCS has an alternative diet where an inmate is

given a substitute for something he is unable to eat for religious reasons, and suggested that he be

provided with fruits, vegetables, rice, grains, peanut butter and jelly as substitutes for the foods

he cannot eat in the CAD.  (Dkt. 113-3 at 48-49.)  That is essentially the diet Plaintiff has

requested in his preliminary injunction motions.  (Dkt. Nos. 5 at 2; 56 at 4.)  However, Plaintiff

has offered no evidence that DOCCS offers any such diet, and the Schattinger Declaration

establishes that the only diets offered by DOCCS, aside from medically prescribed diets, are the

general confinement diet, the RAM, the CAD, and the Green Haven program. (Dkt. No. 113-8.) The alternative means of meeting his religious dietary and dairy allergy or intolerance needs suggested by Plaintiff would be even more onerous than the kosher vegetarian diet DOCCS has found to be too administratively and financially burdensome to implement.[30] *Id*. at 45-51. Accordingly, the final *Turner* factor weighs in favor of Defendants as well.

e.      Compelling State Interest under RLUIPA

Plaintiff's Complaint has been construed by the Court as seeking a permanent mandatory injunction in the nature of the preliminary injunctions he has requested throughout the litigation regarding his diet. Defendants' lack of personal involvement in, and lack of authority with respect to Plaintiff's First Amendment free exercise claim regarding DOCCS' alleged failure to provide him with a nutritionally adequate diet satisfying his religious beliefs and dairy allergy/intolerance, leads the Court to conclude that there is no Defendant in this action against whom effective injunctive relief could be awarded under RLUIPA.[31] Even if there were, for the reasons discussed herein, the Court finds that Defendants are entitled to summary judgment.

---

[30]  Communications among DOCCS personnel, including Defendant Haug, as a part of the investigation of Plaintiff's grievances regarding the failure to provide him with a diet accommodating his religious beliefs, confirm Schattinger's statement that DOCCS does not have a kosher vegetarian meal and explain that no substitutions are made on the CAD unless an inmate has an allergy, that food allergies are handled on an individual basis, and substitutions, if approved, are only made with items already served on the CAD menu. (Dkt. No. 113-4 at 67-69, 71.) According to Haug, Plaintiff's diet order had a milk allergy identified which required substitution of fruit for pudding and cream cheese and jelly with meat or eggs. *Id*. at 71.

[31]  Commissioner Fischer is retired, and as explained herein, even if his successor were substituted as a defendant, Plaintiff is not entitled to an award of injunctive relief under RLUIPA or any of his other claims.

"As a general matter, RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009). Nonetheless, the Supreme Court has observed that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's [compelling state interest] standard with due deference to the experience and expertise of prison and jail administrators in establishing the regulations and procedures necessary to maintain good order, security, and discipline consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005).

The Court has found that Plaintiff's religious exercise has been substantially burdened by DOCCS' failure to provide him with a diet that accommodates his religious beliefs. The onus is therefore on Defendants to demonstrate that the challenged practices further a compelling governmental interest, and that the burden imposed is the least restrictive means of achieving that interest. *See Jova*, 582 F.3d at 415. Controlling costs and the administrative burdens placed on correctional facilities have been found to constitute compelling state interests under RLUIPA. *See, e.g., Vega v. Lantz*, No. 304CV1215DFM, 2009 WL 3157586, at *8, 2009 U.S. Dist. LEXIS 88550, at * 30 (D. Conn. Sept. 25, 2009) ("[T]he defendants have demonstrated . . . that the regulation is in furtherance of compelling governmental interests including prison security, controlling costs, and maintaining workable administrative procedures."), *motion for reconsideration granted on other grounds*, 2012 WL 5831202, 2012 U.S. Dist. LEXIS 163963 (D. Conn. Nov. 16, 2012); *Phipps v. Morgan*, No, 04-CV-5108, 2006 WL 543896, at *9, 2006 U.S. Dist. LEXIS 12198, at * 20 (E.D. Wash. Mar. 6, 2006) ("The Court finds that Defendants have not only shown legitimate interest for First Amendment purposes, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of

vendors, and limiting security risks, they have also established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA.").

The Court finds that Defendants have met the burden of showing that for financial and administrative reasons, DOCCS has a compelling state interest in limiting the number of menu options available to the inmates in the DOCCS system, even though that limitation has resulted in a kosher vegetarian diet being unavailable to those inmates whose religious beliefs require it. The Court also concludes, for the reasons articulated in the Schattinger Declaration (Dkt. No. 113-8), that limiting the number of different menus available to inmates on a DOCCS-wide basis, and restricting individuals facilities' ability to alter those menus, satisfies the least restrictive means standard.

### 5.      Conclusion

For the foregoing reasons, the Court recommends that all of the Defendants be granted summary judgment on Plaintiff's First Amendment free exercise and RLUIPA claims.

### G.      Eighth Amendment Claim for Cruel and Unusual Punishment

Plaintiff claims that as a result of Defendants' refusal to provide him with a nutritionally adequate diet that accommodates his religious beliefs, he has sustained significant weight loss, his health has dramatically declined, and his pre-existing illnesses are being exacerbated as his body is starved of the nutrients it needs. (Dkt. Nos. 1 at ¶137; 113-3 at 36.) Plaintiff claims that Defendants' refusal constitutes cruel and unusual punishment in violation of his Eighth Amendment rights. *Id*. at ¶ 136 and 6 and 9.

In addition to the absence of evidence in the record establishing the named Defendants' personal involvement in Plaintiff's diet and medical care, the medical evidence fails to support

Plaintiff's Eighth Amendment claim. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain, or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).

Under the Eighth Amendment, prisons are required to provide for the basic human needs of inmates, including "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (per curiam) (citation and internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." *Jolly,* 76 F.3d at 480 (citations omitted). "[A] prisoner may prevail only where he proves both an objective element    that the prison officials' transgression was sufficiently serious    and a subjective element    that the officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with deliberate indifference to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farme*r, 511 U.S. at 834) (internal quotation marks omitted).

Under the objective test, no constitutional violation will be found as to restrictive diets unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured

the inmate." *McEachin*, 357 F.3d at 199-201.  *See, e.g., Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) (a deprivation of two of three meals per day for eight days created an issue of material fact sufficient for an Eighth Amendment claim to survive summary judgment); *Moss v. Ward*, 450 F. Supp. 591, 596-97 (W.D.N.Y. 1978) (denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate inmate's Eighth Amendment rights).

Plaintiff's claim that he has sustained significant weight loss, his health has dramatically declined, and his pre-existing illnesses are being exacerbated as his body is starved of the nutrients it needs as a result of not being given the diet he demands is not supported by the medical evidence in the record.  During the period from December of 2010 to March of 2013, while he was being given the CAD diet, Plaintiff's weight actually increased from 134 pounds on December 16, 2011, to 146 pounds on March 13, 2013.  (Dkt. No. 113-7 at ¶¶ 13, 15.)  During that time, Plaintiff's BMI has remained within the healthy range.  *Id.* at ¶¶ 14, 16.

While Plaintiff's medical records reveal that he suffered from stomach pains for which he was given Alamag,[32] and blood in his stool, there is nothing in the records attributing those health problems to the failure to provide him with a nutritionally adequate diet that accommodates his religious beliefs and dairy allergy/intolerance.  (Dkt. No. 115; *see also* Dkt. No. 113-4 at 8.)  To the contrary, Plaintiff's medical progress notes for February 4 and 7, 2011, indicate that his kosher diet was not deemed to be a medical issue.  (Dkt. No. 115 at 7, 9.)  Plaintiff himself at one

---

[32]  Alamag is described as an antacid used to treat acid indigestion, heartburn, upset stomach, and sour stomach.  *See* http://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo .cfm?archieved 40097, last viewed on 12/29/14.

point blamed his digestive system problems on Crohn's disease, but in the late winter and early spring of 2011 refused to have a colonoscopy. *See id.* at 8-10.

Plaintiff filed Grievance No. UST-45070-11 on January 21, 2011, claiming that nothing was being done with regard to his stomach problems and passing blood. (Dkt. No. 113-4 at 5.) He also asked to see a dietician or be transferred to a facility that serves full kosher meals, not the CAD, so that he could get balanced meals. *Id.* In its unanimous denial of Plaintiff's appeal from denial of the grievance, CORC noted that Plaintiff had a colonoscopy on May 11, 2011, and was scheduled for a colorectal surgical consult in the near future. *Id.* at 3.

The record also fails to support Plaintiff's claim that he has worsening gum disease that had moved into his sinuses as a result of malnutrition, or that his spinal stenosis or other health problems are in any way related to his diet. *See* Dkt. No. 115. Furthermore, Karandy's April 28, 2014, examination of Plaintiff revealed him to be in good health with a weight and BMI in the healthy range and, along with the results of Plaintiff's blood work, consistent with appropriate nutrition. (Dkt. No. 113-3 at ¶¶ 9-11.)

Plaintiff's conclusory allegations of violation of his constitutional rights alone, without the support of competent medical evidence, are insufficient to establish a significant risk to his health necessary to defeat Defendants' motion for summary judgment on Plaintiff's Eight Amendment cruel and unusual punishment claim. *See Tafari,* 2012 WL 1085852, at *19 (citing *Llorente v. Rozeff,* No. 99-CV-1799, 2001 WL 474261, at *3-4, 2001 U.S. Dist. LEXIS 5655, at *11 (N.D.N.Y. Apr. 12, 2001) (plaintiff was required to present competent medical evidence of both the injury and the reaction to support a claim of deliberate indifference to a medical need).

Accordingly, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's Eighth Amendment claim.

### H. Equal Protection Claim

Plaintiff contends that his rights to equal protection under the Fourteenth Amendment have also been violated by Defendants' refusal to provide him with a diet that accommodates the tenets of his faith. (Dkt. No. 1 at 8.) According to Plaintiff, he was the only Black Nazarite Jew at Upstate who complained that he was not receiving an adequate and nutritional kosher diet in accordance with the tenets of the Nazarite Jewish faith. (Dkt. No. 1 at ¶ 37.) Other Jewish inmates at Upstate and other DOCCS' facilities were provided the CAD, which contains meat, but Defendants refused to provide Plaintiff with an alternate diet accommodating his beliefs. (Dkt. No. 1 at ¶ 128.) Plaintiff blames Defendants' failure to recognize his Nazarite Jewish faith and provide him with the alternate diet on discrimination based upon his race and religion. (Dkt. Nos. 1 at ¶¶ 36-37 and 39, 41, 56; 113-3 at 25-26, 69-70.)

The Equal Protection Clause directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To prove a violation of the Equal Protection Clause, . . . a plaintiff must demonstrate that he was treated differently from others similarly situated as result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

In the prison context, "the Supreme Court has specifically held that . . . the Equal Protection clause does not require that 'every religious sect or group within a prison . . . must

60

have identical facilities or personnel.'" *Pugh v. Goord*, 571 F. Supp. 2d 477, 502 (S.D.N.Y. 2008) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). The *Turner* standard has been applied to equal protection claims by the Second Circuit, such that "even if plaintiffs can demonstrate that two groups are similarly situated disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Benjamin*, 905 F. 2d 572). This standard requires courts to "determine whether 'the groups are so similar that discretion has been abused.'" *Benjamin*, 905 F.2d at 575 (quoting *Jones v. North Carolina Prisoner's Labor Union, Inc.*, 433 U.S. 119, 136 (1977)).

In addition to the absence of evidence in the record establishing the named Defendants' personal involvement in Plaintiff's dietary requests, the evidence fails to support Plaintiff's claim that they violated his right to equal protection. The evidence supports the finding that the denial of the diet Plaintiff requested, while other Jewish inmates religious dietary requirements were met by the CAD, did not result from "intentional or purposeful discrimination" either on the basis of his race or religion.

Plaintiff's claim that he was discriminated against on account of his race is largely conclusory. Plaintiff's disputed allegation that Rabbi Friedmann called Plaintiff a "nigger" after Plaintiff rejected him as his Rabbi, is not sufficient to raise a material issue of fact as to racial discrimination for purposes of Plaintiff's equal protection claim. "The law is clear that verbal harassment or even threats alone are not actionable under 42 U.S.C. § 1983." *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 372 (S.D.N.Y. 2007) (citing case law involving a corrections officer

harassing an inmate by, *inter alia*, directing racial epithets at him and finding that such an action does not rise to the level of a constitutional violation).

Even if Plaintiff's allegations regarding Friedmann were enough to raise a factual issue regarding racial discrimination, there is no evidence in the record that Friedmann was personally involved in Plaintiff being denied the religious diet he has requested. In fact, the evidence shows that Friedmann had no authority to determine an inmate's religious diet (see Schattinger Declaration 113-8), except for the involvement, if any, he had in Ministerial Services making the determination that an inmate was Jewish and entitled to the CAD. *See* Directive #4202(P). Likewise, there is no evidence that Plaintiff was denied the religious diet he requested by Friedmann or any of the other Defendants because of purposeful and intentional discrimination as a result of his Nazarite Jewish faith or because he is Black, but rather because of the policies and practices of DOCCS food service, which for financial and administrative reasons, do not allow for a personalized religious diet for each inmate.

In his Complaint, Plaintiff described himself as the "Only Black Nazarite Jewish Prisoner Confined at Upstate who has been Complaining About Not Receiving An Adequate & Nutritional Kosher diet in Accordance with the tenets of the Nazarite." (Dkt. No. 1 at ¶ 37.) The evidence shows that Plaintiff is not similarly situated to the significantly larger group of Jewish prisoners in the DOCCS system, whose religious beliefs are satisfied by the CAD diet.

Finally, even if Plaintiff could demonstrate that Black, or even all members of the Nazarite Jewish faith, as a group, are similarly situated to other Jewish inmates in DOCCS, as a group, the Court's analysis of the *Turner* factors with regard to Plaintiff's First Amendment free

exercise claim, reveals that the disparate treatment complained of by Plaintiff is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

The Court therefore recommends that Defendants motion for summary judgment be granted as to Plaintiff's equal protection claim.

I.      **42 U.S.C. §§ 1981, 1982, 1985 and 1986**

Plaintiff has alleged in his Complaint that he has brought his claims for violation of his First, Fifth, Eighth and Fourteenth Amendment rights not only under 42 U.S.C. § 1983, but also pursuant to 42 U.S.C. §§ 1981, 1982, 1985, and 1986.  (Dkt. No. 1 at  7.)

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a protected class; (2) defendant intended to discriminate against plaintiff based upon his membership in the protected class; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).  Like the Equal Protection Clause, § 1981 can only be violated by purposeful discrimination.  *Gen. Bldg. Contractor's Ass'n., Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).  Purposeful discrimination is "conduct motivated by a discriminatory purpose," rather than conduct that "merely result[s] in a disproportionate impact on a particular class."  *Id*. at 386.

Where, as in this case, a plaintiff does not put forward any claim under § 1981 that has

not also been asserted under § 1983, the § 1981 claim is encompassed by the §1983 claim, and they are analyzed together. *See Gladwin v. Pozzi*, 403 F. App'x 603 (2d Cir. 2010). Because the Court has found that Plaintiff's § 1983 claims lack merit, so does Plaintiff's duplicative claim under § 1981. *See Howard v. City of New York*, No. 12 Civ. 933 (JMF), 2014 WL 84357, at *2, 2014 U.S. Dist LEXIS 1015, at *23 (S.D.N.Y. Jan. 6, 2014).

42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State . . . , as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The statute, by its clear terms, has no relevance to the claims asserted by Plaintiff in this action.

The elements of a claim under 42 U.S.C. § 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . (3) an act in furtherance of a conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Brown*, 221 F.3d at 341 (citation and internal quotation marks omitted). The "conspiracy must also be motivated by some racial or perhaps otherwise class based animus behind the conspirators' action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam) (citation and internal quotation marks omitted). The law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985. *See Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993). In this case, the Complaint is devoid of factual allegations showing that any of the Defendants were involved in a conspiracy against Plaintiff, and there is no evidence in the record to support a conspiracy. Furthermore, the Court has concluded that Defendants have not

denied Plaintiff's constitutional rights. Because Plaintiff's § 1985 claim fails, his claim under § 1986 fails as well. *See Brown*, 221 F.3d at 341.

Given the foregoing, the Court recommends that Defendants be granted summary judgment dismissing Plaintiff's claims, if any, under 42 U.S.C. §§ 1981, 1982, 1985, and 1986.

### J. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. Inasmuch as the Court is recommending that Defendants be granted summary judgment based upon lack of personal involvement and/or on the merits, it finds it unnecessary to reach the qualified immunity argument.

## V. CONCLUSION

Based upon the foregoing, the Court recommends that Defendants motion for summary judgment be granted in its entirety. Inasmuch as the Court is recommending summary judgment in Defendants' favor, it also recommends that Defendants' request for revocation of Plaintiff's *in forma pauperis* status be denied as moot.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 113) be **<u>GRANTED IN ITS ENTIRETY</u>**; and it is further

**RECOMMENDED** that Defendants' motion for the revocation of Plaintiff's *in forma pauperis* status under 28 U.S.C. § 1915(g) be **<u>DENIED ON MOOTNESS GROUNDS</u>**; and it is further

**ORDERED** that the Clerk's Office provide Plaintiff with copies of all unpublished decisions cited herein; and it is further

**ORDERED** that the Clerk's Office correct the civil docket in this matter to reflect the correct spelling of the names of Defendants Kenneth S. Perlman and Omega B. Alston.

Dated: January 15, 2015
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven Correctional Facility, R. Pflueger, A. Glemmon, Sgt. Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T. Healey, and John Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.

Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

### MEMORANDUM & ORDER
PAULEY, J.

**\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

### REPORT AND RECOMMENDATION
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

### Background
During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.")

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International,*

*Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

> FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Edward T. FURNACE, Plaintiff,
v.
J.G. ARCEO, et al., Defendants.

No. C 06-4609 MMC (PR).
Docket Nos. 19, 29.
March 3, 2008.

Edward T. Furnace, Soledad, CA, pro se.

Donn Robert Duncan, II, San Francisco, CA, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MAXINE M. CHESNEY, District Judge.

**\*1** On June 12, 2006, plaintiff, a California prisoner incarcerated at Salinas Valley State Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983. On January 5, 2007, the Court found plaintiff had stated cognizable claims in which he alleged the violation of his First and Fourteenth Amendment rights by prison officials for denying him religious meals and rejecting his request for a transfer to another prison that could provide him such meals. The Court ordered the complaint served on SVSP defendants Warden M.S. Evans, Correctional Food Manager R. Conway, Assistant Correctional Food Manager J. Pittman and Supervising Correctional Cook K. Soper; the Court also ordered the complaint served on J.G. Arceo, the Appeals Examiner/Facility Captain at the Inmate Appeals Branch of the California Department of Corrections

and Rehabilitation ("CDCR") in Sacramento. Now before the Court is defendants' motion for summary judgment. Plaintiff has filed an opposition to the motion,[FN1] and defendants have filed a reply.

> FN1. Prior to the date his opposition was due, plaintiff filed a request for an extension of time of thirty days in which to file his opposition. The request is hereby DENIED as moot; plaintiff timely filed his opposition in accordance with the original briefing schedule set forth in the order of service. (Docket No. 29.)

### FACTUAL BACKGROUND[FN2]

> FN2. Unless otherwise noted, the facts set forth in the following section are undisputed.

Plaintiff was received at SVSP on July 2, 2003, and has been housed at SVSP at all times relevant to the complaint. (Decl. D. Robert Duncan Supp. Defs.' Mot. Summ. J. ("Duncan Decl.") Ex. D.) Plaintiff has been a practitioner of the Shetaut Neter faith since 2003. (Duncan Decl. Supp. Defs.' Reply Ex. B ("Pl.'s Dep.") at 23:17-22.) Shetaut Neter, or Neterianism, is an African religion that originated in ancient Egypt in approximately 10,000 B.C.E. (Compl. Ex. A at 1.) The current worldwide head or spiritual leader of Shetaut Neter is Sebai Muata Ashby, Ph.D., ("Dr.Ashby"), of the Sema Institute. (Id. Ex. A at 2.) According to the Sema Institute, one of the main scriptures of the Shetaut Neter tradition is Prt M Hur or "Chapters of Enlightenment." (Id.) In this scripture are written specific practices for worship and meditation. (Id.) The Prt M Hur and other scriptures of the Shetaut Neter mandate a "Kemetic diet" for all Shetaut Neter practitioners. (Decl. Sebai Muata Ashby Supp. Defs. Mot. Summ. J. ("Ashby Decl.") ¶ 6.) The Kemetic diet consists of three types of food: food for the soul, food for the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

mind, and food for the physical body. (*Id.* ¶ 5.) The recommended diet for the physical body is a "vegetarian/vegan diet" that prohibits the consumption of meat, dairy, eggs, wheat, refined sugar and table salt. (*Id.* ¶ 4.)<sup>FN3</sup> The diet is primarily composed of whole foods, raw vegetables and fruits. (*Id.*) The optimal Kemetic diet is a raw food diet that consists of at least eighty percent organic raw vegetables and fruits. (Compl. Ex. A at 3.)

> FN3. Unless otherwise noted, all references hereafter to the "Kemetic diet" are to food for the physical body.

While Shetaut Neter mandates the Kemetic diet for all of its practitioners, individuals who have not yet achieved the optimal level of spiritual practice with respect to their diet are not excluded from practicing Shetaut Neter; these individuals are allowed to gradually transition in adopting the complete Shetaut Neter dietary practices. (Ashby Decl. ¶ 6.) In his book titled "Kemetic Diet: Food for Body, Mind and Soul" Dr. Ashby writes that the transition from a meat-eating diet to a "healthy vegetarian diet" should begin with meat substitutes; a full transition to the point where even the meat substitute can be reduced to a minimal level may require months or years. (Opp. Ex. D at 183.) Dr. Ashby further recognizes that Shetaut Neter practitioners may find themselves in situations where alternatives to dairy, wheat, refined sugar and table salt are not readily available. (Ashby Decl. ¶ 9.) Specifically, Shetaut Neter recognizes that in some instances strict adherence to the Kemetic diet may not be possible for inmates in institutions, as the institution may not be set up to meet some of the "non-traditional" dietary requirements, and, consequently, that an inmate practitioner "may need to make interim adjustments, under the guidance of a licensed dietician and health care practitioner, preferabl[y] knowledgeable about the vegan diet, to maintain the optimum physical health that is possible in the particular circumstances." (*Id.* ¶ 10.) Such adjustments should be viewed as a temporary departure

from the prescribed diet, however, and the practitioner should always strive to improve his circumstances so as to be able to practice Shetaut Neter optimally. (*Id.*)

**\*2** SVSP provides inmates with meals that are based on standardized menus generated by the CDCR's food-services section and approved by a registered dietician. (Decl. R. Conway Supp. Mot. Summ. J. ("Conway Decl.") ¶ 3; Decl. K. Soper Supp. Mot. Summ. J. ("Soper Decl.") ¶ 3; Decl. J. Pittman Supp. Mot. Summ. J. ("Pittman Decl .") ¶ 3.) The weekly menus created by CDCR's food-services section are used as a guideline by correctional food managers at all state institutions, including SVSP. (Conway Decl. ¶ 4; Soper Decl. ¶ 4; Pittman Decl. ¶ 4.) The meals provided by the correctional cooks and correctional food administrators at SVSP follow the menus and portions set forth in the CDCR standardized menus. (Conway Decl. ¶ 5; Soper Decl. ¶ 5; Pittman Decl. ¶ 5.) The standardized menus provided at SVSP meet the basic nutritional needs of average adult males, ages 18-50; the caloric content of meals are averaged per week to ensure an average intake of 2800-3200 calories per day. (Conway Decl. ¶¶ 6-7; Soper Decl. ¶¶ 6-7; Pittman Decl. ¶¶ 6-7.)

The alternative-entree program at SVSP follows the standardized menu guidelines. (Conway Decl. ¶ 9; Soper Decl. ¶ 9; Pittman Decl. ¶ 9.) Under the alternative entree program, an inmate who for religious reasons chooses not to eat meat will be provided with a meat substitute. (*Id.*) Alternative entree items, i.e., meat substitutes, are indicated on the standardized menus provided to SVSP; an inmate who chooses not to eat meat will be provided with meals allowing him to meet the basic nutritional needs of an average adult male between the ages of 18 and 50. (*Id.*)

California Code of Regulations title 15, § 3054 sets out the regulatory guidelines concerning prisoners' special religious dietary needs. Under § 3054(a), "[e]ach facility shall make reasonable efforts, as required by law, to accommodate those inmates who

have been verified to require special religious diets."
(*See* Compl. Ex. 2.) The facility chaplain must verify
an inmate's special religious dietary needs by con-
tacting the religious organization of which the inmate
claims to be an observant member, and must provide
the facility food manager with the inmate's name and
special religious dietary needs. (*Id.*) If an inmate's
special religious dietary needs prohibit him from
consuming an item or items from the daily scheduled
meal, the inmate "may be accommodated by being
provided another item(s) from that same days' sched-
uled meal that is consistent with their dietary need."
(*Id.*) Under § 3054(b), inmates with special religious
dietary needs "may be transferred to another facility
that is equipped to accommodate them." (*Id.*)

On June 6, 2005, D. Moon ("Moon"), the Facility
D Chaplain at SVSP, wrote an institutional "chrono"
providing as follows:

Inmate Furnace is verified to receive a Special Re-
ligious Diet per California Code of Regulations title
15, § 3054. "No Meat" Includes Breakfast, Lunch
and Dinner. (Daily).

**\*3** (Duncan Decl. Ex. B.)

On July 28, 2005, plaintiff filed an inmate appeal
at the informal level of review, complaining that de-
fendants Correctional Food Manager R. Conway
("CFM Conway"), Assistant Correctional Food
Manager J. Pittman ("ACFM Pittman") and Super-
vising Correctional Cook K. Soper ("SCC Soper")
were responsible for providing him with a "nutrition-
ally balanced religiously based vegetarian diet three
times daily," but had failed to fulfill their obligation to
do so. (Compl. Ex. 1 at 2.) Specifically, plaintiff
complained that the meals he was receiving contained
foods that he was prohibited from consuming because
of his religion; he also complained he was not being
provided citrus or protein substitutes with his daily
meals, and was instead given foods that he could not

consume, such as dairy products, jello and pudding.
(*Id.*) Plaintiff asked to be transferred to another prison
under § 3054, on the ground SVSP was unwilling to
provide him with a nutritionally balanced religious
diet. (*Id.*) The informal level reviewer responded to
plaintiff's appeal by telling him that the officers in
each building distributed special meals to inmates
based on a list distributed from the Central Kitchen
(*Id.*)

On September 18, 2005, plaintiff filed his appeal
at the first formal level of review. (*Id.*) On September
28, 2005, the appeal was denied by CFM Conway and
SCC Soper, who told plaintiff the CDCR "does not
recognize vegetarian diets, only religious diets," and
plaintiff had the option of eating alternate entrees from
the CDCR-approved menu. (Compl. Ex. 1 at 5.)

On November 29, 2005, plaintiff filed his appeal
at the second formal level of review, complaining that
he was dissatisfied with the first level response be-
cause the first level reviewer had failed to recognize
the nature of his complaint, specifically, that the in-
stitution was not equipped to facilitate his religious
dietary needs. (Compl. Ex. 1 at 3.) On December 22,
2005, following an investigation by ACFM Pittman,
the appeal was denied at the second level of review.
The following explanation was provided for the deni-
al: (1) SVSP is mandated to follow the menu approved
by the CDCR, including alternate entrees; (2) the
religious diet offered at SVSP was an alternate entree
diet approved by the Muslim chaplain; (3) plaintiff
was receiving the religious diet approved by the
Muslim chaplain, and (4) the religious diet requested
by plaintiff is not offered at SVSP. (Compl. Ex. 1 at
6-7.)

On February 4, 2006, plaintiff filed his appeal at
the Director's level of review, stating his sole request
was that he be transferred to another prison. (Compl.
Ex. 1 at 3.) On May 4, 2006, N. Grannis, Chief of the
Inmate Appeals Branch, denied plaintiff's appeal,
finding as follows:

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

The appellant has not established that the SVSP has failed to make a reasonable effort as required by law, to accommodate those inmates with special religious dietary needs. The institution is serving a meal menu that has been approved by the Department's dietician. The appellant's taste preferences notwithstanding, the meals served are nutritionally balanced, wholesome and healthy. The diet meets government-approved guidelines for adult males. Based upon the documentation presented no modification to the decision reached by the institution is required.

**\*4** (Compl. Ex. 1 at 1.)

On June 12, 2006, plaintiff filed his complaint in the instant action. He claims he is being denied his First Amendment right to the free exercise of his religion because the SVSP alternative religious diet does not meet the requirements of a Kemetic raw food diet, and he is required to eat food forbidden by his faith in order to meet his nutritional needs. Plaintiff also claims the refusal of SVSP prison officials to provide him with a Kemetic diet or to transfer him to another institution where he could be provided with such a diet violates his rights under the Equal Protection Clause of the Fourteenth Amendment.

## DISCUSSION

A. *Legal Standard*

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ." *See* Fed.R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby,* 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *See Celotex,* 477 U.S. at 324 (citing Fed.R.Civ.P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir.1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

B. *Analysis*

1. *Free Exercise Claim*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

**\*5** The First Amendment guarantees the right to the free exercise of religion. *Cruz v. Beto,* 405 U.S. 319, 323, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam). Under the Free Exercise Clause, inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt,* 833 F.2d 196, 198 (9th Cir.1987). "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone v. Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Even if a prison regulation impinges on an inmate's exercise of his religion, however, no First Amendment violation will be found if the regulation is reasonably related to legitimate penological goals. *Id.* at 349 (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

a. *Conduct Mandated by Plaintiff's Faith*

In order to establish a free exercise violation, a prisoner must show the defendant burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith. *See Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997). Such a showing requires a threshold determination that the plaintiff's claim is rooted in a sincerely held religious belief. *See Shakur v. Schriro,* No. 05-16705, slip op. 1011, 514 F.3d 878, 2008 WL 185496, at *3 (9th Cir. Jan.23, 2008) (citing *Malik v. Brown,* 16 F.3d 330, (9th Cir.1994); *Malik,* 16 F.3d at 333 (holding, to implicate Free Exercise Clause, plaintiff's belief must be both "sincerely held" and "rooted in religious belief").

At the outset, defendants argue, plaintiff has not produced evidence showing they have burdened the practice of conduct mandated by his faith, because he has not shown practitioners of Shetaut Neter are required to eat a raw food diet in every situation. Plaintiff claims he has established a free exercise violation

based on his sincerely held beliefs as to the dietary requirements of the Shetaut Neter religion. For the reasons stated below, the Court concludes plaintiff has not produced evidence that creates a genuine issue of material fact as to whether his sincerely held religious beliefs include the belief that practitioners of Shetaut Neter are required to eat a raw food diet in every situation.

Plaintiff alleges he sincerely holds the beliefs of the Shetaut Neter religion, one of which is that the practitioners of Shetaut Neter follow a vegetarian diet. (Compl.¶¶ 3-6.) According to plaintiff, the vegetarian diet adhered to by the practitioners of Shetaut Neter forbids the consumption of meat, dairy, eggs, wheat, refined sugar, table salt, or genetically modified or irradiated foods, and further requires the consumption of at least eighty percent organic raw fruits and vegetables. (Compl. ¶¶ 5-6 & Ex. A at 3.) As support for his claim that such a diet is required of Shetaut Neter practitioners, plaintiff relies upon the writings of Dr. Ashby concerning the Kemetic dietary requirements. (Compl. Ex. A; Opp. Exs. C, D & G; Pl.'s Dep. 42:11-16), and states that were he not incarcerated, he would choose to eat the raw food diet described by Dr. Ashby in his book. (Pl.'s Dep. at 44:2-15.) The raw food diet described by Dr. Ashby consists of raw, fresh, uncooked foods, e.g., vegetables, fruits, nuts and seeds, vegetable and fruit juices; foods that are sun-cooked, e.g., raw bread; or foods that are dehydrated at a low temperature. (Compl. ¶ 6; Opp. Ex. G at 1; Pl.'s Dep. at 44:7-15.)

**\*6** While defendants do not question the sincerity of plaintiff's beliefs as a follower of the Shetaut Neter religion, they argue plaintiff has not established a free exercise violation because he has not produced evidence that contradicts Dr. Ashby's declaration that Shetaut Neter practitioners are not always required to eat a raw food diet. Specifically, they point to Dr. Ashby's statement that Shetaut Neter recognizes that strict adherence to the Kemetic diet may not always be possible for inmates; consequently, under such cir-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

cumstances, some divergence from the optimal practices of Shetaut Neter is allowed, and practitioners may transition over time to the raw food diet. (Ashby Decl. ¶ 10.)

Plaintiff concedes that, according to Dr. Ashby, inmate practitioners of Shetaut Neter are not required to adhere strictly to the raw food diet if they cannot do so due to institutional limitations; moreover, he does not dispute Dr. Ashby's interpretation of this aspect of the Shetaut Neter religion. (Opp.¶ 23.) He emphasizes, however, that Dr. Ashby views such instances of diet modification as a departure from the prescribed Kemetic diet. (*Id.*)

Based on the foregoing, and viewing the evidence in the light most favorable to plaintiff, the Court finds plaintiff is a sincere believer in the Shetaut Neter faith, including the dietary requirements of the faith, but that plaintiff has neither alleged nor produced evidence demonstrating that the consumption of anything other than the optimal raw food diet is mandated by his faith in every situation. Plaintiff's sincere beliefs concerning the dietary requirements of his faith are founded on the teachings of Dr. Ashby concerning the Kemetic diet; such teachings include not only Dr. Ashby's belief that a raw food diet is optimal, but also his recognition that Shetaut Neter practitioners may need to transition to such a diet over time-especially where prisoners are concerned and the transition to a raw food diet might not be possible due to institutional limitations. Moreover, while plaintiff contends defendants' failure to provide him with a raw food diet forces him to defile himself by consuming foods that are forbidden by his religion, in neither Dr. Ashby's declaration nor his writings is there a statement to the effect that anything other than a raw food diet is forbidden by Shetaut Neter. Indeed, in the sections of Dr. Ashby's book that plaintiff has attached to his opposition, Dr. Ashby advises practitioners to transition to the Kemetic diet, but makes clear such transition can take months or even years. (Opp. Ex. D at 1.)

In sum, plaintiff's belief that he must eat a raw food diet is based on the religious teachings of Dr. Ashby, which teachings recognize that eating a raw food diet is not always feasible for Shetaut Neter practitioners, especially in the prison setting. Notably, plaintiff does not claim he sincerely believes only certain aspects of Dr. Ashby's teachings; rather, he claims Dr. Ashby is the author of the Kemetic diet and the "bottom line" concerning the dietary requirements of Shetaut Neter. (Pl.'s Dep. 42:13-16.) Consequently, plaintiff's sincere belief in the dietary aspirations set forth by Dr. Ashby for Shetaut Neter practitioners necessarily includes those aspects of Dr. Ashby's teachings that recognize that the practitioners of Shetaut Neter in general, and those who are prisoners in particular, are not required to eat a raw food diet in all situations, especially when institutional regulations prevent them from so doing.

**\*7** Accordingly, as plaintiff has failed to produce evidence that creates a genuine issue of material fact as to whether defendants' refusal to provide plaintiff with a raw food diet burdens conduct that is mandated by plaintiff's faith, the Court finds plaintiff's claim does not establish a violation of the Free Exercise Clause.

b. *Legitimate Penological Objectives*

Even if there were evidence to support plaintiff's claim that defendants have burdened conduct that is mandated by plaintiff's faith, no violation of plaintiff's First Amendment rights can be made out if the restriction imposed by defendants was reasonably related to legitimate penological objectives. *O'Lone,* 482 U.S. at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). In *Turner,* the Supreme Court identified four factors to consider when determining whether a regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that re-

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

main open to prison inmates"; (3) "the impact ac-commodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner,* 482 U.S. at 89-90.

The task in considering the *Turner* factors is not to balance the four factors, but, rather, to determine whether the state shows a reasonable relation between the policy and legitimate penological objectives, ra-ther than simply a logical one. *Beard v. Banks,* 548 U.S. 521, ----, 126 S.Ct. 2572, 2580, 165 L.Ed.2d 697 (2006). While all justifiable inferences must be drawn in the prisoner's favor with respect to matters of dis-puted fact, in disputed matters of professional judg-ment the court's inferences must accord deference to the views of prison authorities. *See id.* at 2578. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological ob-jectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. *Id.*

With respect to the first *Turner* factor, the initial burden is on defendants to put forth a "com-mon-sense" connection between their policy and a legitimate penological interest. *See Frost v. Syming-ton,* 197 F.3d 348, 357 (9th Cir.1999). If defendants do so, plaintiff must present evidence that refutes the connection. *Id.* Defendants must then present enough counter-evidence to show that the connection is not "so remote as to render the policy arbitrary or irra-tional." *Id.*

Defendants argue that two legitimate penological interests prevent them from providing plaintiff with a raw food diet: budgetary and administrative concerns. In support of their argument, defendants have pre-sented declarations attesting to the fact that all meals provided to inmates at SVSP are based on standard-ized menus generated by the CDCR's food-services

section and approved by a registered dietician; this plan includes the SVSP alternative-entree meals that are provided to inmates who for religious reasons choose not to eat meat. (Conway Decl. ¶¶ 3, 9; Soper Decl. ¶¶ 3, 9; Pittman Decl. ¶¶ 3, 9.) The available alternative-entree items, i.e., meat substitutes, are indicated on the menus provided to SVSP by the CDCR. (Conway Decl. ¶ 9; Soper Decl. ¶ 9; Pittman Decl. ¶ 9.)

**\*8** Even where the marginal cost and administra-tive burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns. *See Shakur,* 514 F.3d 878, 2008 WL 185496, at \*4. Here, it is undisputed that plaintiff's raw food diet cannot be prepared from either the standardized SVSP regular menu or the alternative-entree menu; consequently, the Court finds a common-sense connection exists between defendants' policy of not providing plaintiff with a raw food diet and their legitimate budgetary and administrative concerns. *See id.* (holding prison could rationally conclude that denying requested religious diet would simplify its food service and reduce ex-penditures); *see also Ward v. Walsh,* 1 F.3d 873, 877 (9th Cir.1992) (holding prison has legitimate interest in running simplified food service, rather than one giving rise to many administrative difficulties). Ac-cordingly, as plaintiff has not presented evidence that refutes the connection, defendants have satisfied the first element of the *Turner* test. *See Frost,* 197 F.3d at 357.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 89-90. In the context of free exercise claims, the relevant in-quiry under this factor is not whether the inmate has an alternative means of engaging in the particular reli-gious practice that he claims is being affected; rather, the question is whether the inmate has been denied all means of religious expression. *Ward,* 1 F.3d at 877.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

Thus, the second *Turner* factor has been satisfied where the prisoner retains "the ability to participate in other significant rituals and ceremonies" of his faith, even if some aspects of religious practice are impinged upon. *Id.*

Defendants assert that alternative means of plaintiff's expressing his religion remain open to him; in support of their argument they provide evidence of the following: (1) plaintiff receives vegetarian meals that allow him to avoid meat and meet his basic nutritional needs; (2) he is allowed to meditate, pray and study the Shetaut Neter scriptures for a half hour to a full hour three times each day, in the morning, noon and evening; (3) he is allowed to practice the yoga positions that are recommended by Shetaut Neter; (4) he participates in monthly fasts, at which times he limits his food intake to fruits and water and recites the Shetaut Neter scriptures; and (5) he is permitted to wear an ankh amulet as a symbol of his faith. (Mot. Summ. J. ¶¶ 23-28; Pl.'s Dep. 27:18-25; 28:4-10; 30:9-23; 32:4-7.) Plaintiff does not produce any evidence in opposition to that produced by defendants, nor does he claim that he is being denied alternative means of expressing his religion. Accordingly, the Court finds defendants have satisfied the second element of the *Turner* test.

**\*9** The third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." *Turner,* 482 U.S. at 91. Defendants assert that providing plaintiff with a raw food diet will significantly impact both prison resources and prison officials, and that institutional budgetary concerns weigh strongly in favor of providing plaintiff with a religious vegetarian diet. In support of their assertions, defendants have provided declarations showing that meal preparation at SVSP is a systematized process that involves many different departments and individuals. At the administrative level, SVSP correctional food managers must prepare menus that comply

with the CDCR's weekly standardized food menus, and they must accomplish this task while also managing the food budget and purchasing food from approved vendors. (Conway Decl. ¶¶ 2, 4, 9; Pittman Decl. ¶¶ 2, 4, 9.) At the practical level, kitchen staff must prepare all inmate meals in accordance with the correctional food managers' menus; inmates working in the kitchen must serve the meals or place them on delivery carts; and correctional officers must deliver the meals to the inmates who eat in their cells (a group constituting approximately half of the inmates at SVSP), including those inmates who have a "religious diet" card on their cell and must receive an alternative-entree meal. (Conway Decl. ¶¶ 8, 10; Pittman Decl. ¶¶ 8, 10.)

Based on defendants' evidence, which plaintiff does not dispute, the Court finds that if defendants were required to accommodate plaintiff's religious dietary needs by preparing and serving him an individualized raw food diet three times daily, such accommodation would have a burdensome impact on SVSP administrative and budgetary resources. *See DeHart v. Horn,* 390 F.3d 262, 271-72 (3d Cir.2004) (finding accommodation of plaintiff's religious dietary needs would have burdensome impact on prison where requested vegan diet would require specialized ordering and preparation of food and individualized preparation of meals in kitchen designed for bulk food preparation). Accordingly, defendants have satisfied the third element of the *Turner* test.

The fourth *Turner* factor requires the Court to consider whether there is an absence of ready alternatives to the prison regulation; a ready alternative is one that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 91. The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation. *See O'Lone,* 482 U.S. at 350 (1987); *see also Mauro v. Arpaio,* 188 F.3d 1054, 1063 (9th Cir.1999) (finding in favor of defendants on fourth

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

*Turner* factor where plaintiff failed to point to alternative that accommodated his rights at *de minimis* cost to security interests). Here, plaintiff has not put forth a ready alternative to defendants' religious-diet policy that would accommodate his right to a religious diet at a *de minimis* cost to defendants' legitimate administrative and budgetary concerns. Accordingly, the Court finds defendants have satisfied the fourth element of the *Turner* test.

**\*10** In sum, for the reasons discussed above, the Court concludes plaintiff has not created a genuine issue of material fact with respect to his claim that defendants have violated his First Amendment right to the free exercise of his religion by denying him a raw food diet. Specifically, plaintiff has not produced evidence showing that defendants have substantially burdened conduct that is mandated by his religion. Moreover, defendants have shown that the refusal to provide plaintiff with a raw food diet is reasonably related to legitimate penological objectives. Accordingly, defendants are entitled to summary judgment on plaintiff's First Amendment Free Exercise claim.[FN4]

> **FN4.** In light of this finding, the Court does not reach defendants' argument that they are entitled to qualified immunity on plaintiff's Free Exercise claim.

2. *Fourteenth Amendment Claim*

Plaintiff claims that his right to equal protection under the Fourteenth Amendment was violated by defendants' refusal to transfer him to a prison where he could receive a raw food diet. The Fourteenth Amendment's equal protection guarantee ensures that prison officials not discriminate against particular religions. See *Cruz v. Beto,* 405 U.S. 319, 321-22, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam). Prisons must afford an inmate of a minority religion "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Id.* at 322. Prisons need not provide identical facilities or personnel to different faiths, but must make good faith accommodation of the prisoners' rights in light of practical considerations. See *Freeman v. Arpaio,* 125 F.3d 732, 737 (9th Cir.1997).

To succeed on an equal protection claim, a plaintiff in a § 1983 action must show that officials intentionally acted in a discriminatory manner. *See id.* Consequently, to defeat summary judgment, plaintiff must set forth specific facts showing there is a genuine issue as to whether defendants denied him a reasonable opportunity to pursue his faith as compared to prisoners of other faiths, and that such conduct was intentional. *See id.*

In his complaint, plaintiff claims his right to equal protection was violated because the refusal to transfer him was in direct violation of prison regulations and was not related to legitimate penological concerns. (Compl.¶¶ 17-18.) Defendants argue plaintiff has not established an equal protection violation because he has produced no evidence showing defendants intentionally discriminated against him; specifically, he has not produced any evidence that another prison facility could better accommodate his request for a raw food diet and that defendants intentionally denied his request to be transferred to such facility. Further, defendants argue, the evidence shows plaintiff was provided with a reasonable opportunity to practice his faith, by being served a diet that allowed him to avoid meat, and also being allowed to exercise his religion in several alternative ways, including prayer, yoga, mediation, and recitation of scriptures. In his opposition, plaintiff claims, for the first time, that practitioners of Shetaut Neter are denied equal protection of the law because Muslim and Jewish inmates at SVSP are provided foods that satisfy their religious dietary laws. (Opp.18:8-11.) Defendants reply that plaintiff has produced no evidence to support his conclusory assertion that Muslim and Jewish inmates are receiving dietary accommodations that more fully satisfy their religious dietary requirements

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)
**(Cite as: 2008 WL 618907 (N.D.Cal.))**

**\*11** The Court finds plaintiff has not produced evidence showing there is a genuine issue as to whether defendants have violated plaintiff's right to equal protection, either by refusing to transfer him to another prison or by providing Muslim and Jewish prisoners with foods that satisfy their religious dietary needs. Nor has plaintiff produced evidence showing defendants have denied him a reasonable opportunity to practice his faith as compared to other prisoners, and that such conduct was intentional. Accordingly, defendants are entitled to summary judgment on plaintiff's equal protection claim.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is hereby GRANTED and judgment shall be entered in favor of all defendants.

This order terminates Docket Nos. 19 and 29.

The Clerk shall close the file.

IT IS SO ORDERED.

N.D.Cal.,2008.
Furnace v. Arceo
Not Reported in F.Supp.2d, 2008 WL 618907 (N.D.Cal.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David W.
Sill, Secure Care Treatment Aid; Thomas Nicolette,
RN, Ward Nurse; Charmaine Bill, Treatment Team
Leader; Jill E. Carver, Social Worker, Primary Ther-
apist; Edwin Debroize, Psychologist Assist; Jeff
Nowicki, Chief of Mental Health Treatment Serv.;
Terri Maxymillian, Ph.D., Dir. of Mental Health
Serv.; Sgt. Sweet, Security Services, CNYPC; Mi-
chael Hogan, Comm'r, Dep't of Mental Health, De-
fendants.

No. 9:11–CV–1317 (GTS/RFT).
Feb. 28, 2012.

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

**MEMORANDUM DECISION and ORDER**
Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court, in this *pro se* civil
rights action filed by Kenneth Carl Groves, Sr.
("Plaintiff"), against numerous employees of New
York State or the Central New York Psychiatric
Center ("Defendants"), are Plaintiff's motion to pro-
ceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his
motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)
[FN1] For the reasons set forth below, Plaintiff's motion
to proceed *in forma pauperis* is granted; his motion for
a preliminary injunction is denied; his motion for
appointment of counsel is denied; Plaintiff's claims of
deliberate indifference to his mental health needs

against Defendants Bill, Carver and DeBroize are *sua
sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault
are *sua sponte* dismissed without prejudice and with leave
to amend in this action in accordance with
Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed
without prejudice as a Defendant in this action; the
Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on
Defendants Davis, Sill, and Nicolette.

FN1. This is the fourth civil rights action
filed by Plaintiff in this District. Generally,
two of these actions arose out of Plaintiff's
refusal to consent to a strip search and the
subsequent actions taken against Plaintiff as
a result of his refusal. *See Groves v. New
York,* 09–CV–0406, Decision and Order
(N.D.N.Y. filed May 11, 2009) (Hurd, J.)
(*sua sponte* dismissing complaint pursuant to
28 U.S.C. § 1915[e][2][B] ); *Groves v. The
State of New York,* 9:09–CV–0412, Decision
and Order (N.D.N.Y. filed Mar. 26, 2010)
(Sharpe, J.) (granting defendants' motion to
dismiss the complaint pursuant to
Fed.R.Civ.P. 12[b][6] ). The third action al-
leged numerous violations of Plaintiff's con-
stitutional rights during the period July 23,
2009, and August 26, 2009, and was dis-
missed without prejudice upon Plaintiff's
request in October, 2010. *See Groves v.
Maxymillian,* 9:09–CV–1002, Decision and
Order (N.D.N.Y. filed Oct. 8, 2010)
(Suddaby, J.). As a result, it does not appear
that the current action is barred because of res
judicata, collateral estoppel, and/or the rule
against duplicative litigation.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.) FN2 Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and De-Broize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, De-Broize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

> FN2. At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

**II. MOTION TO PROCEED *IN FORMA PAU-PERIS***

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT**

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).FN3

> FN3. The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

**A. Governing Legal Standard**

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[FN6]

FN4. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN5. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN6. It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

victed criminals in unsafe conditions, it must be un-constitutional [under the Due Process Clause] to con-fine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg, 457 U.S. at 315–16.* As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memoran-dum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[FN7]

> FN7. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a cus-todial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an uncon-victed detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "de-liberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial de-tainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, De-fendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally as-saulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (inter-nal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plain-tiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an op-portunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

## 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[FN8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[FN9]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
(Cite as: 2012 WL 651919 (N.D.N.Y.))

FN8. Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

FN9. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.FN10 Rather, this claim is hereby dismissed with prejudice.

FN10. The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
(Cite as: 2012 WL 651919 (N.D.N.Y.))

Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN11]

> FN11. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[FN12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).[FN13]

> FN12. *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

> FN13. *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its* *entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defend-

ants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

[T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[FN14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

FN14. For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private

sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[FN15] and it is further

> **FN15.** Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and De-Broize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

N.D.N.Y.,2012.
Groves v. Davis
Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Derrick HAMILTON, Plaintiff,
v.
J.T. SMITH, Superintendent, Shawangunk Correctional Facility; J. Maly, Deputy Superintendent of Security; William M. Gonzalez, Deputy Counsel; M. Genovese, Medical Doctor; M. Skies, Registered Nurse; Donald Selsky, Director of Special Housing; D. Parisi, Mail Room Clerk; F. Chiapperino, Counselor; and Elaine Davis, Steward, Attica Correctional Facility, Defendants.

No. 9:06–CV–0805 (GTS/DRH).
Sept. 30, 2009.

West KeySummary**Federal Civil Procedure 170A**
⬿**2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
       170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

A genuine issue of material fact as to whether prison officials intentionally interfered with a prisoner's ability to receive mail addressed to him precluded summary judgment in favor of the officials. The prisoner alleged that the officials violated his First Amendment rights when they confiscated mail addressed to him, including an affidavit from a former inmate. The prisoner was placed on mail watch and some of his mail was intercepted because it allegedly did not comply with facility protocol, but the officials

failed to offer any explanation as to why the documents were never returned to the sender. U.S.C.A. Const.Amend. 1.

Derrick Hamilton, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Christina L. Roberts–Ryba, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*
Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court, in this *pro se* prisoner civil rights action filed by Derrick Hamilton ("Plaintiff") against nine employees of the New York State Department of Correctional Services ("Defendants") pursuant to 42 U.S.C. § 1983, are the following: (1) Defendants' motion for summary judgment (Dkt. No. 51); (2) United States Magistrate Judge David R. Homer's Report–Recommendation recommending that Defendants' motion be granted in part and denied in part (Dkt. No. 60); (3) Plaintiff's Objections to the Report–Recommendation (Dkt. No. 67); and (4) Defendants' Objections to the Report–Recommendation (Dkt. No. 66). For the reasons set forth below, the Report–Recommendation is accepted and adopted as modified, and Defendants' motion is granted in part and denied in part.

**I. RELEVANT BACKGROUND**

On June 28, 2006, Plaintiff filed his Complaint asserting claims against the following seven (7) employees of Department of Correctional Services ("DOCS"): (1) J.T. Smith, the Superintendent of Shawangunk Correctional Facility (hereinafter, "Shawangunk C.F."); (2) J. Maly, a Deputy Superintendent of Security of Shawangunk C.F.; (3) William M. Gonzalez, Deputy Counsel of DOCS; (4) M. Genovese, a medical doctor at Shawangunk C.F.; (5),

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

M. Skies, a registered nurse at Shawangunk C.F.; (6) Donald Selsky, Director of Special Housing of DOCS; and (7) D. Parisi, a mailroom clerk at Shawangunk C.F. (Dkt. No. 1.)

On December 8, 2006, Plaintiff filed an Amended Complaint, naming two additional Defendants to the action: (1) F. Chiapperino, a corrections counselor at Shawangunk C.F.; and Elaine Davis, a steward at Attica Correctional Facility ("Attica C.F."). (Dkt. No. 17.)

Generally, in his Amended Complaint, Plaintiff alleges that Defendants (1) violated his religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), (2) violated his right to medical confidentiality under the Health Insurance Portability and Accountability Act ("HIPAA"), and (3) violated his civil rights under the First, Eighth and Fourteenth Amendments, including his right to be free from mail tampering, deliberate indifference to his serious medical needs, and inadequate prison conditions. (Dkt. No. 17.)

On July 31, 2008, Defendants filed a motion for summary judgment seeking dismissal of all claims against them, arguing that (1) Plaintiff failed to establish claims under RLUIPA, HIPAA, and the First, Eighth and Fourteenth Amendments, (2) Plaintiff failed to allege personal involvement against several Defendants, and (3) Defendants are entitled to qualified immunity. (Dkt. No. 51.)

On October 20, 2008, Plaintiff submitted his response to Defendants' motion, repeating the allegations made in his Amended Complaint. (Dkt. No. 58.)

On January 13, 2009, Magistrate Judge Homer issued a Report–Recommendation that recommended that Defendants' motion for summary judgment be denied as to the following claims: (1) Plaintiff's First Amendment Claim against Defendant Smith regard-

ing the provision of meals which complied with both his health needs and his religious tenets; (2) Plaintiff's First Amendment Claim against Defendants Smith and Maly regarding mail tampering; and (3) Plaintiff's Fourteenth Amendment Claim against Defendants Maly and Selsky regarding the due process violation that occurred during Plaintiff's disciplinary rehearing where Plaintiff was precluded from calling certain witnesses. Magistrate Judge Homer further recommended that all remaining claims be dismissed and that all claims as to Defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino and Davis be dismissed for lack of personal involvement. (Dkt. No. 60.) [FN1] Familiarity with the grounds of Magistrate Judge Homer's Report–Recommendation is assumed in this Decision and Order.

> [FN1]. It should be noted that Defendant Davis was recommended for dismissal in the ordering paragraph of the Report–Recommendation. (*See* Dkt. No. 60, at 48.) However, in reviewing Defendant Davis's involvement in events surrounding the disciplinary proceeding, Magistrate Judge Homer determined that Defendant Davis was directly involved in the disciplinary hearing, which forms the basis for Plaintiff's due process claim. (*Id.* at 45.) Thus, it appears that Defendant Davis was mistakenly included in the ordering paragraph recommending dismissal. (*Id.* at 46–47 [stating that qualified immunity would not extend to those Defendants who were involved in the events forming the basis for Plaintiff's Fourteenth Amendment claim].) As a result, the Court has included Defendant Davis in its analysis with respect to Plaintiff's Fourteenth Amendment claim.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

**\*2** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo"* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

> FN2. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court

did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN3. *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at \*1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion for Summary Judgment**

Magistrate Judge Homer correctly recites the legal standard governing a motion for summary judgment. (Dkt. No. 60, at 16–17.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS OF CLAIMS RECOMMENDED FOR TRIAL**

**A. Plaintiff's Claim Regarding His Meals**

In his Amended Complaint, Plaintiff alleges that Defendant Smith, who is the Superintendent at Shawangunk C.F., failed to provide Plaintiff with meal options that accommodate both his therapeutic dietary needs as well as his religious tenets. (Dkt. No. 17, at 11.) In his Report–Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because he found that there was a genuine issue of material fact as to whether there was a legitimate penological interest for Shawangunk C.F.'s failure to provide Plaintiff with meals that accommodate both

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

his religious and dietary needs. (Dkt. No. 60.)

In their objections, Defendants make the following four arguments: (1) "[w]hile Plaintiff claims that he requires low-sodium and low-cholesterol food, he presents absolutely no evidence aside from his speculation that the nutritional makeup of the Kosher meal (also known as a "Cold Alternative Diet" or "CAD") exceeds the sodium or cholesterol content plaintiff is recommended"; (2) "in coming to its conclusion, the Report ignored the fact that the CAD is provided to inmates who request it, due to religious reasons, through ministerial services staff and that Defendant Smith lacks control over the diet"; (3) "[w]hile the Report cites to the fact that the meals are provided to Shawangunk by outside providers, it [errs] by first agreeing that the Department of Correctional Services ('DOCS') lacks the ability to provide inmates with meals that are kosher and low in sodium and then incredibly finds Defendant Smith liable for this lack and for not creating an acceptable alternative"; and (4) "since there was no diet meeting Plaintiff's request available and Defendant Smith did not have any personal involvement in preparing or providing special diets, the claims must be dismissed as to Defendant Smith for lack of personal involvement." (Dkt. No. 66.)

**\*3** As an initial matter, the Court finds the first argument unpersuasive. In his declaration in opposition to Defendants' motion for summary judgment, Plaintiff swears that Defendant Genovese informed him that the CAD was high in sodium, and that he therefore had to change his diet. (Dkt. No. 58, Part 1, at ¶¶ 10–11.)

In addition, the Court finds the fourth argument unpersuasive. According to his declaration, Defendant Smith is the Superintendent at Shawangunk C.F. (Dkt. No. 58, Part 3, at 10.) In this capacity, he is responsible for "all aspects of facility operations." (*Id* .) Based on this general characterization, the Court finds that there is a genuine issue of material fact as to whether

Defendant Smith was responsible for implementing the facility's meal menus. Accordingly, the claims against Defendant Smith should not be dismissed for lack of personal involvement.

The Court analyzes Defendants' remaining two arguments as follows.

**1. Defendant's Argument Regarding Plaintiff's Claim Arising Under the First Amendment's Free Exercise Clause**

"The right of prison inmates to exercise their religious beliefs ... is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–0057, 2007 WL 3046703, at \*4 (N.D.N.Y. Oct.17, 2007) (Peebles, MJ) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 [1987] ) (other citation omitted). "A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is one of reasonableness, taking into account whether the particular act affecting the constitutional right is reasonably related to legitimate penological interests." *Guiffere,* 2007 WL 3046703, at \*4 (internal quotation marks and citations omitted)

"Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals." *Id.* (citations omitted). Accordingly, "[c]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Id.* (citation omitted). Having said that, because of the demands of prison officials to operate prison facilities in a certain manner, "[a] free exercise claim arising from such a denial brings into focus the tension between the right

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand." *Id.* (citation omitted).

**\*4** When examining a plaintiff's free exercise claim, a court must undergo a three-part, burden shifting framework. *Id.* at \*5 (citation omitted). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs." *Id.* (citations omitted). "Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Id.* (citations omitted). "In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)." *Id.* (citations omitted).

"Under *Turner,* the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective." *Id.* (internal quotation marks and citation omitted). "The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question." *Id.* (citations omitted). "Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* (internal quotation marks and citation omitted). "Decisions rendered since *Turner* have clarified that when applying this test, a court should examine the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Id.* (internal quotation marks and citations omitted).

In their motion, Defendants suggest that, because Plaintiff converted to Judaism only to "learn about the religion" and because Plaintiff no longer practices

Judaism, his beliefs were not serious. (Dkt. No. 51, Part 6, at 14.) While the facts suggested by Defendants may be true, the Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004). As a result, the Court finds that Plaintiff has satisfied his burden in the first part of the above-described, burden-shifting inquiry.

In response, Defendants argue that officials have a legitimate penological interest in carrying out their responsibility for the daily preparation of meals for all inmates within their control. (Dkt. No. 51, Part 6, at 14.) Defendants further argue that "[i]t is a not a reasonable demand that prison officials supply every inmate with their personal diet request for every meal." (*Id.*) As a result, the Court finds that Defendants have satisfied their burden in the second part of the above-described, burden-shifting inquiry.

Because Defendants have articulated a justification for failing to provide Plaintiff with a diet that conforms to both his religious and therapeutic needs, the focus shifts back to Plaintiff to establish, through a weighing of the *Turner* factors, that "the policy is not reasonably related to legitimate penological interests ." *Guiffere,* 2007 WL 3046073, at \*6. "Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment." *Id.* Having said that, a court must also bear in mind that, "[w]hile all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities." *Furnace v. Arceo,* 06–CV–4609, 2008 WL 618907, at \*7 (N.D.Cal. Mar.3, 2008) (citing *Beard v. Banks,* 126 S.Ct. 2572, 2578 [2006] ). Therefore, "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Banks,* 126 S.Ct. at 2578.

**\*5** As described above, the first *Turner* factor is whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective. *Turner,* 482 U.S. at 89–90. Defendants argue, as did the defendants in *Arceo,* that two legitimate penological interests prevent them from providing [P]laintiff with a ... diet [that satisfies both his religious and therapeutic needs]: budgetary and administrative concerns. *Arceo,* 06–CV–4609, 2008 WL 618907, at \*8. Furthermore, as did the defendants in *Arceo, "[i]n* support of their argument, Defendants have presented [a] declaration [ ] attesting to the fact that all meals provided to inmates at [Shawangunk C.F.] are based on standardized menus generated by the [state]; this plan includes the [Shawangunk C.F.] alternative-entree meals that are provided to inmates who for religious reasons choose not to eat meat [or choose to eat only Kosher products]." [FN4]

> FN4. In particular, Defendant Smith states, in his declaration, that Plaintiff was offered the CAD after he submitted a form to change his religious affiliation to Judaism. (Dkt. No. 53, Part 3, at 14, ¶¶ 32–33 [Decl. of Joseph T. Smith].) Defendant Smith further states that the CAD is a diet that exists on a "state wide menu" which is "supplied to Shawangunk C.F. from the Oneida Correctional Facility Food Processing Plant, or other approved, outside vendors." (*Id.* at ¶ 34.) Finally, Defendant Smith states that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium]." (*Id.* at ¶ 32, 35.)

Under the circumstances, this Court finds, as did the district court in *Arceo* that, "[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Arceo,* 2008 WL 618907, at \*8 (citing *Shakur v. Schriro,* 514 F.3d 878, 886 [9th Cir.2008] ). For example, it is clear that a diet that complies with Plaintiff's therapeutic and religious needs cannot be prepared from any of the food menus available to Plaintiff. (Dkt. No. 53, Part 3, at 14, ¶¶ 32, 35 Decl. of Joseph T. Smith, testifying that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium].") "[C]onsequently, the Court finds a common-sense connection exists between [D]efendants' policy of not providing [P]laintiff with a [specialized food menu] and their legitimate budgetary and administrative concerns." *Arceo,* 2008 WL 618907, at \*8. In addition, "[P]laintiff has not presented evidence that refutes the connection [.]" *Id.* As a result, the Court finds that the first *Turner* factor weighs in favor of Defendants.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 89–90. Here, there is no record evidence that indicates that there were not alternative means for Plaintiff to exercise his right to religious freedom. According to his own testimony, Plaintiff was given a Kosher diet that complied with the faiths of his religion. (Dkt. No. 51, Part 5, at 102–104.) In addition, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7–10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].) Finally, Plaintiff has failed to offer any evidence that would suggest that Defendants prevented him from studying, praying, wearing whatever clothing he desired, or attending ceremonies

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

and rituals.[FN5] As a result, the Court finds that the second *Turner* factor weighs in favor of Defendants.

> FN5. *See Arceo,* 2008 WL 618907, at *8 (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon"); *see also O'Lone,* 482 U.S. at 351–52 ("The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is 'virtually unlimited except during working hours,' and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer.").

**\*6** The third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." *Turner,* 482 U.S. at 91. Defendants argue that providing Plaintiff with diet that conforms to both his therapeutic and religious needs will significantly impact both prison resources and prison officials, and that institutional budgetary concerns weigh in favor of maintaining the system in its current fashion. (Dkt. No. 51, Part 6, at 14.) Granted, Defendants have not offered any evidence that specifically describes the budgetary costs associated with adding new food options to prison menus, or other practical obstacles associated with providing a low-sodium CAD. (*See generally* Dkt. No. 51.) *Cf. Arceo,* 2008 WL 618907, at *9 (where defendants provided declarations showing that meal preparation at the facility "is a systematized process that involves many different departments and individuals.").

Having said that, Defendants have adduced evidence that (1) the CAD is diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the special equipment and training required to prepare the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium. (Dkt. No. 53, Part 3, at 14, ¶¶ 32–35 [Decl. of Joseph T. Smith].) Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD. Moreover, Defendants have argued that this accommodation—providing Plaintiff with a meal option outside of the state-wide menu—could have "a significant 'ripple effect' on fellow inmates," *Turner,* 482 U.S. at 90, in that such an accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs. (Dkt. No. 51, Part 6, at 14.) Based on this potential "ripple effect," the Court finds that it must be "deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90. Moreover, Plaintiff has failed to offer any evidence that Defendants' position is unreasonable.[FN6] As a result, the Court finds that the third *Turner* factor weighs in favor of Defendants.

> FN6. "The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable." *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995).

The fourth *Turner* factor requires the Court to consider the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests. "The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Arceo,* 2008 WL 618907, at *9 (citing *O'Lone,* 482 U.S. at 350 [1987] ) (other citation omitted). Here, Plaintiff has

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

not put forth a ready alternative to Defendants' religious-diet policy that would accommodate his right to a religious diet at a *de minimis* cost to Defendants' legitimate administrative and budgetary concerns. As a result, the Court finds that the fourth *Turner* factor weighs in favor of Defendants.

**\*7** In sum, after considering each factor of the *Turner* test,[FN7] the Court finds that it was not unreasonable for Defendant Smith to follow a state-wide meal menu, which did not happen to satisfy both Plaintiff's dietary and therapeutic needs, given the legitimate penological concern of maintaining order. The Court makes this finding cognizant of the fact that "deference must be accorded prison authorities' views with respect to matters of professional judgment," *Beard v. Banks,* 548 U.S. 521, 126 S.Ct. 2572, 2574, 165 L.Ed.2d 697 (2006), understanding that "matters of professional judgment" include selecting inmate meal menus, given the budgetary expense and potential disorder associated with this task.[FN8]

> FN7. It bears noting that the four *Turner* factors must be looked at as a whole when "determining the reasonableness of the regulation at issue." *Turner,* 482 U.S. at 89.

> FN8. *See Kahane v. Carlson,* 527 F.2d 492, 496 (2d Cir.1975) (requiring, under the First Amendment, DOCS to provide "a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws, without otherwise mandating specific items of diet"); *cf. Andreola v. Glass,* 04–CV–0282, 2008 WL 2937574, at *1 (E.D.Wisc. July 23, 2008) (expressing doubt as to whether plaintiff's claim that the Wisconsin Department of Corrections failed to "provide him with a kosher diet low in cholesterol and salt, pursuant to his doctor's orders regarding his cardiac health," established a cognizable claim under the First Amendment).

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's claim under the First Amendment's Free Exercise Clause.

**2. Defendant's Argument Regarding Plaintiff's Claim Arising Under RLUIPA**

"Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1(b)." *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002). "RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce." *Broaddus,* 200 F.Supp.2d at 297 (citations omitted). "[A claim arising under] RLUIPA is an independent cause of action, with a slightly different standard and must be treated separately from the First Amendment claim." *Keesh v. Smith,* 04–CV–0779, 2007 WL 2815641, at *11 (N.D.N.Y. Sept.25, 2007) (Mordue, J.) (citation omitted).

"Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion *and the state bears the burden of persuasion on all other elements." Broaddus,* 200 F.Supp.2d at 297 (citation omitted; emphasis added). Stated another way, "RLUIPA imposes a more exacting standard on prison officials [than does the First Amendment], requiring that any substantial burden on an inmate's exercise of religion be warranted by a compelling governmental interest, and be the least restrictive means of accomplishing that interest." *Keesh,* 2007 WL 2815641, at *11 (internal quotation marks and citations omitted). "By its terms, RLUIPA is to be construed to broadly favor protection of religious exercise." *Broaddus,* 200 F.Supp.2d at 297

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

(citing 42 U.S.C. § 2000cc–3 [g] ).

The Supreme Court has defined substantial burden as "[w]here the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employ. Sec. Div.,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Here, there is no question that forcing an inmate to choose between his therapeutic dietary needs and his religious dietary needs creates a substantial burden on Plaintiff's ability to exercise his religion. Therefore, the Court must determine whether Defendants have demonstrated that (1) the substantial burden on Plaintiff's exercise of religion was warranted by a compelling governmental interest, and (2) following the state-wide menu option was the least restrictive means of accomplishing that interest.

**\*8** As the Supreme Court recently explained in its discussion of RLUIPA, " '[c]ontext matters' in the application of th[e compelling interest] standard." *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (quoting *Grutter v. Bollinger,* 539 U.S. 306, 327 [2003] ). In other words, RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter,* 544 U.S. at 723. In addition, when reviewing a claim under RLUIPA, a court must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (quoting Joint Statement 16699 [quoting S.Rep. No. 103–111, at 10, U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900] ).

Here, the Court notes that Defendants Smith and Genovese have adduced some—albeit little—evidence in an effort to specifically establish that (1) the substantial burden on Plaintiff's exercise of

religion was warranted by a *compelling governmental interest* (e.g., in controlling costs and/or maintaining order) at Shawangunk C.F., and (2) adhering to the state-wide menu option was the *least restrictive means* of accomplishing the above-referenced compelling governmental interest.[FN9] A review of the declarations of Defendants Smith and Genovese reveals why they adduced little such evidence: they argue, in pertinent part, that they lacked personal involvement in the RLUIPA violation alleged. (*See, e.g.,* Dkt. No. 51, Part 6, at 24 [Defs.' Memo. of Law].)

FN9. For example, with regard to the first referenced element, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the specialized nature of the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium. (Dkt. No. 53, Part 3, at 14, ¶¶ 32–35 [Decl. of Joseph T. Smith].) Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD. Moreover, with regard to the second referenced element, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7–10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].)

Furthermore, they have adduced record evidence

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

in support of that argument. More specifically, Defendant Smith, the highest-ranking official at Shawangunk C.F., swears that "[t]he [CAD] menus are not created at Shawangunk. Thus, I have no personal control over the contents of the [CAD] meals." (Dkt. No. 53, Part 3, at 14, ¶ 34 [Decl. of Joseph T. Smith].) Similarly, Defendant Genovese, a Clinical Physician at Shawangunk C.F., swears as follows:

As a Clinical Physician 2, I do not prescribe religious diets due to the fact that such diets are not prescribed by health care workers at DOCS. To receive a religious diet, inmates are required to complete paper work that is processed by the Ministerial Services, not the medical department. Therefore, I have never prescribed a religious diet to any inmate due to the fact that religious diets are not based on medical benefits or health criteria.... In this case ..., plaintiff was placed on a therapeutic diet on June 12, 2006. Plaintiff's diet was a 'Controlled A' which contains enhanced fiber, but is low in fat, cholesterol, and sodium.... As a[C]lincal [P]hysician 2, I am responsible solely for the prescription of therapeutic diets. No part of my job duties require, or allows, me to actually provide the diets as they are distributed by another department.... To the extent that plaintiff claims I violated his right to practice his religion, I reiterate that I at no time had [the] ability to prescribe religious diets.

**\*9** (Dkt. No. 68, Part 3, ¶¶ 6, 11, 14, 15 [Decl. of Maryann Genovese].) It should be noted that Defendant Genovese's testimony is consistent with four administrative decisions denying two of Plaintiff's grievances on the subject, which explain that, pursuant to DOCS Directive 4311, "Inmate requests for religious foods/diets[ ] shall not be prescribed by the health care provider." (Dkt. No. 58, Part 2, at 22, 24–26.) Finally, it should be noted that Plaintiff has failed to adduce any admissible record evidence controverting the record evidence adduced by Defendants Smith and Genovese.

After carefully reviewing the undisputed facts in the record, and the relevant case law, the Court agrees with Defendants Smith and Genovese: they lacked personal involvement in the RLUIPA violation alleged in this action, because (as the superintendent and a physician at Shawangunk C.F.) they lacked the authority to deviate from DOCS' state-wide Kosher menu in order to design, and prepare for Plaintiff, a new Kosher menu that was low in sodium.[FN10] *See Johnson v. Sisto,* 07–CV–1826, 2009 WL 2868724, at *6 (E.D.Cal. Sept.2, 2009) ("Plaintiff has presented no evidence disputing the defendants' averments that they [are not liable under RLUIPA because they] do not create the menus and cannot order substitutions of [Rastafarian religious] menu items, nor has he named as defendants those in [the California Department of Corrections] responsible for establishing the system-wide religious diet plans."); *Acoolla v. Angelone,* 01–CV–1008, 2006 WL 938731, at *13 (W.D.Va. Apr.10, 2006) ("Because the record indicates that decisions about [Virginia Department of Corrections] religious diets are centralized, ... it is clear that officers at individual prisons have no authority to provide [plaintiff] the relief he seeks [under RLUIPA].").[FN11]

FN10. Although Magistrate Judge Homer based his recommendation that Plaintiff's claims against Defendant Genovese be dismissed on this ground, Plaintiff failed to specifically challenge that recommendation in his Objections. (*Compare* Dkt. No. 60 at 43–44 *with* Dkt. No. 67.) As a result, this recommendation is subject only to clear-error review. *See, supra,* Part II.A. of this Decision and Order. However, the Court notes that this recommendation would survive even a *de novo* review, for the reasons stated above.

FN11. *Cf. Agrawal v. Keim,* 06–CV–0945, 2009 WL 309990, at *2 (S.D.Ill. Feb.9, 2009) (dismissing prisoner's RLUIPA claim that a prison chaplain did not provide him with a Hindu vegetarian diet that contained

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
(Cite as: 2009 WL 3199520 (N.D.N.Y.))

dairy products, because "there is no evidence that [chaplain] was personally involved in the diet decisions"); *Williams v. Miller,* 04–CV–0342, 2007 WL 2893641, at *8 (S.D.Ill. Sept.28, 2007) (dismissing prisoner's First Amendment claim that a prison chaplain did not provide him with a Kosher diet, because "[the chaplain] does not make policy for [the Illinois Department of Corrections], ..., and does not have any role in setting or modifying an inmate's diet"); *Ghashiyah v. Wisconsin Dept. of Corr.,* 01–CV–0010, 2007 WL 2822005, at *12–13 & n. 16 (E.D.Wis. Sept.27, 2007) (dismissing prisoner's RLUIPA claim alleging that he was not provided with a halal meal free of contact with pork, because "it is undisputed that [none of the defendants] had any personal involvement with the food service policies at issue in [Oshkosh Correctional Institution] and [Racine Correctional Institution]"), *aff'd,* 278 F. App'x 654 (7th Cir.2008).

The Court finds that the Second Circuit's recent decision in *Jova v. Smith,* No. 08–2816, 2009 WL 3068100 (2d Cir. Sept.28, 2009), is distinguishable for two reasons: (1) in addition to suing Joseph T. Smith, the plaintiffs in that case sued the DOCS Commissioner, Deputy Commissioner for Program Services, and Director of Ministerial & Family Services; and (2) neither the district court nor the Second Circuit in that case addressed the issue of whether Joseph T. Smith had the authority to design, and prepare for the plaintiffs, a new religious menu (especially one that fulfilled the plaintiffs' therapeutic dietary needs). *See Jova,* 2009 WL 3068100; *Keesh v. Smith,* 04–CV–0779, 2007 WL 2815641 (N.D.N.Y. Sept.25, 2007).

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's RLUIPA claim.

**B. Plaintiff's First Amendment Claim Regarding Mail Tampering**

In his Amended Complaint, Plaintiff alleges that Defendants Smith and Maly confiscated legal and non-legal mail addressed to Plaintiff in violation of his First Amendment rights. (Dkt. No. 17.) In his Report–Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly intentionally interfered with Plaintiff's ability to receive mail addressed to him (specifically, mail sent from Nicole Esters enclosing an affidavit from a former inmate, Mr. "D. Mathis"),[FN12] and whether Defendant Smith was negligent in his supervision of Defendant Maly and the procedures followed with respect to prison mail. (Dkt. No. 60.)

> FN12. In his affidavit, Mr. Mathis claims his DOCS identification number was 93–A–6702. (Dkt. No. 58, Part 4, at 50.) According to DOCS' on-line "Inmate Lookup" Service, that DOCS identification number belongs to an inmate named Daniere N. Mathis.

**\*10** In their objections, Defendants argue that "[t]he Report relies on conclusory allegations made by the plaintiff in finding that defendant Maly received an affidavit that was addressed to the plaintiff and failed to forward the affidavit to the plaintiff or mail it back to the sender." (Dkt. No. 66.) Defendants further argue that "the record is void of any proof whatsoever that such an affidavit existed or was ever in the possession of defendant Maly." (*Id.*) In addition, Defendants argue that "plaintiff fails to offer proof that the [Mathis] affidavit was packaged in a way that met the criteria of the Inmate Correspondence Program as set forth in DOCS directives." (*Id.*) With regard to Defendant Smith, Defendants argue that "[P]laintiff had no personal knowledge that defendant Smith allowed defendant Maly to confiscate his mail[, and] Plaintiff cannot establish that an investigation did not take

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

place regarding his mail." (*Id.*)

According to Plaintiff, in December 2005, Nicole Saunders sent Plaintiff legal documents by Federal Express. (Dkt. No. 17, at ¶ 34.) Because the documents, which never reached Plaintiff, were assigned a tracking number, Saunders was able to determine that the documents reached Shawangunk C.F. (*Id.*) According to Plaintiff, Saunders contacted the facility, and was notified by the mail room that Defendant Maly was in possession of the documents, and that, if the documents did not comply with facility protocol, they would be sent back to her with a letter. (*Id.* at ¶ 35.) However, neither Saunders nor Plaintiff ever received the documents or a letter. (*Id.*)

It does not seem disputed that Plaintiff, along with certain other inmates, had been placed on mail watch at around the time that Saunders attempted to send these documents. However, even assuming that Plaintiff's mail was properly intercepted because it did not comply with facility protocol (which would have justified the non-delivery of the documents to Plaintiff), Defendants have failed to offer any explanation as to why the documents were never returned to the sender.

Moreover, in addition to this incident, Plaintiff's Amended Complaint (which is verified pursuant to 28 U.S.C. § 1746, and thus has the force and effect of an affidavit for purposes of a motion for summary judgment)[FN13] identifies at least three other incidents in a seven-month period, prior to when Plaintiff was allegedly on mail watch, in which mail was sent to Plaintiff, but was neither received by Plaintiff or returned to the sender. (Dkt. No. 17, at 7–9; *see also* Dkt. No. 60, at 11–12.) One of the documents that Plaintiff never received (and that was never returned to sender) was Nicole Esters' first mailing of the Mathis affidavit on June 21, 2005, in which Mathis stated that his urine sample was switched with Plaintiff's urine sample, resulting in Plaintiff's positive drug test. (Dkt. No. 17, at 7; *see also* Dkt. No. 60, at 11–12.)

[FN14]

FN13. (Dkt. No. 17, at 37.) *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN14. It appears that Plaintiff received Nicole Esters' *second* mailing of that affidavit, in early July 2005. (*Compare* Dkt. No. 17, ¶¶ 30–31 [Plf.'s Am. Compl., alleging that Defendant Maly stole the affidavit [sent in July of 2005] and refused to provide it to Hamilton] *with* Dkt. No. 58, Part 4, at 49–51 [Plf.'s response papers, attaching letter from Plaintiff to Selsky dated 7/6/05, enclosing affidavit in question].)

**\*11** Under the circumstances, the Court finds that there is at least a genuine issue of material fact as to whether (1) Defendant Maly tampered with Plaintiff's mail, and (2) Plaintiff suffered any harm as a result of the alleged tampering. *Brown v. Kepiec,* 06–CV–1126, 2009 WL 818959, at \*4 (N.D.N.Y. Mar.25, 2009) (Suddaby, J.) ("To prevail on a First Amendment access-to-the-courts claim based on interference with legal mail under § 1983, a prisoner must make a showing that a prison official's deliberate and malicious interference caused an actual injury, such as the dismissal of a non-frivolous legal claim."); *cf. Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

The Court makes this finding with some reservation given that Plaintiff's appeal of the decision to place him in SHU was decided by Defendant Selsky *before* the two dates on which Nicole Esters attempted to mail the Mathis affidavit to Plaintiff (so that Plaintiff could submit that affidavit to Selsky for consideration).[FN15] It is conceivable to the Court that such an anachronism might destroy the causal connection necessary for Plaintiff to succeed on a mail-tampering claim under the First Amendment. However, Defendants have not established that, if Plaintiff had received the Mathis affidavit during the few days after Nicole Esters mailed it on June 21, 2005, and had immediately sent it to Defendant Selsky for reconsideration of his decision of June 13, 2005, that decision would have remained the same. [FN16] As a result, the Court finds that this claim survives judgment as a matter of law, on the current record.

> FN15. The first time that Nicole Esters attempted to mail Plaintiff the affidavit in question was on or about June 21, 2005. (Dkt. No. 58, Part 3, at 2.) However, Plaintiff's appeal of the April 2005 decision to place him in SHU was modified by Defendant Selsky more than a week before that attempted mailing-on June 13, 2005. (Dkt. No. 17, at ¶ 26 [Plf.'s Verified Amended Complaint, asserting fact]; Dkt. No. 58, Part 4, at 49 [Plf.'s response papers, attaching contemporaneous letter from Plaintiff referencing date of decision].)

> FN16. *See, e.g., Dawes v. Coughlin,* 83 N.Y.2d 597, 612 N.Y.S.2d 337, 337–38, 634 N.E.2d 938 (N.Y.1994) (describing procedural history of case in which Donald Selsky granted the plaintiff "supplementary appeal," which served as a motion for reconsideration,

and explaining that "[n]o provision exists ... concerning reconsideration of the Commissioner's decisions. Notwithstanding the absence of explicit statutory or regulatory authority permitting respondent to reconsider an apparently final prior determination, we conclude that respondent acted properly in this case.... In the absence of statutory or regulatory guidance, respondent is entitled to exercise some discretion in fashioning appropriate remedies ....") [citations omitted]; *cf. Miller v. Selsky,* 111 F.3d 7, 8 (2d Cir.1997) (describing procedural history of case in which Donald Selsky *sua sponte* reversed his prior ruling, apparently based on argument raised by the plaintiff in an Article 78 proceeding challenging Selsky's decision).

With regard to Defendant Smith, it is true that "[he] cannot be liable solely because he held a position of authority over other defendants." *Douglas v. Smith,* 05–CV–1000, 2008 WL 434605, at * 15 (N.D.N.Y. Feb.14, 2008) (Homer, MJ). However, liability may be imputed to Defendant Smith where his supervision amounts to gross negligence. *Murray v. Pataki,* 03–CV–1263, 2007 WL 956941, at *4 (N.D.N.Y. Mar.29, 2007) (Kahn, J.) ("[I]f a prisoner claims that a supervisory official failed to train or supervise subordinates because of gross negligence, supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates gross or deliberate indifference by failing to act.") (internal quotation marks and citations omitted).

Here, Plaintiff alleges in his verified Amended Complaint that "[i]n July 2005, Hamilton complained to J.T. Smith about the unconstitutional theft of mail being implemented at Shawangunk." (Dkt. No. 17, at ¶ 31.) "Smith refused to correct the policy being instituted by J. Maly and allowed the theft of mail to continue." (*Id.*) This sworn allegation (which, again,

has the force and effect of a statement in an affidavit) creates a genuine issue of material fact as to whether Defendant had notice of Defendant Maly's alleged behavior. In addition, because Plaintiff swears that some of the mail tampering occurred after he made Defendant Smith aware of the problem (*see* Dkt. No. 17, at ¶ 31–35), there is genuine issue of material fact as to whether Defendant Smith was grossly negligent in his supervision of Defendant Maly.

**\*12** For all of these reasons, Defendants' motion for summary judgment on this claim is denied.

## C. Plaintiff's Fourteenth Amendment Claim of Violation of Due Process

In his Amended Complaint, Plaintiff alleges that Defendants Maly, Selsky and Davis violated his due process rights by precluding him from calling certain witnesses during Plaintiff's disciplinary rehearing, which resulted in Plaintiff being sentenced to twelve months in the Special Housing Unit ("SHU"). (Dkt. No. 17.) In his Report–Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly violated Plaintiff's Fourteenth Amendment due process rights at his disciplinary hearing by refusing to call former inmate named Mathis (who Plaintiff claims possessed exculpatory evidence) and a substance abuse program representative (who Plaintiff claims could have provided mitigating evidence).[FN17] (Dkt. No. 60, at 9–11, 36–38.)

> **FN17.** The Witness Interview Notice, filled out by Defendant Maly, indicates that Plaintiff sought to call Counselor Williams, Counselor Bosland, and/or "someone from OMH." (Dkt. No. 68, Part 2, at 9.)

In their Objections to the Report–Recommendation, Defendants argue that Magistrate Judge Homer erred in his conclusion because (1) the record is clear that Defendant Maly attempted

to contact Mathis, but was unsuccessful in locating him, and (2) Defendant Maly refused to allow other witnesses to testify at the second hearing only after interviewing these witnesses and determining that they lacked direct knowledge of the alleged incident. (Dkt. No. 66.)

On January 12, 2005, Plaintiff was selected for a random drug test. (Dkt. No. 58, Part 3, at 33.) Two separate urinalysis tests were positive for cannabinoids. (*Id.*) As a result, Plaintiff was reported for a violation of Rule 113.24. (*Id.*) On January 31, 2005, Defendant Davis conducted a superintendent's hearing at Attica C.F. and found Plaintiff guilty. (Dkt. No. 68, Part 7.) Plaintiff appealed this determination, and a rehearing was scheduled for April 12, 2005, at Shawangunk C.F. (Dkt. No. 58, Part 3, at 33.)

At his rehearing, Plaintiff requested that the hearing officer, Defendant Maly, allow him to call a former inmate (Mathis), who was recently released from prison, who could offer exculpatory evidence about Plaintiff's positive drug test. (Dkt. No. 51, at 96–98, 121–23 [Hamilton Dep. Tr.].) Defendant Maly interviewed some of the witnesses that Plaintiff requested, and found them to have no direct knowledge of the incident. (Dkt. No. 58, Part 3, at 10.) As a result, Defendant Maly determined that these witnesses were irrelevant, and accordingly denied Plaintiff's request to call them. (*Id.*) Defendant Maly also attempted to contact Mathis, but was unsuccessful in locating him. After interviewing the witnesses that he deemed irrelevant and attempting to contact Mathis to no avail, Defendant Maly proceeded with the hearing in Plaintiff's absence. (Dkt. No. 58, Part 3, at 34.) [FN18]

> **FN18.** Plaintiff refused to attend his hearing because he alleges that it was perfunctory. (Dkt. No. 58, Part 4, at 30–38.)

The Supreme Court has held that "an inmate facing disciplinary proceedings should be allowed to

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). However, the Court also held that "the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff,* 418 U.S. at 566. Furthermore, the Court in *Wolff* explained that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators ... [w]e must balance the inmates's interest [in avoiding the loss of a right or benefit] against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.; see also Scott v. Kelly,* 962 F.2d 145, 147 (2d Cir.1992) (request for witnesses "can be denied on the basis of irrelevance or lack of necessity").

**\*13** "Emphasizing the caution courts should exercise before challenging disciplinary hearings, the Supreme Court instructs, '[p]rison officials must have the necessary discretion to keep a prison disciplinary hearing within reasonable limits and ... to limit access to other inmates to collect statements or to compile other documentary evidence.' " *Dixon v. Goord,* 224 F.Supp.2d 739, 745–46 (S.D.N.Y.2002) (citing *Wolff,* 418 U.S. at 566). "Deference to prison administrators may mean upholding a denial of a request even in situations where the 'denied witness might have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." *Dixon,* 224 F.Supp.2d at 746 (citing *Afrika v. Selsky,* 750 F.Supp. 595, 601 [S.D.N.Y.1990] ).

As an initial matter, the Court finds that Defendant Davis, who worked at Attica C.F. during the time in question, had no personal involvement in the disciplinary proceedings held in April 2005 at Shawangunk C.F., which give rise to Plaintiff's Four-

teenth Amendment due process claims. As a result, Plaintiff's Fourteenth Amendment due process claim against Defendant Davis should be dismissed.

With regard to Defendant Maly, it is undisputed that he attempted to contact Mathis, using the telephone number provided to him by Plaintiff. (Dkt. No. 58, Part 3, at 13.) When Defendant Maly called that telephone number, "the local phone company responded that this number was disconnected." (*Id.*) In addition, Defendant Maly interviewed the witnesses that Plaintiff sought to call, and determined during these interviews that their testimony was irrelevant to the issue of whether Plaintiff tested positive for cannabinoids.

Even assuming that Mathis may have provided exculpatory testimony, it cannot be said that failure to call him (and the other requested witness) amounts to a violation of Plaintiff's due process rights given that Defendant Maly made efforts to contact Plaintiff's witnesses, and provided Plaintiff with an explanation (through the Witness Interview Notice Form) as to why they would not be testifying at his hearing.[FN19] The Court notes that, as previously stated, courts should exercise caution before challenging disciplinary hearings, and prison officials must have the necessary discretion to keep a prison disciplinary hearing within reasonable limits. *Dixon,* 224 F.Supp.2d at 746. Here, the Court finds that such discretion is properly exercised in giving some deference to the hearing officer's judgment as to (1) what constitutes relevant testimony, and (2) what constitutes a reasonable period of time in which to conduct a disciplinary hearing. *Id.; Wolff,* 418 U.S. at 566.

> FN19. The Supreme Court has held that prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify but that they may do so either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)
**(Cite as: 2009 WL 3199520 (N.D.N.Y.))**

mony in court if the deprivation of a 'liberty' interest is challenged because of that claimed defect in the hearing. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). "In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.' " *Ponte v. Real,* 471 U.S. at 497. "Explaining the decision at the hearing will of course not immunize prison officials from a subsequent court challenge to their decision, but so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals,' " the explanation should meet the due process requirements as outlined in *Wolff. Id* .

For these reasons, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's Fourteenth Amendment due process claims.

## IV. ANALYSIS OF REMAINING CLAIMS

The only Objections offered by Plaintiff to Magistrate Judge Homer's Report–Recommendation regarding the claims not discussed above in Part III of this Decision and Order are simply reiterations of Plaintiff's previous arguments of his claims regarding a denial of mental health treatment by Defendant Skies, contaminated drinking water and poor ventilation in the prison facility, and wrongful placement in CSU. (*See* Dkt. No. 67).

**\*14** After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report–Recommendation and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Homer's Report–Recommendation regarding the claims not discussed above in Part III of this Decision and Order is correct in all respects. Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the remainder of the Report–Recommendation for the

reasons stated therein.

**ACCORDINGLY,** it is

**ORDERED** that United States Magistrate Judge David R. Homer's Report–Recommendation (Dkt. No. 60) is ***ACCEPTED*** and ***ADOPTED*** **as modified** by this Decision and Order; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is ***DENIED*** with respect to Plaintiff's First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is ***GRANTED*** as to all other claims and Defendants; and it is further

**ORDERED** that Plaintiff's claims against Defendants Gonzalez, Genovese, Parisi, Selsky, Davis, and Chiapperino are ***DISMISSED*** in their entirety.

N.D.N.Y.,2009.
Hamilton v. Smith
Not Reported in F.Supp.2d, 2009 WL 3199520 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 84357 (S.D.N.Y.)
**(Cite as: 2014 WL 84357 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Douglas HOWARD, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 12 Civ. 933(JMF).
Jan. 6, 2014.

*ORDER PARTIALLY ADOPTING REPORT AND*
*RECOMMENDATION*

JESSE M. FURMAN, District Judge.

**\*1** Defendants' motion for summary judgment was referred to Magistrate Judge James C. Francis IV for a Report and Recommendation ("R & R"). In the resulting R & R, filed on July 3, 2013 (Docket No. 72), Magistrate Judge Francis recommended that the motion for summary judgment be granted and that Plaintiff's case be dismissed.[FN1]

> FN1. As noted in the R & R, Plaintiff has withdrawn all claims against Defendant Adrian Benepe, former Commissioner of the New York City Department of Parks and Recreation.(R & R at 1 n. 1).

After a review of the entire record, this Court concludes that the recommendation is correct and adopts it for the reasons that follow. In short, Plaintiff has failed to adduce sufficient evidence to make out a *prima facie* case of discrimination in violation of the Equal Protection Clause. Because such a showing is a threshold issue in pursuing an equal-protection claim, Plaintiff's discrimination claims fail. Additionally, the speech Plaintiff claims he was retaliated against for

making was not of public concern because it was plainly motivated by his personal relationship with other tennis players and employees rather than by any broader public purpose. As a showing that speech is on a matter of public concern is a necessary requirement for a successful First Amendment retaliation claim, Plaintiff's claim fails as a result. Finally, Plaintiff's remaining objections are without merit for the reasons discussed below.

In reviewing an R & R, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b)(3); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). To accept those portions of the report to which no objection has been made, however, a district court need only satisfy itself that there is no clear error on the face of the record. *See, e.g., Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003). This clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates his original arguments. *See, e.g., Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008).

Plaintiff files what he styles twenty-two objections to Magistrate Judge Francis's R & R. (Pl.'s Objections Magistrate Judge's R & R Def.'s Mot. Summ. J. (Docket No. 73)). Many of these arguments, however, are either overly general or represent attempts to rehash arguments he made in his original opposition to the motion for summary judgment. (*See, e.g., id.* ¶ 1). In accordance with the standard of review recited above, the Court has reviewed these objections only for clear error. In any event, the Court has independently reviewed the motion *de novo* in its entirety and would accept Magistrate Judge Francis's recom-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 84357 (S.D.N.Y.)
**(Cite as: 2014 WL 84357 (S.D.N.Y.))**

mendation even under that standard.

## A. General Objections

Plaintiff's first objection is that the R & R relies on Defendants' account of contested facts and fails to incorporate Plaintiff's evidence, which is more favorable. (*See* Mem. Law Supp. Pl.'s Objections Report and Recommendation Magistrate Judge (Docket No. 74) ("Objections") ¶¶ 1, 6, 12). But Magistrate Judge Francis gave a reason for not relying on Plaintiff's own declarations at the summary judgment stage: They failed to provide any basis on which to assess how Mr. Howard had personal knowledge of the facts in question. (R & R at 21.) Reviewing the R & R's decision not to rely on those portions of Mr. Howard's declaration for which he does not purport to have personal knowledge *de novo* reveals no error, and that portion of the R & R is adopted in its entirety.

**\*2** Second, Plaintiff objects to the fact that the R & R disregards evidence cited in Plaintiff's Local Rule 56.1 statement on the ground that it is hearsay. (Objections ¶ 2).[FN2] To support this objection, Plaintiff notes that the 2010 amendments to Federal Rule of Civil Procedure 56 added a provision formally authorizing parties to object to facts not supported by admissible evidence. (*Id.*). But the fact that the new Rule 56 allows for such objections does not preclude courts from independently declining to rely on inadmissible evidence, and the Second Circuit continues to approve of district court decisions doing so. *See G.I. Home Developing Corp. v. Weis*, No. 07 Civ. 4115(DRH), 2011 WL 4434223, at *11 (E.D.N.Y. Sept. 22, 2011), *aff'd* 499 F. App'x 87, 90 (2d Cir.2012) (summary order). Moreover, the Advisory Committee's notes to the 2010 amendments to Rule 56 explicitly state that "[t]he standard for granting summary judgment remains unchanged" and that "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases." Fed.R.Civ.P. 56 advisory committee's notes. Accordingly, Plaintiff's objection is without merit.

FN2. In his seventh objection, Plaintiff challenges the R & R's failure to consider, on hearsay grounds, statements by one of the individual Defendants and a City employee. (Objections ¶¶ 7, 9). Plaintiff is correct that such statements do not constitute hearsay. *See* Fed.R.Evid. 801(d)(2). This Court has considered the statements at issue, however, and concludes that they do not affect the outcome of the case. Nevertheless, the Court declines to adopt these portions of the R & R. Plaintiff further objects—on the grounds that it is hearsay—to the R & R's reliance on an email sent by Defendant Garnes to Defendant, in which Ms. Garnes stated that she did not have a key to the storage area. (Objections ¶ 8). This Court does not adopt that portion of the R & R either, and has not relied on Ms. Garnes's email in any way.

## B. Equal Protection Objections

Next, Plaintiff objects to the R & R's recommendation that his claims pursuant to Title 42, United States Code, Section 1981 be dismissed on the ground that they are duplicative of his claims pursuant to Section 1983. (Objections ¶ 3). But because Plaintiff does not put forward any claims under Section 1981 that he does not also put forward under Section 1983 (*see* Objections 5 n. 1), and because Plaintiff's Section 1983 claims ultimately lack merit, this Court need not decide the question (which arguably remains open in this Circuit) whether independent recovery is available under Section 1981 against state actors. *Compare Whaley v. City of Univ. of N.Y.*, 555 F.Supp.2d 381, 401 (S.D.N.Y.2008) (noting that "[t]he Second Circuit has not yet ruled on" the issue of whether Section 1981 as amended contains an implied private right of action against state actors), *with Gladwin v. Pozzi*, 403 F. App'x 603 (2d Cir.2010) (summary order) ("[Plaintiff's] § 1981 claims are encompassed by her § 1983 claims, and both are therefore analyzed under § 1983.").

Slip Copy, 2014 WL 84357 (S.D.N.Y.)
**(Cite as: 2014 WL 84357 (S.D.N.Y.))**

Plaintiff next objects to the R & R's reliance on comparator analysis in deciding his Section 1983 equal-protection claim. (Objections ¶¶ 5, 10). Plaintiff, however, has failed to make out a *prima facie* case that the adverse treatment he suffered was *because of* his race, as required to maintain an equal-protection claim. *See, e.g., Hayes v. Cablevision Sys. N.Y.C. Corp., 07 Civ. 2438(RRM), 2012 WL 1106850, at \*10 (E.D.N.Y. Mar. 31, 2012)* (noting that equal protection claims address only "conduct motivated (a) by animus toward[ ] members of a protected class and (b) because of the victim's protected characteristics" rather than "instances of generally poor behavior, personal animosity or even unfair treatment" (internal quotation marks omitted)). His evidence that he was adversely treated because of his race amounts to: (1) a single racially motivated comment uttered by a non-decisionmaker and (2) the fact that the decisionmaker is black and he is white. (*See* R & R 23–24 n. 8; *accord* Objections ¶ 11–12 (failing to identify other discrete facts that would give rise to an inference of discrimination on the basis of race)). Because of this failure, Plaintiff has failed to adduce sufficient evidence to support his equal-protection claims. *See Cabrera v. NYC, 436 F.Supp.2d 635, 643 (S.D.N.Y.2006)* (reciting that a plaintiff must show that adverse treatment occurred in circumstances giving rise to an inference of discrimination in order to make out a *prima facie* case under the *McDonnellDouglas* framework); *Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.1998)* ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Johnson v. City of New York, 669 F.Supp.2d 444, 450 (S.D.N.Y.2009)* ("The mere fact that plaintiff and defendants are of different races, standing alone, is simply insufficient ... .").

### C. Retaliation Objections

**\*3** Plaintiff further objects to the R & R's treatment of his retaliation claims. Plaintiff argues that the R & R's decision to treat the retaliation claims as arising under the First Amendment, as opposed to *Section 1981*, was erroneous. (Objections ¶ 13). As noted above, however, this Court declines to express a view on whether *Section 1981* claims that are duplicative of Section 1983 claims should be dismissed because it is unnecessary to do so. As Plaintiff himself notes, the standards for analyzing retaliation claims under the First Amendment and under *Section 1981* are "essentially the same." (Pl.'s Opp'n Br. (Docket No. 65) 8).

More significantly, Plaintiff argues that the R & R incorrectly concluded that his statements alleging discrimination on the part of Parks Department employees were not of public concern in the First Amendment sense. (Objections ¶ 14). This is a threshold legal issue because, as the R & R carefully and correctly set out, an employee or contractor must show that his speech was on a matter of public concern in order to make out a First Amendment (or indeed, *Section 1981*) retaliation claim. *See Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir.2003)*; *accord Dillon v. Suffolk Cnty. Dep't of Health Servs., 917 F.Supp.2d 196, 204 (E.D.N.Y.2013)*. Plaintiff's speech was not on a matter of public concern.

As the R & R correctly stated, a matter is of public concern if it "relates to any matter of political, social, or other concern to the community." *Singer v. Ferro, 711 F.3d 334, 339 (2d Cir.2013)* (internal quotation marks and alterations omitted). Speech that is "calculated to redress personal grievances," as opposed to speech that "ha[s] a broader public purpose," is less likely to be considered of public concern. *Id.* (internal quotation marks omitted). In this case, the R & R carefully laid out the reasons why Plaintiff's speech was motivated by his personal relationship with Mr. Ruiz and grievances with respect to his workplace conditions rather than by a publicspirited concern for the good of the tennis-playing community of lower Manhattan.

Accordingly, this Court adopts the R & R's conclusion that Plaintiff's speech was not on a matter of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 84357 (S.D.N.Y.)
**(Cite as: 2014 WL 84357 (S.D.N.Y.))**

public concern. Because this issue is sufficient to dispose of Plaintiff's retaliation claims, his objections regarding (1) whether Defendants would have taken the same action in the absence of retaliatory intent (Objections ¶ 15) and (2) pretext (Objections ¶¶ 16–21), are moot.

**D. Plaintiff's *Monell* Claims**

Finally, Plaintiff objects to the R & R's conclusion that he has failed to make out a case of municipal liability under the standards set forth in *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1977), on the grounds that he had failed to allege a constitutional violation by any *individual* municipal employee. (Objections ¶ 22). As the Court adopts the R & R's conclusion that Plaintiff has failed to adduce sufficient evidence to prove that such a violation in fact occurred, however, this objection is without merit. *See, e.g., Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove ... a denial of a constitutional right.")

## CONCLUSION

**\*4** For the foregoing reasons, the R & R's ultimate recommendation is accepted and Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2014.
Howard v. City of New York
Slip Copy, 2014 WL 84357 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael JONES, Plaintiff,
v.
Brian FISCHER et al., Defendants.

No. 9:10–cv–1331 (GLS/ATB).
Sept. 27, 2013.

Michael Jones, Ossining, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Krista A. Rock, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### MEMORANDUM–DECISION AND ORDER
GARY L. SHARPE, Chief Judge.

#### I. Introduction

**\*1** Plaintiff *pro se* Michael Jones commenced this action against defendants Brian Fischer, Tersea David, David Rock, K. Rabideau, L. Whalen, Lt. Chase, J. Eggleston,[FN1] S. Meskunas, A. Prack, C. Leon, and C.O. Lincon, pursuant to the First, Eighth, and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983, and the Americans with Disabilities Act (ADA). (*See generally* Am. Compl ., Dkt. No. 5.) Jones alleged that defendants violated his rights to proper medical care, due process, and his right to be free from cruel and unusual punishment. (*Id.*)

FN1. The court notes that Eggleston's name is misspelled on the docket, and the court directs the Clerk to amend the docket to reflect the proper spelling of Eggleston's name. (Dkt. No. 54, Attach.3.)

The remaining defendants, L. Whalen, Lt. Chase, J. Eggleston, S. Meskunas, A. Prack, and C. Leon, filed a motion for summary judgment, requesting that the remainder of the claims and defendants be dismissed.[FN2] (Dkt. No. 54.) Jones' remaining claims include: (1) an Eighth Amendment claim against Leon regarding Jones' medically prescribed diet; and (2) Due Process and First Amendment retaliation claims against defendants Eggleston, Meskunas, Prack, Whalen, and Chase with respect to allegedly false misbehavior reports and two disciplinary hearings. (Dkt. Nos. 44, 60 at 2.) In a Report–Recommendation and Order (R & R) dated July 22, 2013, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted and Jones' amended complaint be dismissed in its entirety as to all defendants.[FN3] (Dkt. No. 60.) For the reasons that follow, the R & R is adopted in its entirety.

FN2. The court notes that J. Carver was named as a defendant in Jones' initial complaint, (Dkt. No. 1), but was omitted in Jones' amended complaint, (Dkt. No. 5), and subsequently dismissed as a defendant in a Decision and Order by U.S. District Judge Thomas J. McAvoy, (Dkt. No. 6 at 5, 9). In that same Decision and Order, C.O. Lincon also was dismissed as a defendant, and Jones' conspiracy claims and claims that he was denied adequate warmth or food portions at Upstate Correctional Facility were dismissed. (*Id.* at 5–9.) Thereafter, defendants filed a motion to dismiss for failure to state a claim. (Dkt. No. 37.) Magistrate Judge Andrew T. Baxter recommended granting that motion, in part, and dismissing the complaint in its entirety against Fischer, David, Rock, and Rabideau (and, therefore, dismissing Jones' ADA claims). (Dkt. No. 44 at 39–40.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

That recommendation was adopted by this court. (Dkt. No. 45.)

FN3. The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

## II. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo.* See *Almonte v. N.Y. State Div. of Parole,* No. 04–CV–484, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006).* In those cases where no party has filed an objection, only vague or general objections are filed, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error.FN4 *See id.* at *4–5.

FN4. "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 WL 149049, at *6.

## III. *Discussion*

Jones purports to object to the R & R on various grounds, all of which boil down to arguments he previously raised in his response to defendants' motion for summary judgment, (*compare* Dkt. No. 56, *with* Dkt. No. 61), and all of which Judge Baxter considered and rejected.

First, with respect to his Eighth Amendment claim, Jones objects on the theory that genuine issues of material fact exist with respect to: (1) what Leon's intentions were when he removed Jones from his medical diet because (a) it is unclear whether Leon removed Jones from his medical diet after having a conversation with another officer, and (b) if Leon had, in fact, seen Jones exchange food, Leon would have told Jones, (Dkt. No. 61 at 2–3); (2) whether defendant Leon had the authority to remove Jones from his diet, (*id.* at 3); (3) whether the date of the alleged incident took place on July 14, 2010, as Jones contends, or on July 15, 2010, as defendants contend, (*id.* at 3–4); and (4) whether removal from the medical diet caused Jones' blood pressure to rise to the point that he had to be placed on high blood pressure medication, (*id.* at 4). As noted above, however, Jones raised these arguments in his response to defendants' motion for summary judgment, and Judge Baxter considered and rejected them. (Dkt. No. 56 at 4–5; Dkt. No. 60 at 4–19.)

**\*2** Second, with respect to his due process claim, Jones objects on the theory that genuine issues of material fact exist on three grounds: (1) whether the denial of documentary evidence was a due process violation because he was denied the opportunity to review copies of all of the handwriting samples that were used to compare with the handwriting in the threatening letter, (Dkt. No. 61 at 7–8, 10); (2) whether there was sufficient evidence to support Eggleston's conclusions in the Tier III disciplinary hearing because she did not make an independent determination, (*id.* at 10); and (3) whether the special housing unit conditions created an atypical hardship that constituted an Eighth Amendment violation, (*id.*). Again, Jones raised these arguments in his response to defendants' motion for summary judgment, and Judge Baxter considered and rejected each of them. (Dkt. No. 56 at 6–9; Dkt. No. 60 at 20–40.)

Finally, with respect to his retaliation claim, Jones objects on the ground that there is a genuine issue of material fact that exists as to whether the actions of defendants were taken in retaliation of Jones' grievances. (Dkt. No. 61 at 11–12.) This argument, too, was raised in Jones' response to defendants' motion for summary judgment, and considered and rejected by

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

Judge Baxter. (Dkt. No. 56 at 9–10; Dkt. No. 60 at 40–45.)

All of Jones' objections, therefore, are general and do not warrant *de novo* review. *See* Almonte, 2006 WL 149049, at *4. After carefully reviewing the record, the court finds no clear error in the R & R and adopts it in its entirety.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 22, 2013 Report–Recommendation and Order (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 54) is GRANTED; and it is further

**ORDERED** that the amended complaint, (Dkt. No. 5), is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter was referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

### I. *Background*

In his amended civil rights complaint, plaintiff alleged that defendants violated his rights to proper medical care, due process, and his right to be free from cruel and unusual punishment. (Dkt. No. 5). Defendants initially made a motion to dismiss, based upon their allegation that plaintiff had "three strikes" pursuant to 28 U.S.C. § 1915(g) and therefore, should not be entitled to proceed in forma pauperis. (Dkt. No. 32). The defendants' motion was rendered moot when plaintiff paid the filing fee on December 1, 2011.

**\*3** On December 19, 2011, defendants filed a second motion to dismiss for failure to state a claim, addressed to the merits of the amended complaint. (Dkt. No. 37). On May 1, 2012, I recommended granting the motion in part, and on May 23, 2012, Chief Judge Sharpe adopted my recommendation, dismissing some, but not all of plaintiff's claims. (Dkt.Nos.44, 45). On December 28, 2012, the remaining defendants filed a motion for summary judgment, pursuant to Fed.R.Civ.P. 56, addressed to the remainder of the amended complaint. (Dkt. No. 54). Plaintiff has responded in opposition to the motion, and defendants filed a reply. (Dkt.Nos.56, 59).

The remaining claims are as follows:

(1) An Eighth Amendment claim regarding plaintiff's medically prescribed diet against defendant Leon only.

(2) Due process and First Amendment retaliation claims with respect to allegedly false misbehavior reports and two disciplinary hearings against defendants Eggleston, Meskunas, Prack, Whalen, and Chase.

For the following reasons, this court agrees with defendants and will recommend dismissal of the entire complaint against all remaining defendants.

### DISCUSSION

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

## II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

Although the court briefly discussed the facts in its prior ReportRecommendation (Dkt. No. 44), additional evidence has been added to the record, in support of the summary judgment motion,[FN1] in the form of affidavits, documents relating to the claims, and plaintiff's deposition of September 28, 2012. (Dkt. No.

54–1–54–12). Thus, the court will discuss the additional facts as relevant to the issues raised in the pending motion.

> FN1. Defendants' original motion was to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Such a motion is directed to the face of the complaint. The court may also consider documents or exhibits that are attached to the complaint or incorporated by reference. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). With a motion for summary judgment, the court may consider additional evidence beyond the complaint to determine whether there are no disputed questions of material fact and whether summary judgment for either party is appropriate, as stated in the standard set forth above. *See* Fed.R.Civ.P. 56(c)(1)-(4).

## III. *Medical Diet*

### A. Facts

**\*4** In the amended complaint, Plaintiff claims that on June 14, 2010, while he was incarcerated at Clinton, defendant Leon told plaintiff that he was removing plaintiff's name from the "special diet meal list." (Amended Complaint (AC) at 6, ¶ (h)).[FN2] Plaintiff alleges that when he asked why he was being removed from this list, defendant Leon stated that plaintiff knew why, and it was because " 'I was [sic] you eating toast.' "[FN3] (*Id.*) Plaintiff claims that his "special diet" was low sodium, based upon plaintiff's high blood pressure. As a result of his removal from the diet, plaintiff states that he experienced headaches and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

dizziness. (*Id.* at 6, ¶ (i)) When he went to the facility clinic, he was allegedly told that due to his elevated blood pressure, he would have to be monitored to determine whether he should be placed on medication. (*Id.*) Plaintiff filed a grievance against defendant Leon. (*Id.* at 6(j)).

> FN2. Plaintiff has numbered the pages of his amended complaint at the bottom. He has also identified paragraphs on each page by letter. However, plaintiff begins each cause of action with a new set of letters, beginning with ¶ (a). Thus, to properly cite to the amended complaint, the court will first cite the bottom page of the document and then cite to the lettered paragraph in which the cited facts are stated.

> FN3. Other documents in the record have clarified that there is a typographical error in the amended complaint. It is apparent that plaintiff meant that defendant Leon "saw" plaintiff eating toast.

During his deposition, plaintiff testified that he was first placed on a special low sodium diet due to his "above normal" blood pressure when he was incarcerated at Shawangunk Correctional Facility. (Pl.'s Dep. at 15) FN4 (Dkt. No. 54–9; Rock Decl. Ex. B). Plaintiff stated that his blood pressure was not "too high," and that the special diet helped "somewhat." (*Id.* at 17). Plaintiff was on the special diet while he was incarcerated at Eastern, Clinton, Upstate, and Coxsackie Correctional Facilities. (*Id.* at 18).

> FN4. The deposition transcript has its own numbered pages which are different than the page numbers assigned by the court's CM/ECF system. The court will use the pages that are on the deposition transcript itself.

The incident with defendant Leon took place while plaintiff was confined at Clinton Correctional Facility. Plaintiff testified that defendant Leon was one of the "head cooks" at the Clinton Annex. On June 14, 2010, plaintiff states that he came into the mess hall for breakfast, and as he was "on the line getting close to receiving [his] tray, he saw an officer speaking to defendant Leon, and pointing at plaintiff. (*Id.* at 20, 22). After plaintiff sat down with his tray, defendant Leon walked over to plaintiff and asked whether his name was "Jones." (*Id.* at 20). Plaintiff acknowledged that he was Jones, and defendant Leon walked away. (*Id.*)

Plaintiff testified that when he came back for the lunch meal, he went to the diet line to pick up his tray, but was told that he was no longer on the list for the special diet. Plaintiff stated that when he asked defendant Leon why, he said " 'You know what you did.' " (*Id.*) Plaintiff testified that he "never could figure out why he took my name off the diet list." (*Id.* at 22). During the deposition, plaintiff stated that he did not recall defendant Leon saying anything else. (*Id.* at 23). According to plaintiff, the only difference between the special diet and the regular meal was the sodium content. (*Id.*)

Plaintiff acknowledged that in order to participate in a special diet program, he had to sign a "contract," agreeing to certain things. (*Id.* at 24). When asked whether he could "trade food with other inmates," plaintiff stated that it depended on the kind of food, and that although he was allowed to eat bread, he could not eat bread with butter. (*Id.*) Plaintiff testified that he never cheated on the diet, and he never traded food with any inmates. (*Id.* at 26).

**\*5** Plaintiff testified that later on in the day, he became dizzy, so he sought medical attention by putting himself on the list for sick call. (*Id.* at 27). Plaintiff stated that when he told the nurse about his symptoms, she took his blood pressure and noticed that it was elevated. (*Id.* at 28). Plaintiff told the nurse

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that he had been removed from the special diet, and the nurse made plaintiff an appointment to see a doctor. (*Id.* at 29). Plaintiff testified that when he saw the doctor, he told plaintiff that he was going to put him back on the special diet. (*Id.*) Plaintiff states that he was off of the diet for about a month. (*Id.* at 30). When asked whether he knew the procedure to put an inmate back on a special diet list, plaintiff stated that it depended on the "circumstances [of] the removal." (*Id.*)

Plaintiff testified that he filed a "basic inmate" grievance about his removal from the diet, but that he also wrote to the medical health director in Albany and the Commissioner of the Department of Corrections and Community Services ("DOCCS"). (*Id* .) When asked what he thought defendant Leon did "wrong," plaintiff stated that defendant Leon

had no authority to remove me from the diet, he wasn't a doctor and he's a cook, so that was outside of his jurisdiction. The only thing he should have done was reported me to the doctor, let them [sic] make a decision [sic] what they was [sic] going to do if something occurred that wasn't supposed to happen.

(*Id.* at 31). Defense counsel asked plaintiff: "Is that why you're suing Leon?" Plaintiff answered: "Yes, it is." (*Id.*) When plaintiff was asked if defendant Leon did anything else to violate plaintiff's constitutional rights, plaintiff stated that he could not answer the question because he had not completed discovery. (*Id.*)

Defendant Leon has filed an affidavit, together with exhibits, in support of the summary judgment motion. (Dkt. No. 54–4; Leon Aff.) Defendant Leon states that he is the Head Cook at Clinton and has held that position since 2007, overseeing the preparation and distribution of food for 2,800 inmates, including those inmates who are medically-ordered therapeutic diets. (Leon Aff. ¶ 2). He is responsible for ensuring

that the appropriate quantities of food are available to the inmates and for the prevention of waste. (*Id.*) Therapeutic diets "generally involve a modification of servings of food items from the general facility menu." (*Id.* ¶ 4).

Inmates who receive a therapeutic diet get their food trays by going through a separate diet line, and each food tray is individually prepared for the inmate by a food server in order to meet the requirements of the particular diet. (*Id.* ¶ 5). Inmates are required to comply with their therapeutic diets, and the diets are treated the same as if they were a prescription for medication. There is also a presumption that the inmate is eating the appropriate food because the diets are monitored. If an inmate eats only intermittently, or does not eat, the tests used to monitor the inmate's condition will not provide the physician with a correct appraisal of the effect of the diet on the inmate's condition. (*Id.* ¶ 6). The failure of an inmate to follow his diet also creates problems for the food service personnel, who must serve 2,800 inmates per day, while maintaining quality and preventing waste. Therapeutic meals are prepared for individual inmates, pursuant to a prescription, and if the meals are not eaten, they must be thrown away. (*Id.* ¶ 7).

**\*6** On June 1, 2010, a "Controlled A" diet was ordered for plaintiff by his doctor. (Leon Aff. ¶ 8 & Ex. A). A "Controlled A" diet consists of enhanced fiber, low fat, low cholesterol, and low sodium foods.[FN5] (*Id.*) In order to participate in the diet, plaintiff signed the "Therapeutic Diet Request Form and Attendance Agreement," which states that attendance is mandatory, his eating would be monitored, and if he did not comply with the diet, he could be subject to disciplinary action or removal from the program, "or both." (*Id.* ¶ 9 & Ex. A). The agreement is signed by plaintiff and witnessed by a nurse. (*Id.* Ex. A).

[FN5]. Plaintiff's testimony that the only difference between the standard inmate diet and

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

his therapeutic diet was the sodium content was not accurate. (*See* Pl.'s Dep. at 23).

The Therapeutic Diet Meal Attendance policy is attached to defendant Leon's affidavit. (Leon Aff. Ex. B at 17). The policy states that non-compliance with the meal plan or failure to participate in three diet meals per week is a violation of the attendance policy. Violation of the attendance policy can result in counseling, removal from the diet meal program or disciplinary action. (*Id* ). Inmates are expected to accept their trays and "avoid food swapping." (*Id.*) The policy also states that

> Health Services will be notified in writing by the food service supervisor when diet meal service has been discontinued due to attendance policy violation. Discontinuance of the therapeutic meals due to noncompliance should be documented in the medical record.

(*Id.*) One of defendant Leon's responsibilities as Head Cook is to monitor the inmates' compliance with their special diets. (Leon Aff. ¶ 12). Defendant Leon states that he is required to report any incidents of non-compliance to his supervisor, Food Administrator ("FA") David Timmons. (*Id.*) FA Timmons then relays that information to the Director of Health Services, who ultimately makes the determination of whether the inmate should be "removed from the diet." (*Id.* ¶ 13).

Defendant Leon states that on June *15,*[FN6] 2010, he saw plaintiff exchanging and taking other inmates' "regular" food, which "constituted non-compliance" with his "therapeutic diet regimen." (Leon Aff. ¶ 14). As a result, on the same day, defendant Leon wrote a note to his supervisor, FA Timmons, informing him of the plaintiff's violation. (*Id.* ¶ 15 & Ex. C). FA Timmons would then be responsible for sending the information to the Director of Health Services. (*Id.*) Defendant Leon states that the *"actual cancellation of*

a therapeutic diet can only be approved and effectuated by the Director of Health Services." (*Id.* ¶ 16) (emphasis added). Sometimes the inmate is "removed" from his special diet, sometimes he is not. (*Id.*) Defendant Leon states that in reporting plaintiff's non-compliance, he was not acting with any malicious intent or deliberate indifference. (*Id.* ¶ 18).

> FN6. Plaintiff now disputes the date of the incident. In his response to the motion for summary judgment, he states that the incident occurred on July 14, 2010 at breakfast, not on July 15, 2010 at lunch time. (Dkt. No. 56 at 4). First, plaintiff must mean "June" not "July," and second, plaintiff's own exhibit indicates that the date was June 15, 2010. (Dkt. No. 56–1, Ex. A). The Inmate Grievance Complaint is dated *June 15, 2010,* and the first sentence states that *"on the above date,* I went to the *noon* meal and was told be Cook Colos [sic] that he has removed my name off the diet list." (*Id.*) (emphasis added). Because plaintiff's own exhibits contradict his statement regarding the date and time of the incident, there is no question of fact, even if such a dispute would have made a difference.

FA Timmons [FN7] has also submitted an affidavit, which includes the documents generated by plaintiff's grievance related to this incident. (Timmons Aff. Ex. B; Dkt. No. 54–10). FA Timmons confirms in his affidavit, that defendant Leon properly reported plaintiff's non-compliance with the therapeutic meal plan on the same day that the violation occurred. (Timmons Aff. ¶ 26 & Ex. C). Plaintiff filed his grievance on June 17, 2010, two days after the incident. (*Id.* Ex. C at 2).

> FN7. FA Timmons has not named as a defendant in plaintiff's action.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*7 On June 17, 2010, during the grievance investigation, defendant Leon stated in a memorandum to Nancy Rattlif, Inmate Grievance Supervisor, that "I saw inmate Jones ... exchanging and taking other inmates [sic] regular food on 6–15–2010, this puts him on [sic] violation of his diet contract." (*Id.* Ex. C at 7). The Inmate Grievance Resolution Committee ("IGRC") responded that the "cook" stated that plaintiff was observed exchanging and taking other inmates' regular food "and removed him from diet." (*Id.* Ex. C at 9). The "dissenting" opinion stated that "removing from medical diet should only be done by medical personnel." (*Id.*) Plaintiff appealed, indicating that he wished to be put back on the diet, and the Superintendent "granted" plaintiff's request on July 15, 2010, stating that "[o]nly the medical provider may remove an inmate from a therapeutic diet." [FN8] (*Id.* Ex. C at 5).

> FN8. One of plaintiff's exhibits shows that he was placed back on the therapeutic diet on July 17, 2010. (Pl.'s Resp. Ex. B; CM/ECF p .7).

Although it is unclear why a favorable result would be appealed, plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC").[FN9] The CORC's decision is dated October 6, 2010, "accepts" the action requested "in part," and indicates that it considered the facts and circumstances of the case, including the "recommendation of the Division of Health Services." (*Id.* at 1). The CORC confirmed that plaintiff was observed trading food while on the diet "and was appropriately removed in accordance with the signed contract." (*Id.*) Plaintiff was cautioned to "comply" with the contract in the future to avoid "similar difficulties." The CORC found insufficient evidence to substantiate malfeasance by the staff and noted that plaintiff had been transferred. (*Id.*)

> FN9. The "Appeal Statement" says only "see body of grievance." (Timmons Aff. Ex. C at

5). The body of the grievance states that plaintiff wishes to be placed back on the special diet list and "no retaliation" be commenced as a result of the grievance. (*Id.* at 6). It is possible that plaintiff appealed because the Superintendent's decision did not address the issue of retaliation. The CORC did address that issue, stating that it is against DOCCS regulations to retaliate against inmates for good faith use of the grievance procedure, and if an inmate feels that he has been the subject of retaliation he "may pursue a complaint that reprisal occurred through the grievance mechanism." (*Id.*)

In response to defendants' motion for summary judgment, plaintiff has submitted a variety of medical records, many of which contain blood pressure measurements, in an attempt to argue that the removal from his therapeutic diet caused his blood pressure to be permanently elevated such that he was no longer able to control it with diet alone. (Pl.'s Exs. I, J, K, J–2).

**B. Legal Standards**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

**\*8** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844.

Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

The denial of a medically prescribed diet may, under certain circumstances, rise to the level of an Eighth Amendment violation. *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983); *Mandala v. Coughlin,* 920 F.Supp. 342, 353 (E.D.N.Y.1996); *Johnson v. Harris,* 479 F.Supp. 333, 336–37 (S.D.N.Y.1979)). The objective component requires the plaintiff to show evidence of some adverse health impact cause by the discontinuance or failure to provide the special diet. *Hall v. County of Saratoga,* No. 1:10–CV–1120, 2013 WL 838284, at *7 (N.D.N.Y. Mar. 6, 2013) (citing *Davidson v. Desai,* 817 F.Supp.2d 166, 190 (W.D.N.Y.2011)). The subjective, deliberate indifference, component must be demonstrated by proof that corrections personnel intentionally denied access to, or interfered with the prescribed treatment. *Abdush–Shahid v. Coughlin, supra.* The plaintiff also has a duty to inform staff that he is not receiving his medically prescribed diet, and if he fails to do so, deliberate indifference does not exist. *Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400, 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citing *LaBounty v. Gomez,* No. 94 Civ. 3360, 1998 WL 214774, at *2 (S.D.N.Y. May 1, 1998)).

**C. Application**

The plaintiff was prescribed the "Controlled A" diet, consisting of enhanced fiber, low cholesterol, and low sodium. It is clear that plaintiff did not receive his therapeutic diet for approximately one month between June 15 and July 15 of 2010.

Plaintiff signed an agreement that he would not deviate from the diet and would not miss meals. He

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was well aware that the failure to do so could result in counseling, removal from the diet, and/or disciplinary action.[FN10] The evidence submitted shows that on June 15, 2010, defendant Leon reported to his supervisor, FA Timmons, in writing, that plaintiff was in violation of his special meal agreement. The handwritten note at the bottom of the "Interdepartmental Communication" form states that "[the] inmate was eating [a] regular meal." (Leon Aff. Ex. C). Plaintiff testified that he did not know why defendant Leon took his name off the list, but at one point, states that defendant Leon told plaintiff that he was seen eating toast.

> FN10. Plaintiff has signed several of these "contracts." The earliest one submitted by plaintiff is dated June 26, 2009. (Pl.'s Ex. L at CM/ECF p. 44). Plaintiff has also submitted requests dated September 8, 2009; December 17, 2009; June 1, 2010; August 25, 2010; and November 5, 2010. (*Id.* at CM/ECF pp. 39–43).

**\*9** Plaintiff argues that because he was off of his diet for "so long," his blood pressure went so high that he could no longer monitor it with diet, and he had to be prescribed medication. However, plaintiff sought medical attention from a nurse "the next day" after his name was taken off the list because he was allegedly feeling dizzy. Plaintiff stated that when he went to sick call, "they" could see his blood pressure had gone up. (Pl.'s Dep. at 27–28). Plaintiff stated that the nurse told him that she would make an appointment for plaintiff to see his doctor, and the doctor said that he would put plaintiff back on the diet. (*Id.* at 29). Moreover, plaintiff filed a grievance two days after the incident, which was immediately investigated. On July 15, 2010, he was placed back on the special diet. The court notes that July 15, 2010 was the same day that the Superintendent granted plaintiff's grievance.

Defendant Leon states that he saw plaintiff eating food that was not on the diet menu and reported the violation to his supervisor. If plaintiff were already eating foods that were not authorized on the diet, the fact that defendant Leon discontinued the diet meals did not affect plaintiff's health; his own violation of the diet rules was the cause of any problems.[FN11] Refusal to comply with proper treatment, including violations of the diet and the failure to attend meals according to the contract has been held to be sufficient to grant summary judgment in the defendant's favor. *See e.g. Abdush–Shahid,* 933 F.Supp. at 180 (plaintiff's removal from the special diet was not deliberate indifference where plaintiff refused to eat the special meals); *Hucks v. Artuz,* No. 99 Civ. 10420, 2003 WL 22019744, at \*6 (S.D.N.Y. Aug.22, 2003) (evidence that an inmate refuses to comply with medical treatment was sufficient for summary judgment); *Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y.2003) (citations omitted) (same).

> FN11. The court notes in passing that plaintiff has submitted copies of his medical records. On July 14, 2010, the day before he was placed back on the special diet, and when he had been off of the therapeutic diet for approximately one month, plaintiff's blood pressure was 129/83. (Pl.'s Ex. I at 1). One week after he started the diet again, his blood pressure was back up to 147/90 in one arm and 146/96 in the other arm. (*Id.* at 2). The provider ordered a "BP med eval." In August of 2010, plaintiff's blood pressure was 139/92, and on October 21, 2010, his blood pressure was 118/64. (Pl.'s Ex. J–2 at CM/ECF pp. 114, 117). On August 21, 2010, plaintiff's blood pressure was 139/92, and there was an order for a low sodium diet signed at Upstate Correctional Facility on August 25, 2010. (*Id.* at CM/ECF pp. 114, 115). While plaintiff had a few extremely high readings in August of 2011 (more than one year after this incident), after he was prescribed Catapress and another blood pressure medication, in September of 2011, his blood pressure readings were 120/86 and

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

138/85. (Pl.'s Ex. J at CM/ECF p. 29). On September 6, 2011, plaintiff complained that he had headaches associated with his blood pressure, but his blood pressure reading was 120/86 that day, and ten days later, on September 16, 2011, it was still relatively low. (*Id.* at CM/ECF p. 29). There is no question that plaintiff has high blood pressure, which was poorly controlled from time to time. However, there is no evidence that defendant Leon's conduct in reporting plaintiff's violation of the therapeutic meal rules was the cause of any serious problems plaintiff experienced with his blood pressure.

There appears to have been no actual cancellation of plaintiff's special diet, [FN12] only a temporary discontinuance, apparently initiated by defendant Leon. [FN13] FA Timmons states that the "actual cancellation" of a therapeutic diet can only be approved and effectuated by the Director of Health Services." (Timmons Aff. ¶ 27). Defendant Leon's only recourse was to report the violation to FA Timmons, which was done in this case.

FN12. A diet "cancellation" would be registered on the same form as the diet request and attendance contract. There is a space on the form for a "DIET REQUEST" and a "DIET CANCELLATION." (Timmons Aff. Ex. A). The policy provides that if the diet order is cancelled, and the inmate's name is removed from the list, "documentation of the supporting reasons for cancellation or removal MUST be placed in the inmate's medical record." (Timmons Aff. Ex. B at 10). There is no such documentation in this record.

FN13. Defendant Leon does not concede that he initially discontinued giving plaintiff his special diet, but there appears to be no question that plaintiff did not receive the therapeutic diet for one month. The grievance documents show that the IGRC stated that the "Cook stated Jones was observed exchanging [sic] taking other inates [sic] regular food on 6–15–10 which put him in violation of contract and *removed him from diet.* Must request reinstatement to diet meal with medical." (Leon Aff., Ex. B at 9) (emphasis added). The "dissenting opinion" stated that "removing from medical diet should only be done by medical personnel." (*Id.*) The investigative report on appeal, written by M. Ratliff, after interviewing defendant Leon, states that plaintiff "was observed exchanging and taking other inmates [sic] regular food on 6–15–10 which put him in violation of the diet contract and *he was removed from diet."* (*Id.* at 14) (emphasis added). A meeting was scheduled with a doctor to "address this procedure," and on the next day, Deputy Superintendent of Programs ("DSP") Keysor wrote that "only medical will remove from diet. 3 missed meal—warning given—2nd offense, medical *notified."* (*Id.*)

There is no question that defendant Leon had no authority to ***cancel*** a diet request, and it is unclear whether he had the authority to discontinue the meals while cancellation was being contemplated by the Director of Health Services. [FN14] The policy itself implies that a diet may be "discontinued," pending possible cancellation by Health Services. (Leon Aff. Ex. B at 17). The policy states that Health Services will be *notified* in writing by the food service supervisor "when diet meal service has been *discontinued* due to attendance policy violation." (*Id.*) (emphasis added). This sentence implies that "discontinuance" is different from "cancellation." The diet is "discontinued" because of the violation, but then the medical department is notified and must then decide whether to "cancel" the therapeutic diet order.

FN14. The court notes that plaintiff's grievance was granted to the extent that he was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ordered back on the diet because, according to the Superintendent's response, only the medical department could remove someone from the therapeutic diet.

**\*10** Even assuming that defendant Leon had no authority to "discontinue" giving plaintiff the special meals, and even if plaintiff's medical condition had been seriously impacted by the one-month interruption of his special diet, there is absolutely no indication that defendant Leon took the action he did with deliberate indifference to plaintiff's serious medical needs. The therapeutic meal policy specifically provides that an inmate may be put back on the program through the facility sick call procedures. (Timmons Aff. Ex. B at 17). Defendant Leon knew of the policy, and he sent his memorandum to defendant Timmons on the same day that the violation occurred. Thus, defendant Leon acted knowing that the medical staff would evaluate whether plaintiff needed to be placed back on the special diet for medical reasons. By requesting sick call and filing a grievance, plaintiff essentially asked to be placed back on the special diet within days of being advised by defendant Leon that plaintiff was no longer on the list. The length of time that plaintiff ultimately spent "off" of the diet was not under defendant Leon's control.[FN15] The court notes that the grievance investigation report implies that the procedure followed was discussed with "Dr. Johnson" and ultimately, it appears that plaintiff's grievance was granted because only medical personnel should be allowed to even "discontinue" giving inmates the therapeutic diet.[FN16]

FN15. Defendants argue that the "removal" from plaintiff's medical diet was caused by "someone else, namely the medical personnel who possessed the sole authority to effectuate that removal." (Def.'s Br. at 11) (Dkt. No. 54–12). However, FA Timmons states that he "would have" discussed the report with medical personnel who then "would have" made a determination of

whether to cancel the diet. (Timmons Aff. ¶ 26). It is not clear from the affidavit that this is exactly what happened. FA Timmons states that sometimes an inmate is removed from the special diet and sometimes he is not. (*Id.* ¶ 28). FA Timmons also states that the Form 3273 is not used when addressing an issue of non-compliance with the Attendance Agreement: "that is an administrative matter handled between the Director of Food Services and the Director of Health Services." (*Id.* ¶ 29). Although it is unclear, this may mean that unless the diet is actually canceled by the Director of Food Services, no form is used, and there is no record of the action taken.

FN16. The notation states "7/15/10 pe [sic] DSA Keysor-only medical *will remove* from diet." (Leon Aff. Ex. B at 14). It appears that the DSP was indicating that in the future, the procedure to follow was that after 3 missed meals, an inmate would be warned, and after the "2nd offense," the medical department would be notified. (*Id.*)

In *Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011), the court granted summary judgment in favor of a defendant who removed an inmate from the special meal program, finding that there was nothing in the record to indicate that the defendant had the requisite intent in either of two instances in which he asked for the plaintiff's special dietary status to be revoked. Each time that the defendant asked for a revocation of the inmate's dietary status, the defendant had determined that plaintiff had violated the rules of the mess hall or of the special diet itself. *Id.* In *Collazo,* once it was determined that the plaintiff's violations were the result of a misunderstanding, the special diet was restored.

Defendant Leon has presented evidence that he reported plaintiff's violation of the special diet, not to

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
(Cite as: 2013 WL 5441353 (N.D.N.Y.))

jeopardize his health, but in an effort to make sure that plaintiff properly participated in the therapeutic diet program. Plaintiff admits that he was seen in the medical department the day after his special diet was discontinued. Plaintiff's special diet was restored after plaintiff filed a grievance about the discontinuance. Plaintiff has not submitted any evidence or facts to rebut the defendant's showing. Therefore, summary judgment may be granted in favor of defendant Leon on the Eighth Amendment claim, given the complete lack of evidence suggesting that he acted with deliberate indifference to plaintiff's serious medical needs.

### IV. *Disciplinary Hearings/Retaliation*

### A. Facts

**\*11** Defendants have included additional facts about plaintiff's due process and retaliation claims regarding his two disciplinary hearings.

### 1. Threatening Letter

Plaintiff claims that on July 26, 2010, defendant Chase improperly confined plaintiff in the Special Housing Unit ("SHU") and issued a misbehavior report, charging him with threats, rioting, false statements, and impersonation. (AC ¶ 6–s). Defendant Chase has filed an affidavit stating that, as part of his duties as a Corrections Lieutenant, he investigates charges of serious misconduct by inmates. (Chase Aff. ¶ 5; Dkt. No. 54–2). Lt. Chase states that on July 23, 2010, he was Acting Captain at Clinton Annex, and one of his responsibilities was to open all mail addressed to Captain Holdridge. (Chase Aff. ¶ 8). On that date, defendant Chase opened a letter that was purportedly from an inmate named A. Alexander. The letter contained allegations against two corrections officers, and ended with a threat that the writer and "other inmates" in his housing unit would " 'do all we have to do to get these officers off the unit.' " (*Id.* ¶ 9). A copy of the letter is attached to defendant Chase's affidavit as Exhibit A.

Defendant Chase brought the letter to the attention of Housing Sergeant Giambruno, and they began an investigation with the help of Corrections Counselor, defendant Laura Whalen. (*Id.* ¶ 10). Following an interview with inmate Alexander, they determined that he did not write the letter. Defendants then began comparing the handwriting in the letter to the handwriting of other inmates in the unit, including plaintiff. Similarities between plaintiff's handwriting and the handwriting in the letter caused defendants Chase and Whalen to conclude that plaintiff was the true author of the letter. Defendant Chase then wrote the misbehavior report and had plaintiff confined to SHU on July 26, 2010, pending the Tier III disciplinary hearing. (Chase Aff. ¶¶ 14–15 & Ex. C).

Defendant Chase denies that he took this action in retaliation for any grievance written by plaintiff. (*Id.* ¶ 16). Defendant Chase alleges that the letter raised the possibility of a serious threat to the safety and security of the facility, and he believed that the investigation conducted by the officers "conclusively established" that plaintiff was the author of the letter. (*Id.* ¶ 17). Defendant Chase states that, at the time he wrote the misbehavior report, he was not aware that plaintiff filed grievances against defendant Leon, Officer Lincoln, or any other individual. (*Id.* ¶ 19). Defendant Chase states he had a good faith basis for writing the report, and plaintiff was ultimately found guilty of the violation. (*Id.* ¶ 20). Defendant Chase states that he is not, and has never been, involved with Clinton's food service program or with plaintiff's special diet in any way. (*Id.* ¶ 22).

In his affidavit, defendant Chase also explains the method by which they determined that plaintiff was the author of the letter, even though defendant Chase has never taken a course in handwriting analysis. Defendants Chase and Whalen compared the handwriting in the letter to the handwriting of eight porters in plaintiff's housing unit. (Chase Aff. ¶ 26). The penmanship of each sample differed sufficiently so

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

that the samples could not be confused, and there was no need to distinguish among similar samples. (*Id.* ¶ 30). Defendant Whalen was plaintiff's counselor, was familiar with his handwriting, and concurred with defendant Chase's analysis. (*Id.*)

**\*12** Defendant Whalen has also filed an affidavit in support of the summary judgment motion. (Whalen Aff.) (Dkt. No. 54–11). Defendant Whalen states that anonymous or forged notes are common in the prison environment, and it is often necessary to identify the authors. (Whalen Aff. ¶ 7). She saves all correspondence and any other documents that she receives from inmates, and she has been asked at times to participate in investigations involving the identification of an inmate's handwriting. (*Id.* ¶¶ 7–8).

On July 23, 2010, she was asked to assist defendant Chase and Lieutenant Giambruno in investigating the letter described above. Once the defendants determined that Alexander had not written the letter, they put together a list of porters housed in the same building for a comparison of their handwriting to the letter in question. After looking at a sample of plaintiff's handwriting, defendant Whalen determined that some of the characteristics in his writing were very similar to the threatening letter, but that the samples of the handwriting of other inmates in the unit did not match the letter. (Whalen Aff. ¶¶ 9–14).

The defendants then examined additional samples of plaintiff's handwriting and concluded that plaintiff was the true author of the letter. Defendant Whalen states that the comparison they conducted would not have required an expert in handwriting analysis, and it was "immediately obvious" that plaintiff's sample was the only one that bore any resemblance to the handwriting in the threatening letter. (*Id.* ¶¶ 15–19). Defendant Whalen has participated in many such investigation and states that she is confident that defendants drew the correct conclusion about the author. (*Id.* ¶ 23).

The disciplinary hearing was held before defendant Eggleston, who at the time in question, was an Education Supervisor for DOCCS.[FN17] She was often asked to conduct Tier III disciplinary hearings. (Eggleston Aff. ¶ 2). She held the Tier III disciplinary hearing against plaintiff from July 29, 2010 through August 5, 2010. A copy of the transcript of the hearing is attached as Exhibit B to defendant Eggleston's affidavit. At the conclusion of the hearing, defendant Eggleston found plaintiff guilty of the charges and imposed a penalty of 45 days in SHU, plus 45 days from a previously suspended sanction, and included 90 days loss of privileges, together with a two month loss of good time. (Eggleston Aff. ¶ 11 & Ex. A at 1).

FN17. Defendant Eggleston is currently retired. (Eggleston Aff. ¶ 2).

Defendant Eggleston states that she did not violate any of plaintiff's due process rights, she did not conduct an "off-the-record" conversation about the charges with defendant Chase, she agreed to show plaintiff the letter that he was accused of writing and to check on the availability of the letters used for comparison, but denied as unreasonable, plaintiff's request that she obtain writing samples from all inmates housed in plaintiff's unit. (*Id.* ¶¶ 20–23).

**2. Phone Program Violation**

**\*13** Defendant Whalen filed a misbehavior report against plaintiff, dated July 27, 2010. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 4 & Ex. A).[FN18] The misbehavior report states that on July 23, 2010, plaintiff was moved from Building 14 to Building 11–A2, pending an investigation. A review of the telephone records showed that plaintiff had exchanged his personal identification number ("PIN") with another inmate in Building 14 so that plaintiff could circumvent his keeplock status. Defendant Whalen states that this was established by records, showing that four telephone calls were made, using plaintiff's PIN, to a telephone

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

number listed on his personal telephone list, belonging to "Anthony Mosley." These calls were made after plaintiff was placed on keeplock status and could not have made the telephone calls. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 5 & Ex. A at 4). The misbehavior report states that plaintiff gave his PIN to another inmate, who used the number to call Mr. Mosley—on plaintiff's telephone list—on plaintiff's behalf. *Id.* Plaintiff was charged with a telephone program violation, exchanging PINs, and refusing a direct order. (Meskunas Aff. ¶ 4).

> **FN18.** Although defendant Whalen states that her misbehavior report is attached to her affidavit as Exhibit C, there is no such exhibit in the record. However, the misbehavior report has been attached to defendant Meskunas's affidavit in Exhibit A. The court will cite to the copy in the Meskunas affidavit.

On July 28, 2010, plaintiff met with his employee assistant. (Meskunas Aff. ¶ 7 & Ex. A at 7). Defendant Meskunas held a disciplinary hearing between August 2, 2010 and August 10, 2010, and a copy of the transcript of the hearing is attached to his affidavit as Exhibit B. Defendant Meskunas refused to call Mr. Mosley as a witness for plaintiff. (Meskunas Aff. Ex. A at 5). The denial was in writing and indicated that the requested witness could not give relevant evidence because the inmate who placed the call already testified. (*Id.* ¶¶ 16–18). At the conclusion of the hearing, plaintiff was found guilty of two of the three charges.[FN19] (Meskunas Aff. Ex. A at 1). Defendant Meskunas imposed a penalty of two months loss of telephone and commissary privileges. (*Id.* ¶ 19 & Ex. A at 1–2). The determination was affirmed by defendant Prack. (Meskunas Aff. ¶ 20 & Ex. C).

> **FN19.** Plaintiff was found not guilty of the refusal to obey an order. (Meskunas Aff. Ex. A at 1).

**B. Legal Standard**

**1. Due Process**

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. See *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

**\*14** If a liberty interest is found to exist, due process requires advance notice of the charges against the inmate and a written statement of reasons for the disposition. *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[FN20]

> FN20. "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at \*13 n. 21 (S.D.N.Y. Sept.12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**2. Retaliation**

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
(Cite as: 2013 WL 5441353 (N.D.N.Y.))

**C. Application**

**1. Due Process**

**a. Threatening Letter**

*15 Defendants first argue that plaintiff has failed to establish a liberty interest and that, in any event, he was afforded the requisite due process with respect to the disciplinary hearing.[FN21] As a sanction for writing the letter in question, plaintiff received a 45–day term of confinement in SHU, the reinstatement of a prior suspended 45–day term, and a two month recommended loss of good time. The period of SHU confinement was 90 days. Defendant Eggleston also declined to give plaintiff credit for the time he spent in pre-hearing confinement from July 26, 2010 until the conclusion of the hearing. She ruled that his SHU time would begin to run on the date that the hearing concluded. The extra time could be considered additional confinement relating to the charges. Although defendant Eggleston also recommended a loss of good time, plaintiff is serving a life sentence and is not entitled to earn good time. (Prack Aff. ¶ 18 & Ex. B). Thus, the "deprivation" of good time credits did not affect plaintiff's term of imprisonment, and does not count toward creating a liberty interest in this case. The only sanction that the court may consider is the time that plaintiff spent in confinement as a result of these charges.[FN22] In his response to the motion for summary judgment, plaintiff alleges that he spent 106 days in SHU. (Pl.'s Resp. at 2) (Dkt. No. 56).

> FN21. Defendant Prack, the Acting Director of Special Housing and Inmate Programs and Inmate Disciplinary Program also argues that plaintiff has not shown sufficient personal involvement by defendant Prack. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496,

501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Because I find no constitutional violation in this case, I need not reach the issue of personal involvement.

> FN22. Although in its Report, recommending denial of the defendants' motion to dismiss, this court found that plaintiff had a liberty interest in the first hearing, the court was not aware that plaintiff was unable to earn good time credits. (Dkt. No. 44 at 39).

As stated above, typically, sanctions of SHU confinement of less than 101 days do not implicate a liberty interest protected by due process unless the conditions were more severe that "normal" SHU conditions. *Palmer, supra.* There is no indication in plaintiff's amended complaint that the conditions in SHU were any more severe than those experienced in SHU generally. In fact, plaintiff testified at his deposition that he received one hour per day recreation, got his meals, was able to have books, was able to have writing materials, and the same was true for the time he spent in SHU at Upstate in connection with this charge. (Pl.'s Dep. at 52–53). Thus, plaintiff did not have a liberty interest that was protected by due process in his first disciplinary hearing, even if plaintiff spent a few extra days in SHU, more than the 101 days cited in the case law. The plaintiff's due process claims could be dismissed on this basis, however, the court will also consider the merits.

Even assuming that plaintiff did have a liberty interest, he received all the process to which he was entitled. He argues that defendant Eggleston spoke to defendant Chase ex-parte for seven minutes prior to his testimony at the disciplinary hearing. In the amended complaint, plaintiff argued that defendant Eggleston denied him the right to review the eight samples that were used for comparison and did not make an independent appraisal of the evidence. Plaintiff claims that defendants Chase and Whalen are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

not handwriting experts and have no basis for finding that plaintiff's handwriting matched that of the letter. Plaintiff argued that defendant Eggleston improperly directed that plaintiff's SHU sentence should run from the conclusion of the hearing, rather than giving him credit for the time that he served in pre-hearing confinement. In his response to defendants' motion for summary judgment, he now argues that defendant Eggleston violated plaintiff's right to present evidence because she refused to obtain writing samples from *all* of the inmates in the housing unit before finding that the handwriting on the suspect letter matched plaintiff's handwriting.[FN23] (Pl.'s Resp. at 7).

> FN23. This basis for his due process claim was not raised in the amended complaint. (*See* AC at 9, ¶¶ u, w). Generally, a party may not raise new claims in his or her response to a motion for summary judgment. *See Brown v. Raimondo,* 9:06–CV–0773, 2009 WL 799970, at *2, n. 2 (N.D.N.Y. March 25, 2009)* (Report–Recommendation of Treece, M.J.), *adopted by* Suddaby, J.) ("The Court notes that opposition papers [on summary judgment motions] are not the proper vehicle to instill new causes of action or add new defendants."), *aff'd,* 373 F. App'x 93 (2d Cir.2010); *Smith v. Greene,* 9:06–CV0505, 2011 WL 1097863, at *3, n. 5 (N.D.N.Y.Feb.1, 2011) (Baxter, M.J.) ("[P]laintiff should not be allowed to assert any new claims at this stage of the case, particularly through his response to a summary judgment motion."), *adopted by,* 2011 WL 1097862 (N.D.N.Y. March 22, 2011) (Suddaby, J.); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary

judgment); *Shaheen v. McIntyre,* 9:05–CV–0173, 2007 WL 3274835, at *1, 9 (N.D.N.Y. Nov.5, 2007)* (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment). Because, plaintiff did not raise this issue in the amended complaint, defendant Eggleston did not address it in her affidavit. Notwithstanding the above, and because this is an alternative finding, the court will consider the merits of this claim in addition to the other bases for plaintiff's due process claim against defendant Eggleston.

### i. Seven Minute Conversation

**\*16** Defendant Eggleston denies plaintiff's allegations and states that the transcript of the hearing belies plaintiff's claim that any off-the-record, ex parte conversations occurred. (Eggleston Aff. ¶¶ 16–19). A review of the transcript shows that there is no basis for plaintiff's allegations. During the hearing, the telephone rang, defendant Eggleston answered, and she had a conversation with the individual on the other end. (Eggleston Aff. Ex. B at 25). From the conversation, it is apparent that the person on the other end of the telephone was defendant Chase, and at the end of the conversation, defendant Eggleston stated that "Lieutenant Chase is coming." (*Id.*)

While they were waiting for defendant Chase, defendant Eggleston and plaintiff discussed obtaining documents. (*Id.* at 25–26). Plaintiff complained that he should have obtained documents at least 24 hours before the hearing, and complained that he needed the time to prepare a defense. Defendant Eggleston then asked if plaintiff needed more time, and he said yes, but that he still would like defendant Chase to come and testify because plaintiff had some questions. (*Id.* at 26). Defendant Eggleston stated "Okay. What we're going to do then at this time, I am going to adjourn this

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

hearing, or stop the tape." Plaintiff said "Right." (*Id.*) The tape was stopped at 9:45 a.m. "so that [defendant Eggleston could] evaluate Lieutenant Chase's materials." Plaintiff agreed, and defendant Eggleston also stated that she would evaluate what they could give plaintiff to look at. (*Id.*) Thus, plaintiff agreed to stopping the tape recording, and the tape was off until 10:05 a.m. Defendant Chase then testified about his investigation. (*Id.* at 27–41).

There is no indication that plaintiff was asked to step out of the room at any time as he alleges in the amended complaint. (AC at 9 ¶ u). In any event, if plaintiff was not present during the alleged conversation, it is unclear how he would have known that defendant Chase discussed the subject matter of the investigation with defendant Eggleston.[FN24] In her affidavit, defendant Eggleston specifically states that "it was [her] invariable practice as Hearing Officer never to have a witness in the hearing room without the inmate being present." (Eggleston Aff. ¶ 19). She correctly states that the transcript shows that, from the time of defendant Chase's arrival until the conclusion of his testimony, plaintiff was present. (*Id.*) (citing Ex. B at 26–41).

> [FN24.] The court also notes that the transcript contradicts plaintiff's assertion in the amended complaint that defendant Eggleston told plaintiff to step out. The transcript reads as follows:
>
> Jones: ... I'm objecting to the seven minute conversation you had with Chase off the record before he testified.
>
> Eggleston: I didn't have a seven minute conversation with him.
>
> Jones: Yes it was. Yes. When he came in you all was discussing ... what was the nature of the investigative material. You

told him to step out.

> Eggleston: That didn't have nothing [sic], that had nothing to do with this investigation.
>
> Jones: Okay. All right All right. [sic] That's cool.....
>
> (Eggleston Aff. Ex. B at 82).

Plaintiff was afforded the opportunity to question defendant Chase about his investigation during the testimony. Defendant Whalen and Sergeant Giambruno also testified at the hearing. (*Id.* at 44–47). Inmate Alexander testified at the hearing as a witness for plaintiff. (*Id.* at 50–58). Inmate Alexander testified that he did not believe that plaintiff wrote the letter because he always typed his letters. (*Id.* at 57).

At the end of the hearing, when plaintiff was noting all of his objections, he objected to the "seven minute conversation" that defendant Eggleston had with defendant Chase "off the record" before he testified. (*Id.* at 82). Defendant Eggleston stated on the record, that she did not have a seven minute conversation with defendant Chase, and that whatever discussion she had with him "had nothing to do with this investigation." (*Id.*) As reflected in the portion of the transcript referred to in footnote 24 above, the plaintiff accepted the defendant Whalen's response to his objection during the hearing. No reasonable fact finder could credit plaintiff's conclusory allegation regarding an ex parte communication, given the clearly contradictory evidence in the record.

**ii. Documentary Evidence**

**\*17** Plaintiff claims that his due process rights were violated because defendant Eggleston refused to produce the handwriting samples taken from the other porters on the unit. The court also notes that at the hearing, plaintiff asked for handwriting samples from

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

*all* inmates in his housing unit and samples from other members of the Inmate Liaison Committee ("ILC").[FN25] Plaintiff was given the threatening letter and the samples of his own handwriting that were used as a comparison. (Eggleston Aff. Ex. B at 22–23). Defendant Eggleston stated that plaintiff's samples and the threatening letter were the only "pertinent" samples, and that she was not going to produce the samples from the other eight porters, obtain samples from other ILC members or obtain samples from 50 other inmates on the unit.[FN26] (*Id.* at 6, 17–18, 42–43).

> FN25. Inmate Alexander was the Vice Chairperson of the ILC, and plaintiff's theory was that someone on the ILC wrote the letter, pretending to be Alexander in order to get Alexander into trouble. (Eggleston Aff. Ex. B. at 14).

> FN26. Initially, defendant Eggleston stated that although she was not going to obtain 50 samples, she would "do probably a reasonable number like three." (Eggleston Aff. Ex. B at 5). She then asked plaintiff "which inmates would you like," but plaintiff did not give her any names and continued to request all the inmates.

Plaintiff claims that defendant Eggleston did not give appropriate reasons for her refusal. A hearing officer does not violate due process by excluding irrelevant or unnecessary evidence or testimony. *Kawalinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999) (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)); *Chavis v. vonHagn,* No. 02–CV–119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009) (citing *Kawalinski, supra* ).

It is clear from defendant Eggleston's comment that she believed she had the "pertinent" information, and that she believed the samples of the other inmates' handwriting that were determined not to match the threatening letter were not relevant to the hearing. She specifically stated that asking for handwriting samples from all the ILC members was not a reasonable request, as was plaintiff's request for samples from all the inmates on the unit. (Eggleston Aff. Ex. B at 9). Defendant Eggleston noted that there were no other members of the ILC in plaintiff's dorm, other than Alexander, and the threatening letter referred to officers who worked in plaintiffss and Alexander's housing unit. (*Id.* at 17–18). Defendant Eggleston credited defendant Whalen's and defendant Chase's testimony that none of the other samples matched the letter, thus producing the samples taken from the eight porters was also not necessary. Plaintiff had the opportunity to argue that *his* samples did not match the threatening letter. Thus, defendant Eggleston was justified in refusing to produce or obtain the requested evidence.

### iii. Sufficiency of the Evidence

Defendant Chase and Whalen compared the threatening letter with samples of plaintiff's handwriting and samples of the handwriting of eight porters who lived on the same unit. They both testified at plaintiff's hearing, and stated that plaintiff's was the only sample that came close to the handwriting in the threatening letter. Plaintiff had the opportunity to question them. Defendant Whalen also testified that she was plaintiff's counselor and was familiar with his handwriting, but that when she was approached to help with the investigation "at no time was a specific inmate directed to [her]." (Eggleston Aff. Ex. B at 45–47). Plaintiff was allowed to present his witnesses, including the inmate who was impersonated in the letter.

**\*18** Sergeant Giambruno also testified that he was involved in the investigation, and he remembered comparing the threatening letter to three or four different inmates' samples, given to him by officers. (*Id.* at 48). He stated that he compared a couple of samples from plaintiff's unit and some from another building who had previously been housed in plaintiff's unit.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

However, Sergeant Giambruno did not find enough similarities in any of the letters. (*Id.* at 49). When he was not successful in finding a match, he turned a copy of the letter over to defendant Whalen, and ended his involvement in the case. (*Id.*) He was not involved in determining that plaintiff's handwriting was a match for the threatening letter. (*Id.*)

The proof relied upon by defendant Eggleston constituted at least "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e.g., Monier v. Holt,* 4;CV–05–2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec.21, 2005), *aff'd,* 259 F. App'x 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at *3 (W.D.N.C. Apr.2, 2007), *aff'd,* 242 F. App'x 19 (4th Cir.2007) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar.9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

Defendant Eggleston read a lengthy decision into the record that is supported by at least "some" evidence. (*Id.* at 87). She stated that she discussed the witnesses that she found were credible and the witnesses that were less relevant. She explained why she made her determination, discussed the sentence, and reminded plaintiff of his right to appeal. (*Id.* at 87–88).

The court notes that this determination was later administratively reversed after plaintiff filed an Article 78 proceeding challenging the determination. (Prack Aff. ¶ 21 & Ex. D). Defendant Prack states that this was "[d]ue to an overabundance of caution." (*Id.*) Notwithstanding that reversal, the hearing officer's failure to make an independent examination of the handwriting would not have violated plaintiff's federal due process rights. *See, e.g., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[FN27]

> FN27. In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489–90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

assess the reliability of other sources of evidence. *See* Luna v. Pico, 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). Neither of these cases applies here. Both defendants Chase and Whalen testified regarding their investigation, there were no confidential informants, and plaintiff was allowed to question both of the defendants. His theory that they should have reviewed more handwriting samples and that defendant Chase was unreliable because he was not a handwriting expert does not implicate federal due process rights. This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to cross-examination.

**\*19** In his response to the motion for summary judgment, plaintiff cites various New York State cases. *See e.g.* Hill v. LeFevre, 124 A.D.2d 383, 507 N.Y.S.2d 330 (4th Dep't 1986). This case discussed confidential testimony by an individual who did not testify in the inmate's presence. Plaintiff cites the "substantial evidence" standard, however, as stated above, the sufficiency standard for federal due process is "some" or a "modicum" of evidence. Plaintiff also cites state law cases in which it was determined that the hearing officer erred in failing to make her own determination of whether the plaintiff's handwriting was similar to the subject letter. *See* Odom v. Goord, 271 A.D.2d 723, 705 N.Y.S.2d 433 (3d Dep't 2000). In *Odom,* the court stated that although the corrections officer was not legally qualified to render an opinion that two documents contained the same handwriting, the hearing officer was so qualified. *Id.* 271 A.D.2d at 724.

As stated above, the standard for review of disciplinary hearings in state court is stricter than for federal due process purposes. In any event, in this case, defendant Eggleston had the samples of plaintiff's own writing to compare to the unknown author's threatening letter, and she did compare them. Plaintiff is complaining that defendant Eggleston did not look at the *other* inmates' letters to make an independent determination of whether defendants chose the correct inmate as the author. (Pl.'s Resp. at 8). The cases cited by plaintiff do not apply, and even if the evidence had been insufficient for state law purposes, that did not rise to the level of a constitutional violation.

**iv. Credit for Time Served in Pre–Hearing Confinement**

Finally, plaintiff alleges that it was error for defendant Eggleston to make plaintiff's sanction run from the time of the hearing, rather than giving him credit for time served in keeplock prior to the hearing. Defendant Eggleston states in her affidavit that giving credit for time served is a common practice, but the decision to grant such credit is within the discretion of the hearing officer and is not a procedural requirement. (Eggleston Aff. ¶ 33). Defendant Eggleston "rarely" granted credit for time served, and she believed it would have been "particularly inappropriate" in this case because of plaintiff's lengthy disciplinary history and because the suspension of a prior disciplinary sanction did not deter plaintiff from repeated offenses. (*Id.* ¶ 34).

The court notes that, other than a section stating that any disciplinary penalty imposed in a Tier III hearing is to be run consecutively to "any other like penalty previously imposed" unless *"the hearing officer"* determines that the penalties shall run concurrently and advises the inmate, there are *no regulations* governing credit for pre-hearing confinement. N.Y. Comp.Code R. & Regs., tit.7, § 254.7(a)(2) (emphasis added). This section clearly leaves the determination of whether to run penalties consecutively or concurrently up to the hearing officer,

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

without any procedural requirement other than notice to the inmate. The federal due process requirements do not contain any reference to the sanctions imposed or when the sanction must begin to run after an inmate is found guilty of the violation. Thus, there is no due process implication to this claim.

#### b. Telephone Violation

**\*20** The sanction imposed after plaintiff's second disciplinary hearing consisted only of a short period of deprivation of privileges. The length of plaintiff's confinement was not affected. Based on *Sandin,* this court finds that plaintiff had no liberty interest protected by due process with respect to the disciplinary hearing held by defendant Meskunas. Thus, any due process claim relating to that hearing may be dismissed.

#### 2. *Retaliation*

Plaintiff alleges that the two misbehavior reports discussed above were filed against him in retaliation for his grievance against defendant Leon. In their affidavits, both defendants Chase and Whalen state that they did not know about plaintiff's grievance against defendant Leon, and they did not issue any false or retaliatory misbehavior reports. (Chase Aff. ¶¶ 19–23; Whalen Aff. ¶¶ 24–33).

During plaintiff's deposition, he was asked which grievance he believed resulted in retaliation. (Pl.'s Dep. at 32). Plaintiff stated that "it was a number of grievances and complaints," but then he stated that only one was a grievance, and "the rest of them I think were complaints. I don't recall there being actual grievances." (*Id.*) Plaintiff specified the grievance against defendant Leon as the formal grievance that caused the alleged retaliation. (*Id.*) Plaintiff testified that when he was going to the grievance hearing, he was sitting in the hallway, and an officer asked plaintiff to tell him the subject matter of the grievance. (*Id.* at 33). When plaintiff explained the facts of the grievance, the officer told plaintiff that "it's not a good thing to write grievances against people in Clinton,

especially somebody that's well liked like Leon." (*Id.*) Plaintiff could not name the officer who allegedly gave plaintiff this information. He described the officer as "[h]eavy-set, about 5'7" or 8", brown hair, about 260 pounds ...." (*Id.*)

Plaintiff claims that the unknown officer gave plaintiff a hard time about a permit for his wedding band approximately one week after the above conversation. Plaintiff attributes this verbal harassment to the fact that he told the officer about the Leon grievance. (*Id.* at 35). Plaintiff testified that he wrote a "complaint" against this unknown officer. (*Id.*) It does not appear that this "complaint" was a formal grievance because plaintiff states he wrote to the Superintendent and was interviewed by a Sergeant about this issue. (*Id.* at 35–38). Plaintiff also explained that in retaliation for the grievance against Leon, and in retaliation for his wife's complaints, plaintiff's wife was harassed at various times when she was visiting. (*Id.* at 38–41). Plaintiff stated that Officer Lincoln was involved in this harassment, and unnamed officers were "whispering and pointing" at plaintiff and his wife.[FN28] (*Id.* at 39–30).

> [FN28.] Any claims relating to these alleged incidents were dismissed after the defendants' first motion. (Dkt. Nos. 44, 45–1 at 32–33).

Plaintiff also alleges that the July 23, 2010 incident and misbehavior report were in retaliation for the Leon grievance and plaintiff's wife's complaints about poor treatment during her visits. (*Id.* at 41). Plaintiff claims that on July 23, 2010, his housing unit was searched, and he was taken to SHU. He testified that he knew these actions were in retaliation for the Leon grievance and other complaints because, after he was taken to SHU, defendant Chase interviewed plaintiff and asked him about "the complaints." (*Id.* at 42). Plaintiff told Chase "what was going on and why." (*Id.*) Plaintiff claimed that defendant Chase told plaintiff that writing complaints was not viewed fa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

vorably at Clinton,[FN29] and that Chase could "do anything he want[ed] because he was in charge." (*Id.*)

> FN29. Whatever plaintiff told defendant Chase during this interview could not have been the reason for retaliation. The investigation of the threatening letter was already underway.

**\*21** Although plaintiff discussed defendant Chase at great length during the deposition, there was really no indication of how he or defendant Whalen would have known about a grievance against defendant Leon or any other complaint, formal or otherwise, made by plaintiff. Defendant Whalen only became involved in the misbehavior report regarding the threatening letter because defendant Whalen was a corrections counselor, who kept all correspondence sent to her by inmates, and who was asked to assist in the investigation of the threatening letter by examining samples of plaintiff's handwriting. (Whalen Aff. ¶¶ 4, 7, 9, 11). They looked at a number of samples of inmates' writing by putting together a list of the porters housed in the same building as plaintiff for a handwriting comparison. (*Id.* ¶¶ 11–12).

Plaintiff speculates that this misbehavior report and the telephone violation charge were retaliatory based upon an alleged statement by an unknown officer and a claim that defendant Chase told plaintiff that writing grievances was not a good idea. However, plaintiff claims that this alleged retaliation was committed by officers against whom he had not written any grievances, and it is unclear how either defendant Chase or defendant Whalen would have become aware of plaintiff's grievance against defendant Leon.

In his response to the motion for summary judgment, plaintiff also speculates that his letters of complaint regarding visitation, addressed to other officers, found their way to defendant Chase. A few of the complaint letters were forwarded to Captain

Holdridge, and defendant Chase testified at plaintiff's disciplinary hearing that he was Acting Captain and was reading Captain Holdridge's mail. (Pl.'s Resp. at 10–11). One of the letters attached as an exhibit states that plaintiff's "July 5, 2010 letter regarding staff complaint" was referred to Captain Holdridge. (Pl.'s Ex. N). No July 5, 2010 letter was attached.[FN30] The next two letters are dated July 9, 2010 and July 13, 2010 and are addressed to Superintendent LaValley. (Pl.'s Ex. O). Both letters complain about visitation and Officer Lincoln. The response from Superintendent LaValley states that at the time of the incident, defendant Chase "intervened and remedied the situation *in [her] favor.*"[FN31] (Pl.'s Ex. P) (emphasis added).

> FN30. This might be a typographical error by Superintendent LaValley because two letters of complaint were referred to Captain Holdridge, (Pl.'s Ex. N, Q), but the letters in Exhibit O are dated July 9, and July 13.

> FN31. Neither plaintiff nor his wife, ever mentions defendant Chase by name, but plaintiff's letter states that his wife spoke to "a Lieutenant," who stated he would take care of the situation. (Pl.'s Ex. O; Dkt. No. 56–1, CM/ECF p. 51). Plaintiff's letter then states: "After that I was call [sic] down to the visiting room approximately five minutes later." (*Id.*) Plaintiff's wife also mentions that she spoke to "a lieutenant" who remedied the situation. (Pl.'s Ex. O; Dkt. No. 56–1, CM/ECF p. 52). Plaintiff's wife stated that the time elapsed was 15 minutes, but in any event it was clear that the "lieutenant," who we now know from Superintendent LaValley's letter was defendant Chase, helped plaintiff and his wife during the incident.

Thus, plaintiff has not established a nexus between his protected activity and the alleged retaliation. Retaliation claims have been dismissed when they are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441353 (N.D.N.Y.)
**(Cite as: 2013 WL 5441353 (N.D.N.Y.))**

supported only by conclusory allegations that the retaliation was based upon complaints against another officer. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). In this case, plaintiff's current speculation that defendant Chase retaliated against plaintiff based on two letters forwarded to Captain Holdridge that defendant Chase may have seen, is unfounded. This is particularly true because in Superintendent LaValley's letter, he states that defendant Chase resolved the visitation issue in plaintiff's wife's favor.

**\*22** Finally, defendants also argue that even if plaintiff had made the appropriate showing, they would have taken the same action, notwithstanding any retaliatory motive. Defendants point out that plaintiff was found guilty of the conduct charged in the misbehavior reports. The charges in question were supported by documentary evidence, and notwithstanding the reversal of the first hearing, a review of the letters and plaintiff's handwriting shows that defendants had a reasonable basis for the charges. The

PIN violation was also supported by evidence documenting the telephone calls made using plaintiff's PIN when he would have been unable to make the telephone calls. Thus, plaintiff's claims of retaliation may be dismissed. *See Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (where the record clearly demonstrates that the inmate in fact committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report, the defendants meet their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report, and are entitled to summary judgement on a retaliation claim).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 54) be **GRANTED,** and the amended complaint **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2013.
Jones v. Fischer
Slip Copy, 2013 WL 5441353 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Derek JOSEY, Plaintiff,
v.
David ROCK, P. Heath, E. Russell, Capt. Holdridge,
W. Redmond, Sarah Hicks, Jane Doe, Dr. Thompson,
R. RAO, Dr. Adams, M.D. Lester Wright, B. Fischer,
Defendants.

No. 9:11–CV–0028 (NAM/TWD).
March 19, 2013.

Derek Josey, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Adele M. Taylor–Scott, Esq.,
Stephen M. Kerwin, Esq., of Counsel, Albany, NY,
for Defendants.

### REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magis-
trate Judge.

**\*1** This *pro se* prisoner civil rights action, com-
menced pursuant to 42 U.S.C. § 1983, has been re-
ferred to me for Report and Recommendation by the
Honorable Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). Plaintiff Derek Josey claims that Defendants
violated his Eighth Amendment right to adequate
medical care by discontinuing his prescription for a
particular pain medication. Currently pending before
the Court is Defendants' motion for summary judg-
ment pursuant to Federal Rule of Civil Procedure 56.
(Dkt. No. 37.) For the reasons discussed below, I
recommend that the Court grant Defendants' motion.

### I. FACTUAL AND PROCEDURAL SUMMARY

Plaintiff, an inmate in the custody of the New
York Department of Corrections and Community
Supervision ("DOCCS"), was shot in the back prior to
entering the DOCCS system and underwent surgery
for his injuries. (Dkt. No. 1 at 4; Dkt. No. 37–2 ¶ 13.)
At Great Meadow Correctional Facility, Plaintiff was
prescribed Ultram, a pain medication. (Dkt. No. 1 at
3.) Ultram is intended for short-term use and induces
drug-seeking behavior in patients who consume it for
long periods. (Dkt. No. 37–2 ¶¶ 4, 8–9.) It can cause
kidney damage and should not be used by patients
who are also taking a selective serotonin reuptake
inhibitor ("SSRI") because that drug combination can
induce seizures. (Dkt. No. 37–13 ¶ 8.) Because Ultram
is addictive and can produce a high if consumed in-
appropriately, it has been the object of much abuse
among DOCCS inmates. (Dkt. No. 37–2 ¶¶ 1, 7.)
Inmates have been known to crush Ultram and snort
the pulverized pills. *Id.* ¶ 10. Bartering with Ultram
pills among inmates has been a common occurrence in
DOCCS facilities. *Id.* ¶ 11.

Defendant David H. Thompson, a doctor at Great
Meadow, first saw Plaintiff on February 12, 2008.
(Dkt. No. 37–11 ¶ 10.) Plaintiff told Defendant
Thompson that the dosage he was receiving of Ultram
was not relieving the pain in his back. *Id.* Defendant
Thompson increased Plaintiff's's dosage. *Id.* The next
day, Plaintiff refused his evening dose. *Id.*

On March 17, 2008, the nurse who delivered
Plaintiff's medication noted that Plaintiff had tried to
conceal his pills under his tongue. *Id.* ¶ 11. The nurse
requested that Plaintiff's medication be discontinued.
*Id.* Upon receiving that report, Defendant Thompson
discontinued Plaintiff's Ultram. *Id.* ¶ 12. Defendant
Thompson declares that the "behavior recorded in the
nurse's March 17 note, and the plaintiff's refusal of his

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

medication the day after insisting that he needed more of it raised my suspicion that the plaintiff was obtaining the medication for other than a legitimate medical need. In addition, he had been on [the medication] for a long time and I thought it would be wise to see if he could get by without [it], particularly in light of the nurse's notation that he was in no acute distress and that he walked, sat and stood well." *Id.*

**\*2** After Defendant Thompson discontinued Plaintiff's Ultram prescription, Plaintiff repeatedly wrote to him seeking restoration of the prescription. *Id.* ¶ 13. Defendant Thompson saw Plaintiff again on April 29, 2008. *Id.* ¶ 14. Plaintiff reported that his back pain persisted. *Id.* Because Plaintiff's need for pain relief seemed genuine and because Plaintiff had been off of the medication for a month, Defendant Thompson restored the prescription. *Id.*

On July 7, 2008, Defendant Eileen Russell wrote a memorandum regarding Plaintiff to Defendant William Redmond, the Nurse Administrator at Great Meadow. (Dkt. No. 37–9 ¶ 7.) At the time of the events giving rise to this lawsuit, Defendant Russell was the Assistant Deputy Superintendent for Mental Health Programs at Great Meadow. (Dkt. No. 37–9 ¶ 2.) In that position she was responsible for the operation of the facility's Behavioral Health Unit ("BHU"). *Id.* BHUs are collaborative efforts between DOCCS and the Office of Mental Health that provide intensive levels of mental health services to inmates prone to disciplinary infractions. *Id.* ¶¶ 3–4. BHUs are staffed with combinations of security personnel and therapists who comprise "treatment teams." *Id.* ¶ 5. Treatment teams receive frequent informal reports about individual inmates' positive and negative behaviors. *Id.* ¶ 6. Treatment teams do not include medical staff. *Id.* ¶ 7. Defendant Redmond was part of the medical staff at Great Meadow and, as such, was responsible for providing medical services to both BHU and general population inmates. *Id.* Defendant Russell's memorandum stated:

Inmate Josey ... was caught trying to flush meds down the toilet in his cell today. The officer was able to retrieve the rubber glove tip that he had the meds in and upon examination all he saw was dissolved pills. Can inmate Josey's meds be crushed or given to him in liquid form? Considering we had an incident this weekend with [another inmate] trying to hang himself we don't want anyone hoarding their meds in case they really want to harm themselves. Please advise and thanks.

(Dkt. No. 37–10 at 1.) In response, Defendant Redmond asked if an informational report had been written about the incident and, if so, if he could have a copy for the medical provider to provide justification for the "crush order." *Id.* When patient is under a "crush order," his medications are crushed and administered to him in a pulverized form with water to minimize the possibility of him secreting the medication for illicit purposes. (Dkt. No. 37–11 ¶ 15.) Defendant Russell replied that an informational report had been written and that she would "send it over today." (Dkt. No. 37–10 at 1.)

Defendants have not been able to locate a copy of the informational report. (Dkt. No. 37–9 ¶ 9.) Plaintiff contends that Defendant Russell's memorandum was a lie and that a copy of the informational report stating that Plaintiff was discovered flushing medication down the toilet cannot be found because there was no such report. (Dkt. No. 37–6 at 80:20–83:5.[FN1]) Other contemporaneous records support the existence of an informational report, although they do not indicate who authored it. For example, minutes from a meeting of Plaintiff's treatment team dated July 8, 2008, state that Plaintiff was "agitated about an informational report he received." (Dkt. No. 38–1 at 5.)

FN1. Citations to page numbers in the transcript of Plaintiff's deposition refer to the page number in the original document rather than to the page number assigned by the Court's electronic filing system.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

**\*3** When Defendant Thompson learned of Plaintiff's actions, he ordered that Plaintiff's Ultram be discontinued. (Dkt. No. 37–11 ¶ 16.) He declares that Plaintiff's Ultram was discontinued "per my order, and ... none of the other defendants from Great Meadow ... or from DOCCS' Central Office ... had anything to do with my medical decision to terminate the plaintiff's Ultram based upon his suspected abuse of that medication and the two and half months that he had been taking it.... [M]y interest, aside from stopping the plaintiff's potential abuse of the medication, was to see if he could manage without a medicine which was designed for treatment of acute rather than chronic pain." *Id.*

Defendant Thompson declares that "[t]ermination of the plaintiff's Ultram produced an aggressive response from the plaintiff to the point where, on one occasion, he had to be escorted out of the medical clinic by Correction Officers after exhibiting belligerent behavior toward me." *Id.* ¶ 17.

After Defendant Thompson discontinued Plaintiff's Ultram, Plaintiff's was supplied with ibuprofen when he complained of pain. *Id.* Plaintiff occasionally declined to accept the ibuprofen, stating that it did him no good. *Id.*

Defendant Thompson saw Plaintiff again on August 12, 2008. *Id.* ¶ 18. Plaintiff complained of back pain. *Id.* Defendant Thompson "decided to give the plaintiff the benefit of the doubt and reinstate his Ultram prescription.... I also ordered that the pills be crushed before they were given to the plaintiff to inhibit any effort on his part to hoard rather than properly consume the medication." *Id.*

On two occasions after Defendant Thompson reinstated Plaintiff's Ultram prescription, Plaintiff protested that the crushed pills given to him in water were ineffective. *Id.* ¶ 19. Defendant Thompson declares

that "[o]f course this method of administration would do nothing to diminish the potency of the medication." *Id.*

Plaintiff was transferred from Great Meadow to Attica Correctional Facility on or about September 8, 2008. *Id.* ¶ 20. At the time of his transfer, Plaintiff had a valid prescription for Ultram. *Id.*

Defendant Jadow Rao is, and was at the time of Plaintiff's transfer, the Health Services Director at Attica. (Dkt. No. 37–12 ¶ 2.) As such, he is responsible for all medical care provided to the inmates at Attica. *Id.* He directly supervises the physicians, physician assistants, nurses, and non-medical staff of the Attica medical department. *Id.* Defendant Rao declares that "[u]pon undertaking the care of a new patient, ... I do not regard myself as being bound by a prior physician's determinations as to treatment, and I certainly do not regard myself bound by [a] patient's requests for particular courses of treatment, particularly when it comes to addictive prescription medications." (Dkt. No. 37–12 ¶ 7.) Defendant Rao declares that every effort is made to switch newly-arriving inmates from Ultram to "other, less troublesome pain relievers." *Id.* ¶ 11.

**\*4** Defendant Rao declares that when Plaintiff arrived at Attica, his Ultram prescription was continued until Defendant Rao could review his records. *Id.* ¶ 8. Defendant Rao reviewed Plaintiff's medical records on October 1, 2008. *Id.* ¶ 9. Defendant Rao "found that the plaintiff had a history of hoarding his medication, and also flushing it in the toilet.... This history and the nature of the medication the plaintiff had been taking caused me concern. The history indicated to me that either the plaintiff did not need the medication, that he was improperly consuming it, or that he was using it to barter with other inmates for favors or to obtain other contraband items." *Id.* Defendant Rao discontinued Plaintiff's Ultram prescription and noted that Plaintiff could have Motrin for pain relief. *Id.* ¶ 11. Defendant Rao repeated this direction

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

after seeing Plaintiff on October 23, 2008. *Id.*

Defendant Rao declares that Plaintiff's medical record is "replete with entries documenting the all-too-familiar reaction by a[n] Ultram-dependent patient to the withdrawal of that medication." *Id.* ¶ 12. Plaintiff refused offers of over-the-counter medications. *Id.* ¶¶ 12, 14. Plaintiff was prescribed other prescription pain relievers, but on at least one occasion it was discovered that Plaintiff was not taking the medication and had failed to request a refill. *Id.* ¶¶ 13–14. This reinforced Defendant Rao's "suspicion that the plaintiff's desire for Ultram—which he invariably requested by name—was sought, not for pain relief, but for some illicit purpose." *Id.* ¶ 14. During this same time period, an x-ray of Plaintiff's lumbar spine showed a "normal lumbar spine." *Id.* ¶ 13.

Plaintiff was referred to physical therapy in January 2009 and attended twice a week from March 9, 2009, through April 20, 2009. *Id.* ¶ 15. The physical therapist concluded that the therapy was not effective in relieving Plaintiff's pain, but also noted that Plaintiff was not performing the recommended exercises between therapy sessions. *Id.*

After completing physical therapy, Plaintiff was seen by non-defendant physician Stephen Laskowski at Attica. *Id.* ¶ 16. Dr. Laskowski agreed to consider prescribing Ultram if Plaintiff received a recommendation for it from a pain management specialist. *Id.*

Plaintiff saw a pain management specialist on July 28, 2009, who made a number of recommendations. *Id.* ¶ 17. One of these recommendations was that "consideration be given to restarting Ultram." *Id.* Upon reviewing the specialist's report, Dr. Laskowski prescribed Ultram for Plaintiff. *Id.* ¶ 18. This prescription continued until Plaintiff was transferred out of Attica to Clinton Correctional Facility on October 19, 2009. *Id.*

At Clinton, Plaintiff demanded Ultram from a nurse practitioner. (Dkt. No. 37–13 ¶ 11.) The nurse observed that Plaintiff was in no acute distress, presented no non-verbal signs of pain, was able to lean forward on the table, and was generally argumentative and demanding. *Id.* The nurse practitioner informed Plaintiff that she would not prescribe Ultram for degenerative disc disease and proposed a course of a non-steroidal anti-inflammatory drug and a muscle relaxer. *Id.* Plaintiff said, "Whatever. I'll be on sick call every day until I get my Ultram back." *Id.* The nurse practitioner terminated the encounter because Plaintiff continued to be argumentative and displayed drug-seeking behavior. *Id.*

**\*5** Defendant Richard N. Adams, a doctor at Clinton, examined Plaintiff for the first time on March 1, 2010. (Dkt. No. 37–13 ¶ 12.) His assessment was that Plaintiff suffered from low back pain. *Id.* Defendant Adams did not renew Plaintiff's prescription for Ultram because Plaintiff's pain was long-standing and unchanged and Ultram is intended for acute, not chronic, pain. *Id.* Defendant Adams declares that Ultram needs to be taken at least three times a day to maintain pain reduction because it is a short-acting pain reliever. *Id.* ¶ 8. He declares that at Clinton "the staffing level is insufficient to administer medications three times a day, thus medication like Ultram that generally needs to be administered one-on-one and more than twice a day presents logistical problems. For these reasons, I and other physicians at Clinton are cautious in prescribing it, and make every effort to find alternatives for those inmates who come under our care who are already on it." *Id.*

Defendant Adams next saw Plaintiff on April 6, 2010. *Id.* ¶ 13. Plaintiff, who had previously been told that he could not have Ultram because he was taking psychiatric medications, informed Defendant Adams that "his psychiatric medications were stopped because he did not need them." *Id.* On physical exam, Plaintiff's deep tendon reflexes were equal side to side, he had no pain on straight leg raising, his gait was

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

normal, there was no radiation of back pain, and Plaintiff did not report any functional problems with activities of daily living. *Id.* Plaintiff asked for Ultram and Defendant Adams declined to provide it. *Id.*

Defendant Adams next saw Plaintiff on September 28, 2010. *Id.* ¶ 14. A physical examination was unrevealing but a CT scan showed disc degeneration at the L–5, S–1 level. *Id.* Defendant Adams prescribed a one-week trial of Indocin for pain relief. *Id*

Defendant Adams next saw Plaintiff on October 29, 2010. *Id.* ¶ 15. Plaintiff reported that the Indocin caused him to "freak out." *Id.* Plaintiff told Defendant Adams that he "received 100% relief from taking Ultram twice a day." *Id.* Defendant Adams found this significant because Ultram is a short-acting pain reliever that is generally effective for no more than six hours. *Id.* He thus found it "unlikely that the plaintiff obtained 'total relief' of his pain from Ultram taken only twice a day ... This, combined with his aggressive demands for Ultram, demanding it by name, and the inconsistency between his complaints and my findings on physical examination heightened my suspicion that the plaintiff sought Ultram for other than pain relief." *Id.* Defendant Adams prescribed Feldene and a Medrol dose pack for pain relief and requested approval for an electromyography and a nerve conduction study of Plaintiff's left leg. *Id.*

Defendant Adams saw Plaintiff again on December 8, 2010. *Id.* ¶ 16. Plaintiff said that Feldene did not work and that Ultram was the only medication that provided him relief. *Id.* After a physical examination, Defendant Adams' assessment was that plaintiff had mild low back pain with mild degenerative disc or joint disease in his spine and exhibited drug-seeking behavior. *Id.* Defendant Adams recommended that Plaintiff use over-the-counter medications like aspirin, Tylenol, or ibuprofen to manage his pain. *Id.*

**\*6** On December 30, 2010, Plaintiff was seen by

another doctor at Clinton. *Id.* ¶ 17. The doctor authorized Voltaren twice a day for pain. *Id.* On January 3, 2011, Plaintiff complained to the nurse on sick-call duty that he had yet received the prescription, which he characterized as being for Ultram. *Id.* The nurse, apparently unable to read the doctor's December 30 note, believed the prescription was for Ultram. *Id.* She asked Defendant Adams to sign a prescription for Ultram. *Id.* Defendant Adams signed the prescription without recognizing the identity of the patient. *Id.* Plaintiff thus received Ultram on January 4 and 5, 2011. *Id.* When Defendant Adams discovered this on January 5, 2011, he discontinued the Ultram because he believed that Plaintiff was taking an SSRI and the drug combination put Plaintiff at risk of seizures. *Id.*

Plaintiff saw a physician assistant on March 24, 2011. *Id.* ¶ 19. He requested Ultram and advised the physician assistant that his SSRI had been discontinued. *Id.* The physician assistant prescribed Ultram. *Id.* Plaintiff first received Ultram under that prescription on March 25, 2011, and continued receiving it until mid-June 2011. *Id.*

On June 15, 2011, Plaintiff argued with a nurse over the procedure for receiving Ultram. *Id.* ¶ 20. Under the required procedure, Plaintiff was to appear at the front of his cell with a cup of water, prepared to take the medication from the nurse and swallow it in her presence. *Id.* Plaintiff wanted to put the pill in his mouth and turn away from the nurse to get water from his sink, where he would seemingly swallow the pill. *Id.* The nurse asked Defendant Adams to review the matter. *Id.* Upon reading the nurse's note, Defendant Adams determined that it appeared that Plaintiff was attempting to hoard the medication. *Id.* On June 17, 2011, Defendant Adams discontinued Plaintiff's Ultram prescription. *Id.*

Plaintiff was transferred away from Clinton on June 23, 2011. *Id.* ¶ 21.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

Plaintiff wrote grievances and letters of complaint regarding his desire for Ultram. (Dkt. No. 1 at 3.) Plaintiff received responses to some of these communications from the office of Defendant Lester Wright, the Director of Medical Services for DOCCS. (Dkt. No. 1 at 2; Dkt. No. 37–6 at 108:21–114:20.) Defendant Wright declares that he did not personally handle Plaintiff's complaints. (Dkt. No. 37–4 ¶ 5.)

Plaintiff filed this action on January 10, 2011, while he was still incarcerated at Clinton. (Dkt. No. 1.) Plaintiff seeks a declaration that Defendants violated his Eighth Amendment right to adequate medical care, an injunction ordering Defendants to "[i]mmediately provide Plaintiff with consultation to a pain specialist of his choice and immediately restore him to his pre-scribed Ultram medication," compensatory damages, and punitive damages. *Id.* at 5.

Defendants now move for summary judgment. (Dkt. No. 37.) Plaintiff has opposed the motion. (Dkt. Nos. 41 and 43.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

**\*7** Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of show-ing, through the production of admissible evidence, that no genuine issue of material fact exists. *Sala-huddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id. at 273.* The nonmoving party must do more than "rest upon the mere allegations ... of the [plain-

tiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 & n. 11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all rea-sonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for sum-mary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D .N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard gov-erning Federal Rule of Civil Procedure 12(b)(6) mo-tions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*8** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

### III. ANALYSIS

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care.[FN3] (Dkt. No. 1 at 4.) The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97,

102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* at 102 (quoting *Trop v. Dulles,* 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

> FN3. Plaintiff does not assert claims under any other constitutional provisions. I note, in particular, that Plaintiff does not claim that any Defendant retaliated against him for any type of protected conduct or discriminated against him based upon his membership in a protected class.

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citation omitted).

Here, Defendants concede for the purposes of this motion only that Plaintiff suffered from a serious medical need and has thus established the objective prong of his Eighth Amendment claim. (Dkt. No. 37–15 at 18.[FN4]) The issue, then, is whether Plaintiff has raised a triable issue of fact that Defendants were deliberately indifferent to that need. I will examine this issue in three parts: (1) medical personnel; (2)

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

non-medical personnel; and (3) Central Office personnel.

> FN4. Citations to page numbers in Defendants' memorandum of law refer to the page number in the original document rather than to the page number assigned by the Court's electronic filing system.

### 1. *Medical Personnel*

**\*9** Defendant has sued four medical professionals: Defendants Redmond and Thompson from Great Meadow, Defendant Rao from Attica, and Defendant Adams from Clinton. Defendants argue that Plaintiff has failed to raise a triable issue of fact that the medical providers were deliberately indifferent to Plaintiff's serious medical needs. (Dkt. No. 37–15 at 22–27.) Defendants are correct.

Medical mistreatment by a medical provider rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference by a medical provider, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F .3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. Inmates do not have a right to choose a specific type of treatment. *Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004). More specifically, "[d]ifferences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs." *Wright v. Genovese,* 694 F.Supp.2d 137, 160

(N.D.N.Y.2010) (punctuation omitted).

Here, Defendants Thompson, Rao, and Adams have each filed declarations explaining their reasons for the courses of treatment that they chose for Plaintiff. (Dkt. Nos. 37–11; 37–12; 37–13.) Each of these doctors had concerns that Plaintiff was seeking Ultram for non-medical reasons and that the medication was not the best treatment for Plaintiff's chronic pain. Each examined Plaintiff fairly regularly and attempted to treat his complaints. Plaintiff's claims against these doctors amount merely to a disagreement with the course of treatment they prescribed. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss these claims.

Plaintiff has not raised a triable issue of fact that Defendant Redmond, who served as a nurse administrator at Great Meadow, played any role in the decision to discontinue Plaintiff's Ultram prescription. Defendant Thompson declares that Defendant Redmond had nothing to do with the decision. (Dkt. No. 37–11 ¶ 16.) Plaintiff has not presented any evidence disputing that declaration. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claim against Defendant Redmond.

### 2. *Non–Medical Personnel at Great Meadow Correctional Facility*

**\*10** Plaintiff has sued five non-medical personnel from Great Meadow. These individuals are Defendants Eileen Russell, David Rock, P. Heath, Capt. Holdridge, and S. Hicks. Plaintiff alleges that Defendant Russell filed a false report stating that he had attempted to flush medication, which resulted in the discontinuation of his Ultram at Great Meadow and followed him to other facilities. (Dkt. No. 1 at 3–4.) Plaintiff alleges that Defendants Rock, Heath, Holdridge, and Hicks violated his Eighth Amendment rights by covering up Defendant Russell's alleged wrongdoing in the course of their investigation into the matter. *Id.* Defendants argue that Plaintiff has

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

failed to raise a triable issue of fact that the non-medical personnel at Great Meadow were deliberately indifferent to Plaintiff's serious medical needs. (Dkt. No. 37–15 at 20–22.) Defendants are correct.

"Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (citation and internal quotation marks omitted). Here, there is no triable issue of fact that Defendants Russell, Rock, Heath, Holdridge, or Hicks intentionally delayed Plaintiff's access to medical care. The act about which Plaintiff most vigorously complains—Defendant Russell's memorandum—did not delay Plaintiff's access to care. As the document shows, Defendant Russell did not recommend that Plaintiff's prescription be discontinued. (Dkt. No. 37–10.) Rather, she inquired whether a "crush order" would be appropriate. *Id.* Defendant Russell did not engage in any improper conduct and any finding to that effect by Defendants Rock, Heath, Holdridge, and Hicks was not a "cover up," as Plaintiff alleges. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against these Defendants.

3. *Central Office Personnel*

Plaintiff has named Brian Fischer, the Commissioner of DOCCS, and Lester Wright, the Director of Medical Services for DOCCS, as Defendants. (Dkt. No. 1 at 2.) Defendants argue that Defendants Fischer and Wright were not personally involved in any constitutional violation. (Dkt. No. 37–15 at 27–30.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a §

1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).[FN5]

FN5. In *Iqbal,* 556 U.S. 662, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. See *Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)
**(Cite as: 2013 WL 1500435 (N.D.N.Y.))**

    *Colon* remains good law.

    **\*11** Here, Defendants Fischer and Wright were not personally involved in any constitutional violation. As discussed above, the discontinuation of Plaintiff's Ultram prescription did not violate his Eighth Amendment rights. Thus, there was no constitutional violation with which to be personally involved. Even if there had been a constitutional violation, there is no indication that Defendants Fischer or Wright were personally involved. A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see also Wright,* 694 F.Supp.2d at 161. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Fischer and Wright.

    **ACCORDINGLY,** it is

    **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be ***GRANTED.***

    Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2013.
Josey v. Rock
Not Reported in F.Supp.2d, 2013 WL 1500435 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Devin KEITT, Plaintiff,
v.
A. SCHUN, et al., Defendants.

No. 11–CV–438.
Jan. 30, 2014.

Stormville, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

**\*1** The above-referenced case was referred to Magistrate Judge Jeremiah J. McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(B). Defendants filed an unopposed motion to dismiss plaintiff's amended complaint pursuant to 28 U.S.C. § 1915A and Rules 12(b)(1), (2) and (6) of the Federal Rules of Civil Procedure. Defendants also moved for a stay of all proceedings pending resolution of the motion to dismiss. On September 19, 2013, Magistrate Judge McCarthy issued a Report and Recommendation recommending that the motion to dismiss be granted in part and denied in part, and ordered that the motion for a stay be granted.

On October 9, 2013 plaintiff filed objections to those portions of the Report and Recommendation which recommended that certain of his claims be dismissed. Defendants filed a reply on October 30, 2013. The Court deemed the matter submitted without oral argument.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon *de novo* review, and after reviewing the submissions of the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge McCarthy's Report and Recommendation, defendants' motion to dismiss the amended complaint is denied to the extent it seeks to dismiss the deliberate indifference/failure to protect claims against defendants Schunh, Dr. Evans, Dr. Rao and Dr. Kowski, in their individual capacities, but is otherwise granted.

The matter is referred back to Magistrate Judge McCarthy for further proceedings.

SO ORDERED.

**REPORT, RECOMMENDATION, ORDER**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including preparation of a Report and Recommendation on dispositive motions [18].[FN1] Before me is defendants' unopposed motion [39] to dismiss the Amended Complaint pursuant to 28 U.S.C. § 1915A and Fed.R.Civ.P. ("Rules") 12(b)(1), (2), and (6), and for a stay of all proceedings pending resolution of the motion.[FN2] For the following reasons, I recommend that the motion to dimiss be granted in part and denied in part, and order that the motion for a stay is granted.

FN1. Bracketed references are to the CM/ECF docket entries.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

FN2. Although defendants move to dismiss the Amended Complaint [29] pursuant to Rules 12(b)(1) and (b)(2), they do not argue that either subject-matter or personal jurisdiction are lacking.

## BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correction and Community Supervision ("DOCCS") commenced this action *pro se* by Complaint filed May 20, 2011[1]. Defendants initially moved to dismiss the Complaint [14], and plaintiff responded by cross-moving [21] for leave to file an Amended Complaint seeking to add two new defendants. At a conference held on July 5, 2012, I denied plaintiff's motion for leave to amend [21] "as moot, since plaintiff [could] amend as of right", and defendants' motion to dismiss the Complaint [14] was withdrawn, without prejudice to their right to move against the Amended Complaint. July 6, 2012 Text Order [28]. Plaintiff filed an Amended Complaint [29] on July 11, 2012.

**\*2** Plaintiff's Amended Complaint centers on the medical treatment he received while incarcerated at Attica Correctional Facility. According to plaintiff, a bullet is lodged in his head, causing him to suffer "chronic" and "substantial pain" that hinders his ability to sleep or engage in physical activity. Amended Complaint [29], ¶¶ 17, 19. A pain management specialist who treated plaintiff in December of 2004 for his complaints that Tylenol and Motrin were causing gastrointestinal distress, including "blood in [his] underwear" (*id.*, ¶ 20), prescribed certain pain relievers, including Ultracet, "Morin", Neurontin, and Pepcid. *Id.* ¶ 21, p. 33 of 43. At the two facilities where he was housed prior to being transferred to Attica, plaintiff was prescribed the recommended medications. *Id.*, ¶¶ 22–23.

However, when he arrived at Attica on October

19, 2010, plaintiff was examined by defendant Schunh,[FN3] a "medical provider", who informed him that she was "not going to give pain medication for migraine headache" and was "withdraw [ing][the] treatment that was prescribed by [the] pain management [specialist]". *Id.*, ¶ 24.[FN4] Instead, she offered him Tylenol and Motrin, despite "being aware that ... [it] causes [him] *'distress'* ". *Id.*, ¶ 37 (emphasis in original). When plaintiff requested a second opinion, defendant Schunh told him that "she doesn't care who else Plaintiff speaks to about issue.... [S]he's going to make sure as long as plaintiff is in the facility, none of her co-workers is going to go against her". *Id.*, ¶ 26.

FN3. Whereas the Amended Complaint identifies this individual as "Schun", it's spelled "Schunh" by defendants.

FN4. Where the full names of the defendants are not contained in the record, I have identified them by their surnames.

Plaintiff repeats these allegations against several doctors at Attica, including Dr. Evans, who examined him on November 19, 2010 (*id.*, ¶ 41), Jadow Rao, M.D., who examined him on December 9, 2010 (*id.*, ¶ 64), and Dr. Kowski, who examined him on December 1, 2011 (*id.*, ¶ 83). He also alleges that he informed defendants Nurse Administrator Killinger, Superintendent Mark Bradt, and DOCCS's Commissioner Brian Fischer, that he was intentionally being denied treatment that was prescribed by a pain management specialist, but they failed to remedy the wrong. *Id.*, ¶¶ 101–108, 115, 122–132, 137–154.

Plaintiff alleges that he was denied pain medication "because of the color of his skin" (*id.*, ¶ 30), and as a penalty for "exercising the right of free speech" (*id.*, ¶¶ 32, 48, 75, 94, 108, 126, 155). He alleges that he "is a member of racial minority[.] The defendant intended to discriminate on the basis of race[.] This discrimination concerned the rights to make and en-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

force contacts to sue both parties; give evidence and the full [*sic* ] and equal benefits of all laws and proceedings for security of persons and property." *Id.,* ¶¶ 56, 74, 93, 107, 127, 154. He also alleges that defendants "carried out a malicious retaliation against [him] because of the color of his skin. *Id.,* ¶¶ 73, 92, 106, 125, 153. According to plaintiff, defendants collectively

**\*3** "conspired to deprive [him] of the equal protection of the laws or privileges and immunities under the laws with avert act in furtherances [*sic* ] of the conspiracy and injury to the privilege of a citizen of the United States; some racial or perhaps otherwise class-based, invious [*sic* ] discriminatory animus." *Id.,* ¶¶ 31, 60, 79, 105.

Plaintiff's action is brought pursuant to "42 U.S.C. § 1981, 1983, 1985, 1986, 1988, civil rights first, eighth, fourteenth amendment, Discrimination, deliberate indifference, equal protection, failure to protect, and due process, cruel and unusual punishment." *Id.,* ¶ 1.[FN5] Each of the defendants are named in their individual and official capacities (*id.,* ¶¶ 16, 40, 63, 82, 100, 122, 137), and plaintiff seeks compensatory and punitive damages (*id.,* ¶ 157).

> FN5. Plaintiff's "Section 1988 claim for attorney's fees ... fails because the statute is not an independent cause of action". *Reid v. Toyota Motor Credit Corp.,* 2013 WL 3776201, *2 (S.D.N.Y.2013).

After defendants filed this motion, I appointed Attorney James Greco to represent plaintiff and set a briefing schedule on the motion to dismiss, giving plaintiff until November 30, 2012 to respond. October 3, 2012 Text Order [44]. To date, no response or motion for an extension of the November 30, 2012 deadline has been filed. Nevertheless, I "cannot grant a motion to dismiss solely on the ground that it is unopposed. Rather, where a Rule 12(b) motion has not

been opposed, this Court must review the merits of the motion and determine whether the movant has carried its burden." *Foster v. Phillips,* 2005 WL 2978686, *3 (S.D.N.Y.2005). *See McCall v. Pataki,* 232 F.3d 321, 323 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal").[FN6]

> FN6. Under 28 U.S.C. § 1915A(a), a district court "shall review ... a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and it "shall" dismiss the complaint (or any portion thereof) if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted." *Id.* § 1915A(b)(1). Since "Section 1915A's third ground for dismissal—legal sufficiency—is identical to the dismissal standard under Federal Rule of Civil Procedure 12(b)(6)" *McGhie v. Main,* 2011 WL 4852268, *1 (E.D.N.Y.2011), I have addressed defendants' motion only under the Rule 12(b)(6) standard.

## ANALYSIS

### A. Motion to Dismiss

### 1. 42 U.S.C. § 1981

Defendants argue that plaintiff's 42 U.S.C. § 1981 claim must be dismissed because plaintiff "fails to allege any contract right ... nor of any infringement on his ability to give evidence, nor of a causal link between the defendants' actions and the plaintiff's race." Defendants' Memorandum of Law [40], p. 10. I agree.

42 U.S.C. § 1981 provides that "[a]ll persons ... shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and pro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

ceedings for the security of persons and property as is enjoyed by white citizens". 42 U.S.C. § 1981(a). "The essential elements of the claim are actions that were racially motivated and purposefully discriminatory." *Dove v. Fordham University,* 56 F.Supp.2d 330, 338 (S.D.N.Y.1999), *aff'd,* 210 F.3d 354 (2d Cir.2000) (Summary Order). In pleading a claim arising under § 1981, "[c]onclusory or naked allegations will not suffice .... Fact-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required." *Id.*

Plaintiff's conclusory allegations parroting the language of § 1981, which fail to include fact-specific conduct linking defendants' alleged deliberate indifference to his race, are insufficient to state a claim. Coupled with the absence of specific facts supporting his claim that defendants' conduct was racially motivated, plaintiff offers other reasons for the conduct that he experienced, including retaliation, and is equivocal as to whether this conduct was motivated by race, alleging that "some racial or perhaps otherwise class-based, invious [*sic* ] discriminatory animus" was to blame. Amended Complaint [29], ¶¶ 31, 60, 79, 105.[FN7] Since "a complaint that sets forth other possible motives for the alleged conduct, and does not contain specific facts supporting a claim of racial animus, contradicts a claim of racial discrimination", *Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC,* 2013 WL 417406, *9 (S.D.N.Y.2013), I recommend that this claim be dismissed.

> FN7. Although not raised by defendants, it is questionable whether plaintiff's § 1981 claim is viable in its current form. "Plaintiff cannot assert a claim under 42 U.S.C. § 1981 because 42 U.S.C. § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.... Defendants here are state actors. Therefore, Plaintiff's claims cannot be raised under 42 U.S.C. § 1981." *Hughes v. Butt,* 2009 WL

3122952, * 11 (N.D.N.Y.2009) (*citing Jett v. Dallas Independent School District,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). *See Wynder v. McMahon,* 2013 WL 1759968, *5 (E.D.N.Y.2013) ("When a plaintiff alleges § 1981 and § 1983 claims for the same conduct, a court may dismiss the § 1981 claim or deem it merged with the § 1983 claim; the result, in practice, is the same"). "Courts have interpreted this prohibition to extend to actions against individual defendants in their individual capacities." *Rehman v. State University of New York at Stony Brook,* 596 F.Supp.2d 643, 654 (E.D.N.Y.2009).

**2. Equal Protection**

**\*4** Defendants argue that plaintiff's conclusory allegations of racial discrimination likewise fail to state an equal protection claim. Defendants' Memorandum of Law [40], pp. 10–11. I agree.

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race ." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "In order to plead a facially valid equal protection claim, however, plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right." *Nash v. McGinnis,* 585 F.Supp.2d 455, 462 (W.D.N.Y.2008) (Larimer, J.). "Conclusory allegations of disparate treatment or plaintiff's personal belief of discriminatory intent is insufficient." *Id.*

Here, plaintiff only sets forth conclusory allegations of discriminatory intent. He also fails to allege that he was treated differently from other similarly situated inmates. Therefore, I recommend that this claim be dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

**3. Conspiracy**

Defendants argue that this claim must be dismissed because the Amended Complaint "is devoid of any factual allegations that plausibly suggest a meeting of the minds or agreement between any of the defendants". Defendants' Memorandum of Law [40], p. 15. I agree.

"In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003), *cert. denied,* 540 U.S. 1110, 124 S.Ct. 1077, 157 L.Ed.2d 897 (2004).[FN8] "To survive a motion to dismiss, plaintiff must include some facts in his complaint tending to show that defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated his rights, privileges, or immunities secured by the Constitution or federal courts." *McLaurin v. New Rochelle Police Officers,* 368 F.Supp.2d 289, 295 (S.D.N.Y.2005). At best, plaintiff alleges that Schunh stated that her co-workers would not "go against her". Amended Complaint [29], ¶ 26. However, he has "not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants." *Webb,* 340 F.3d at 111.

> FN8. "The plaintiffs' [conspiracy] claim under 42 U.S.C. § 1983, ... should actually be stated as a claim under Section 1985, which applies specifically to conspiracies." *Webb,* 340 F.3d at 110.

"As for the § 1986 claim, no such claim lies unless there is a viable conspiracy claim under § 1985." *Abdi v. Brookhaven Science Associates, LLC,* 447 F.Supp.2d 221, 227 (E.D.N.Y.2006). Therefore, I recommend that plaintiff's §§ 1985 and 1986 con-

spiracy claims be dismissed.

**4. Retaliation**

Defendants argue that this claim is "nonsensical" since his grievance, which was filed *after* the termination of his pain medication, could not have prompted the decision to terminate his pain medication. Defendants' Memorandum of Law [40], p. 17.[FN9] I agree. To establish retaliation, "the plaintiff must prove that the alleged retaliatory action would not have been taken but for his having exercised his constitutional rights." *Andino v. Fischer,* 698 F.Supp.2d 362, 382 (S.D.N.Y.2010). Here, the challenged action occurred prior to his grievance, so it clearly could not have been taken in response to his grievance.[FN10] Although plaintiff's claim against defendant Schunh is also premised on her retaliation arising from his request for a second opinion (Amended Complaint [29], ¶ 32), this too, occurred after she had decided to terminate his pain medications. Therefore, I recommend that this claim be dismissed.

> FN9. It appears that plaintiff's grievance was not filed until December 16, 2010. Amended Complaint [29], p. 31 of 43. This was after he was seen by Schunh, Dr. Evans and Dr. Rao.

> FN10. If plaintiff's claim is that defendants continued to deprive him of pain medication after he filed his grievance in retaliation for that grievance, that is not evident from the allegations of the Amended Complaint as it is currently pled.

**5. Due Process**

**\*5** Defendants argue that other than plaintiff's conclusory claim that plaintiff was denied due process (Amended Complaint [29], ¶ 1), he "fails to complain about either a procedural or substantive due process violation." Defendants' Memorandum of Law [40], p. 18. I agree, and recommend that this claim be dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

**6. Deliberate Indifference**

Defendants argues that "[a]s the very exhibits plaintiff relies upon demonstrate, he was actually continued on Ultram and then weaned off of it. Thereafter, he was prescribed a non-prescription pain reliever with food. That he preferred a prescription narcotic at a higher dose does not make for a claim of constitutional dimension". Defendants' Memorandum of Law [40], p. 14. I disagree.

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs". *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The "deliberate indifference" standard has both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). To satisfy the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

To satisfy the subjective component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id. See also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

"[D]isagreements over treatment do not rise to the level of a Constitutional violation", *Graham v. Gibson,* 2007 WL 3541613, *5 (W.D.N.Y.2007) (Siragusa, J.), as "[t]he Constitution does not require that an inmate receive a particular course of treatment". *Tafari v. Stein,* 2009 WL 331378, *7 (W.D.N.Y.), *recon. denied,* 2009 WL 1322317, 2009 WL 1579530 (W.D.N.Y.2009) (Scott, M .J.). Consequently, "a prison doctor *who relies on his medical judgment* to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference." *Williams v. Smith,* 2009 WL 2431948, *9 (S.D.N.Y.), *recon. denied,* 2009 WL 5103230 (S.D.N.Y.2009) (emphasis added).

**\*6** Accepting plaintiff's allegations as true for purposes of this motion, they plainly establish that defendants' decisions in discontinuing plaintiff's prior pain medications were not based on medical judgments. I also disagree that plaintiff's claims are belied by the medical records he attaches to his Amended Complaint. While these records demonstrate that he was weaned from Ultram (Amended Complaint [29], p. 32 of 43), they do not undermine his claim that this medication was ultimately discontinued in favor of Motrin, a medication plaintiff alleges defendants knew caused him "distress". *Id.,* ¶ 37. Therefore, I recommend that this claim not be dismissed.

**7. Failure to Protect**

Defendants argue that "[w]hile such a claim

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

generally arises in the context of an attack by another inmate, [they] assume that plaintiff's sweeping claim is based on the same medical indifference assertions". Defendants' Memorandum of Law [40], p. 19. Thus, they argue that "like the plaintiff's Eighth Amendment medical indifference claim, plaintiff's 'failure to protect' claim should be dismissed as well." *Id.* Defendants' Memorandum of Law [40], p. 19.

However, since I have recommended that plaintiff's deliberate indifference claim not be dismissed, I likewise recommend that plaintiff's failure to protect claim not be dismissed.

**8. Personal Involvement**

Defendants argue that there is insufficient personal involvement alleged to support the claims against Nurse Administrator Killinger, Superintendent Bradt, and Commissioner Fischer. Defendants' Memorandum of Law [40], pp. 19–20. [FN11]

> FN11. I have analyzed defendants' remaining arguments in light of the claims that I have recommended not be dismissed.

Prior to *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), it had been well settled that "[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). However, in *Iqbal,* the Supreme Court

clouded this issue when it rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution", concluding that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677.

Since *Iqbal,* some districts courts have determined that not all five of *Colon's* categories of conduct that may give rise to supervisory liability remain viable. *See e.g., Spear v. Hugles,* 2009 WL 2176725, *2 (S.D.N.Y.2009) ("only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal"* ); *Bellamy v. Mount Vernon Hospital,* 2009 WL 1835939, *6 (S.D.N.Y.2009),* aff'd,* 387 Fed. Appx. 55 (2d Cir.2010) (Summary Order) ("The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin.* Iqbal's active conduct standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal's* muster") [FN12]; *Bryant v. County of Monroe,* 2010 WL 4877799, *3 (W.D.N.Y.2010)* (Siragusa, J .) ("The Court ... is persuaded by the analysis of ... *Iqbal* ... in *Bellamy"* ).[FN13]

> FN12. "[T]he *Iqbal* issue was not raised on appeal" in *Bellamy. Stresing v. Agostinoni,* 2012 WL 2405240, *4 (W.D.N.Y.2012) (Skretny, J).

> FN13. Adding to the uncertainty, "[t]he Second Circuit has not yet addressed which, if any, of the *Colon* categories survive *Iqbal .*" *Jamison v. Fischer,* 2012 WL 4767173, *4 (S.D.N.Y.2012). *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) ("Although the Supreme Court's decision in *Ashcroft v. Iqbal* ... may have heightened the requirements for showing a supervisory's

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

personal involvement with respect to certain constitutional violations, we need not reach *Iqbal's* impact on *Colon* in this case").

**\*7** However, I agree "with the apparent majority view that where, as here, the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth and Fourteenth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Shepherd v. Powers,* 2012 WL 4477241, \*10 (S.D.N.Y.2012).

**a. Nurse Administrator Killinger**

Plaintiff alleges that on April 18, 201, he sent Nurse Administrator Killinger a letter complaining about the intentional interference with his pain medication. Amended Complaint [29], ¶ 101. The Amended Complaint attaches an April 19, 2011 response from Nurse Administrator Killinger stating "You are scheduled to see a medical clinician to assess your medical concerns". *Id.,* p. 39 of 43.

"The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, \*4 (S.D.N.Y.2009). Nevertheless, "[a] supervisor's detailed, specific response to a plaintiff's complaint" may suffice to establish personal involvement. *Mateo v. Fischer,* 682 F.Supp.2d 423, 430–31 (S.D.N.Y.2010); *see Rosario v. Fischer,* 2012 WL 4044901, \*5 (S.D.N.Y.), *adopted* 2012 WL 6681695 (S.D.N.Y.2012) ("a pro forma response to a letter or grievance" does not amount to personal involvement); *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006) (Larimer, J.) ("in general personal involvement will not be found unless 'the supervisor's response is detailed and specific' ").

Nurse Administrator Killinger's generalized re-

sponse to plaintiff's complaint is not sufficient to establish personal involvement. *See Mateo,* 682 F.Supp.2d at 430–31. Beyond this, plaintiff only generally alleges that Nurse Administrator Killinger was informed of the violation through "grievances, appeal, [and] letters". Amended Complaint [29], ¶ 115. However, "the naked assertion ... that he complained to Defendants ... that he was being deprived of reasonable and adequate ... care ... is simply too lacking in factual detail to show that Plaintiff is entitled to relief.... Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints." *Jean–Laurent v. Lane,* 2013 WL 600213, \*16 (N.D.N.Y.), *adopted* 2013 WL 5999893 (N.D.N.Y.2013).

Moreover, "where the personal involvement of a defendant in a Section 1983 violation is premised upon a claim of conspiracy, '[i]t is incumbent on a plaintiff to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights.' " *Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009), (*quoting Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990)). Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Nurse Administrator Killinger be dismissed.

**b. Superintendent Bradt**

**\*8** Although the Amended Complaint [29] generally alleges that Superintendent Bradt was informed of the violations through "grievances [,] appeal[, and] letters" (Amended Complaint [29], ¶ 132), the only specific communication identified is Superintendent Bradt's January 6, 2011 denial of plaintiff's grievance concerning the termination of his pain medication. *Id.,* ¶ 135, p. 41 of 43. However, "[t]he fact that [the] Superintendent ... affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement".

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

*Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). *See Ramos v. Wright,* 2011 WL 2462482, *6 (N.D.N.Y.2011), *adopted* 2011 WL 2462472 (N.D.N.Y.2011) (dismissing claims against superintendent on personal involvement grounds where "[p]laintiff's sole factual allegation against Defendant Superintendent Smith, [was] that he affirmed the resolution of Plaintiff's institutional grievance and indicated that Plaintiff was receiving adequate medical attention"); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (Larimer, J.) ("To the extent that [Superintendent] Lempke may have, in the course of his official duties, denied or affirmed the denial of certain grievances filed by the plaintiff, 'the denial of [a] plaintiff's grievance—[where that] is all that is alleged against him-is insufficient to establish personal involvement [in a constitutional violation]' by a prison superintendent"); *Ramsey v. Goord,* 2005 WL 2000144, *8 (W.D.N.Y.2005) (Skretny, J.) ("the fact that a prison official in the prison chain of command affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official"); *Vogelfang v. Capra,* 2012 WL 832440, *7 (S.D.N.Y.2012) ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights"); *White v. Sears,* 2011 WL 2728443, *8 (N.D.N.Y.2011), *adopted* 2011 WL 2728431 (N.D.N.Y.2011) ("To the extent that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to establish personal involvement").[FN14] Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Superintendent Bradt be dismissed.

> FN14. *Compare with McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make [the defendant deputy superintendent for administration] liable for the conduct complained of", where the defendant was responsible for the prison's medical program and "allegations of improperly denied medical treatment come to [his] attention ..., his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility").

**c. Commissioner Fischer**

Without identifying any specific grievances, plaintiff alleges that he "sent grievances" to Commissioner Fischer. Amended Complaint [29], ¶ 138. However, there is no allegation that Commissioner Fischer ever responded to these grievances. "The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, *4 (S.D.N.Y.2009). Thus, "[t]he receipt of a prisoner's letter of grievance by a DOCS Commissioner who delegates to other prison officials the task of responding to such complaints is insufficient to establish the Commissioner's personal involvement ." *Spavone v. Fischer,* 2012 WL 360289, *5 (S.D.N.Y.2012). Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Commissioner Fischer be dismissed.

**9. Official Capacity Claims**

**\*9** Defendants argue that plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. I agree. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that neither the state, its agencies, nor its employees acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983). Therefore, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's official capacity claims.

**10. Qualified Immunity**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

Defendants argue that they are entitled to qualified immunity "[g]iven that the ... Eighth Amendment is not violated when an inmate does no receive medication of his choosing ..., defendants had every reason to believe their actions were lawful." Defendants' Memorandum of Law [40], p. 22. I disagree.

Under the qualified immunity doctrine "a defendant is not liable if he did not violate clearly established law or it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). "Thus, government officials are entitled to qualified immunity at the dismissal stage only where it appears on the face of a plaintiff's complaint that they did not violate clearly established rights of which they should have known." *Richardson v. Department of Corrections of N.Y.S.,* 2011 WL 4091491, *4 (S.D.N.Y.2011), *recon. denied,* 2012 WL 76910 (S.D.N.Y.2012). "Usually, the defense of qualified immunity cannot support the grant of a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This case is no different.

It is undisputed that the right to be free from deliberate indifference to serious medical needs was clearly established throughout the period of the alleged deliberate indifference. "At this early procedural juncture, accepting plaintiff's allegations as true and drawing all inferences in his favor, I am unable to say that it was objectively reasonable for the defendants to conclude that their actions did not violate plaintiff's clearly established right to be free from deliberate medical indifference." *Taylor v. Goord,* 2010 WL 3825661, *11 (N.D.N.Y.), adopted, 2010 WL 3825656 (N.D.N.Y.2010). *See Briel v. Fields,* 2013 WL 1833248, *4 (E.D.N.Y.2013).

**B. Motion to Stay**

Defendants move to stay all proceedings until resolution of their motion to dismiss. Defendants' Notice of Motion [39]. Although there appears to have been no proceedings in this action since the filing of defendants' motion to dismiss, to the extent plaintiff seeks to move forward with discovery while any objections to this Report, Recommendation and Order are pending, a stay is granted.

**CONCLUSION**

For these reasons, defendants' motion [39] is granted to the extent it seeks a stay, and I recommend that their motion to dismiss the Amended Complaint be denied to the extent it seeks to dismiss the deliberate indifference/failure to protect claims against defendants Schunh, Dr. Evans, Dr. Rao and Dr. Kowski, in their individual capacities, but otherwise be granted.

**\*10** Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation, and Order must be filed with the clerk of this court by October 7, 2013 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson– Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal author-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 347053 (W.D.N.Y.)
**(Cite as: 2014 WL 347053 (W.D.N.Y.))**

ity", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

W.D.N.Y.,2014.
Keitt v. Schun
Slip Copy, 2014 WL 347053 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)
**(Cite as: 2001 WL 474261 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Dean B. LLORENTE, Plaintiff,
v.
Jonathan ROZEFF, Individually and as an agent,
servant and/or employee and police officer of Amtrak,
Wayne Peplowski, Individually and as an agent,
servant and/or employee and police officer of the City
of Rensselaer and City of Rensselaer Police Depart-
ment, and the City of Rensselaer, Defendants,

No. 99-CV-1799.
April 12, 2001.

Tobin and Dempf, Albany, NY, for Plaintiff, Kevin A.
Luibrand, of counsel.

Landam, Corsi, Ballaine & Ford, P.C., New York,
New York, for Defendant Joseph Rozeff, Mark S.
Landman, of counsel.

Ryan & Smallcombe, LLP, Albany, New York, for
Defendants Wayne Peplowski and the City of Rens-
selaer, Claudia A. Ryan, of counsel.

### MEMORANDUM DECISION AND ORDER
MUNSON, Senior J.
   **\*1** On November 4, 1998, Assistant Conductor
Gary Paugh had plaintiff put off an Amtrak train at the
Rensselaer, N.Y. station for allegedly creating a dis-
turbance. He was immediately arrested for disorderly
conduct by defendant Wayne Peplowski, a City of
Rensselaer police officer, and defendant Jonathan
Rozoff, an Amtrak police officer, and taken, along
with his luggage, to the Rensselaer Police Department.
Plaintiff was placed on a bench in the booking area of
the station, and his luggage was placed nearby. De-
fendant Rozoff was seated at the booking desk pre-
paring a criminal information charging plaintiff with

disorderly conduct. Defendant Poplowski was also
present in the booking area, but left briefly to obtain
some required paperwork.

   Plaintiff alleges that while he was seated in the
booking area, an unidentified City of Rensselaer Po-
lice Officer started searching through his luggage, and
when he stood up and to make an objection, the police
officer struck him with an open hand hitting plaintiff
on his left ear. Plaintiff fell to the floor stunned. He
claims that defendants Rozeff and Peplowski then
picked him up and dragged him to a jail cell where he
passed out. He awoke the next morning with severe
pain in his left ear and the blanket his head had rested
upon saturated with blood. Plaintiff claims that he then
cleaned himself up, had breakfast, was taken to court,
pled guilty to the charge, paid the assessed fine and
was released from custody. He went immediately to
have his ear examined at the Albany Medical Center
where he was diagnosed as having a perforated left ear
drum, was treated with antibiotics, and was advised to
obtain follow up medical attention. The court notes
that the police guard on duty that morning makes no
mention in the Renesselaer Police Department Pris-
oner Log of seeing a blood drenched blanket in plain-
tiff's cell when he awakened plaintiff and provided
him with breakfast. (Luibrand-Affidavit in Partial
Opposition to Defendants' Motions for Summary
Judgment, Ex. H)

   Plaintiff commenced this action on November 23,
1999, asserting that because defendants Rozeff and
Peplowski denied him his constitutional right to
medical treatment in violation of 42 U.S.C. § 1983, he
suffered permanent damage to his left ear, including
extreme pain and ringing in his ear as well as mental
suffering. The complaint also contains a pendent state
claim for assault and battery. Plaintiff seeks compen-
satory and punitive damages, attorney's fees and costs.

   On April 28, 2000, plaintiff's motion to amend the
complaint to add Amtrak as a party defendant and
asserting causes of action of conspiracy to violate 42

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)
**(Cite as: 2001 WL 474261 (N.D.N.Y.))**

U.S.C. § 1985, negligence and respondeat superior was granted, however, the record does not show that an amended complaint was ever served on Amtrak.

Currently before the court are individual motions for summary judgment, one made by defendant Rozeff, and the other by defendants Peplowski and the City of Rensselaer for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has entered partial opposition to each of these motions.

DISCUSSION

**\*2** Rule 56 of the Federal Rules of Civil Procedure permits summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2709, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catreet,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). In determining whether there is a genuine issue of material fact a court must resolve all ambiguities and draw inferences against the moving party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)(*per curiam* ). An issue of credibility is insufficient to preclude the granting of a motion for summary judgment. Neither side can rely on conclusory allegations or statements in affidavits. The disputed issue of fact must be supported by evidence that would allow a "rational trier of fact to find for the non-moving party." *Mashusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Unsupported allegations will not suffice to create a triable issue of fact. *Goenga v. March of Dimes Birth Defects Federation,* 51 F.3d 14, 18 (2d Cir.1995). Nor will factual disputes that are irrelevant to the disposition of the suit

under governing law preclude any entry of summary judgment. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

The papers submitted by plaintiff in opposition to the two summary judgment motions address only that portion of his first cause of action that claims that defendants Peplowski and Rozeff denied him medical attention in an unconstitutional manner. Plaintiff did not challenge the contentions made by defendants Peplowski and Rozeff in their motion papers that plaintiff's claims in his first cause of action regarding defendant Rozeff's striking the plaintiff, and defendant Peplowski's failure to intervene to stop this assault, are without merit, as is the state law assault and battery claim he sets forth in his second cause of action. The court agrees with the defendants' positions here and will dismiss these causes of action. The only remaining claim for the court to consider in these summary judgment motions is that defendants Peplowski and Rozeff did not provide medical treatment to plaintiff for his injured ear.

Although plaintiff does not so state in his complaint, what he is claiming is that defendants Roseff and Peplowski were deliberately indifferent to his serious medical needs. The Eighth Amendment's prohibition on cruel and unusual punishment proscribes "deliberate indifference to serious medical needs manifested by ... intentionally delaying access to medical care. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment does not apply in cases where there has been no formal adjudication of guilt. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). The rights of one who has not been convicted are protected by the Due Process Clause and ... it is plain that the unconvicted detainee's rights are at least as great as those of the convicted prisoner. *Weyant v. Osk,* 101 F.3d 845, 856 (2d Cir.1996). Therefore, the deliberate indifference claims apply arise under the Due Process Clause of either the Fourteenth Amendment or the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)
**(Cite as: 2001 WL 474261 (N.D.N.Y.))**

Fifth Amendment. *Cuoco v. Mortisgugu,* 222 F.2d 99, 106 (2d Cir.2000).

**\*3** Here, plaintiff was under arrest and in custody at the time of the alleged delay of medical attention, and had not been arraigned or convicted of any crime. He was neither a pre-trial detainee nor a prisoner, but an arrestee in custody. Even though the Supreme Court has not formulated the duties of the custodial official under the Due Process Clause to provide medical care to arrestees, it is clear that the arrestee's rights are as great as those afforded to the pre-trial detainee and to a convicted prisoner under the Eighth Amendment. Hence, plaintiff's denial of medical care claim will be analyzed under Eighth Amendment case law. *Smith v. Montefiore Medical Center-Health Services Division,* 22 F.Supp.2d 275, 280 (S.D.N.Y.1998).

"The deliberate indifference standard is comprised of an objective and subjective prong. First the alleged deprivation must be, in objective terms, 'sufficiently serious' [and][s]econd, the charged official must act with sufficiently culpable state of mind. *Hathaway v. Coughlin,* 37 F.2d 63, 66 (2d Cir.1994). For the first prong, a sufficiently serious medical need "contemplates a condition urgency, one that may produce death, degeneration, or extreme pain." *Id.* To meet the second prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct., 128 L.Ed.2d 811 (1994). The subjective element of deliberate indifference "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result ." *Id.,* at 835.

Here, plaintiff's evidence does not support a claim of deliberate indifference against either defendant Rozeff or defendant Peplowski. First, assuming that plaintiff had a sufficiently serious medical need,

plaintiff has not shown that either defendants' state of mind was deliberate indifference as formulated in *Farmer v. Brennan, Id.* Plaintiff does not call attention to evidence to support that either defendant knew the facts from which he could draw that inference. *Id.* at 837. He only speculates that either or both defendants may have seen him struck by the unidentified police officer because they both were entering and leaving the booking room throughout the period he was being detained there. Furthermore, plaintiff offers no evidence that his need for medical attention was evident. At the Albany Medical Center he was diagnosed as having a perforated left ear drum, treated with antibiotics, and advised to obtain follow up medical evaluation. Plaintiff's alleged injury was internal. There is no evidence in plaintiff's's testimony or any document from which it can be inferred that plaintiff had suffered a serious injury obvious to either of the defendants. "It is impossible to respond to invisible injury without notice." *Owens v. Colburn,* 860 F.Supp. 996, 974-75 (N.D.N.Y.1994). Plaintiff has not presented any evidence that either defendant would have known that plaintiff needed medical attention just by looking at him.

**\*4** The record also indicates that plaintiff's medical problem may have pre-existed his being struck on the left outer ear by an unidentified police officer. On February 14, 2000, plaintiff had his left ear examined by a Doctor Qec, at The Queen Emma Clinics in Hawaii. Dr. Qec's examination report states that plaintiff said "in November 1998, he injured his ear while diving into a pool." Plaintiff's left ear was again examined at an ENT clinic in the same medical facility on February 23, 2000, by Meredith K.L. Pang, M.D. Dr. Pang's examination report states that plaintiff said the ear was injured in Colorado "while playing basketball 16 months ago." (Def, Peplowski's Notice of Motion, Ex. L).

In paragraph 20 of his complaint plaintiff maintains that he asked for medical treatment after he had been struck on the ear. The record disagrees with this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)
**(Cite as: 2001 WL 474261 (N.D.N.Y.))**

assertion. Plaintiff has admitted as part of his opposition papers that at no point did he either cry out or express pain or or request medical assistance from any member of the City of Rensselaer Police Department, the officer who woke him in the morning and escorted him to court, nor the presiding judge of the court. Plaintiff first complained of his injury at the Albany Medical Center. He has put forward no evidence that defendants Rozeff and Peplowski would have known that he needed medical attention just by looking at him thereby failing to demonstrate that defendants had the requisite state of mind under *Farmer v. Brennan* to show deliberate indifference to plaintiff's medical needs.

Plaintiff also alleges that the defendants conduct in delaying him medical assistance caused him permanent injury. (Complaint ¶ 24). A delay in providing medical care to an arrestee does not by itself violate the constitution. *Shockly v. Jones,* 823 F.2d 1068, 1072 (7 th Cir.1987). To establish a constitutional violation, an arrestee must show that he suffered substantial harm as a result of the delay in receiving medical care. *de La Paz v. Danzel,* 646 F.Supp. 914, 922-23 (D.C.N.D.Ill.1986). A plaintiff who complains that a "delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Hill v. DeKalb Regional Youth Detention Center,* 40 F.3d 1176, 1188 (11 th Cir.1994). Not only has plaintiff not done this, he acknowledges that he has not identified any expert who will testify that his injury was aggravated as a result of the claimed delay in medical treatment, (Plnf.7.1(a)(3) Respn to Peplowski ¶ 36), and admits that no medical records exist which supports that a delay in medical care resulted in aggravation of his injury. (*Id.* at ¶ 37)

The evidence submitted does not support plaintiff's claim that defendants Rozeff and Peplowski exhibited deliberate indifference to plaintiff's medical needs, and these defendants are entitled to summary judgment on plaintiff's claim of deliberate medical indifference to his medical needs. What is more, because plaintiff has not established any legally cognizable federal claim against municipal police officer defendant Pepolski, no claim can lie against municipal defendant The City of Rensselaer. *City of Los Angles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)

**\*5** Defendants Rozeff and Peplowski have both set forth affirmative defenses of qualified immunity. In an action brought under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, L. 64 Ed.2d 572 (1980). If a plaintiff fails to set forth facts sufficient to meet these elements, as has occurred in the instant case, the court need not consider whether a defendant is entitled to qualified immunity. *Calhoun v. New York State Division of Parole Officers,* 999 F.2d 647, 652 (2d Cir.1993).

Accordingly, the two motions for summary judgment made by defendants Rozeff and Peplowski and the City of Rensselaer are GRANTED and the complaint is DISMISSED.

IT IS SO ORDERED

N.D.N.Y.,2001.
Llorente v. Rozeff
Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Time of Request:** Wednesday, January 14, 2015  15:29:59 EST
**Client ID/Project Name:**
**Number of Lines:** 510
**Job Number:**      2827:496326324

Research Information

**Service:**    LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 2009 U.S. Dist. LEXIS 71616

**Send to:**  Pontius, Nancy
            FEDERAL COURTS:  2ND CIRCUIT
            500 PEARL ST
            NEW YORK, NY 10007-1316



ABDUL MAJID and JEARMY CHAM, Plaintiffs, -v- BRIAN FISCHER,
Defendant.

07 Civ. 4584 (NRB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2009 U.S. Dist. LEXIS 71616*

July 31, 2009, Decided
July 31, 2009, Filed

**PRIOR HISTORY:** *Majid v. Goord, 2007 U.S. Dist. LEXIS 77839 (S.D.N.Y., Oct. 10, 2007)*

**COUNSEL:** [*1] Abdul Majid, Plaintiff, Pro se, Stormville, NY.

Jearmy Cham, Plaintiff, Pro se, Stormville, NY.

Masjid Sankure at Taubah et al, Plaintiff, Pro se.

Mr.q Ralph Hanerson, Movant, Pro se, Stormville, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

    NAOMI REICE BUCHWALD

**UNITED STATES DISTRICT JUDGE**

    *Pro se* plaintiffs Abdul Majid and Jearmy Cham ("plaintiffs"), incarcerated prisoners at the Green Haven Correctional Facility ("Green Haven"), bring this action under *42 U.S.C. § 1983* and the Religious Land Use and

Institutionalized Persons Act of 2000 ("RLUIPA"), *42 U.S.C. § 2000cc-1 to -5 (2000)*, against the Commissioner of the New York State Department of Correctional Services [1] ("DOCS"), seeking injunctive relief. Plaintiffs allege that DOCS violated their *First* and *Fourteenth Amendment* rights and RLUIPA by (1) failing to provide them with a diet consistent with Muslim dietary law, and (2) closing a portion of Green Haven's "Masjid Sankore At-Taubah" Mosque ("the Mosque"). Defendant now moves for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. For the reasons set forth below, defendant's motion is granted.

    1  This lawsuit [*2] was commenced against Glen Goord, the former Commissioner of DOCS, in his official capacity. Pursuant to *Rule 25(d) of the Federal Rules of Civil Procedure*, current Commissioner Brian Fischer has been 'substituted for Goord as the defendant in this action.

**BACKGROUND**

    2

    2  The facts in this section have been drawn from the Amended Complaint ("Am. Compl."), Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), excerpts from the deposition

testimony of Abdul Majid, attached as exhibit A to Def.'s Mem. ("Majid Dep."), excerpts from the deposition testimony of Jearmy Cham, attached as exhibit B to Def.'s Mem. ("Cham Dep."), the Declarations of Elizabeth Culkin ("Culkin Decl." and "Further Culkin Decl.") and Raymond Koskowski ("Koskowski Decl.") in Support of Defendant's Motion for Summary Judgment, Plaintiffs' Response to Defendant's Memorandum of Law, Expert Disclosure, and Supporting Declarations for Summary Judgment ("Pls.' Mem.") and the Declaration of Richard Timmons in Opposition to Defendant's Motion for Summary Judgment ("Timmons Decl."). As is appropriate in deciding a motion for summary judgment, we resolve all ambiguities and draw all [*3] factual inferences in favor of the non-movants, the plaintiffs. *Adams v. Dep't of Juvenile Justice of City of New York, 143 F.3d 61, 65 (2d Cir. 1998).*

Plaintiff Abdul Majid, who converted to Islam in 1967, has been in DOCS' custody since 1983, and is currently incarcerated at Green Haven. (Def.'s Mem. at 2.) Plaintiff Jearmy Cham has been incarcerated since 1996 and is also housed at Green Haven. (*Id.*) He converted to Islam in 1996. (*Id.*)

On May 31, 2007, plaintiffs filed a complaint *in forma pauperis* commencing the present action, seeking an injunction "[o]rdering defendants to immediately sit down with plaintiffs or their representatives to formulate a meaningful Halal menu/diet . . . [and] to re-open the back area of [the] Masjid." (Am. Compl. I at 5; Am. Compl. II at 5.) [3] On October 14, 2008, defendant, the former Commissioner of DOCS, filed the instant motion for summary judgment.

3   Plaintiffs filed an amended complaint on July 31, 2007. Both the original and the amended complaints are composed of what appear to be two separate complaints stapled together, as they are labeled "Complaint # 1" and "Complaint # 2." The former of these relates to plaintiffs' dietary claims, whereas [*4] the latter relates to plaintiffs' claims concerning the Green Haven Mosque. We treat both documents as a single complaint, and when citing to plaintiffs' amended complaint, use the labels "Am. Compl. I" and "Am. Compl. II" to distinguish between the

separate sections of the Amended Complaint.

**a. Plaintiffs' Dietary Claims**

Plaintiffs allege that defendant "placed a substantial burden on [p]laintiffs who wish to adhere to an Islamic (Halal) diet" (Pls.' Mem. at 5), in violation of their *First Amendment* rights and RLUIPA, by: (1) restricting Muslim inmates to "[s]oya bean based meals . . . lacking in nutritional value," thereby causing some Muslims to "return to eating the non-Halal regular diet" (*Id.* at 6), and (2) compelling them to eat using the same utensils that are used to eat meals containing non-halal foods. [4] (*Id.* at 2.) Plaintiffs further claim that defendant violated their equal protection rights by restricting them to a soy-based diet, instead of providing them with a separate halal diet equivalent to the kosher diet that Jewish inmates at Green Haven receive. (*Id.* at 13.)

4   According to defendant's expert, Imam Feisal Abdul Rauf, the Koran dictates that practicing Muslims must [*5] eat food that is "halal," which means lawful or permissible, and must refrain from eating food that is "harem," or forbidden. (Def.'s Mem., Ex. E at 4.) Items such as fruits, vegetables and seafood are considered intrinsically halal, whereas other items, such as cow, lamb and other herbivorous animals, must be made halal through ritual slaughter. (*Id.*) A few items, such as pork, are haram, and simply can never be made halal. (*Id.*) In situations of necessity, however, a Muslim may be allowed to eat haram items. (*Id.*)

Their claims, however, are by no means original). [5] Indeed, DOCS' food service policies have been challenged in a number of cases in this Circuit, and each time, they have been found adequate to withstand constitutional scrutiny. In *Abdul-Malik v. Goord,* Judge Cote of this Court specifically considered the constitutionality of the Religious Alternative Menu ("RAM") program offered at Green Haven and determined that "[t]he RAM diet is sufficient to sustain prisoners in good health and its consumption does not require any violation of the tenets of Islam." *96 Civ. 1021(DLC), 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997).* Similar conclusions have been reached in a number of [*6] subsequent decisions. *See, e.g., Cox v. Kralik, 05 Civ. 5917(DLC), 2006 U.S. Dist. LEXIS 8765, 2006 WL 42122, at *2 (S.D.N.Y. Jan. 6, 2006)* (provision of

vegetarian or kosher diet in place of a halal diet did not unduly burden Muslim prisoner's *First Amendment* rights); *Smith v. Nuttal, 04 Civ. 0200(F), 2007 U.S. Dist. LEXIS 18354, 2007 WL 837111, at *4-5 (W.D.N.Y. Mar. 14, 2007)* (rejecting Muslim prisoner's *First and Fourteenth Amendment* and RLUIPA claims where prison denied him access to kosher meal plan, instead providing RAM meals); *Muhammad v. Warthu-Deen Umar, 98 F. Supp. 2d 337, 345 (W.D.N.Y. 2000)* (RAM diet did not substantially burden Nation of Islam adherents' free exercise and was reasonably related to legitimate penological interests).

> 5 Plaintiff Majid himself has already litigated the constitutionality of DOCS' alternative meal program in state court and lost. *Majid v. Leonardo, 172 A.D.2d 914, 914, 568 N.Y.S.2d 200 (3rd Dept. 1985)* ("[T]he pork-free diet provided [at the Great Meadow Correctional Facility] by respondents satisfies constitutional requirements and their dietary guidelines are based on legitimate penological concerns due to budgetary constraints and staff resources.").

In the present case, and in response to plaintiffs' [*7] claims, defendant contends that DOCS' meal programs do not violate plaintiffs' constitutional rights or RLUIPA because they are consistent with Islamic dietary requirements and are nutritionally adequate, and because they are reasonably related to legitimate penological interests in reducing costs and administrative burdens.

In support of his motion for summary judgment, defendant has provided the following unchallenged (unless otherwise indicated) details about DOCS' service of food to DOCS inmates:

In the DOCS system, the Office of Nutritional Services ("Nutritional Services") is responsible for establishing a statewide menu to feed DOCS' approximately 61,000 inmates. (Culkin Decl. P 4.) In preparing its menu, Nutritional Services considers, among other factors, nutritional quality, accommodation of religious requirements, security implications and cost containment. (*Id.*)

Between August and November 1996, Nutritional Services instituted the RAM program in virtually all DOCS facilities including Green Haven, with the purpose of "accommodat[ing] the needs of inmates who may have different dietary requirements due to their religious beliefs or personal dietary beliefs . . . in an economically [*8] viable way." (*Id.* PP 5-6.) The RAM program provides an alternative to the standard lunch and dinner entrees and is "available to any inmate who wants it regardless of religious affiliation." (*Id.* P 6; Majid Dep. 90:3-4.) A typical RAM meal costs approximately $ 2.60 per inmate, whereas a regular meal costs approximately $ 2.61 per inmate. (Culkin Decl. P 10 n.1.)

Service of the RAM meal option takes place at the same time as service of the regular meal option. (*Id.* P 6.) To prevent contamination, RAM meals are served by a single server, using separate serving utensils. (Johnston Decl. P 7.) All utensils used to serve non-RAM meals are thoroughly sanitized before being reused. [6] (*Id.* PP 7-8; Majid Dep. 92:21-93:2.) The New York State Department of Health inspects Green Haven's mess hall once a year. (Johnston Decl. P 9.) Of the 175 food service personnel that work in Green Haven's mess hall, 40 are Muslim inmates. (*Id.* P 3.)

> 6 Plaintiffs do attempt to challenge Green Haven's sanitization procedures, through the declaration of Green Haven inmate Richard Timmons. Timmons stated that: "While working in the dishrooms declarant [Timmons] would search the trays as they came out the finished [*9] end and often . . . trays [would] come out with food still visible in the tray. . . . When declarant was serving on the line . . . [he would] find [that] 25% [of the trays] would be dirty in need of rewashing. Declarant would . . . see inmates that had received their trays with food return [them] for finding last meals [sic] food in the corner of the tray, at least 4% of the time." (Timmons Decl. P 43.)

To accommodate DOCS' approximately 9,729 Muslim inmates (Further Culkin Decl. P 3), DOCS' regular meal program is pork-free, with the exception of a single pork entree per month. (Culkin Decl P 7.) At Green Haven, this pork entree is cooked in a sealed, plastic package and is served by a single server, as far away as possible from the RAM entree. (Johnston Decl. PP 5-6.) A Muslim chaplain visits several times a year to discuss food service with Muslim inmates. (*Id.* P 4.)

To further accommodate Muslim inmates, the RAM program provides for one halal chicken patty per week, either for lunch or for dinner. (Culkin Decl. P 7; Majid Dep. 113:3-4.) Each halal patty costs $ 0.4864, while

each non-halal patty costs $ 0.223. (Further Culkin Decl. P 3.) Halal meat is also provided to Muslim inmates [*10] during the Muslim feast days of Idul-Fitr and Idul-Adha, and during Ramadan. (Culkin Decl. P 12; Majid Dep. 111:8-9, 114:13-15.) Additionally, Muslim prisoners can obtain halal meat from their facility's commissary or from care packages from relatives. (Culkin Decl. P 12; Majid Dep. 90:22-24.) According to DOCS administrators, for nearly two decades, DOCS has been exploring the possibility of providing more halal meat, but has had limited success in finding suppliers who can cost-effectively meet its requirements. (Culkin Decl. P 13.)

DOCS also provides a separate meal program, the Cold Alternative Diet ("CAD"), for Jewish inmates. (Id. P 8; Pls.' Mem. at 2, 14.) The CAD was formulated in order to comply with Jewish dietary law, which requires the use of separate utensils for meat and dairy dishes (which may not be served concurrently), separation of kosher from non-kosher dishes and rabbinical oversight. (Culkin Decl. PP 8, 10.) Each CAD meal is prepackaged and costs approximately $ 5.42 per inmate. (Id. P 10 n.1.) The CAD is restricted to Jewish inmates (Id. P 11; Pls.' Mem. at 14), both because of the greater cost of each CAD meal and in order to minimize the administrative burden [*11] that preparing kosher meals presents. (Culkin Decl. P11.) Because the CAD, unlike the standard diet at Green Haven, only includes cold meals, DOCS has also instituted a pilot program at Green Haven that provides approximately 50 Jewish inmates with daily, hot kosher meals (prepared in a separate kitchen, served on separate dishes and consumed in a separate area). (Id. P 9.)

Defendant's expert, Imam Feisal Abdul Rauf (the "Imam"), prepared a report concerning the conformity of RAM and DOCS' food service procedures to halal requirements, in which he concluded that, "[t]he Religious Alternative Meal offered by DOCS is adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving." (Def.'s Mem., Ex. E at 4.) With regard to DOCS' service of food, the Imam concluded that, "Under Islamic law, it is permissible for Muslims to eat from utensils that have been used to serve non-halal foods (such as pork) but have since been washed and thoroughly sterilized." (Id. at 6.) He added that at Green Haven, "it is more probable that the utensils are thoroughly cleaned than not, which satisfies the Islamic legal requirement [*12] on the issue of utensils." (Id. at 7.)

In response to the Imam's conclusions, plaintiffs have merely alleged that the Imam is "of questionable beliefs," and that his conclusions are speculative and insufficiently grounded in Islamic law. (Pls.' Mem. at 3.) Further, relying on the declaration of a Muslim food server at Green Haven, plaintiffs allege that Green Haven's service and sanitization procedures are inadequate, such that intermingling of RAM and non-RAM dishes and utensils is routine. (See Timmons Decl. PP 40-45.)

### b. Plaintiffs' Claims Regarding the Closure of the Green Haven Mosque

Plaintiffs also allege that defendant violated their *First Amendment* rights and RLUIPA by closing the back area of Green Haven's Mosque after discovering weapons there, thereby causing a reduction in number or elimination of some religious classes and services. Further, plaintiffs claim that the closure of the back area violated their *Fourteenth Amendment* rights because only the back area of the Mosque was closed, even though similar items were also found in the common areas of other groups.

The Mosque was closed on May 6, 2002, after a search of the Mosque by security personnel yielded 14 metal shanks [*13] originating from Green Haven's kitchen. (Koskowski Decl. P 4; Pls.' Mem. at 19.) With the exception of approximately 1,787 square feet of space constituting the back area of the Mosque, the Mosque was reopened on May 8, 2002. (Koskowski Decl. PP 3-5; Pls.' Mem. at 23.)

According to defendant, the back area has remained closed because "[s]ecurity personnel concluded that inmate access posed a significant safety risk to employees and other inmates as the back area lacked a safe corridor for ingress and egress and its layout made proper scrutiny by officers nearly impossible." (Id. P 6.) These safety concerns "came to light on or about the time of the search." (Id.)

Plaintiffs argue that the closure of the back area was "arbitrary" and "nothing short of . . . discriminatory" (Pls.' Mem. at 18) because the security logbook detailing the May 6, 2002 search shows that similar weapons were also discovered in the group areas of other religious

groups, including the Protestant Center's kitchen and the Rastafarian room, and yet none of these groups had portions of their group space permanently closed. (*Id.* at 19.)

The closure of the back area, which plaintiffs claim was partly used as classroom [*14] space (Cham Dep. 55:18-19), has, according to plaintiffs, "hampe[red] the procurement of religious knowledge in a classroom setting." (Pls.' Mem. at 22.) However, plaintiffs concede that classes are still held at the Mosque (Cham Dep. 55:22-23; Pls.' Mem. at 4), even if certain accommodations have had to be made (Majid Dep. 137:17-25), and that the Friday night "Jumah" prayer service is still held. (*Id.* at 142:8-12.)

## DISCUSSION

### a. Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law, *Fed. R. Civ. P. 56(c)*, i.e., where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel Inc., 263 F.3d 208, 212 (2d Cir. 2001)* (internal citation and quotation marks omitted). However, "[c]onclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of material fact." *Shannon v. New York City Transit Authority, 332 F.3d 95, 99 (2d Cir. 2003)* (internal citation and quotation marks omitted). We construe the submissions of *pro se* litigants liberally and interpret them to raise [*15] the strongest arguments that they suggest. *Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006).*

### b. Plaintiffs' Dietary Claims

Plaintiffs bring their dietary claims under the *First* and *Fourteenth Amendments* and RLUIPA. We assess each claim *seriatim.*

### 1. The *First Amendment*

Plaintiffs allege that defendant violated their *First Amendment* rights by restricting them to the RAM diet, which they claim is neither nutritionally adequate nor in conformity with halal requirements.

In order to make a claim under the *First Amendment*, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." [7] *Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006).* However, even if he makes such a showing, "the [Supreme] Court [has] held that a challenged prison regulation is judged 'under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests.'" *Id.* at 274 (quoting *O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987)* (internal quotation marks omitted)).

[7] There is a debate in this [*16] Circuit concerning whether it is sufficient for a plaintiff who asserts a *First Amendment* free exercise claim to prove that his religious practice is "burdened," or whether he must prove a "substantial burden," as under RLUIPA. *See Graham v. Mahmood, 05 Civ. 10071(NRB), 2008 U.S. Dist. LEXIS 33954, 2008 WL 1849167, at *12 n.23 (S.D.N.Y. Apr. 22, 2008)* (citing *Salahuddin, 467 F.3d 263, 275 n.5 (2d Cir. 2006)).* In *Salahuddin*, the Second Circuit did not address plaintiff's argument in favor of the lesser "burden" standard because "the unchallenged and unresolved factual allegations as viewed in the light most favorable to [plaintiff] Salahuddin establish[ed] that Salahuddin's free-exercise rights were substantially burdened." *Salahuddin, 467 F.3d at 275 n.5.* However, in *Graham*, this Court chose to employ the lesser "burden" standard, explaining that, "[g]iven that it is possible to argue that a substantial burden is not an element of a free exercise claim, we apply this less burdensome ["burden"] standard . . . to ensure that if we grant summary judgment for defendants, we do so using a legal test that favors plaintiff, who is proceeding *pro se*, to the extent possible." *2008 U.S. Dist. LEXIS 33954, 2008 WL 1849167, at *12 n.23.* In the present [*17] case, because we find that Green Haven's meal programs are reasonably related to legitimate penological interests, we need not decide which of the two standards is appropriate.

To determine whether a prison regulation is reasonably related to legitimate penological interests, we evaluate four factors:

[1] whether there is a rational relationship between the regulation and the legitimate government interests asserted; [2] whether the inmates have alternative means to exercise the right; [3] the impact that accommodation of the right will have on the prison system; and [4] whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990)* (citing *Turner v. Safley, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987))*. The first of these factors is "more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin, 467 F.3d at 274*. In conducting the *Turner* analysis, we accord "wide-ranging deference" to the decisions of prison administrators because "the realities of running a penal institution are complex and difficult, . . . [and c]ourts are ill equipped [*18] to deal with the increasingly urgent problems of prison administration and reform." *Jones v. North Carolina Prisoner's Union, Inc., 433 U.S. 119, 126, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977)* (internal citations and quotation marks omitted).

In the present case, the RAM program places at most a minimal burden on plaintiffs' free exercise of religion, given that the RAM diet has been found to be consistent with Islamic dietary requirements. *See, e.g., Abdul-Malik v. Goord, 96 Civ. 1021 (DLC), 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)* ("The RAM diet is sufficient to sustain prisoners in good health and its consumption does not require any violation of the tenets of Islam."). In any event, even if we assume that the burden prong of the free exercise claim is met, we reject plaintiffs' *First Amendment* claim because DOCS' dietary policies easily pass muster under the *Turner* four-part test.

With regard to the first *Turner* factor, it is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups, and that the RAM program, which was "designed to accommodate the needs of inmates who may have different dietary requirements due to their religious beliefs [*19] or personal dietary beliefs . . . in an economically viable way" (Culkin Decl. PP 5-6), is rationally related to that interest. *See Abdul-Malik*

*, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *8* (finding that DOCS' "adoption of the largely meatless RAM menu as a means of addressing the religious dietary requirements of a number of different religious groups" satisfied the first factor of the *Turner* test).

The second *Turner* factor also supports defendant's position. Plaintiffs themselves admit that they have the option to, and in fact do, supplement their diet with halal food items purchased at Green Haven's commissary or received in care packages. (Majid Dep. 90:24; Cham Dep. 50:16-22, 51:4-9.)

With regard to the third *Turner* factor, it is clear that providing a separate halal meal program for Green Haven's Muslim inmates would significantly burden prison resources and staff. DOCS formulated the RAM program in order to accommodate the needs of as many inmate groups as possible in a cost-effective way (Culkin Decl. PP 5-6), and each religion that is removed from under the RAM program and individually accommodated imposes serious economic and administrative burdens on DOCS. The CAD, for example, which exclusively [*20] accommodates those Jewish inmates whose religion forbids them from partaking of RAM, costs $ 5.42 per meal -- significantly more than the $ 2.61 DOCS spends for each regular meal and the $ 2.60 it spends for a RAM meal. (Culkin Decl. P 10 n.1.) As the religious dietary needs of Muslims, however, can be accommodated through the RAM program, there is no similar justification for imposing upon DOGS the burden and expense of a separate halal meal program.

Requiring DOGS to provide more halal meat as part of its RAM program would similarly burden DOGS' resources. According to defendant, a halal chicken patty costs more than twice as much as a non-halal patty. (Further Culkin Decl. P 3.) If DOGS were to offer a halal chicken patty just one more time per week across the DOGS system, it would cost DOGS between $ 133,256 per year (if consumption were limited to DOGS' Muslim inmates) and $ 401,448.51 per year (if the patties were offered to the general inmate population, which is currently allowed to consume RAM meals). (*Id.*)

Finally, with regard to the fourth *Turner* factor, plaintiffs do not suggest another way to accommodate their requests for a separate halal diet that does not implicate the [*21] legitimate penological interests discussed above.

In sum, because it is not our role to substitute our judgment for that of the DOGS' officials who have made reasonable efforts to accommodate the practices of all its inmates, we find that accommodating the plaintiffs' dietary requirements through the RAM program is "reasonable" under the *Turner* four-part test. We therefore grant summary judgment to defendant on plaintiffs' *First Amendment* claim challenging Green Haven's dietary policy.

## 2. RLUIPA

Plaintiffs also bring their dietary claims under RLUIPA, alleging that DOCS' provision of the RAM diet substantially burdened their free exercise of Islam.

*Section 2000cc-1(a) of RLUIPA* protects inmates by providing that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person --
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

*42 U.S.C. § 2000cc-1(a).* Under RLUIPA, "[o]nly if [*22] a plaintiff shows that his religious exercise has been 'substantially' burdened[] do the defendants need to show something more than a rational relationship between the policy at issue and a governmental interest." *Graham, 2008 U.S. Dist. LEXIS 33954, 2008 WL 1849167, at *13.* A "substantial burden" exists "when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *'Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007)* (citing *Sherbert v. Verner, 374 U.S. 398, 404, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963)).*

Applying this framework to the present case, we determine that plaintiffs' dietary claims under RLUIPA must fail because plaintiffs have not demonstrated that their exercise of religion is substantially burdened by DOCS' provision of the RAM meal program in place of an exclusively halal diet.

Although the Second Circuit has held that inmates have a constitutional right to a diet consistent with their religious scruples, *Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003)*, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the [*23] 'provision of a diet sufficient to sustain the prisoner in good health without violating [his religion's] dietary laws.'" *Abdul-Malik, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6* (quoting *Kahane v. Carlson, 527 F.2d 492, 496 (2d Cir. 1975))* (assessing the constitutionality of Green Haven's menu planning under the Religious Freedom Restoration Act ("RFRA"), the predecessor to RLUIPA). In *Abdul-Malik*, this Court specifically found that "[Green Haven's] RAM diet is sufficient to sustain prisoners in good health and its consumption does not require any violation of the tenets of Islam," *1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6*, and we have no reason, on the facts alleged here, to conclude otherwise. [8] Plaintiffs have not offered any evidence that indicates that RAM is not nutritionally adequate, other than allegations by three Green Haven inmates who assert that they have lost weight since they opted to partake only of the RAM meals. [9] However, there is nothing to indicate that these prisoners are not "in good health" under *Kahane*, as inmate Boyd's weight is now 210 pounds, inmate Dennard's weight is 235 pounds and inmate Anderson's weight was not provided.

[8] Indeed, since Judge Cote issued an opinion in *Abdul-Malik*, DOCS has enacted [*24] even more measures to ensure that its RAM program accommodates the religious dietary needs of its inmate population, including: (1) the separation of the RAM entree from the regular entree "to minimize or eliminate the possibility of cross-contamination;" (2) the designation of clean and separate utensils to be used exclusively for service of RAM meals; (3) the designation of a single server to serve the RAM entree; (4) guaranteed access for any Coordinating Chaplain to the food service area to observe the service of food; and (5) the sanitization, according to special DOCS protocol, of equipment and utensils used to prepare RAM meals. (Def.'s Mem., Ex. G.)

9   Ulysses Boyd states that his weight went from 240 lbs in 2005, when he was "eating the mainline meals," to 210 lbs since he switched to the RAM program. (Declaration of Ulysses Boyd PP 2-4.) Dominic Dennard maintains that his weight went from 290 lbs to 235 lbs over four years. (Declaration of Dominic Dennard P 9.) The third inmate, Leroy Anderson, provided neither a start weight nor a current weight. (Declaration of Leroy Anderson P 10.) We note that it is far from clear that these changes in weight were not the natural result [*25] of incarceration, or that they were not in fact salutary.

Defendant has also offered abundant evidence indicating that service of RAM and the cleaning procedures in place at Green Haven conform to Islamic dietary law. Defendant's expert testified that "it is more probable that the utensils are thoroughly cleaned than not, which satisfies the Islamic legal requirement" (Def.'s Mem., Ex. E at 7), and plaintiffs themselves concede that "[t]here are conditions [in] which Muslims are permitted to use a haram [utensil]." (Pls.' Mem. at 3.) Further, 40 of the 175 food service personnel in Green Haven's mess hall are Muslim inmates (Johnston Decl. P 3), such that Green Haven's Muslim inmates are themselves in a position to ensure that the prison's cleaning and serving procedures conform to Islamic requirements.

Plaintiffs' non-expert assertions are insufficient to overcome the universal holdings that DOCS' RAM program withstands constitutional scrutiny. Moreover, it should be noted that DOCS has made efforts to accommodate through a common denominator the religious dietary needs of multiple prison groups. Because we find that plaintiffs have not shown that DOCS imposed a substantial burden on [*26] their free exercise, we do not reach the issue of whether DOCS has demonstrated a compelling interest to justify its menu planning. Accordingly, we grant summary judgment for defendant on plaintiffs' dietary claim under RLUIPA.

### 3. The *Fourteenth Amendment*

Finally, plaintiffs allege that defendant violated their equal protection rights by failing to provide them with a halal diet equivalent to the kosher diet that Jewish inmates at Green Haven receive.

In order to make a claim under the *Equal Protection Clause*, a claimant "must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)*. Further, "[h]e . . . must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.'" *Id.* (quoting *Shaw v. Murphy, 532 U.S. 223, 225, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001))*. As is true in the *First Amendment* context, the reasonableness of prison regulations drawing distinctions among inmate groups is determined by application of the *Turner* [*27] four-part test, discussed above. *Benjamin, 905 F.2d at 575*.

Applying these principles to plaintiffs' dietary claims under the *Fourteenth Amendment*, we determine that, even if plaintiffs had established "intentional or purposeful discrimination" by DOCS, their equal protection claim must fail because DOCS' adoption of the RAM menu to accommodate their religious dietary requirements easily survives scrutiny under the *Turner* four-part test.

With regard to the first *Turner* factor, DOCS has asserted several reasons for providing Jewish prisoners with the CAD program, while denying Muslim inmates a halal equivalent. The first of these is economic. DOCS statistics indicate that (as of January 1, 2008) 351 Green Haven inmates are Muslim (16.7%), whereas only 81 (3.8%) identify as Jewish. (The Hub System Profile of Inmate Population Under Custody on January 1, 2008, http://www.docs.state.ny.us/Research/Rep orts/2008/Hub_Report_2008.pdf (last visited Jul. 28, 2009).) Because Jewish inmates cannot partake of the RAM program (Def.'s Mem. at 22), DOCS has decided to separate out the small group of Jewish prisoners and accommodate all other groups with similar requirements together, rather than to [*28] restructure the RAM program to accommodate all inmates, which would significantly increase the per-meal cost of RAM and would render the RAM diet less appealing to all prisoners as the additional kosher restrictions were put into place. 10

10   We note that although DOCS also provides a hot meal program to 50 Jewish inmates, this program merely gives Jewish inmates, like other inmates, access to hot meals.

In addition to the economic rationale for limiting the

CAD to Jewish prisoners, defendant asserts that it restricts the program to Jewish inmates in order to "minimize the administrative burden in preparing kosher meals due to the special handling and preparation requirements of food required by the tenets of Judaism." (Culkin Decl. P 11.) Indeed, opening up the CAD to the 351 Muslim inmates at Green Haven or requiring DOCS to provide Muslims with separate halal meals would entail a substantial investment in resources and time. These justifications reflect legitimate governmental interests, which are rationally related to the decision to provide Jewish inmates with the CAD program, and to structure the RAM program so as to meet the dietary requirements of multiple inmate groups including [*29] Muslim inmates.

Turning to the second *Turner* factor, as described above, there are several alternatives through which Muslim inmates at Green Haven may supplement the RAM diet with additional halal items. Plaintiffs themselves admit that they have the option to, and in fact do, supplement their diet with halal food items purchased at Green Haven's commissary or received in care packages. (Majid Dep. 90:24; Cham Dep. 50:16-22, 51:4-9.)

With regard to the third *Turner* factor, accommodating the 351 Muslim inmates at Green Haven by providing them with a separate halal meal program or by opening up the CAD program -- which costs DOCS approximately $ 5.42 per meal (Culkin Decl. PP 10 n.1, 11) and requires separate handling and packaging -- to Muslim inmates would significantly burden DOCS' staff and resources.

Finally, with regard to the fourth *Turner* factor, plaintiffs have not suggested an alternative way for DOCS to structure its meal programs that does not implicate the legitimate penological interests discussed above. Denying Jewish inmates the CAD program would violate their constitutional right to a diet consistent with their religious beliefs, and including Muslims in the CAD or providing [*30] them with a separate meal program would impose significant administrative and economic burdens on DOCS. DOCS has also stated that, although it has been exploring the possibility of providing more halal meat through the RAM program, it has had "limited success in finding vendors/suppliers who can meet our quantity requirements in a cost effective manner." (Culkin Decl. P 13.)

Given the legitimate penological interests that inform DOCS' meal program policies, we grant summary judgment in favor of defendant on plaintiffs' equal protection claim regarding DOCS' dietary policies.

**b. Plaintiffs' Claims Regarding the Closure of the Green Haven Mosque**

Plaintiffs bring their challenge to the closure of the back area of the Mosque under the *First* and *Fourteenth Amendments* and RLUIPA. We address each claim *seriatim*.

**1. The *First Amendment***

Plaintiffs allege that the May 6, 2002 closure of the back area of the Mosque violated their *First Amendment* rights because it impeded their ability to hold classes and religious services in the Mosque.

Applying the framework laid out above, we determine that DOCS' decision to close the back area did not violate plaintiffs' constitutional rights because, even assuming, [*31] without deciding, that the closure burdened plaintiffs' free exercise of religion, it nonetheless passes muster under the *Turner* four-part test.

Considering the first *Turner* factor, it is clearly established in the record that the closure was rationally related to a legitimate penological interest in security. According to Raymond Koskowski, the Deputy Superintendent of Security at Green Haven, the decision to close the back area following the discovery of weapons there was motivated by a determination by security personnel that "inmate access posed a significant risk to employees and other inmates as the back area lacked a safe corridor for ingress and egress and its layout made proper scrutiny by officers nearly impossible." (Koskowski Decl. P 6.) We give special deference to this determination because, as the Supreme Court has indicated, the purpose of the *Turner* four-part test is to "ensure[] the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and avoid[] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." *O'Lone, 482 U.S. at 349-50* [*32] (internal citations and quotation marks omitted).

With regard to the second *Turner* factor, plaintiffs concede that they can still hold religious classes and

services in the Mosque. (Cham Dep. 55:22-23.) Plaintiff Majid also testified that plaintiffs have the option of gathering in the prison yard, when the weather permits, to do Koranic recitation. (Majid Dep. 137:23-25.) *See O'Lone, 482 U.S. at 352* (applying *Turner* four-part test to deny plaintiffs' free exercise claim where it was established that they were not "deprived of all forms of religious exercise, but instead freely observe[d] a number of their religious obligations").

Finally, considering the third and fourth *Turner* factors, accommodating plaintiffs' request to reopen the back area would present, according to Deputy Superintendent Koskowski, a significant security burden on Green Haven officials, and plaintiffs have not suggested another way to accommodate their request to reopen the back area that does not implicate legitimate penological security concerns.

Because we find that that the decision to close the back area of the Mosque was "reasonable" under *Turner* four-part test, we grant summary judgment to defendant on [*33] plaintiffs' *First Amendment* claim challenging Green Haven's closure of the back area of the Mosque.

## 2. RLUIPA

Plaintiffs also bring their claims concerning the closure of the back area under RLUIPA, alleging that the closure substantially burdened their free exercise by impeding their ability to hold religious services and classes. In response, defendant argues that summary judgment is appropriate because plaintiffs have offered no evidence, other than a reduced number of religious classes, indicating that their exercise of religion has been substantially burdened by the closure of the back area. (Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment at 9-10.) We agree.

Plaintiffs concede that religious classes are still held at the Mosque (Cham Dep. 55:22-23), even if certain accommodations have had to be made (Majid Dep. 137:17-25), and that the Friday night "Jumah" prayer service is still held. (*Id.* at 142:8-12.) Because it is clear that plaintiffs have been able to participate in weekly classes and services, plaintiffs cannot convincingly argue that DOCS has put substantial pressure on them to abandon the precepts of their religion. *See Graham, 2008 U.S. Dist. LEXIS 33954, 2008 WL 1849167, at *14* [*34]

(finding that prison's decision to limit an adherent of the Nation of Islam religion to one weekly religious meeting at a pre-arranged time did not constitute a substantial burden under RLUIPA).

Because we find that the closure of the back area of the Mosque does not constitute a "substantial burden" under RLUIPA, we grant summary judgment for defendant on this aspect of plaintiffs' amended complaint.

## 3. The *Fourteenth Amendment*

Finally, plaintiffs argue that defendant violated their equal protection rights by closing only the back area of the Mosque, even though similar weapons were also found in the common areas of other prison groups. In light of the framework set out above for evaluating inmates' equal protection claims, we determine that plaintiffs' equal protection claims concerning the closure of the back area must fail because, even if plaintiffs had succeeded in showing "intentional or purposeful discrimination," the closure survives scrutiny under the *Turner* four-part test.

With regard to the first *Turner* factor, and as discussed above, DOGS has asserted a legitimate penological interest in security in connection with the closure of the back area, which was rationally related [*35] to DOGS' decision to close the back area. The fact that DOGS chose to close only the back area of the Mosque and not the areas of other prison groups in which weapons were also found does not mean that DOGS did not have a legitimate security interest in closing the back area. Moreover, plaintiffs have not argued that the two areas that DOCS did not close suffer from a lack of "safe corridor[s] for ingress and egress" and are difficult to supervise (Koskowski Decl. P 6), as defendant maintains is the case for the back area of the Mosque.

With regard to the second *Turner* factor, plaintiffs concede that they can still hold religious classes and services in the Mosque or in Green Haven's yard despite the closure of the back area. (Cham Dep. 55:22-23; Majid Dep. 142:8-12, 137:23-25.)

Turning to the third *Turner* factor, accommodating plaintiff's request to reopen the back area would impose a security burden on Green Haven personnel (Koskowski Decl. P 6), and, as discussed above, we give special deference to the prison's security-related determinations.

Finally, with regard to the fourth *Turner* factor, plaintiffs have not suggested a way of accommodating their request to reopen the back area [*36] that would not implicate the legitimate penological interest in security discussed above.

In sum, given defendant's legitimate penological interest in security that was reasonably related to DOCS' decision to close the back area, we grant summary judgment in favor of defendant on plaintiffs' equal protection claim regarding DOCS' closure of the back area.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety, and plaintiffs' request for injunctive relief is denied.

**IT IS SO ORDERED**.

Dated: New York, New York

July 31, 2009

/s/ Naomi Reice Buchwald

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

********** Print Completed **********

Time of Request: Wednesday, January 14, 2015  15:29:59 EST

Print Number:   2827:496326324
Number of Lines: 510
Number of Pages: 11

Send To:  Pontius, Nancy
          FEDERAL COURTS:  2ND CIRCUIT
          500 PEARL ST
          NEW YORK, NY 10007-1316

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. Michigan,
Northern Division.
Shayarto PERKINS, Plaintiff,
v.
Raymond BOOKER, et al., Defendants.

No. 2:08–cv–97.
May 29, 2009.

Shayarto Perkins, Munising, MI, pro se.

### REPORT AND RECOMMENDATION

TIMOTHY P. GREELEY, United States Magistrate
Judge.

**\*1** Plaintiff Shayarto Perkins, an inmate currently
confined at the Baraga Maximum Correctional Facil-
ity (AMF), filed this *pro se* civil rights action pursuant
to 42 U.S.C. § 1983 against Defendants Ryan Cor-
rectional Facility Warden Raymond Booker, Southern
Michigan Warden Sherry Burt, Rhonda Anderson,
LMF Inspector James Contreras, Resident Unit
Manager Curt Rife, LMF Records Office Supervisor J.
Hinsa, LMF Assistant Resident Unit Supervisor Keith
M. Castello, LMF Corrections Officer William Maki,
LMF Resident Unit Officer K. Hill, LMF Resident
Unit Officer Unknown Sebaly, LMF Resident Unit
Officer Unknown Miron, MDOC Assistant Librarian
S. Saltner, LMF Librarian J. Yoak, LMF Corrections
Officer T. Gould, LMF Hearing Officer Linda Maki,
LMF Assistant Deputy Warden Lyle Rutter, and LMF
Warden Dave Bergh.

Plaintiff's complaint alleges that in July of 2006,
he made numerous attempts from prison to com-
municate with his daughter Siwatu–Salama Ra, but
Defendant Anderson, who is the mother of Plaintiff's
daughter, was not giving the letters to his daughter.

In August of 2006, Plaintiff learned that De-
fendants Booker and Burt were giving Defendant
Anderson confidential and other information regard-
ing Plaintiff, including the names and addresses of
Plaintiff's family, their dates of birth and social secu-
rity numbers. In addition, Defendants Booker and Burt
also gave Defendant Anderson information regarding
Plaintiff's location, misconduct report history, and
their opinion on whether Plaintiff might be released on
parole. Defendant Anderson asked Defendants Booker
and Burt to make Plaintiff's time at LMF as hard as
possible and to keep him incarcerated as long as pos-
sible.

Defendants Booker, Burt and Anderson contacted
Defendant Contreras and asked that he make Plain-
tiff's time as hard as possible. Defendant Contreras
then began systematically telling staff at LMF that
Plaintiff did not have anything coming and that they
should deny Plaintiff's requests and grievances as
much as possible. Plaintiff states that he subsequently
was subjected to a barrage of "retaliation and other
illegal acts." Specifically, Plaintiff states that on
September 8, 2006, Defendant Hines refused to give
Plaintiff credit for time served. On December 6, 2006,
Plaintiff was moved to Maple unit, where Defendant
Rife ordered staff to harass him with false misconduct
reports. On January 15, 2007, Defendant Maki falsi-
fied a notice of intent on Plaintiff, claiming that he had
violated Kosher dietary rules and causing Plaintiff to
be removed from a Kosher diet. On January 19, 2007,
Defendant Castello told Plaintiff that Defendant Maki
was a friend of his and that he was not going to jeop-
ardize that for Plaintiff despite the evidence showing
that Plaintiff did not violate any Kosher rules. De-
fendant Maki then upheld the false notice of intent. On

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

February 10, 2007, Defendant Gould told Plaintiff that he had not forgotten the legal action and police report that Plaintiff had filed on him, and stated that Defendant Contreras had sent him to teach Plaintiff a lesson. He then conducted a body search on Plaintiff, grabbing hold of Plaintiff's penis and pulling on it. Plaintiff claims that this caused him to suffer pain and that he was subsequently denied medical attention.

**\*2** On February 14, 2007 and February 15, 2007, Defendants Hill and Sebaly wrote five fabricated misconduct reports on Plaintiff, which resulted in Plaintiff receiving an 18 month continuance of parole. On February 23, 2007, Defendant Maki told Plaintiff that he should not have "made problems for Contreras and his friends down state or made a complaint on William Maki." Defendant Maki stated that because of his complaints, she was going to find Plaintiff guilty on every misconduct ticket. Plaintiff claims that she has followed through on this threat. On March 6, 2007, Defendant Hinsa refused to terminate Plaintiff's consecutive sentences, which Plaintiff has already served. On April 9, 2007, Plaintiff submitted legal documents for copying. Defendants Salter and Yoak refused to copy the documents. On June 6, 2006, Plaintiff discovered that an incorrect parole guideline score sheet had been completed on him and was being used to deny Plaintiff parole. On September 20, 2007, while Plaintiff was trying to enter his cell, Defendant Miron closed the door on him, and then denied him medical attention.

Plaintiff states that on September 28, 2007, Defendant Contreras covered up the February 14–15, 2007 fabricated misconducts. On October 26, 2007, Defendant Miron removed Plaintiff from his Kosher diet, claiming that Plaintiff had purchased non-Kosher foods from the prisoner store. Plaintiff's mother contacted LMF officials seeking to have the retaliatory conduct stopped, to no avail. On December 21, 2007, Defendants Booker, Burt and Anderson told Defendant Contreras to cut off all communications between Plaintiff and his daughter. Defendant Anderson al-

tered some of Plaintiff's letters as a pretext in order to justify the action. Defendant Contreras then prepared a notice of intent to that effect and gave it to Defendant Castello to be carried out. Defendant Castello cut off Plaintiff's communication with his daughter on January 4, 2008. Plaintiff states that his daughter is a 16 year old minor and that his parental rights have never been terminated. On February 1, 2008, Defendant Contreras intercepted a letter to his daughter and wrote Plaintiff a major misconduct report. Plaintiff was found guilty of the misconduct.

Plaintiff claims that Defendants Rutter and Bergh were repeatedly made aware of the illegal acts against Plaintiff, but failed to take any corrective action. Plaintiff claims that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments, as well as under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc–1. Plaintiff seeks compensatory and punitive damages, as well as equitable relief.

On June 9, 2008, the court dismissed Plaintiff's claims against Defendants Booker, Burt, Anderson, Contreras, Rife, Hinsa, Hill, Sebaly, Saltner, Yoak, Gould, Maki (Linda and William), Rutter, and Bergh with prejudice and ordered service of the complaint on Defendants Miron and Castello. (Docket # 17 and # 18.)

**\*3** Presently before the Court is the Motion for Summary Judgment filed by Defendants Miron and Castello pursuant to Fed.R.Civ.P. 56. Plaintiff has filed a response, Defendants have replied to the response, Plaintiff has filed a surreply to the Defendants' reply, and the matter is ready for decision. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant carries the burden of showing there is an absence of evidence to support a

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324–25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close,* 379 F.3d 413, 416 (6th Cir.2004) (*citing Adams v. Metiva,* 31 F.3d 375, 382 (6th Cir.1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson,* 477 U.S. at 251–52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.,* 996 F.2d 136, 139 (6th Cir.1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439, 1448 (6th Cir.1993) (single affidavit concerning state of mind created factual issue).

Plaintiff claims that he is entitled to relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA) 42 U.S .C. § 2000cc–1, which states:

(a) General Rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The RLUIPA applies a strict-scrutiny standard whenever a substantial burden is imposed on religious exercise by a state government and occurs in a program or activity that receives Federal financial assistance, or affects, or removal of that substantial burden would affect, interstate or foreign commerce. *Cutter v. Wilkinson,* 423 F.3d 579, 582 (6th Cir.2005).

**\*4** In their motion for summary judgment, Defendants state that they are entitled to summary judgment on Plaintiff's claims for money damages because the RLUIPA does not specifically allow for damages against prison officials in their individual capacities. In support of this contention, Defendants state that the RLUIPA is applicable only to programs or activities that receive federal assistance and state that the individual Defendants did not receive such funds. Defendants also state that the RLUIPA is spending clause legislation, and because the individual defendants were not parties to the grant agreement, holding them liable for individual damages under the Act would be contrary to principles of contract law. As noted by the United States District Court in the Northern Division of Georgia, this issue continues to be unresolved:

[A] growing number of federal courts have expressed equivocation, if not doubt, as to whether the RLUIPA permits suits for damages against government officials in their individual capacities. *See Gooden v. Crain,* 405 F.Supp.2d 714, 2005 WL 3436769, at *9 (E.D.Tex.Dec.13, 2005) (appearing to hold claims for damages, especially those against officials in individual capacities, unavailable under the RLUIPA); *Smith v. Haley,* 401 F.Supp.2d 1240, 1246 (M.D.Ala.2005) ("Because there is simply

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

nothing in the statute that clearly suggests that government employees can be liable for damages in their individual capacities, the court doubts that RLUIP[A] provides for such."); *Boles v. Neet,* 402 F.Supp.2d 1237, 1240 (D.Colo.2005) ("The Court understands [the RLUIPA] to permit cases against a governmental entity, but not against an individual officer, except perhaps in his or her official capacity."); *Chase v. City of Portsmouth,* No. Civ. A. 2:05CF446, 2005 WL 3079065, at *5 (E.D.Va. Nov.16, 2005) ("Appropriate relief may include injunctive and declaratory relief as well as nominal damages."); *Farrow v. Stanley,* No. Civ. 02–567–PB, 2005 WL 2671541, at *11 n. 13 (D.N.H.Oct.20, 2005) ("There is substantial uncertainty ... as to whether [42 U.S.C. § 2000cc–2] even provides a right to money damages."); *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter,* 326 F.Supp.2d 1140, 1162 (E.D.Cal.2003) ("the issue of whether RLUIPA allows the recovery of damages is an open question"); *Agrawal v. Briley,* No. 02C6807, 2003 WL 164225, at *2 n. 2 (N.D.Ill.Jan.22, 2003) ("it is unclear whether [42 U.S.C. § 2000cc–2(a) ] authorizes a claim for damages as well as injunctive relief"). *But see Williams v. Bitner,* 359 F.Supp.2d 370 (M.D.Pa.2005) (recognizing corrections employees and officials' exposure to liability in individual capacities on inmate's § 1983 claim asserting violation of the RLUIPA).

*Daker v. Ferrero, et al.,* 2006 WL 346440, slip op. p. 9 (N.D.Ga. Feb. 13, 2006).

The cases reviewed by the *Daker* court rely, in part, on the language of the RLUIPA, which provides for appropriate relief against a "government." *Id.;* 42 U.S.C. § 2000cc–2(a). In addition, 42 U.S.C. § 2000cc–1(a) states that no "government" shall impose a substantial burden on the religious exercise of a prisoner. *Id.* (emphasis added). However, for purposes of the RLUIPA, the term government includes:

**\*5** (i) a State, county, municipality, or other governmental entity created under the authority of a State;

(ii) any branch, department, agency, instrumentality, or **official** of an entity listed in clause (i); **and**

(iii) **any other person acting under color of State law.**

*Daker,* 2006 WL 346440 at *9 (emphasis in original) (*citing* 42 U.S.C.2000cc–5(4)). As noted by the *Daker* court, if the statute's definition of "government" was limited to (i) and (ii), "its remedial reach would no doubt be susceptible to a construction that embraces only those claims asserted against officials in their official capacities." *Id.* Consequently, the addition of section (iii), whose language tracks closely that found in 42 U.S.C. § 1983, appears to provide for actions against state officials in their individual capacities. *Daker,* 2006 WL 346440 at * 9.

The *Daker* court further notes because the RLUIPA provides for "appropriate relief," some courts have questioned whether Congress intended to permit only injunctive relief. However, the *Daker* court observed that while § 2000cc–2(a) does not explicitly permit individual capacity suits for money damages, it does not explicitly preclude them either. *Id.* In *Daker,* the court concluded that the RLUIPA's provision for appropriate relief should be read as an incorporation by Congress of the vast body of law respecting the "manifold limitations on government and government actor's exposure to suit-including, e.g., the Eleventh Amendment, qualified immunity, and the Prison Litigation Reform Act." *Id.*

The undersigned notes that the Sixth Circuit has not directly addressed the liability of individual defendants under the RLUIPA. However, the Sixth Circuit has allowed a lawsuit filed under the RLUIPA against individual defendants to proceed without

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

considering whether individuals are amenable to lawsuit. *Cutter v. Wilkinson,* 423 F.3d 579 (6th Cir.2005). Because the undersigned is persuaded by the reasoning set forth in *Daker,* I recommend that Defendants be denied summary judgment on the issue of individual liability.

Moreover, Defendants' claim that they are entitled to qualified immunity on the issue of individual liability also lacks merit. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir.1999); *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997); *Noble v. Schmitt,* 87 F.3d 157, 160 (6th Cir.1996); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The test is whether the official could reasonably have believed his conduct was lawful, not whether the official could reasonably have believed his conduct would subject him to monetary damages, as opposed to injunctive relief. *Dietrich,* 167 F.3d at 1012; *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

**\*6** Defendants further claim that they are entitled to summary judgment in this case because the denial of Kosher meals to Plaintiff was the least restrictive means of furthering a compelling government interest. Defendants contend that the denial of a Kosher diet to prisoners who are not sincere in their religious beliefs furthers the MDOC's interest in maintaining security because prisoners who are sincere in their beliefs can be offended by those who are not sincere. In addition, Kosher meals cost at least twice as much as regular meals, so that denying such meals to non-sincere prisoners furthers the compelling governmental interest of controlling costs.

As noted above, Plaintiff claims that Defendants' conduct violated his constitutional right to freedom of religion and his rights under the RLUIPA, 42 U.S.C. § 2000cc–1. Prisoners do not lose their right to freely exercise their religion by virtue of their incarceration. *Cruz v. Beto,* 405 U.S. 319, 322, n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Freedom of religion being a fundamental right, any regulation which infringes upon it must generally be justified by a "compelling state interest." *See, for example, Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). However, as a prisoner, plaintiff's constitutional rights are subject to severe restriction. *See, for example, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (restriction on receipt of reading materials); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (privacy); *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to call witnesses); *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (vote). *See, generally, Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

The standard by which prison regulations impinging on prisoner constitutional rights is judged is "reasonableness." *Turner,* 482 U.S. at 88–95; *Washington,* 494 U.S. at 223–25. In *Turner,* the Supreme Court expressly rejected any degree of "heightened scrutiny" in order to assure that "prison administrators ... and not the courts ... make the difficult judgments concerning institutional operations." *Id.* at 89, *quoting Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

In *Turner,* the court set forth four factors "relevant in determining the reasonableness of the regulation at issue." 482 U.S. at 89–91. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Id.* at 89, *quoting Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). Second, the reasonableness of a restriction

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
(Cite as: 2009 WL 2058780 (W.D.Mich.))

takes into account whether there are "alternative means of exercising the right that remain open to the prison inmate." *Turner,* 482 U.S. at 90. Third, the court should consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner,* 482 U.S. at 90. Finally, the existence or absence of ready alternatives of accommodating the prisoner's rights is relevant to reasonableness. *Turner,* 482 U.S. at 90. As stated by the court, this final factor "is not a 'least restrictive alternative' test." *Id.* at 90. "Prison officials need not show that "*no* reasonable method exists by which [prisoners'] rights can be accommodated without creating bona fide [prison] problems." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

**\*7** In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996). Instead, the inquiry is "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." *Patrick [v. LeFevre],* 745 F.2d at 157 (quoting *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)) (alteration in original) (emphasis added). A claimant need not be a member of a particular organized religious denomination to show sincerity of belief. *See Frazee v. Illinois Dep't of Employment Sec.,* 489 U.S. 829, 834, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

*Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999).

In *Jackson v. Mann,* the Second Circuit held that the district court erred in substituting the objective "accuracy" of the plaintiff's assertion that he was Jewish for the correct test—whether the plaintiff's beliefs were sincerely held. 196 F.3d at 320. The per-

tinent issue in *Jackson,* as in this case, was whether the plaintiff was entitled to receive a Kosher diet. *Id.* at 318. The Second Circuit concluded that the defendants in *Jackson v. Mann* were not entitled to summary judgment because even if the plaintiff was not Jewish according to Judaic law, this did not resolve the issue of material fact regarding the sincerity of the plaintiff's religious beliefs. *Id.* at 320–21.

Similarly, in *Mosier v. Maynard,* 937 F.2d 1521 (10th Cir.1991), the Tenth Circuit held that merely because the plaintiff was not a member of the Cherokee nation or the Native American worship group at his prison, it did not mean that his belief was insincere. *Id.* at 1523.[FN1] As noted by the Tenth Circuit in *Mosier*[FN2], the United States Supreme Court has rejected the idea that membership in a religious organization is a prerequisite for religious convictions to be judged sincere. *Frazee v. Illinois Dep't of Employment Sec.,* 489 U.S. 829, 834, 109 S.Ct. 1514, 1517–18, 103 L.Ed.2d 914 (1989).

> FN1. The plaintiff in *Mosier* was seeking an exemption from the prison's requirement that hair be kept to a certain length.

> FN2. *See Mosier,* 937 F.2d at 1523.

Defendants have the right to ensure that each prisoner is sincere in his belief before allowing him access to the Kosher Meal Program. The use of MDOC Operating Procedure 05.03.150 is a legitimate means of determining whether a prisoner is entitled to the Kosher menu. The MDOC Operating Procedure 05.03.150–A provides that a prisoner can be removed from the program if staff observe the prisoner in possession of non-Kosher items. (*See* Defendants' Exhibit F.) In addition, 05.03.150–A provides:

> K. A prisoner who wants to participate in the Kosher Meal Program must submit a written request to the Warden or designee for approval. The request

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

shall include a statement as to his/her religious beliefs which necessitate a Kosher diet.

L. Upon receipt of such a request, the Warden shall verify that the prisoner is eligible to participate in the Kosher Meal Program based on the prisoner's designated religion by requiring the Assistant Deputy Warden for Programs or the chaplain to interview the prisoner and obtain a response to the following questions:

**8** 1. Briefly explain the major teachings of your designated religion.

2. Why is a kosher diet required by this religion.

3. What is a kosher diet? In other words, how does it differ from food otherwise prepared by the institution? What types of food are not allowed?

(*See* Defendants' Exhibit F.)

Defendants offer the affidavit of Dave Burnett, who was employed as Special Activities Coordinator during the pertinent time period. Mr. Burnett attests that the Kosher Meal Program is reserved for those whose faith of preference requires eating from a Kosher menu and that allowing prisoners who are not sincere to participate in the program is offensive to those who are sincere. Mr. Burnett states that this often leads to conflict between prisoners, which raises security concerns. In addition, Mr. Burnett attests that there is also a compelling economic interest because providing Kosher meals requires extra effort and expense, and that Kosher meals cost up to three times that of a regular meal. (*See* Defendants' Exhibit G, ¶¶ 7–9.)

Defendants assert that given the State's interest in reducing potential conflicts that could arise between prisoners and its interest in controlling the cost of food for prisoners, it is reasonable to require prisoners to comply with Kosher dietary rules in order to demonstrate that their participation in the program is supported by a sincere religious belief.

Defendants offer the affidavit of Chaplain Gerald Riley, who attests that he was the Chaplain at the Alger Maximum Correctional Facility (LMF) during the pertinent time period. Chaplain Riley states that Plaintiff changed his religious preference at least five times: from Jewish to Nation of Islam on December 14, 2002, to "other faiths" on July 3, 2003, to Catholic on December 19, 2003, and back to Jewish on June 6, 2005. (*See* Defendants' Exhibit A, ¶¶ 1, 8.) Chaplain Riley attests that Plaintiff was placed on the Kosher Meal program on July 31, 2006, and was removed from the program on January 19, 2007. Plaintiff became eligible for reinstatement to the Kosher Meal program in July of 2007, at which time Chaplain Riley interviewed Plaintiff. At this time, Plaintiff demonstrated knowledge of the Jewish faith and its dietary requirements, which suggested some measure of sincerity. Therefore, Chaplain Riley approved Plaintiff's request for Kosher accommodations. However, on October 26, 2007, Plaintiff was again removed from the Kosher Meal program. (*See* Defendants' Exhibit A, ¶¶ 3–7.)

As noted by Defendants in their brief, Plaintiff was originally denied his request for a Kosher diet in 2005 because he lacked knowledge of the Jewish faith. *See Perkins v. Prisk,* 2007 WL 179623 8, *1 (2007). The court in *Perkins v. Prisk* noted:

Perkins has a multifaceted religious background. When he entered the prison system, his presentence report listed him as "Protestant." At various times, he has formally declared himself on official prison forms to be an adherent of the "Nation of Islam," "Catholic," and a follower of the "House of Yahweh," as well as of Judaism. At one time he had his name changed to a Jewish sounding name, but has always been referred to in prison by the name, Shayarto Perkins. Prison records show that Perkins

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

has attended religious services sponsored by these various faiths. In fact, Perkins was attending a Roman Catholic service when he requested a kosher diet in June 2005. Additionally prison records show that Perkins was married by a Muslim cleric.

**\*9** *Perkins v. Prisk,* 2007 WL 1796238, at *1. The court also stated:

> In view of Perkins' background, it appeared to Burnett that Perkins was trying to obtain a prison transfer rather than to practice a faith sincerely. Perkins knew that no kosher diet was offered at Marquette, and that a kosher diet would have to be provided elsewhere in the MDOC.

*Id.* The court finally noted that Plaintiff was approved for a Kosher diet in 2006, after he had achieved more familiarity with Judaism, at which point he was transferred to LMF, where that diet was provided. *Id.* at *2.

Defendants state that having effectuated his transfer out of the Marquette Branch Prison (MBP), Plaintiff was removed twice from the Kosher Meal program for being in possession of non-Kosher food. Defendants offer the affidavit of William Maki, who was employed as a Corrections Officer at LMF during the pertinent time period. Officer Maki attests that he observed Plaintiff receive a piece of hamburger, a non-Kosher food item, from a non-Kosher meal tray in January of 2007. Plaintiff attempted to conceal the item using other food from his Kosher meal tray. Officer Maki then asked to inspect Plaintiff's tray and wrote a notice of intent (NOI) on Plaintiff regarding his non-compliance with a Kosher diet. (*See* Defendants' Exhibit B, ¶¶ 4–5, 7, 9.) On January 19, 2007, Defendant Castello conducted an administrative hearing on the NOI. Defendant Castello attests that he took statements from Plaintiff and prisoner Holman, as well as from Officer Maki and found Maki's account to be more credible. Defendant Castello then removed Plaintiff from the Kosher Meal program. (*See* Defendants' Exhibit C, Defendant Castello affi-

davit, ¶¶ 1–5.) Defendants offer a copy of the hearing report on the NOI, which states Defendant Castello's reasons for findings:

> On 1–15–07, Officer Maki observed Perkins accept a piece of hamburger from another prisoner which was received from the main food line. Perkins covered the burger with food items from his Kosher meal styrofoam tray. Maki is very detailed and factual with regard to the facts in this matter. Therefore, Maki is found to be credible in his account of Prisoner Perkins being in possession of a Non–Kosher item.

(*See* Defendants' Exhibit C, Hearing Report.)

Defendants offer the affidavit of Heidi Swajanen, who was employed as the storekeeper at LMF during the pertinent time period. Ms. Swajanen attests that on September 19, 2007, Plaintiff placed an order with the prisoner store for an 8 ounce tub of cheddar cheese spread, which is a non-Kosher item. On September 22, 2007, the order was delivered to Plaintiff. Ms. Swajanen also attests that Chaplain Riley had sent a list to the store and requested that she check the orders of those prisoners on a Kosher diet to determine if they were ordering food according to their designated religious tenet. In addition, Ms. Swajanen wrote a NOI on Plaintiff, proposing that he be removed from the Kosher Meal program. (*See* Defendants' Exhibit D, Swajanen Affidavit, ¶¶ 1–.) Defendants also offer a copy of the Notice of Intent written by Ms. Swajanen, and a copy of the store order showing that Plaintiff purchased the cheese spread as attachments to the Swajanen Affidavit. (*See* Defendants' Exhibit D.) Defendant Miron conducted a hearing on the NOI and subsequently ordered that Plaintiff be removed from the Kosher Meal program. (*See* Defendants' Exhibit E, ¶ 4.)

**\*10** In response to the motion for summary judgment, Plaintiff offers his affidavit, in which he

attests that the NOI written by Defendant Maki accusing Plaintiff of putting a portion of hamburger on his plate was false. Plaintiff states that Defendant Maki had previously threatened to get him removed from his Kosher diet detail by falsifying a NOI. Plaintiff further attests that he did not order the cheese spread, and that when his store order was delivered, he refused to accept the cheese because he had not ordered it. (*See* Plaintiff's affidavit, ¶¶ 3–4, 8–9.) Plaintiff offers the affidavit of prisoner Holman, who attests that contrary to the NOI written by Defendant Maki on January 15, 2007, Plaintiff never took any hamburger off of his tray. (*See* Plaintiff's Exhibit C, ¶ 2.) In addition, Plaintiff offers the affidavit of prisoner Robinson, who claims that he witnessed Plaintiff refusing the cheese. (*See* Plaintiff's Exhibit E, ¶ 2.) Prisoner Robinson also states that on October 26, 2007, he was questioned regarding whether or not Plaintiff had received cheese spread by Defendant Miron. Prisoner Robinson told Defendant Miron that Plaintiff had refused to accept the cheese and Defendant Miron stated that he did not "give a damn" about what the evidence showed. Defendant Miron indicated that it was irrelevant whether the cheese was Kosher or whether Plaintiff took the cheese, that Plaintiff did not deserve to be on a Kosher diet because of his litigious activities. (*See* Plaintiff's Exhibit F, ¶¶ 3–4.) Furthermore, prisoner Ervin Smith attests that on January 19, 2007, while sitting outside Defendant Castello's office, he overheard Defendant Castello tell Plaintiff that Defendant Maki was a friend of his and that he did not like Plaintiff because he had "taken things to court." Defendant Castello went on to tell Plaintiff that because of Plaintiff's litigious behavior, he was going to have Plaintiff taken off his Kosher diet. (*See* Plaintiff's Exhibit D, ¶¶ 2–3.)

In addition, Plaintiff offers a copy of a typed note from himself to Rabbi Jacob Feinberg, asking whether cheese is necessarily non-Kosher just because it does not have a Kosher symbol on it. On the bottom of this note, there is a hand-written response which Plaintiff asserts is from Rabbi Feinberg. The response states

that most cheese that could be purchased today is Kosher "due to the process the way it is made." This response is unsigned. (*See* Plaintiff's Exhibit G.) Plaintiff also offers a letter from Rabbi Feinberg, stating that he is a Rabbi at Congregation Bet Shalom Israel in Norman, OK, and the director of the Jewish outreach organization "The International Prison Yeshiva," which provides Biblical studies to incarcerated individuals interested in making a sincere commitment to becoming observant in Jewish religious practices. The letter states:

> Azaryah Ben Ammi # 184125 [Plaintiff] became an official member of The International Prison Yeshiva on March 23, 2006. I have been in regular correspondence with him, advising him on religious matters. In this time he has demonstrated to me his understanding of Jewish beliefs and dedication to Jewish practice. Paul has shown progress in his study of Jewish scriptures, including completing regularly the Correspondence Course lessons that I have sent to him and passing my examinations with excellent marks. It is obvious that he is sincerely trying to follow the statutes and teachings of Judaism, and I fully support and endorse all of the requests that he is making.

**\*11** (*See* Plaintiff's Exhibit H.)

In their reply to Plaintiff's response, Defendants state that while Plaintiff has offered affidavits from other prisoners in support of his assertion that Defendants are lying, they have offered not only their sworn affidavits, but copies of the NOI's, administrative hearing reports, affidavits of other prison officials, a copy of Plaintiff's store order form, and Plaintiff's own grievances regarding the incident. Defendants assert that against this evidence, there is nothing to suggest that Defendants are lying and that a reasonable jury could not find in Plaintiff's favor. However, the undersigned notes that the court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

favor of the party opposing the motion. *See Matsu-shita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Twin City Fire Ins. Co. v. Adkins,* 400 F.3d 293, 296 (6th Cir.2005). Under this standard, Plaintiff has succeeded in showing that there is an issue of fact regarding whether Defendants Castello and Miron retaliated against Plaintiff by having him removed from his Kosher diet in violation of his rights under the RLUIPA and the First Amendment.

Finally, Defendants Miron and Castello claim that they are entitled to qualified immunity on Plaintiff's claims. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir.1999); *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997); *Noble v. Schmitt,* 87 F.3d 157, 160 (6th Cir.1996); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich,* 167 F.3d at 1012; *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Williams v. Mehra,* 186 F.3d 685, 690 (6th Cir.1999).

When determining whether a right is clearly es-

tablished, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this Circuit, and finally to decisions of other circuits. *Dietrich,* 167 F.3d at 1012. An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful. Rather, in light of pre-existing law, the unlawfulness of the official's conduct must be apparent. *Dietrich,* 167 F.3d at 1012; *Wegener v. City of Covington,* 933 F.2d 390, 392 (6th Cir.1991).

**\*12** When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the plaintiff. Part of the analysis is to determine whether there are any genuinely disputed questions of material fact. *Kain v. Nesbitt,* 156 F.3d 669, 672 (6th Cir.1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This would be true notwithstanding that the trial judge found the [defendant] officer to be more credible than the plaintiff because it is not for the court to make credibility determinations at this stage of the proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified.

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the preexisting law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 639–40. *See also Durham v. Nu'Man,* 97 F.3d 862, 866 (6th Cir.1996), *cert. denied,* 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997).

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

The Sixth Circuit has observed:

A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.

*Durham,* 97 F.3d at 866 (citing *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir.1988)).

Thus qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson,* 483 U.S. at 639–40. Rather, the test is whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violated plaintiff's federal rights. *Id.*

Furthermore, a defendant need not actively participate in unlawful conduct in order to be liable under Section 1983. Rather, a defendant may be liable where he has a duty to protect a plaintiff and fails to comply with this duty. *Durham,* 97 F.3d at 866–868 (holding that a nurse and a security guard at a state hospital may be liable under Section 1983 where they do not take action to prevent a patient from being beaten). *See also McHenry v. Chadwick,* 896 F.2d 184 (6th Cir.1990) (a correctional officer who observes an unlawful beating may be liable under Section 1983 even though he did not actively participate in the beating), and *Bruner v. Dunaway,* 684 F.2d 422 (6th Cir.1982), *cert. denied sub nom, Bates v. Bruner,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983) (police officers who stood by and observed an unlawful beating by fellow officers could be held liable under Section 1983).

When faced with a qualified immunity defense, the court must first determine whether or not the plaintiff has stated a claim upon which relief can be granted. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Turner,* 119 F.3d at 429. If the court answers that question in the affirmative, the court goes on to determine whether or not the right allegedly violated was clearly established. *Turner,* 119 F.3d at 429. These are both purely legal questions. The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated clearly established rights. *Hall v. Shipley,* 932 F.2d 1147, 1154 (6th Cir.1991). Thus, where the underlying claim is one in which a certain motive or intent is an element, and plaintiff has made allegations which, if proven, will establish the existence of the necessary state-of-mind, a factual issue exists, preventing dismissal pursuant to Rules 12(b)(6) or 56. *See Sanchez v. Sanchez,* 777 F.Supp. 906 (D.N.M.1991). In the Sixth Circuit, plaintiff need not include such allegations in his complaint, since in preparing his Complaint, he has no duty to anticipate affirmative defenses. *Dominique v. Telb,* 831 F.2d 673, 676 (1987). However, once the affirmative defense is raised, plaintiff must come forward with such additional facts as would establish the requisite state of mind). *Id.*

**\*13** Accordingly, when a plaintiff pleads his claim in generalized "notice" form, and the defense of qualified immunity is asserted through a motion to dismiss, the plaintiff is required to respond to that defense. If his original complaint is deficient in that regard, he must amend his complaint to include the specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity. For example, if the original complaint alleged that a police officer "used excessive force," and qualified immunity is asserted, then plaintiff would be required to amend with allegations of evidence sufficient to demonstrate that the force used against him was, indeed, unreasonable. It is in this sense that a heightened standard attaches to plaintiff's pleading.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)
**(Cite as: 2009 WL 2058780 (W.D.Mich.))**

*Veney v. Hogan,* 70 F.3d 917, 922 (6th Cir.1995).

In the opinion of the undersigned, when the issue is raised prior to the completion of discovery, the plaintiff must simply respond with specific allegations of fact adequate to survive scrutiny under Rule 12(b)(6) standards. However, when the issue of motive is raised in the context of a motion for summary judgment following an adequate period of discovery, the amount of proof required is that quantum of evidence necessary to allow a jury to return a verdict in plaintiff's favor. *Crutcher v. Commonwealth of Kentucky,* 883 F.2d 502, 504 (6th Cir.1989); *Hull v. Cuyahoga Valley Joint Vocational School District Bd. of Education,* 926 F.2d 505 (6th Cir .), *cert. denied sub nom., Hull v. Shuck,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991). *Cf. Poe v. Haydon,* 853 F.2d 418, 424 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989) (to avert dismissal short of trial, plaintiff must come forward with something more than inferential or circumstantial support for his allegation of unconstitutional motive). A plaintiff will defeat a defense of qualified immunity if he can present sufficient evidence to prove the existence of a genuine issue of material fact regarding the issue of immunity or if the undisputed facts show that defendant violated plaintiff's clearly established rights. *Noble,* 87 F.3d at 161.

In this case, as noted above, Plaintiff attaches the affidavits of himself, fellow prisoners, and a letter from his Rabbi. In the opinion of the undersigned, Plaintiff has sustained his burden of proof in response to Defendants' motion for summary judgment. Accordingly, it is recommended that the Motion for Summary Judgment filed by Defendants Miron and Castello (Docket # 30) be denied.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). *See also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

W.D.Mich.,2009.
Perkins v. Booker
Not Reported in F.Supp.2d, 2009 WL 2058780 (W.D.Mich.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

**(Cite as: 2006 WL 543896 (E.D.Wash.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
E.D. Washington.
Linniell PHIPPS, Plaintiff,
v.
Richard MORGAN, et al., Defendants.

No. CV-04-5108-MWL.
March 6, 2006.

Linniell Phipps, Monroe, WA, pro se.

Brian G. Maxey, Attorney General of Washington, Olympia, WA, for Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION

SUKO, J.

**\*1** Magistrate Judge Leavitt filed a report and recommendation on January 13, 2006, recommending that Defendants' motion for Summary Judgment be granted, Defendants be awarded summary judgment on all claims set forth in Plaintiff's amended complaint, and Plaintiff's case be dismissed with prejudice. (Ct.Rec.89).

The report and recommendation permitted Plaintiff ten (10) days, following service thereof, to file written objections to the report and recommendation. (Ct.Rec.89). However, on January 26, 2006, the Court was informed that the report and recommendation was returned as not deliverable to Plaintiff. (Ct.Rec.90). On January 30, 2006, Plaintiff informed the Court that his address had been changed. (Ct.Rec.91). Therefore, on January 30, 2006, the Court ordered that the previously set date for the filing of objections to the re-

port and recommendation be vacated and that the parties be allowed additional time, through, February 17, 2006, to file written objections to the report and recommendation. (Ct.Rec.92).

On February 17, 2006, Plaintiff filed an objection to the report and recommendation. (Ct.Rec.96). On February 28, 2006, Defendants filed a response to Plaintiff's objections. (Ct.Rec.100).

A. *First Amendment Claim*

In a claim arising under the First Amendment's Free Exercise Clause, an inmate must first satisfy two criteria: 1) the religious belief is sincerely held and 2) the claim must be rooted in religious belief. *Malik v. Brown,* 16 F.3d 330 (9th Cir.1994). If these prerequisites are established, then the reasonableness of a prison policy is determined pursuant to the four factors articulated in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[FN1]

> FN1. The *Turner* case sets forth the following four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests: 1) There must be a valid, rational connection between the prison regulation and the asserted legitimate governmental interest; 2) whether there are alternative means of exercising the right available to prison inmates; 3) the impact the accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and 4) exploration of the absence of ready alternatives to the regulation. 482 U.S. at 89-91.

The Magistrate Judge properly concluded that Defendants failed to provide the Court with any reason to doubt that Plaintiff sincerely believed that his reli-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

gion required him to eat Halal meat, a tenet he believed was central to his religious beliefs. (Ct.Rec.89, p. 8). Therefore, the Magistrate Judge then discussed the *Turner* factors finding that the Defendants' failure to provide Halal meat to Plaintiff was reasonable.

Despite Plaintiff's objections, the Magistrate Judge appropriately analyzed the *Turner* factors in this case. The Department of Corrections ("DOC") has a legitimate interest in reducing its costs, streamlining its food production, limiting the number of required staff, maintaining consolidation of its vendors, and preventing security risks. Islamic law does not require the eating of meat as a condition of being a Muslim, and the ovo-lacto vegetarian meals adequately accommodate Plaintiff's religious dietary requirements at the lowest cost to the DOC. Although Plaintiff has directed the Court to passages from the Quran, none of the quotations actually mandate the eating of meat.

As determined by the Magistrate Judge, the current program of providing Muslim inmates with ovo-lacto vegetarian meals is an adequate alternative to providing Halal meals. By providing ovo-lacto vegetarian meals, the DOC is able to meet Muslim religious requirements and not incur the burdens of a complicated food service, demands for additional staffing, potential increased security threats and increased costs.

**\*2** The undersigned finds that the Magistrate Judge properly concluded that Defendants' failure to provide Halal meals to Muslim inmates is reasonably related to legitimate penological interests and, accordingly, Plaintiff's right to the free exercise of his religion was not violated by Defendants.

B. *RLUIPA*

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides:

No government shall impose a substantial burden

on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1.

The Magistrate Judge appropriately found that Defendants established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks. (Ct.Rec.89, pp. 14-15). The Magistrate Judge also properly concluded that providing ovo-lacto vegetarian meals, the dietary program currently available to Plaintiff, was the least restrictive means of furthering that compelling interest. (*Id.*) The undersigned thus finds, in accord with the report and recommendation, that Defendants are entitled to summary judgment on Plaintiff's RLUIPA claim.

C. *Equal Protection Claim*

Equal protection claims arise when a charge is made that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 67, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972). In order to state a § 1983 claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that defendants acted with intentional discrimination against plaintiff or against a class of inmates which included plaintiff. *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir.2000). To prevail on this equal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

protection claim, Plaintiff must prove that a discriminatory intent was a motivating factor in the decision not to provide Halal meat to Plaintiff and that Defendants also failed to satisfy the *Turner* reasonable relationship test. *Salaam v. Collins,* 830 F.Supp. 853, 859 (D.Md.1993); *Abdullah v. Fard,* 974 F.Supp. 1112, 1119 (N.D.Ohio 1997).

The Magistrate Judge correctly found that Plaintiff failed to allege a discriminatory purpose behind DOC's policy of providing ovo-lacto vegetarian meals to Muslim inmates to accommodate their religious beliefs. (Ct.Rec.89, p. 16). As determined by the Magistrate Judge, even if a discriminatory purpose was shown, Defendants' dietary program pertaining to Muslim inmates still met the *Turner* reasonable relationship test. Accordingly, the undersigned finds, in accord with the report and recommendation, that Defendants are entitled to summary judgment with respect to Plaintiff's equal protection claim as well.

D. *Conclusion*

**\*3** Having reviewed the report and recommendation (Ct.Rec.89), Plaintiff's objections to the report and recommendation (Ct.Rec.96), and Defendants' response (Ct.Rec.100), said report and recommendation is ADOPTED in its entirety.

IT IS HEREBY ORDERED that Defendants' motion for summary judgment (Ct.Rec.48) is GRANTED, Defendants are awarded summary judgment on all of the claims set forth in Plaintiff's amended complaint (Ct.Rec.33), and Plaintiff's case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED. The District Court Executive shall enter this order, enter JUDGMENT in favor of the Defendants, forward a copies to Plaintiff and counsel, and CLOSE THE FILE.

REPORT AND RECOMMENDATION GRANTING
DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT

LEAVITT, Magistrate J.
I. *Procedural History*

Plaintiff Linniell Phipps ("Plaintiff") is currently incarcerated at the Monroe Correctional Complex ("MCC") in Monroe, Washington. (Ct.Rec.50-1, Exh. 1, Att.A). Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims Defendants have violated his constitutional rights by failing to accommodate his religious needs by not providing him with a Halal religious diet,[FN1] for Muslim prisoners, during his incarceration. (Ct.Rec.33).

> FN1. Muslims are only allowed to eat Halal meat. Halal meat is prepared as follows: The animal should be slaughtered in such a way as to allow its blood to flow out freely and completely (i.e., with a sharp tool cutting the main veins and throat). The name of Allah should be invoked over the animal at the time of the slaughter. The meat should be inspected to ensure that it is wholesome and does not contain any matter injurious to human health. The person who slaughters the animal may be a Muslim, Jew or Christian, but not an atheist, pagan, or polytheist. (Ct.Rec.50-2, pp. 32-33).

The parties did not consent to the jurisdiction of the Magistrate Judge in this case. On November 17, 2005, Defendants filed a timely motion for summary judgment. (Ct.Rec.48). Pursuant to Local Rule 7.1(h), the hearing on Defendants' motion for summary judgment was set for January 9, 2006. (Ct.Rec.51). On November 30, 2005, the Court held a telephonic hearing on four non-dispositive motions filed by Plaintiff. (Ct.Rec.72). At the hearing on the motions, the Court orally issued Plaintiff a *Klingele/Rand* notice to ensure Plaintiff understood the implications of a grant of summary judgment and to permit him the opportunity to file his opposition accordingly. *Rand v. Rowland,* 154 F.3d 952 (9th Cir.1998); *Klingele v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

*Eikenberry,* 849 F.2d 409 (9th Cir.1988). The Court thereafter granted Plaintiff additional time, through December 29, 2005, to respond to Defendants' motion for summary judgment. (Ct.Rec.73). Plaintiff filed a response in opposition to Defendants' motion for summary judgment on December 21, 2005. (Ct.Rec.85). On December 28, 2005, Plaintiff filed a supplement to his response. (Ct.Rec.87). On January 6, 2006, Defendants filed a reply in support of their motion for summary judgment. (Ct.Rec.88).

After considering the arguments presented and the relevant authorities, the Court recommends that Defendants' motion for summary judgment be granted. (Ct.Rec.48).

II. *Legal Standard*

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under summary judgment practice, the moving party

***4** [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 586 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." ' *Matsushita,* 475 U.S. at 587 (quoting

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments).

**\*5** In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed.R.Civ.P. 56(c). The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita,* 475 U.S. at 587 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which that inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (citation omitted).

### III. *Plaintiff's Claims*

Plaintiff's amended complaint (Ct.Rec.33) sets forth the following four allegations:

1. Plaintiff's First Amendment right to free exercise of his religion was violated by Defendants' refusal to provide him Halal meat.

2. Defendants' refusal to provide him Halal meat is a violation of RLUIPA.

3. Plaintiff was denied his Fourteenth Amendment right to the equal protection of the law because

other inmates receive food pursuant to their religious principles, while Muslims do not receive Halal meals.

4. Defendants violated Plaintiff's rights under not only the United States Constitution, but also the Washington State Constitution.

### IV. *Discussion*

### A. *First Amendment Claim*

The First Amendment to the United States Constitution provides that Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof. U.S. Const., amend. I. The United States Supreme Court has held that prisoners retain their First Amendment rights, including the right to free exercise of religion. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). A human being does not cease to be human because the human being is a prisoner of the state. *Ward v. Walsh,* 1 F.3d 873, 877 (9th Cir.1993). The Court has also recognized that limitations on a prisoner's free exercise rights arise from both the fact of incarceration and from valid penological objectives. *O'Lone,* 482 U.S. at 348; *McElyea v. Babbit,* 833 F.2d 196, 197 (9th Cir.1987). "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone,* 482 U.S. at 348. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), provides the test for balancing those interests: "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

**\*6** The *Turner* case sets forth four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate gov-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

ernmental interest put forward to justify it." *Id.* at 89. Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. *Id.* Third, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be determined. *Id.* Fourth, "the absence of ready alternatives" to the regulation must be explored. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.*

However, before analyzing a prison regulation under *Turner,* in a claim arising under the First Amendment's Free Exercise Clause, an inmate must first satisfy two criteria: 1) the religious belief is sincerely held and 2) the claim must be rooted in religious belief. *Malik v. Brown,* 16 F.3d 330 (9th Cir.1994). If these prerequisites are established, then the reasonableness of a prison policy is determined pursuant to the factors articulated in *Turner.* "In order to establish a free exercise violation, [plaintiff] must show the defendants burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith." *Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997). The burden imposed must be substantial, and not merely an inconvenience. *Id.* at 737.

Defendants provide adequate support for their argument that there is no requirement that Muslims consume meat prepared in accordance with Halal requirements and that Plaintiff thus fails to demonstrate that eating meat is a central tenet of Islam. (Ct. Rec. 49, p. 4; Ct. Rec. 50-3, Exh. 4, pp. 15-16; *see infra* ). Even accepting that the consumption of Halal meat is a tenet of Plaintiff's religious practice, the materials provided by Plaintiff himself establish that Kosher meat is also considered Halal and that a Kosher diet is considered Halal. (Ct.Rec.87). It is undisputed that Kosher meals are also available to Plaintiff. The unpublished Colorado district court case provided by Plaintiff in his supplemental response

recognized that providing Kosher meals satisfied a Muslim's religious exercise to consume Halal meat.[FN2] (Ct.Rec.87).

> FN2. The case provided by Plaintiff in his supplemental response states as follows: "Kosher meat is also considered halal as the strictures governing the processing of Kosher meats are at least as rigorous as the strictures governing the processing of halal meat. Thus, a Kosher diet, to the extent it does not contain alcohol, is considered halal." (Ct.Rec.87).

Nevertheless, as was the case in the unpublished Colorado district court case provided in Plaintiff's supplemental response (Ct.Rec.87), Defendants fail to provide the Court with any reason to doubt that Plaintiff sincerely believes that Islam requires him to eat Halal meat. *See, also, Williams v. Morton,* 343 F.3d 212, 217 (3rd Cir.2003). Having determined that Defendants have imposed a substantial burden on Plaintiff's sincerely held religious belief, the Court must next determine whether the Defendants' failure to provide Halal meat to Plaintiff is reasonable under *Turner.*

### 1. *Legitimate Penological Interests*

**\*7** Defendants assert that the Department of Corrections ("DOC") has a legitimate interest in reducing its costs, streamlining its food production, limiting the number of required staff, and maintaining consolidation of its vendors. (Ct.Rec.49, p. 6). They contend that the current ovo-lacto vegetarian meals accommodate Plaintiff's religious dietary requirements at the lowest cost to the DOC, and that these costs are not just financial, but include simplified food services, lower numbers of staff, and efficiency of consolidating food service vendors. (Ct. Rec. 49, p. 6; Ct. Rec. 50-3, Exh. 5, p. 2). In addition, Defendants assert that the use of an alternate vendor to provide the meals would create a security risk, as those vendors have not been screened by the DOC.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

Simplified food service, security, and budget constraints are legitimate penological interests. *Williams,* 343 F.3d at 217; *see also, Al- Alamin v. Gramley,* 926 F.2d 680, 686 (7th Cir.1991) (Both security and economic concerns are legitimate penological concerns); *DeHart v. Horn,* 227 F.3d 47, 53 (3rd Cir.2000) (simplified food service is a legitimate penological interest).

Cheryl Johnson, Food Program Manager for the DOC, provides persuasive evidence to support Defendants' claim of legitimate penological interests. (Ct.Rec.50-3, Exh. 5). Ms. Johnson declared that all special meals create increased demands on staff, the provision of Halal meals to Muslim inmates would create additional costs, decrease efficiency of the food preparation and necessitate hiring additional staff members, and there would be increased security risks associated with special delivery services if Halal meals were not available through the primary vendor. (Ct.Rec.50-3, Exh. 5, p. 2).

Ms. Johnson's statements are logical and are not adequately refuted by Plaintiff's remarks to the contrary (Ct.Rec.85, pp. 19-25). Plaintiff simply makes assertions, without support, to refute Ms. Johnson's declaration. (Ct.Rec.85, pp. 23-25). Plaintiff's unsupported, conclusory statements do not create an issue of fact necessary to defeat summary judgment. *See Celotex Corp.,* 477 U.S. at 322. Moreover, federal case law supports the fact that introducing Halal meals would increase costs and lead to additional security concerns. *Williams,* 343 F.3d at 218 ($1.80 more per meal for a Halal meal with meat than the cost of a regular meal in addition to evidence of security concerns associated with providing Halal diet); *Salaam v. Collins,* 830 F.Supp. 853 (D.Md.1993) (recognized cost advantage of providing Muslim inmates with a lacto-ovo-vegetarian diet instead of a Halal diet).

Defendants submit the declarations of Daniel L.

Williams, Religious Program Manager for the DOC (Ct.Rec.50-2, Exh. 2) and Brannon Wheeler, Distinguished Professor of History and Politics, and Director of the Center for Middle East and Islamic Studies at the United States Naval Academy (Ct.Rec.50-3, Exh. 4), as support for their assertion that the ovo-lacto vegetarian diet adequately accommodates Plaintiff's religious dietary requirements.

**\*8** Mr. Williams stated that inmates at the DOC are provided with ovo-lacto vegetarian meals which are nutritionally adequate and which meet the religious requirements for Muslims. (Ct.Rec.50-2, Exh. 2, p. 4). He indicated that he inquired directly to the Islam advisor about the sufficiency of ovo-lacto vegetarian meals to meet Islam requirements, and that individual advised Mr. Williams that the consumption of Halal, Kosher, or vegetarian diets would be sufficient under Islam. (*Id.*)

Mr. Wheeler declared that Islamic law does not require the eating of meat as a condition of being a Muslim, and that the consumption of a vegetarian diet is actually considered more pious than the eating of a meat diet. (Ct.Rec.50-3, Exh. 4, p. 16). He additionally stated that animals slaughtered according to Kosher (Orthodox Jewish) laws are considered Halal (lawful) for Muslims to consume. (Ct.Rec.50-3, Exh. 4, p. 17).

Federal case law, including the Colorado district court case provided by Plaintiff in his supplemental response (Ct. Rec. 87; Kosher meals accommodate religious needs of Muslim inmates), has consistently held that vegetarian, ovo-lacto vegetarian or Kosher meals all meet the religious requirements for Muslims. *Williams,* 343 F.3d at 218 (vegetarian meals); *Salaam,* 830 F.Supp. at 861 (lacto-ovo-vegetarian meals); *Abdullah v. Fard,* 974 F.Supp. 1112, 1118 (N.D.Ohio 1997) (vegetarian meals); *Cochran v. Schotten,* 172 F.3d 47 (6th Cir.1998) (ovo-lacto-vegetarian diet)

The declarations of Ms. Johnson, Mr. Williams

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

and Mr. Wheeler, in addition to federal case law, support a conclusion that ovo-lacto vegetarian meals adequately accommodate Plaintiff's religious dietary requirements at the lowest cost to the DOC.[FN3] Moreover, it is undisputed that Kosher meals are also available to Plaintiff, and the materials provided by Plaintiff, as well as Mr. Williams' declaration, indicate that Kosher meals also satisfy a Muslim's religious exercise to consume Halal meat.

> FN3. While Plaintiff argues that the ovo-lacto vegetarian diet does not accommodate his religion because the diet contains eggs (Ct.Rec.85, p. 16), the Court finds nothing in the record to support this assertion. There is simply no evidence, other than argument by way of Plaintiff's memorandum, to contradict the fact that the currently provided ovo-lacto vegetarian meals accommodate Plaintiff's religious dietary requirements. *See, Celotex Corp.,* 477 U.S. at 322.

**2.** *Alternative Means of Expressing Religious Belief*

Defendants met the second factor by providing alternate means for Plaintiff to exercise his religion. Muslims are given time off of work to celebrate the two major holidays, are allowed to meet together to celebrate Eidul-Fitr and Eidul-Adha, and receive special meals, their fasting requirements are met during Ramadan, accommodations are made for the five daily required prayers, and Muslims are permitted to congregate every Friday for the Jum'ah service. (Ct.Rec.50-2, Exh. 2). Education classes or other activities are often held for Muslims on other days, and a number of DOC facilities have hired a Muslim contract chaplain to assist in the religious practice and instruction of the Muslim inmates. (*Id.*) Plaintiff does not dispute these assertions. (Ct.Rec.85).

**3.** *Impact on Guards and Other Inmates*

While it is true that Defendants have not submitted any analysis regarding the impact that supplying Halal meat will have on guards, other inmates and the allocation of prison resources, such a showing is not required. *Abdullah,* 974 F.Supp. at 1118. The burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it. *Overton V. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Defendants have, however, shown by way of declaration from Ms. Johnson that all special meals create increased demands on staff, the provision of Halal meals to Muslim inmates would decrease efficiency of the food preparation and necessitate hiring additional staff members, and there would be increased security risks associated with special delivery services if Halal meals were not available through the primary vendor. (Ct.Rec.50-3, Exh. 5, p. 2).

**4.** *The Absence of Ready Alternatives*

**\*9** Finally, Defendants have demonstrated that the current program of providing ovo-lacto vegetarian meals for Plaintiff is an adequate alternative to providing Halal meals. By providing ovo-lacto vegetarian meals, the DOC is able to meet Muslim religious requirements and not incur the burdens of a complicated food service, demands for additional staffing, potential increased security threats and increased costs. The Court is convinced that there is no reasonable alternative that would accommodate Plaintiff's request with a diminimus impact on the DOC.

Defendants have satisfied the four factors set forth in *Turner* thus demonstrating that Defendants' failure to provide Halal meals to Muslim inmates is reasonably related to legitimate penological interests. As a matter of law, Plaintiff's constitutional right to free exercise of his religion was not violated by Defendants. Accordingly, Defendants are awarded summary judgment on this claim.

**B.** *RLUIPA*

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1.

Plaintiff alleges that eating Halal meat is compelled by and central to his religion and that Defendants' refusal to provide him the benefit of eating Halal meat pressures him to either violate the covenants of his belief or to simply no longer be a Muslim. (Ct.Rec.85, pp. 26-27). Plaintiff thus asserts that the Defendants' refusal to provide him with Halal meat is in violation of RLUIPA.

As determined in Section A, above, the Court finds that Plaintiff has adequately alleged that the Defendants' refusal to provide him with Halal meat burdens the exercise of his religion. The Court thus finds that Plaintiff has made a prima facie showing, and the burden shifts to Defendants to demonstrate that the regulation furthers a compelling government interest and is the least restrictive means of furthering that compelling interest. *San Jose Christian College v. Morgan Hill,* 360 F.3d 1024 (9th Cir.2004).

The Court further finds that Defendants have not only shown legitimate interests for First Amendment purposes, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks, but they have also established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA. Additionally, Defendants have demonstrated that the least restrictive means of furthering that compelling interest is providing ovo-lacto vegetarian meals, the dietary program currently available to Plaintiff.[FN4] Therefore, Defendants are entitled to summary judgment on Plaintiff's RLUIPA claim as well.

> FN4. Kosher meals, which are considered Halal according to the supplemental materials provided by Plaintiff and the declaration of Mr. Williams, are also available to Plaintiff.

C. *Equal Protection Claim*

*10 Equal protection claims arise when a charge is made that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972).* In order to state a § 1983 claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that defendants acted with intentional discrimination against plaintiff or against a class of inmates which included plaintiff. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (equal protection claims may be brought by a "class of one"); *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir.2000); *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998); *Federal Deposit Ins. Corp. v. Henderson,* 940 F.2d 465, 471 (9th Cir.1991); *Lowe v. City of Monrovia,* 775 F.2d 998, 1010 (9th Cir.1985). "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren,* 152 F.3d at 1194.

Plaintiff contends that he was denied equal protection of the law because other inmates receive food pursuant to their religious principles, while Muslims do not receive Halal meat. (Ct.Rec.33). To prevail on

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

this claim, Plaintiff must prove that a discriminatory purpose was a motivating factor in the decision not to provide Halal meat to Plaintiff and that Defendants failed to satisfy the *Turner* reasonable relationship test. *Salaam,* 830 F.Supp. at 859; *Abdullah,* 974 F.Supp. at 1119.

Plaintiff fails to even allege that the practice at DOC to give ovo-lacto vegetarian meals to Muslim inmates is done with discriminatory intent. (Ct.Rec.33). Defendants contend that the DOC provides all religions diets that accommodate their central tenets and requirements. (Ct.Rec.49, pp. 13-14). They indicate that the DOC treats all religions similarly by meeting their nutritional and religious needs, while still maintaining an efficiently run food service program. (*Id.*) Plaintiff does not dispute these assertions in his response. (Ct.Rec.85). Furthermore, even if a discriminatory purpose were established, Defendants meet the *Turner* reasonable relationship test. *Supra.* Accordingly, Plaintiff cannot prevail on his equal protection claim. The Court finds that there is no genuine issue for trial with regard to Plaintiff's equal protection claim and Defendants have thus met their burden as the parties moving for summary judgment. Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiff's equal protection claim.

D. *State Law Claims*

Plaintiff alleges that Defendants violated his rights under not only the United States Constitution, but also the Washington State Constitution. (Ct.Rec.33). A court is not, however, required to undertake an independent state constitutional analysis without the plaintiff first raising a convincing argument. *State v. Gunwall,* 106 Wash.2d 54, 63, 720 P.2d 808 (1986). "Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articuable, reasonable, and reasoned." *Id.* "If a party does not provide constitutional analysis based upon

the facts set out in *Gunwall,* the court will not analyze the state constitutional grounds in a case." *First Covenant Church of Seattle v. City of Seattle,* 120 Wash.2d 203, 224, 840 P.2d 174 (1992).

**\*11** The six nonexclusive criteria established in *Gunwall* to determine whether the Washington State Constitution should be considered as extending broader rights to its citizens than does the United States Constitution are as follows: 1) the textual language of the state constitution; 2) significant differences in the texts of parallel provisions of the federal and state constitutions; 3) state constitutional and common law history; 4) preexisting state law; 5) differences in structure between federal and state constitutions; and 6) matters of particular state interest and local concern. *Gunwall,* 106 Wash.2d at 59-61, 720 P.2d 808.

As indicated by Defendants (Ct.Rec.49, 11-13), Plaintiff has failed to consider or brief the *Gunwall* factors. In addition, Plaintiff failed to plead with particularity his state constitutional claims in his amended complaint. (Ct.Rec.33). Plaintiff offers no response to Defendants' motion for summary judgment on Plaintiff's state law claims. (Ct.Rec.85). Based on the foregoing, the court also awards Defendants summary judgment on Plaintiff's state law claims.

Due to the conclusions determined above, the Court finds that it need not reach Defendants' affirmative defense arguments of qualified immunity and Eleventh Amendment immunity. (Ct.Rec.49, pp. 15-20). Nevertheless, it appears that Plaintiff's claims would be defeated by these defenses as well.[FN5]

> FN5. The State has not waived its immunity to suit in this case; therefore, pursuant to the Eleventh Amendment, it appears that the named Defendants are immune from suit in their official capacities. In addition, there is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
**(Cite as: 2006 WL 543896 (E.D.Wash.))**

no clear-cut rule or established right regarding Muslim inmates and their right to Halal meals. *See, Hudson v. Maloney,* 326 F.Supp.2d 206, 211-214 (D.Mass.2004). Therefore, pursuant to *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the uncertain applicability of the law to the facts of record in this case with respect to the religious diet issues entitles the named Defendants to qualified immunity.

V. *Conclusion*

For the reasons discussed above, the Court recommends that Defendants' motion for summary judgment (Ct.Rec.48) be GRANTED, Defendants be awarded summary judgment on all of the claims set forth in Plaintiff's amended complaint (Ct.Rec.33), and Plaintiff's case be DISMISSED WITH PREJUDICE.

In light of the foregoing recommendation, it is ORDERED that all dates and obligations set forth in the June 30, 2005 amended scheduling order (Ct.Rec.47) are STRICKEN pending a final determination by the district court.

OBJECTIONS

Any party may object to a magistrate judge's proposed findings, recommendations or report within ten (10) days following service with a copy thereof. Such party shall file with the District Court Executive all written objections, specifically identifying the portions to which objection is being made, and the basis therefor. Attention is directed to Fed.R.Civ.P. 6(e), which adds another three (3) days from the date of mailing if service is by mail.

A district judge will make a *de novo* determination of those portions to which objection is made and may accept, reject, or modify the magistrate judge's determination. The district judge need not conduct a new hearing or hear arguments and may consider the magistrate judge's record and make an independent determination thereon. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. See 28 U.S.C. § 636(b)(1)(B) and (C), Fed.R.Civ.P. 73, and LMR 4, Local Rules for the Eastern District of Washington. A magistrate judge's recommendation cannot be appealed to a court of appeals; only the district judge's order or judgment can be appealed.

**\*12** The District Court Executive is directed to enter this Report and Recommendation and to forward copies to Plaintiff, to counsel for Defendants and to the referring judge.

DATED this *13th* day of January, 2006.

E.D.Wash.,2006.
Phipps v. Morgan
Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aurel SMITH, Plaintiff,
v.
Kenneth PERLMAN, Deputy Commissioner of Programs, NYS Department of Correctional Services;
Mark Leonard, Director of Ministerial Services, NYS Department of Correctional Services; Daniel Martuscello, Superintendent of Coxsackie Correctional Facility; Captain R. Shanley, Captain, Acting Deputy Superintendent of Security at Coxsackie Correctional Facility; Jeffrey A. Hale; Harry S. Graham, Superintendent of Auburn Correctional Facility; G. Robinson, Deputy Superintendent of Auburn Correctional Facility, Defendants.

No. 09:11–cv–00020 (MAD/CFH).
Signed Dec. 18, 2014.
Filed Dec. 19, 2014.

Aurel Smith, Attica, NY, pro se.

Office of the New York, State Attorney General, Kevin M. Hayden, AAG, of Counsel, Albany Office, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brought this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights under the First and Fourteenth Amendments, as well as

his rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See* Dkt. No. 1; Dkt. No. 47. Now before the Court are Plaintiff's motion to accept the filing of late objections to the Magistrate Judge's Report–Recommendation and Order and motion for reconsideration, pursuant to Fed.R.Civ.P. 59(e), of the Court's March 13, 2014 Order denying Plaintiff's motions for partial summary judgment and injunctive relief and granting Defendants' cross motion for summary judgment. Dkt. No. 93; Dkt. No. 94.

**II. BACKGROUND**

The factual background and full procedural history of this case is set forth in the Court's prior orders, the parties' familiarity with which is assumed. Relevant here, on August 23, 2013, Plaintiff moved for partial summary judgment against Defendants Perlman and Leonard on his claims alleging violations of the Fourteenth Amendment and RLUIPA based on the DOCCS policy of limiting religious family guest events for Muslim inmates to one per year and against Defendants Perlman, Leonard, Hale, and Graham on his claims alleging violations of the First and Fourteenth Amendments and RLUIPA based on Defendants' refusal to provide Plaintiff with meals combining therapeutic diet and halal restrictions. Dkt. No. 73. On October 28, 2013, Plaintiff moved for a temporary restraining order and preliminary injunction requiring Defendants to accommodate his religious and medical dietary needs by substituting halal meat for haram meat in his therapeutic diet. Dkt. No. 79. Defendants filed an opposition to Plaintiff's motion for partial summary judgment and cross motion for summary judgment on all counts on November 27, 2013. Dkt. No. 81.

In a Report–Recommendation and Order dated February 18, 2014, Magistrate Judge Christian F. Hummel recommended that the Court deny Plaintiff's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

motions for partial summary judgment and injunctive relief, grant Defendants' cross motion for summary judgment, and dismiss this case. Dkt. No. 90. Neither party filed objections to Magistrate Judge Hummel's Report–Recommendation and Order by the filing deadline of March 7, 2014. Finding no clear error or manifest injustice in Magistrate Judge Hummel's Report–Recommendation and Order, the Court adopted the Report–Recommendation and Order in its entirety in an Order dated March 13, 2014 and entered judgment in Defendants' favor. Dkt. No. 91; Dkt. No. 92.

On March 24, 2014, Plaintiff filed a letter motion requesting that the Court accept his late filing of objections addressing specific portions of Magistrate Judge Hummel's report. Dkt. No. 93.[FN1] Plaintiff's primary objection to the Report–Recommendation and Order was that Magistrate Judge Hummel erred in concluding that Plaintiff did not respond to Defendants' cross motion for summary judgment, thereby mistakenly taking Defendants' motion as unopposed and evaluating Defendants' factual assertions in the absence of Plaintiff's response and exhibits. *See id.* at 4. Plaintiff then filed a motion for reconsideration of the Court's Order adopting the Report–Recommendation and Order, which again contended that Plaintiff was prejudiced to the extent that Magistrate Judge Hummel's analysis overlooked Plaintiff's response to Defendants' cross motion for summary judgment, reply to the opposition of his motion for partial summary judgment, and related exhibits. *See* Dkt. No. 94–1. Defendants oppose Plaintiff's motion to reconsider, arguing that, "[d]espite his claims to the contrary, Plaintiff's reply papers were accepted for filing before the Report–Recommendation was issued" and that "Plaintiff has failed to dispute the law relied upon by the Court when dismissing his action." Dkt. No. 95 at 5.

FN1. Plaintiff asserts that he deposited his objections in a mailbox at the Attica Correctional Facility, where he is currently housed,

on February 28, 2014, and the facility returned the objections to him on March 6, 2014 for insufficient postage. *Id.* at 2–3. Plaintiff contends that he did not have access to a postage scale to determine sufficient postage for his filings because he was not permitted to visit the law library where the postage scale is located between the time of the issuance of the Report–Recommendation and Order and the deadline for filing his objections. *Id.* at 3. Because the Court received Plaintiff's objections to the Report–Recommendation and Order after issuing its Order, the Court will treat the motion as one for reconsideration in conjunction with the Plaintiff's subsequent motion.

### III. MOTION FOR RECONSIDERATION
### A. Legal Standards

**\*2** Rule 59(e) of the Federal Rules of Civil Procedure provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed.R.Civ.P. 59(e). The courts in this Circuit generally permit motions to reconsider grants of summary judgment to be brought under Rule 59(e). *Patel v. Lutheran Med. Ctr., Inc.,* 775 F.Supp. 592, 596 (E.D.N.Y.1991); *see also Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 739 F.Supp. 209, 213 (S.D.N.Y.1990) (vacating a grant of summary judgment pursuant to Rule 59(e)).

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). Under Rule 59(e), "a court is justified in reconsidering its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law

or to prevent obvious injustice." *Nossek v. Bd. of Educ. of Duanesburg Cent. Sch. Dist.,* No. 94–CV–219, 1994 WL 688298, \*1 (N.D.N.Y. Nov. 10, 1994). A motion for reconsideration "is not to be used as a means to reargue matters already argued and disposed of by prior rulings or to put forth additional arguments which [a party] could have made but neglected to make before judgment." *Duane v. Spaulding & Rogers Mfg. Inc.,* No. 92–CV–305, 1994 WL 494651, \*1 (N.D.N.Y. Aug. 10, 1994) (internal quotations omitted).

**B. Analysis**

Here, Plaintiff contends that reconsideration is necessary to prevent manifest injustice because Magistrate Judge Hummel and the Court did not consider his reply papers and exhibits in deciding the underlying motions. In a text order dated February 14, 2014, Magistrate Judge Hummel accepted for filing Plaintiff's reply to the opposition of Plaintiff's motion for partial summary judgment and Plaintiff's response to Defendants' cross motion for summary judgment. Dkt. No. 89. However, the Report–Recommendation and Order stated that "Smith does not oppose defendants' cross motion. Upon requests, this Court twice granted Smith an extension of time to respond to defendants' cross motion, the most recent deadline being February 5, 2014. The deadline expired and Smith never responded." Dkt. No. 90 at 2 (citations omitted). Thus, the Report–Recommendation and Order clearly indicates that despite having accepted Plaintiff's late reply papers, Magistrate Judge Hummel did not consider the reply papers or attached exhibits in evaluating the parties' respective motions.[FN2] The Court, which adopted Magistrate Judge Hummel's Report–Recommendation and Order in its entirety, also failed to examine Plaintiff's reply papers in its analysis of the parties' respective motions.

> FN2. The Court's view that Plaintiff's reply papers were in fact overlooked, despite Defendants' arguments to the contrary, is reinforced by the fact that the Report–Recommendation and Order does not include a single reference or citation to Plaintiff's reply papers or exhibits outside of the language quoted above.

**\*3** Thus, Plaintiff's motion for reconsideration does not attempt to raise arguments or evidence Plaintiff neglected to put forth earlier, but rather urges the Court to grant due consideration to overlooked evidence Plaintiff presented. Along with his reply papers, Plaintiff filed approximately 185 pages of exhibits, including, *inter alia,* Defendants' responses to interrogatories, records related to Plaintiff's grievances filed with DOCCS, and various DOCCS internal communications and policy materials. *See* Dkt. No. 88–3. Such evidence "might reasonably be expected to alter the conclusion reached by the court" upon consideration of a motion for summary ment. *Shrader,* 70 F.3d at 257. In the interest of avoiding manifest injustice, Plaintiff is entitled to have the Court consider this evidence. Accordingly, the Court hereby **ORDERS** that Plaintiff's motion for reconsideration is **GRANTED** and the Court's Order dated March 13, 2014 is **VACATED.**

**IV. RECONSIDERATION AND ORDER**

Having thoroughly reviewed Plaintiff's reply papers, attached exhibits, objections to Magistrate Judge Hummel's Report–Recommendation and Order, and motion for reconsideration, the Court now reviews Magistrate Judge Hummel's findings and recommendations.

**A. Standard of Review**

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U .S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*4** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N .Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**B. Statement of Material Fact**

Defendants argued that Plaintiff's motion for partial summary judgment should be denied because Plaintiff failed to include a Statement of Material Facts as required by N.D.N.Y.L.R. § 7.1(a)(3). Magistrate Judge Hummel found that Plaintiff substantially complied with Local Rule 7.1(a)(3) by filing a supporting memorandum of law and exhibits, a declaration, and an affidavit of service. Having reviewed Magistrate Judge Hummel's reasoning on this issue and finding no clear error, the Court adopts this portion of the Report–Recommendation and Order.

**C. Personal Involvement**

Defendants Leonard, Perlman, Graham, Hale, and Martuscello moved for summary judgment on the claims against them based upon lack of personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Although a defendant that occupies a supervisory position may not be held liable based solely on the defendant's position of authority,

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*5** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Magistrate Judge Hummel concluded that Defendants Perlman, Leonard, and Graham were personally involved in the alleged constitutional deprivations and should be denied summary judgment on this ground. Magistrate Judge Hummel further concluded that a genuine dispute of material fact existed with respect to Defendant Hale's personal involvement and that summary judgment for Defendant Hale should also be denied on this ground. Upon review, the Court finds no clear error or manifest injustice and adopts this portion of the Report–Recommendation and Order.[FN3]

> FN3. Plaintiff agrees with Magistrate Judge Hummel's conclusions, but objects to his analysis pertaining to Defendant Perlman's personal involvement because it did not address Defendant Hale's interrogatory re-

sponse asserting that Defendant Perlman made the decision to reduce the number of Islamic family guest events. Dkt. No. 88–3 at 21. The Court notes that this fact is disputed by Defendant Perlman's own interrogatory, *see* Dkt No. 88–3 at 40, and agrees with Magistrate Judge Hummel's conclusion that even if Defendant Perlman did not personally make the final decision to institute this policy, his actions in carrying out the policy were sufficient for a finding of personal involvement at the summary judgment stage. Plaintiff also objects that Magistrate Judge Hummel did not address the fact that "by signing into effect the CORC decision, Defendant Hale signed into effect departmental memoranda to be acted upon thenceforth." This fact does not substantively impact the personal involvement analysis, which focuses not on the effect of denying a grievance, but rather whether the official "proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio,* No. 10–CV–6481L, 2012 WL 1252630, *5 (W.D.N.Y. Apr. 13, 2012) (quotations omitted).

Plaintiff objects to Magistrate Judge Hummel's finding that Defendant Martuscello lacked personal involvement in the alleged constitutional violations. Plaintiff alleges that Defendant Martuscello was personally involved in the alleged constitutional violations because when Defendant Martuscello served as Deputy Superintendent of Security, he created a custom of not allowing keeplocked inmates to attend religious services "in an arbitrary and blanketed fashion" or allowed such custom to continue. *See* Dkt. No. 38 at 13; Dkt. No. 93–1 at 20. Defendants Martuscello and Shanley both attested that no such blanket policy existed and that keeplocked prisoners' requests to attend religious services were handled on a case-by-case basis in accordance with DOCCS Di-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

rective 4202. Dkt. No. 81–22 at 4; Dkt. No. 81–28 at 2–3. Directive 4202 directs that "[t]he final decision to permit attendance [at congregate religious services by keeplocked inmates] rests with the Deputy Superintendent for Security." Dkt. No. 81–27 at 4. In support of his claim that such an impermissible blanket policy nonetheless existed and was permitted by Defendant Martuscello, Plaintiff introduced a grievance he submitted on August 19, 2009, in which Plaintiff claimed:

> Today, at approximately 1:05 pm, I encountered D.S.S. Martuscello, in person, while he conducted rounds on the F–3 housing unit. I informed him of my 08/08/09 and 8/15/09 submitted requests to his office. To this D.S.S. Martuscello inquired whether I was confined via keeplock or I.P.C., to which I informed him that I was keeplocked (for a disciplinary infraction). In response thereto, D.S.S. Martuscello immediately, and in absolute terms, stated that I would not be allowed to go (to religious services) under any circumstances as I was a threat to his security. Notingly [sic], the reasons for my infraction weren't even mentioned/discussed.

> Dkt. No. 88–3 at 53.

Viewing this evidence in the light most favorable to Plaintiff, the nonmoving party, the Court finds it sufficient to create an issue of material fact with respect to Defendant Martuscello's personal involvement in the creation or continuance of the alleged unconstitutional policy. Defendant Martuscello's alleged statement that Plaintiff would not be permitted to attend religious services solely because he was in disciplinary keeplock can reasonably be viewed as evidence that Defendant Martuscello knew and approved of an informal policy or custom of prohibiting all keeplocked inmates from attending congregate religious services. Permitting an unconstitutional policy to operate is sufficient to establish a supervisor's personal involvement in an alleged constitutional violation. Therefore, Defendant Martuscello's motion for summary judgment on this ground is denied.

**D. First Amendment and RLUIPA Claims**

**\*6** Plaintiff alleges that his First Amendment and RLUIPA rights were violated by Defendants Perlman and Leonard when DOCCS reduced the number of Islamic holy days designated as family events from two to one. Plaintiff also alleges that his rights were violated by Defendants Shanley, Martuscello, Robinson, and Hale when they refused to allow Plaintiff to attend congregate religious services while in keeplock. Finally, Plaintiff alleges that Defendants Perlman, Leonard, Hale, and Graham violated his free exercise rights when they denied Plaintiff's request to incorporate halal meats into his therapeutic diet.[FN4]

> FN4. In light of Plaintiff's numerous specific objections to Magistrate Judge Hummel's Report–Recommendation and Order based on facts and arguments from Plaintiff's reply papers and exhibits, the Court will make *de novo* determinations on Plaintiff's constitutional and RLUIPA claims.

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. U.S. Const. Amend. I. Although "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," such protection is balanced against "the interests of prison officials charged with complex duties arising from the administration of the penal system," and prisoner's free exercise claims "are therefore judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (internal quotations and citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (quoting *Turner v. Safley,* 482

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

U.S. 78, 89 (1987)).

In order to prevail on a free exercise claim, a prisoner must show that the defendant's conduct "substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006).[FN5] A burden is substantial if it interferes with a practice or tenant that " 'is considered central or important' " to the plaintiff's religious exercise. *See Pugh v.. Goord,* 571 F.Supp.2d 477, 499 (S.D.N.Y.2008) (quoting *Ford,* 352 F.3d at 593–94). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. The burden then "remains with the prisoner to 'show that these [penological] concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989)).

> FN5. As Magistrate Judge Hummel noted in his Report–Recommendation, "[i]n the Second Circuit, it is uncertain whether the 'substantial burden' test, or a lesser 'burdened' test is employed in carrying out a free exercise claim analysis." Dkt. No. 90 at 18 (citations omitted); *see also Holland v. Goord,* 785 F.3d 215, 220 (2d Cir.2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs" (internal quotations omitted)). The Court need not decide which standard is appropriate because it finds that Defendants' conduct was justified by legitimate penological interests.

In making a reasonableness determination, the court must consider the following:

> 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

**\*7** *Benjamin,* 905 F.2d at 574 (citing *Turner,* 482 U.S. at 89–90).

The RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). RLUIPA claims are evaluated under principles similar to those applicable to First Amendment claims, but the RLUIPA places a higher burden on defendants, who must show a compelling government interest advanced through the least restrictive means. *See Griffin v. Alexander,* No. 9:09–CV–1334, 2011 WL 4402119, \*10 (N.D.N.Y. Aug. 25, 2011) (citation omitted). For a defendant to show that a practice is the least restrictive means, the defendant must show that it "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Jova v. Smith,* 582 F.3d 410, 416 (2d Cir.2009) (internal quotations omitted). Nonetheless, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," and courts are to "apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson,* 544 U.S. 709, 723 (2005) (internal quotations omitted). RLUIPA does not authorize claims for monetary damages against state officers in their official or individual capacities. *Holland,* 758 F.3d at 224.

**1. Family Guest Events**

Plaintiff alleges that Defendants Perlman and Leonard substantially burdened his sincerely held religious beliefs by removing family guest event designation from Eid–ul–Adha, a Muslim holy day, thereby no longer permitting family guests to attend and participate in the prison's Eid–ul–Adha celebration.[FN6] DOCCS stopped designating Eid–ul–Adha as a family guest event under a policy change that reduced the number of designated family events for each recognized religion, with the exception of the Native American religion, to one event per year.[FN7] DOCCS implemented the new policy after consultation with religious leaders and various DOCCS employees. Dkt. No. 81–29 at 2; Dkt. No. 81–30 at 2. Defendants Leonard and Perlman attested that the policy was motivated by the desire to reduce the administrative costs of providing food and security for family events and the increasing difficulty of balancing growing demand for family events by different religions. Dkt. No. 81–29 at 2; Dkt. No. 81–30 at 2.

> **FN6.** Defendants do not dispute that Plaintiff's religious beliefs are sincerely held.

> **FN7.** The Court will address the policy's exception for Native Americans in its discussion of Plaintiff's Fourteenth Amendment claims, *infra.*

These interests are rationally related to the policy of limiting nearly all recognized religions to only one family guest event per year. Plaintiff contends that reducing the number of family events is not rationally related to reducing administrative costs because in-

mates pay the facility commissary a meal charge of $1.95 per adult guest and $0.50 per child guest for family event guests. *See* Dkt. No. 93–1 at 24; Dkt. No. 88–3 at 174. This argument assumes, however, that DOCCS incurs no other costs in hosting family events. Plaintiff provides no evidence in support of his related argument that the cost of holding a family guest event for Eid–ul–Adha is insignificant. *See* Dkt. No. 88 at 37–38. Plaintiff also points to additions to the family events calendar for other religions as evidence that Defendants faced no administrative burden in balancing demand for events. *See* Dkt No. 88 at 34–35. This argument ignores that the new family events were added for religions that previously had no family events designated. The fact that the policy change enabled DOCCS to accommodate more religious groups strengthens Defendants' claim that it was rationally related to the need to balance demand from numerous groups. Lastly, Plaintiff's argument that the fact that no family event is currently scheduled for the weekend on which Eid–ul–Adha is celebrated takes too narrow a view of administrative burden, namely that DOCCS incurs no administrative burden in holding a family guest event if the event is not in direct conflict with another guest event. *See* Dkt. No. 93–1 at 22.

**\*8** Under the new policy, Plaintiff has alternative means of exercising his religious rights. Plaintiff acknowledges that despite the policy change, he may continue to observe Eid–ul–Adha, as DOCCS still holds a celebration for the holiday that incorporates a special menu, prayer, and a day off from work. *See* Dkt. No. 93–1 at 24; Dkt. No. 88–3 at 145. Plaintiff introduced no evidence that he cannot fully observe Eid–ul–Adha without family guests present. In fact, Plaintiff admitted that when DOCCS did permit family members to attend Eid–ul–Adha, he never had a family guest attend the celebration. *See* Dkt. No. 81–3 at 13.[FN8]

> **FN8.** Plaintiff claims that other prisoners' visitors were in fact Plaintiff's guests at un-

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

specific events. *See id.* at 68–69. He introduces no evidence in support of this claim.

Further, Plaintiff proffered no alternative for accommodating his rights that would satisfy the government's interests. His only suggested accommodations were for DOCCS to revert to its former policy recognizing Eid–ul–Adha as a family event or to recognize all "holy day events, beyond the once a year restriction available for all religious groups, to those holy days in which family and guest participation is integral or important thereto." *See* Dkt. No. 93–1 at 25–27. Neither option would serve Defendants' interest in reducing fiscal and administrative burdens.

Therefore, Plaintiff has not shown that Defendants' asserted penological interests unreasonably burdened Plaintiff's religious beliefs. Accordingly, Defendants' motion for summary judgment on Plaintiff's First Amendment claims arising out of the DOCCS family event policy is granted. In light of the foregoing analysis, the Court also finds that, even if the policy change substantially burdened Plaintiff's religious exercise, Defendants' conduct advanced a compelling government interest through the least restrictive means. Therefore, Defendants' motion for summary judgment on Plaintiff's RLUIPA claim on this ground is also granted.

**2. Attendance at Friday Services**

Plaintiff alleges that Defendants Shanley and Martuscello violated his First Amendment and RLUIPA rights by denying him permission to attend weekly Jum'ah congregate services at Conxsackie Correctional Facility on three occasions while Plaintiff was in disciplinary keeplock in August 2009. Plaintiff also alleges that Defendants Robinson and Hale violated his First Amendment rights by denying him permission to attend weekly Jum'ah services at Auburn Correctional Facility while Plaintiff was in disciplinary keeplock in May 2011.

In *O'Lone v. Estate of Shabazz,* while evaluating the validity of a prison regulation limiting Muslim prisoners' ability to attend Jum'ah, the Supreme Court recognized the centrality of Jum'ah services to the Islamic faith, noting that "[t]here is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah." 482 U.S. 342, 345 (1987). Generally, the courts "have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989). Prisoners in disciplinary confinement do not lose the right to attend religious services solely because of their confinement; "prison officials must make individual determinations on a case-by-case basis as to the need for exclusion." *Id.* (quoting *Leon v. Harris,* 489 F.Supp. 221, 225 (S.D.N.Y.1980)); *see also Mawhinney v. Henderson,* 542 F.2d 1, 3 (2d Cir.1976) ("[N]ot every prisoner in segregation can be excluded from chapel services; because not all segregated prisoners are potential troublemakers, the prison authorities must make some discrimination among them").

**\*9** However, courts have consistently found protecting institutional security and inmate safety to be a legitimate, compelling penological interest justifying the denial of attendance at religious services. *See, e.g., O'Lone,* 482 U.S. 342, 350 (finding that the regulation that forced prisoners to miss Ju'mah services was "justified by concerns of institutional order and security"); *Salahuddin v. Jones,* 992 F.2d 447, 449 (2d Cir.1993) ("In this case, appellant was in SHU for fighting with another inmate. Given that appellant posed a threat to the safety of other prisoners and that the state forbade only congregate religious services and not his solitary practice of religion, the state's purpose was legitimate"); *Salahuddin,* 467 F.3d at 277 ("[P]rison officials must have been pursuing the interest in inmate safety when limiting [the plaintiff]'s religious exercise. The defendants' burden on summary judgment is to 'point[ ] to [something] in the record suggesting that the [denial of religious exer-

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

cise] *was viewed as* preventing [threats to inmate safety]" (quoting *Turner,* 482 U.S. at 98)).

In this case, Plaintiff contends that Defendants denied his requests to attend Jum'ah while in keeplock pursuant to an unofficial blanket policy of denying all keeplocked prisoners' requests to attend congregate religious services. Defendants Shanley and Robinson both attested that they address each keeplocked inmate's request to attend congregated services on a case-by-case basis, pursuant to DOCCS Directive 4202, and denied Plaintiff's requests because he was determined to have presented a threat to the operation of the facility. *See* Dkt. No. 81–22; Dkt. No. 81–31. Specifically, Defendant Shanley identified Plaintiff's disciplinary history, including threatening violent conduct, a physical interaction with a correctional officer, and creating a disturbance while being escorted to a religious service, and Plaintiff's reason for being in keeplock, which was threatening physical violence toward correction officers and urging inmates to participate in detrimental actions, as the basis for denying Plaintiff's requests. Dkt. No. 81–22. Defendant Robinson indicated that he denied Plaintiff's requests because of Plaintiff's October 2010 violent conduct, fighting, and creating a disturbance and April 2010 assault of prison staff. Dkt. No. 8131.[FN9] Morever, Defendant Martuscello attested that Coxsackie Correctional Facility had no blanket policy of denying keeplocked inmates' requests. Dkt. No. 81–28.

> **FN9**. Plaintiff argues that *"Salahuddin v. Goord* ... rejected the practice of prison officials justifying preclusion from services due to infractions incurred at other facilities besides the one at which services are held." Dkt. No. 93–1 at 31. However, in *Salahuddin,* the Second Circuit reversed a grant of summary judgment for the defendants because they claimed they denied the plaintiff's request to attend services based on safety considerations, but "[did] not point to any

record evidence that suggests that the denial of religious exercise while in disciplinary keeplock ... was actually viewed as preventing threats to inmate safety.... Post hoc justifications with no record support will not suffice." 467 F.3d at 276–77. As the Court discusses below, there is ample record evidence here that Defendants' denials were actually based on safety concerns, and the Court does not read *Salahuddin* as requiring safety concerns to be based solely on an inmate's history at the facility at which he is in keeplock.

Defendants' contentions that Plaintiff's requests were denied on an individual basis are supported by Plaintiff's own exhibits, including DOCCS Directive 4202, which describes the process by which keeplocked inmates can request to attend religious services, *see* Dkt. No. 88–3 at 61; two memoranda from Defendant Shanley indicating that "[a]fter a careful review of [P]laintiff's facility records, and for the safety and security of the facility, I have denied [Plaintiff]'s request to attend Religious Services while he is on keeplock status," Dkt No. 88–3 at 55, 58; and Plaintiff's grievances, Dkt. No. 88–3 at 53–54, 57. The fact that the Inmate Grievance Resolution Committee recommended that one of Plaintiff's grievances be accepted in part because Defendant Shanley should have provided Plaintiff with a fuller explanation for the basis of the denial of Plaintiff's request does not make Defendant Shanley's denial defective. Rather, the Court finds ample evidence in the record, including the above-quoted memoranda, that Defendant Shanley denied Plaintiff's requests to protect facility safety and security. The only evidence Plaintiff introduced of an implicit blanket policy of denying all keeplocked inmates' requests was his alleged conversation with Defendant Martuscello. Plaintiff's unsupported assertion is not sufficient to create a genuine issue of material fact regarding the existence of such a policy, which Defendants unanimously denied.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

**\*10** Finally, the Court acknowledges that Plaintiff had no alternative means of participating in Ju'mah, as Ju'mah requires congregate worship. However, the Supreme Court in *O'Lone* rejected this argument as being fatal to the reasonableness of a prison regulation restricting prisoners from attending Ju'mah that protected institutional security and explained:

> Our decision in *Turner* also found it relevant that "alternative means of exercising the right ... remain open to prison inmates." There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time. But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service. While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end.... Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies.

482 U.S. at 351–52 (citation omitted). Plaintiff's ability to worship and pray individually in his keeplock cell thus afforded him some alternative means of exercising his religious rights, and Plaintiff has suggested no alternative or less restrictive means of protecting institutional security that would have permitted him to participate in Ju'mah.

Based on the foregoing, the Court finds that the burdens on Plaintiff's religious exercise were reasonably related to legitimate penological objectives, and Defendants had no less restrictive means of furthering those objectives. Defendants' motion for summary judgment on Plaintiff's First Amendment and RLUIPA claims on this issue is therefore granted.

**3. Dietary Restrictions**

Plaintiff contends that Defendants Perlman, Leonard, Hale, and Graham violated his First Amendment and RLUIPA rights by failing to incorporate halal meats into the therapeutic diet Plaintiff receives pursuant to a physician's approval.

Prison officials are required, at minimum, to provide inmates with nutritionally adequate meals, but otherwise retain "considerable discretion" over dietary decisions. *Walker v. Fischer,* No. 10–CV–01431, 2012 WL 1029614, \*6 (N.D.N.Y. Mar. 26, 2012). However, the Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597 (citations omitted). "Courts have generally found that to deny inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin v.. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). Even so, courts "are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin,* 905 F.2d at 579 (citations omitted). Further, "[c]ourts have consistently held that DOCCS' Religious Alternative Meal ["RAM"] is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required." *DeBlasio v. Rock,* No. 9:09–CV–1077, 2011 WL 4478515, \*20 (N.D.N.Y. Sept. 26, 2011) (citation omitted).

**\*11** In the present matter, Plaintiff currently receives the therapeutic "Controlled A" diet, which is high fiber, low cholesterol/low fat, and low sodium, at the request of Plaintiff's health care provider. The Controlled A menu contains meats that are haram, or prepared in a manner that violates the tenets of Islam. Plaintiff requested that Defendants provide him with a special diet combining the Controlled A diet with halal meats, which are prepared in a manner consistent with the laws of Islam. Defendants refused his request, noting that per the DOCCS Medical Nutritional Therapy Manual, "[r]eligious menus are not available

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

in combination with any therapeutic diet restrictions. [M]any of the religious selections are not compatible with therapeutic diet requirements." Dkt. No. 88–3 at 85. Plaintiff contends he is thus forced to choose between a diet suited to his medical needs and one which satisfies the dictates of his religious beliefs.

Plaintiff does not contend that Islam requires him to consume halal meat with any specific frequency or indeed at all, but rather that it prohibits him from consuming haram meat. The RAM diet, which courts have consistently approved of as sufficient to meet Muslim prisoners' dietary and religious needs, only includes one halal meat entree per week. *See* Dkt. No. 81–34 at 3. Plaintiff does not dispute that he remains free to choose the RAM diet, which complies with his religious beliefs, and does not claim that he is forced to consume the haram meats on the Controlled A diet when they are provided to him.[FN10] However, because haram meats are a prevalent component of the Controlled A diet, and the RAM diet would not fulfill Plaintiff's specific medical needs, the Court finds that Plaintiff's religious exercise is burdened by Defendants' refusal to provide him a meal option suited to his therapeutic needs that also complies with his religious beliefs. *See* Dkt. No. 81–37 (listing two typical weekly menus for the Controlled A diet, each of which feature non-halal meats in at least twelve meals).

FN10. Plaintiff claims that the RAM diet causes him adverse digestive and/or gastrointestinal reactions but provides no evidence in support of this claim. *See* Dkt. No. 88 at 15. Notably, Plaintiff was placed on the Controlled A diet because of his high blood sugar and creatine levels, not because of any gastrointestinal complications produced by the general population or RAM diets. *See id.* at 10. Further, in response to Plaintiff's arguments that the soy-based components of the RAM diet make the RAM diet generally unsuitable to meet prisoners' nutritional needs, the Court again notes that "[c]ourts

have consistently held that DOCCS' Religious Alternative Meal ["RAM"] is sufficient to sustain Muslim prisoners' good health." *DeBlasio,* 2011 WL 4478515 at *20.

Defendants' refusal to serve Plaintiff a special menu combining elements of the RAM and Controlled A diets is justified by the legitimate penological concern of meeting the disparate dietary needs of approximately 54,700 inmates in an economically viable way. *See* Dkt. No. 816. "[I]t is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups." *Majid v. Fischer,* No. 07–CV–4585, 2009 U.S. Dist. LEXIS 71616, *18–19 (S.D.N.Y. July 31, 2009); *see also Hamilton v. Smith,* No. 9:06–CV–0805, 2009 WL 3199520, *4 (N.D.N.Y. Sept. 30, 2009)* ("It is not a reasonable demand that prison officials supply every inmate with their personal diet requests for every meal" (internal quotations omitted)). There is clearly a rational relationship between this interest and the policy, which offers numerous menus tailored to meet different inmates' needs in a cost-effective manner by following a standardized state-wide menu prepared under considerations of "the palatability of the food to inmates, nutritional quality, accommodation of religious requirements and therapeutic needs, security implications, and cost containment." Dkt. No. 81–34 at 2. Defendants' refusal to permit Plaintiff to incorporate RAM entrees of his choosing into his diet also serves the legitimate purpose of maintaining the therapeutic integrity of the medical diet. For example, Elizabeth Culkin, assistant director of the DOCCS Office of Nutritional Services and a registered dietitian, attested that the halal chicken patty offered on the RAM diet that Plaintiff sought to have included in his diet was too high in sodium to meet the restrictions of the Controlled A diet. *Id.* at 5.

**\*12** Second, Plaintiff does not contest that Defendants make halal meat available to Muslim prisoners, including Plaintiff, numerous times per year

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

pursuant to special menus for religious observances. Ms. Culkin attested that Muslim inmates may also obtain halal meats to supplement their diets through care packages or their facility's commissary. Dkt. No. 81–34 at 3. Although Plaintiff alleges that halal meat is not sold at his current facility's commissary, Ms. Culkin attested that inmates may petition their facilities to have specific products sold at the commissary. *Id.* Therefore, Plaintiff has alternative means of exercising his religious beliefs.

Third, incorporating nutritionally appropriate halal entrees into the Controlled A menu would burden prison administrative and fiscal resources. Ms. Culkin attested that the cost of a single low sodium halal chicken entree suitable to the Controlled A diet is $0.78, while a single comparable non-halal chicken entree costs $0.43. *Id.* at 5. Ms. Culkin calculated that making this substitution just once per week for the 2,890 inmates currently on the Controlled A and B diets would cost DOCCS $52,598 annually. *Id.* Plaintiff contends that such a substitution would in fact cost DOCCS only $109 .20 annually because only three Controlled A diet recipients at the Attica Correctional Facility are Muslim. Dkt. No. 88 at 24. However, Plaintiff provides no support for his contention that only three Muslim prisoners at his facility require a therapeutic diet, and overlooks the fact that DOCCS operates its menus on a standardized, state-wide basis in the interest of cost containment. Further, the Court agrees with the *Hamilton* court, which found that under similar circumstances, " '[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns.' " *Hamilton,* 2009 WL 3199520 at *5 (quoting *Furnace v. Arceo,* No. C 06–4209, 2008 WL 618507, *8 (N.D.Cal. Mar. 3, 2008)).

Plaintiff's proffered alternatives to accommodate his rights include that DOCCS replace the haram proteins in all prison menus with halal proteins. Dkt.

No. 88 at 26. In light of Ms. Culkin's uncontroverted assertion that halal proteins are more expensive than non-halal proteins, this option would not satisfy Defendants' legitimate penological interest in meeting prisoners' nutritional needs in a cost-effective manner. *See* Dkt. No. 81–34. A second alternative Plaintiff suggests is that DOCCS provide him with Ensure dietary supplements. Dkt. No. 88 at 27. Plaintiff has proffered no evidence that he requested such supplements or that Defendants denied him such supplements under their current policy. Finally, Plaintiff suggests that DOCCS provide Muslim inmates with prepackaged halal meals. Dkt. No. 88 at 26. Plaintiff provides no evidence that these prepackaged meals are consistent with the restrictions of his therapeutic diet, are available to DOCCS for purchase, or would be cost-effective. Thus, Plaintiff has offered no viable less restrictive means of accommodating his rights that are consistent with Defendants' valid penological interests.

**\*13** For the above reasons, Defendants' motion for summary judgment on Plaintiff's free exercise and RLUIPA claims on this issue is granted.

**E. Equal Protections Claims**

Plaintiff contends that his rights under the Fourteenth Amendment were violated by Defendants Perlman and Leonard when DOCCS reduced the number of Islamic holy days designated as family events but did not similarly reduce the number of Native American religious family guest events. Plaintiff also contends that Defendants Perlman, Leonard, Hale, and Graham violated his rights when they refused to incorporate halal meats into Plaintiff's therapeutic diet but provided Jewish inmates kosher meals "satisfying both their medical and religious needs." Dkt. No. 47 at 17–18; Dkt. No. 47–4 at 10.

The Fourteenth Amendment to the United States Constitution provides in relevant part that "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

XIV, § 1. "To prove a violation of the Equal Protection Clause, ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). In the prison context, "the Supreme Court has specifically held that ... the Equal Protection clause does not require that 'every religious sect or group within a prison ... must have identical facilities or personnel.' " *Pugh,* 571 F.Supp.2d at 502 (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972)). The Second Circuit has applied the *Turner* standard to equal protection claims, such that "even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Benjamin,* 905 F.2d at 572). This standard requires courts to "determine whether 'the groups are so similar that discretion has been abused.' " *Benjamin,* 905 F.2d at 575 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136 (1977)).

### 1. Family Guest Events

In this case, Plaintiff claims that Defendants violated his equal protection rights by reducing the number of religious events at which family guests are permitted for Muslim inmates but not Native American inmates. It is undisputed that under the new policy, DOCCS reduced the number of religious events designated as family guest events to one event per year for all recognized religions except the Native American religion. Defendants argue that the exception for Native Americans is justified because in 1999, DOCCS agreed by stipulation to designate eight Native American holy days as family guest events, pursuant to DOCCS' recognition that "Native Americans believe that family ... is important to the religious celebration and for that reason it does not separate religiously from family celebrations and allows the eight sacred seasonal holy days of the Longhouse to be celebrated in a unique way as described herein." *See* Dkt. No. 81–4 at 12.

**\*14** Plaintiff contends that Muslim and Native American inmates are similarly situated because both "require family and guest participation as integral aspects of their holy day celebrations." Dkt. No. 93–1 at 58. On the other hand, Plaintiff asserts that Muslim inmates and the other religious groups that had family event days reduced are not similarly situated because the other religious groups "do not have any set holy day as a family event, but decide which ones they will celebrate as such at some time throughout the year." *Id.* at 59.[FN11] Defendant Leonard acknowledged in his response to Plaintiff's interrogatories that the DOCCS Muslim Chaplains objected to the reduction in family events because "religious holidays can be considered family days." Dkt. No. 88–3 at 47. However, Defendant Hale indicated that the decision to reduce all religious groups to one family guest event was made after Defendant Perlman "determined that having only one family day event in no way limited the religious practices of the inmate population of any religious faith." *Id.* at 21. This statement is consistent with the denial of Plaintiff's grievance regarding the change in family event policy, which stated, in relevant part:

> FN11. Plaintiff's evidence in support of this claim is his own recounting of personal conversations he had with Protestant and Catholic inmates, *see* Dkt. No. 88 at 33–34, the fact that the annual holy day given family event status for the Protestant and Catholic religions can vary annually, *see* Dkt. No. 88–3 at 157, 161, and a page from a text by Dr. Mandouh N. Mohamed, an associate professor at American Open University, which states that one common error concerning the celebration of Eid–ul–Adha Muslims may make is "[n]ot accompanying family members to attend Eiid," Dkt. No. 88–3 at 102.

Per Ministerial Services, Central Office allows one family event per year, with the exemption of the

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

Native American faith group. A Native American religious ceremony is observed with a family meal. The other religions do not require a family meal as part of the religious observance. Other religious holidays can be observed without a family event scheduled.

Dkt. No. 73–3 at 31. Defendants have consistently justified the policy's different treatment of Native American inmates and inmates practicing all other recognized religions as based on a legitimate penological interest of accommodating what DOCCS perceives as a unique need to incorporate family members into Native American religious celebrations, pursuant to a stipulation DOCCS has adhered to since 1999. This interest is rationally related to the DOCCS policy exception for Native American holy days. Plaintiff has introduced no evidence that Defendants' refusal to permit a similar exception for Muslims was the result of intentional or purposeful discrimination.

Morever, Plaintiff has failed to introduce any evidence demonstrating that he is so similarly situated with the Native Americans such that Plaintiffs abused their discretion. Accordingly, the Court has no basis for finding that Defendants abused their discretion in adhering to a stipulation recognizing eight annual family guest events for Native American inmates. Therefore, Defendants' motion for summary judgment on this ground is granted.

### 2. Dietary Restrictions

Plaintiff also contends that Defendants violated his equal protection rights by refusing to incorporate halal proteins from the RAM diet into Plaintiff's therapeutic diet while providing Jewish inmates the "hot kosher" meal option at Green Haven Correctional Facility. Plaintiff claims that the hot kosher program is provided to Jewish prisoners whose medical needs render the standard kosher menu, known as the Cold Alternative Diet ("CAD"), inappropriate. However, Plaintiff proffered no evidence in support of his claim that the hot kosher diet satisfies both the religious and

dietary needs of Jewish inmates requiring specific therapeutic diets, as Plaintiff requires. The record establishes only that the hot kosher meal program satisfies the Jewish dietary doctrine, and is devoid of any evidence that the program satisfies specific medical needs not met by the CAD. *See* Dkt. No. 88–3 at 22. In fact, an internal DOCCS communication regarding the Green Haven hot kosher program offered by Plaintiff as evidence of disparate treatment indicates that the program is intended for "more observant and religiously astute" inmates, not inmates requiring therapeutical diets. Dkt. No. 88–3 at 98. Similarly, DOCCS Directive 4202 describes eligibility to participate in the hot kosher program as "based upon past religious history and approval by the Office of Ministerial and Family Services," not medical concerns. *Id.* at 108. Further, the record indicates that all religious diets are strictly followed and cannot be combined with therapeutic menus, with no exception for Jewish inmates or reference to the hot kosher diet as a means of accommodation. *See* Dkt. No. 88–3 at 23, 29, 77. In the absence of any support for Plaintiff's unsubstantiated claim that Jewish inmates with medical dietary needs receive a special diet that accommodates their specific therapeutic and religious needs, Plaintiff has failed to show any disparity in treatment and raises no genuine issue of material fact on his equal protection claim. Based on the foregoing, the Court grants Defendants' motion for summary judgment on this ground.

### F. Qualified Immunity

**\*15** Defendants contend that even if Plaintiff established a constitutional violation, they are entitled to qualified immunity. Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations omitted).

For a constitutional right to be clearly established

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

for purposes of determining whether an officer is entitled to qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Mollica v. Volker,* 229 F.3d 366, 370–71 (2d Cir.2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 638 (1987)) (internal quotations and emphasis omitted). "Where the right at issue in the circumstances confronting [the government officials] ... was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to believe their acts did not violate those rights.' " *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York,* 612, F.3d 149, 165 (2d Cir.2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness.... That is, '[e]ven if the right at issue was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.' " *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner,* 494 F.3d at 367 (citing *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004)) (other citations omitted).

The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case.' "

**\*16** *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman,* 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003) (quotation omitted); *see also Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (quotation omitted).

In the present matter, Magistrate Judge Hummel concluded that because Plaintiff's allegations did not show that Defendants violated Plaintiff's constitutional rights, Defendants are entitled to qualified immunity. Upon review, the Court finds no clear error or manifest injustice and adopts this portion of the Report–Recommendation and Order.

In addition, the Court finds that a reasonable official would not believe that he was violating Plaintiff's clearly established constitutional rights by the conduct described here. As to the family guest events, Defendants reduced the number of family event days

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

for all religions, with the exception of the Native American religion, because of the increased number of requested family events, their associated costs, and the limited number of available weekends on which to hold the events. The exception for the Native American religion was made because of a stipulation in place and the centrality of family participation to Native American religious holidays. In light of these legitimate penological interests, a reasonable official would not conclude that implementing or following the policy violated Plaintiff's constitutional rights.

As to Plaintiff's restriction from Jum'ah, an inmate's general right to attend congregate religious services is clearly established. However, a prison's ability to restrict that right based on legitimate security concerns is also well-established. The law requires an individual determination of the risk a keeplocked inmate poses to security. Therefore, a reasonable official would not understand denying Plaintiff's requests to attend Jum'ah while in keeplock to violate Plaintiff's rights where Defendant made individual determinations that Plaintiff posed a threat to facility security.

As to the failure to incorporate halal meals into Plaintiff's therapeutic diet, an objectively reasonable officer would not believe that the options provided to Plaintiff violated his rights. This finding is supported by the fact that the RAM diet is widely accepted by courts as nutritionally and religiously appropriate for Muslim inmates, by the availability of other sources of halal meat to Plaintiff, and by the uniform manner in which DOCCS prohibited combinations of therapeutic and religious diets.

*17 Based on the foregoing, the Court finds that Defendants are entitled to qualified immunity, and grants Defendants' motion for summary judgment on this alternative ground.

**G. Preliminary Injunctive Relief**

Finally, Magistrate Judge Hummel concluded that Plaintiff was not entitled to a temporary restraining order or preliminary injunction. The Court has reviewed Magistrate Judge Hummel's reasoning and conclusion on this issue and finds no clear error. Accordingly, this portion of the Report–Recommendation is adopted and Plaintiff's motion for a temporary restraining order and preliminary injunction is denied.

## V. CONCLUSION

For the reasons stated above, the Court arrives as the same conclusions as Magistrate Judge Hummel as to the proper disposition of the parties' respective motions on full review and incorporation of Plaintiff's opposition papers. Although the Court disagrees with Magistrate Judge Hummel's recommendation regarding the personal involvement of Defendant Martuscello, the Court's finding on this issue does not alter the Court's conclusion that Defendants are entitled to summary judgment on all counts of Plaintiff's complaint. Therefore, the Court hereby

**ORDERS** that Plaintiff's motion for reconsideration is **GRANTED** and the Court's Order dated March 13, 2014 is **VACATED;** and the Court further

**ORDERS** that the Report and Recommendation by United States Magistrate Judge Christian F. Hummel (Dkt. No. 90) is rejected in part and accepted in part for the reasons set forth herein; and the Court further

**ORDERS** that Plaintiff's motion for partial summary judgment (Dkt. No. 73) is **DENIED;** and the Court further

**ORDERS** that Defendants' cross motion for summary judgment (Dkt. No. 81) is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's motion for a temporary

Slip Copy, 2014 WL 7333229 (N.D.N.Y.)
**(Cite as: 2014 WL 7333229 (N.D.N.Y.))**

restraining order and preliminary injunction (Dkt. No. 79) is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2014.
Smith v. Perlman
Slip Copy, 2014 WL 7333229 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Injah TAFARI, a/k/a Richard O. Foust,[FN1] Plaintiff,

> FN1. The Court notes that Plaintiff has prosecuted other *pro se* prisoner civil rights actions under the name of "Richard O. Foust." *See, e.g., Tafari v. Aidala,* OO–CV–0405 (W.D.N.Y.); *Foust v. Gosline,* 93–CV–1274 (N.D.N.Y.); *Foust v. Gilmore,* 93–CV–0479 (W.D.N.Y.).

v.

William D. BROWN; Sheryl butler; John W. Carvill; Charles M. Devane; Roche Frank; Glenn S. Goord; Peter Healy; Zvi Jacob; Karen LaPolt; Lucien J. Le-Clair, Jr.; David L. Miller; Arthur Morgenstern; John H. Nuttall; Thomas Poole; Richard Roy; Rosemarie Wendland; Jean Yost; and S. Zenzen, Defendants.

No. 9:10–CV–1065 (GTS/DRH).
March 30, 2012.

Injah Tafari, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Charles J. Quackenbush, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***MEMORANDUM–DECISION and ORDER***
GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Injah Tafari ("Plaintiff") against the eighteen above-captioned

New York State correctional employees ("Defendants"), are the following: (1) the United States Magistrate Judge's Report–Recommendation recommending that (a) Defendants' motion to revoke Plaintiff's *in forma pauperis* status as having been improvidently granted pursuant to 28 U.S.C. § 1915(g) ("motion to revoke") be denied, and (b) Defendants' motion for summary judgment be granted in part and denied in part, such that all of Plaintiff's claims are dismissed, except for his claim against Defendants Wendland and Nuttal for their failure to provide him with kosher meals between January 24, 2005 and March 24, 2005 (Dkt. No. 126); (2) Plaintiff's four sets of Objections to the Report–Recommendation (Dkt.Nos.127, 129, 130, 133); and (3) Defendants' Objection the Report–Recommendation (Dkt. No. 128). For the reasons set forth below, the ReportRecommendation is accepted and adopted except for its recommendation regarding the survival of Plaintiff s claim against Defendants Wendland and Nuttal for failing to provide him with kosher meals between January 24, 2005 and March 24, 2005; Defendants' motion to revoke is denied; their motion for summary judgment is granted in its entirety; and Plaintiff's Second Amended Complaint is dismissed in its entirety.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs Second Amended Complaint**

Generally, construed with the utmost of liberality, Plaintiff's Second Amended Complaint asserts the following eight claims against the eighteen above-captioned Defendants: (1) Defendants Miller, Wendland, Butler, Goord, and Nuttal wrongfully denied Plaintiff kosher meals from January 24, 2005, through March 24, 2005, in violation of the First Amendment; (2) Defendants Wendland and Butler wrongfully removed Plaintiff from the kosher meal

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

list from July 13, 2005, to July 15, 2005, in violation of the First Amendment; (3) Plaintiff was wrongfully denied requests for vegetarian-kosher meals, in violation of the First Amendment, (a) by Defendants Miller, Wendland, Butler, Healy, LaPort and Brown in 2006 at Eastern Correctional Facility, (b) by Defendants Poole, Yost, LeClaire, Goord, Nuttall and Devane in 2006 at Five Points Correctional Facility, and (c) by Defendants Frank, Jacob, Morgenstern, and Zenzen in 2007 at Eastern Correctional Facility and Five Points Correctional Facility; (4) Defendants Brown, Healy, LaPolt, LeClaire, Poole, Wendland, Yost, and Zenzen wrongfully denied Plaintiff holiday meals for Yom Kippur, Hannukah, and Passover during the years 2005 and 2006, in violation of the First Amendment; (5) Defendants Healy and Brown wrongfully placed Plaintiff on a restricted "loaf diet as a result of disciplinary sanctions from December 18, 2005, through January 9, 2006, in violation of the First and Eighth Amendments; (6) through the above-described actions, Defendants caused Plaintiff to suffer weight loss and constipation, in violation of the Eighth Amendment; (7) Defendants Goord, LeClaire, Nuttall, Poole, Roy, Yost, Carvill, Frank, Jacob, Morgernstern, and Devane wrongfully denied his requests for a transfer to Green Haven Correctional Facility (which provides qualified inmates with vegetarian-kosher meals), in violation of the First Amendment; and (8) Defendant Poole filed two misbehavior reports against Plaintiff in 2007 in retaliation for his retaining his dreadlocks, in violation of the First Amendment. (*See generally* Dkt. No. 38.)

**\*2** For a more detailed recitation of Plaintiff's claims and supporting factual allegations, the Court refers the reader to the Second Amended Complaint in its entirety, as well as the Magistrate Judge's Report–Recommendation, which accurately summarize those allegations. (Dkt. No. 38; Dkt. No. 126, at Part I [Background of Report–Rec].)

**B. Defendants' Motion to Revoke Pursuant to 28 U.S.C. § 1915(g)**

On August 12, 2011, Defendants filed a motion to revoke pursuant to 28 U.S.C. § 1915(g). (Dkt. No. 118.) Generally, in support of their motion, Defendants assert that Plaintiff is precluded from litigating this case without payment of filing fees pursuant to the "three strikes" provision under 28 U.S.C. § 1915(g). (Dkt. No. 118.)

**C. Defendants' Motion for Summary Judgment**

On August 24, 2011, Defendants filed a motion for summary judgment. (Dkt. No. 122.) Generally, in support of their motion, Defendants assert the following seven arguments: (1) Plaintiff's claims for monetary relief against Defendants in their official capacities are barred by the Eleventh Amendment, and his claims for equitable relief are moot due to his having been transferred to Upstate Correctional Facility; (2) Plaintiff has failed to adduce admissible record evidence establishing the personal involvement of Defendants (who were all high-ranking correctional officials during the times in question) in the constitutional violations alleged; (3) Plaintiff has failed to adduce admissible record evidence establishing that the challenged policies and/or actions regarding food and hair were not reasonably related to legitimate penological interests; (4) Plaintiff's claims against Defendant Miller regarding the failure to provide kosher meals are barred by the doctrines of res judicata and/or collateral estoppel; (5) Plaintiff's claims regarding Defendants' refusal to transfer him to Green Haven Correctional Facility are not actionable; (6) Plaintiff has failed to adduce admissible record evidence establishing either of the two elements of a inadequate-conditions-of-confinement claim under the Eighth Amendment; and (7) in any event, based on the current record, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity. (*Id.*)

**D. The Magistrate Judge's Report–Recommendation**

On March 6, 2012, the Magistrate Judge issued a Report–Recommendation recommending that De-

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

fendants' motion to revoke be denied and that their motion for summary judgment be granted in part and denied in part. (Dkt. No. 126.) More specifically, with respect to Defendants' motion to revoke, the Magistrate Judge determined that, because Plaintiff's third strike occurred *after* the filing of the current action, Plaintiff has not acquired three strikes under the parameters of 28 U.S.C. § 1915(g). (*Id.* at 23–25.) With respect to Defendants' motion for summary judgment, the Magistrate Judge recommended that Plaintiff's claim for the denial of kosher meals for an eight-week period from January 24 through March 24, 2005 should survive Defendants' motion, and that Plaintiff's remaining claims should be dismissed pursuant to Fed.R.Civ.P. 56 and/or 12(b)(6). (*Id.* at 26–27.)

**E. Defendants' Objection to the Report–Recommendation**

**\*3** On March 16, 2012, Defendants submitted their Objection to the Report–Recommendation. (Dkt. No. 128.) Generally, in support of their Objection, Defendants assert the following two arguments: (1) Plaintiff has failed to adduce admissible record evidence establishing that the eight-week delay in January through March 2005 (during which Defendants Wendland and Nuttal failed to provide Plaintiff with kosher meals), was anything more than negligence, which is not actionable under the First Amendment and 42 U.S.C. § 1983; and (2) in any event, Defendants Wendland and Nuttal are protected from liability as a matter of law, particularly in light of Plaintiff s shifting religious designations and demands (e.g., from Rastafarianism to Judaism), which rendered entirely reasonable any errors committed by Defendants Wendland and Nuttal. (*Id.*)

**F. Plaintiffs Four Sets of Objections to the Report–Recommendation**

Plaintiff has filed four sets of Objections to the Magistrate Judge's Report–Recommendation. (Dkt.Nos.127, 129, 130, 133.) [FN2]

> FN2. Each of these Objections was dated,

and thus deemed "filed," before the applicable deadline of March 23, 2012.

More specifically, on March 13, 2012, Plaintiff filed an Objection to the Report–Recommendation. (Dkt. No. 127.) Generally, in his Objection, Plaintiff asserts the following six arguments: (1) genuine issues of material fact remain that preclude granting summary judgment; (2) Defendants should not have been dismissed for lack of personal involvement; (3) Defendant Goord created the DOCCS policy prohibiting dreadlocks, Defendant Poole allowed the policy to continue, and the policy violated Plaintiff's First Amendment rights; (4) the right to practice one's religion includes the right to assemble and acts of worship, and Plaintiff was denied these rights during the Yom Kippur, Hanukkah, and Passover holidays; (5) Plaintiff was denied the free exercise of religious practice by Defendants, who withheld special holiday meals and failed to provide him with daily vegetarian-kosher meals in accordance with his religious beliefs; and (6) the provision of a vegetarian-kosher meal is neither cost-prohibitive nor administratively difficult. (*Id* )

On March 15, 2012, Plaintiff filed a Supplemental Objection to the Report–Recommendation. (Dkt. No. 129.) Generally, in his Supplemental Objection, Plaintiff asserts the following two arguments: (1) because Defendants were personally involved in the constitutional violations alleged, they should not have been dismissed from the action; and (2) correctional facilities currently provide special meal accommodations to certain prisoners because of food allergies or other health-related issues. (*Id.*)

On March 19, 2012, Plaintiff filed a "Second Addendum" to his Supplemental Objection. (Dkt. No. 130.) Generally, in his Second Addendum, Plaintiff asserts the following two arguments: (1) based on a review of a CAD menu, it is clear that, once meat and meat byproducts are removed from the selections, Plaintiff is permitted to eat only some items that do not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

provide him a nutritionally adequate diet; and (2) Defendants have adduced no admissible record evidence that any deviation from the CAD menu would present a substantial financial or administrative burden. (*Id.*)

**\*4** Finally, on March 22, 2012, Plaintiff filed a "Third Addendum" to his Supplemental Objection. (Dkt. No. 133.) Generally, in his Third Addendum, Plaintiff asserts the following three arguments: (1) the current DOCCS menu is a health hazard, red meat is a health hazard with risk of premature death, and the United States District Court for the Central District of Illinois is currently reviewing use of soy products in prisons and whether this constitutes a health hazard; (2) Rastafarians are bound by religious principles in all areas of life and keeping kosher is critical to their belief system; and (3) Defendants are incorrect in stating that Plaintiff has failed to produce evidence that the eight-week-kosher-meal delay was intentionally inflicted by Defendants as Plaintiff's numerous requests were ignored and many Defendants were aware of the problem but failed to timely address it. (*Id.*)

## I. APPLICABLE LEGAL STANDARDS

## A. Standard of Review Governing a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D .N.Y. L.R. 72.1(c). [FN3] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to

consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[FN4]

> FN3. *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

> FN4. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
(Cite as: 2012 WL 1098447 (N.D.N.Y.))

party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[FN5] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[FN6] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[FN7]

FN5. *See also* Brown v. Peters, 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

FN6. *See* Mario, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992)

(explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord,* Praileau v. Cnty. of Schenectady, 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); Hickman ex rel. M.A.H. v. Astrue, 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); Almeda v. N.Y.S Div. of Parole, 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

FN7. *See also* Batista v. Walker, 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard of Review Governing a Defendants' Motion to Revoke**

**\*5** The Magistrate Judge correctly recited the legal standard governing Defendants' motion to revoke Plaintiff's *in forma pauperis* status pursuant to 28 U.S.C. § 1915(g). (Dkt. No. 126, at Part II.C.) As a result, these standards are incorporated by reference in this Decision and Order, which is intended primarily for the review of the parties.

**C. Standard of Review Governing a Motion for Summary Judgment**

The Magistrate Judge correctly recited the legal standard governing motions for summary judgment.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

(Dkt. No. 126, at Part II.A .) As a result, these stand-ards are incorporated by reference in this Decision and Order, which is intended primarily for the review of the parties.

## III. ANALYSIS

For the sake of brevity, the Court will liberally construe Plaintiff's Objections, and Defendants' Objections, as together specifically challenging each and every finding and recommendation of the Magistrate Judge's Report–Recommendation, so as to subject that Report–Recommendation to a *de novo* review, rather than a clear-error review. (*See generally* Dkt.Nos. 127, 128, 129, 130, 133.)

After carefully subjecting the Magistrate Judge's thorough Report–Recommendation to a *de novo* review, the Court adopts that Report–Recommendation for the reasons stated therein, except for its recommendation regarding the survival of Plaintiff s claim against Defendants Wendland and Nuttal for failing to provide him with kosher meals between January 24, 2005 and March 24, 2005, which is also dismissed.

The Court reaches this latter conclusion for each of the three alternative reasons offered by Defendants Wendland and Nuttal in their memorandum of law and Objection: (1) Plaintiff has failed to adduce admissible record evidence from which a rational fact-finder could conclude that they were personally involved in the denial of his kosher meals between January 24, 2005 and March 24, 2005; (2) even if the two Defendants in question were personally involved in that violation, Plaintiff has failed to adduce admissible evidence establishing that those two Defendants were anything more than negligent, which is not actionable under the First Amendment and 42 U.S.C. § 1983; and (3) in any event, those two Defendants are protected from liability as a matter of law by the doctrine of qualified immunity. (*See* Dkt. No. 122, Attach. 1, at 5–8, 16–18 (arguing that the two Defendants in question were not personally involved, and that they are protected by qualified immunity); Dkt. No. 128 (ar-

guing that negligence is not actionable, and that Defendants are protected by qualified immunity).

The Court would add only the following six brief points. First, based on the current record, it appears that Defendants Wendland and Nuttal received notice of Plaintiff s letters at the *very earliest* on March 21, 2005, and March 23, 2005, respectively-some eight weeks after the alleged violations started and rather immediately before they ceased. More specifically, on March 21, 2005, Plaintiff wrote a letter to Defendant Goord complaining that he was being harassed and intentionally denied the CAD, which he had requested as part of his Jewish faith. (Dkt. No. 124, Part 22, at 33–34.) Eighteen days later, Defendant Nuttal sent a letter to Plaintiff stating as follows:

**\*6** Commissioner Goord has referred your recent letters to me for a response.

Please be advised that your letter regarding the alleged verbal harassment by staff and the handling of your Cold Alternative Diet has been referred to Superintendent Miller for his appropriate action and follow up. Superintendent Miller is in the best position to deal with your concerns.

(*Id.* at 35.) On April 15, 2005, Defendant Wendland wrote a memorandum to Plaintiff stating as follows:

This is in response to your letters of March 23, 2005 and March 24, 2005 addressed to the Commissioner, and letter of April 17, 2005 addressed to the Superintendent.

Issues of alleged verbal harassment are being addressed through inmate grievance complaints 20721–05 and 20710–05.

I have been advised that you were placed on the cold alternative meal as soon as proper notification was received from the facility Chaplain. Meals are pro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

vided each and every day, three times a day, no exception. Issues regarding hot water and cup of soup were resolved immediately.

Kosher turkey and salad dressing have been ordered. Different varieties of fruit will be provided when available. Dry goods such as bread and cup of soup are not placed within the tray. Kitchen staff will continue to monitor meals.

(*Id.* at 52.) As a result, no rational fact finder could conclude that Plaintiff's letters gave

Defendants Wendland and Nuttal a reasonable opportunity to prevent the alleged constitutional violations from starting on January 24, 2005, or to cause them to stop before March 24, 2005.[FN8]

> FN8. While Plaintiff alleges, in his Second Amended Complaint, that he *orally* requested the meals in question from Defendant Wendland soon after January 24, 2005, his Second Amended Complaint is not verified and thus does not have the force and effect of an affidavit. (Dkt. No. 38, at ¶ 37.) *See also Torres v. Viscomi,* 03–CV–0796, 2006 WL 2728628, at \*3 (D.Conn. Sept.25, 2006) ("The plaintiff has filed no affidavit in response to the motion for summary judgment and his amended complaint is not verified. Thus, the plaintiff has not provided any evidence [with regard to his First Amendment claim] ...."); *Chisari v. Leeds, Morelli & Brown, P.C.,* 02–CV–8836, 2004 WL 1588161, at \*1, n. 2 (S.D.N.Y. July 16, 2004) ("As Chisari's initial and amended complaints are not verified, they may not serve as affidavits for summary judgment purposes."). The Court notes that his declaration in opposition to Defendants' motion does not appear to specifically address this issue, nor does his deposition transcript. (*See generally*

Dkt. No. 124, at ¶ 37; Dkt. No. 122, Attach. 8.)

Second, Defendant Nuttal was, during the time in question, entitled to refer Plaintiff's letter of complaint to a subordinate, such as Defendant Miller, and rely on that subordinate to conduct an appropriate investigation and response, without rendering himself personally involved in the constitutional violations alleged in the complaint.[FN9] Similarly, Defendant Wendland was entitled to rely on advice from her subordinates that (1) Plaintiff was placed on the CAD as soon as proper notification was received from the facility Chaplain, and (2) kitchen staff will continue to monitor Plaintiff's meals.[FN10]

> FN9. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Brown v. Goord,* 04–CV–0785, 2007 WL 607396, at \*6 (N.D.N.Y. Feb.20, 2007) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review) (holding that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved in constitutional violations alleged) [citations omitted], *accord, Pilgrim v. Artus,* 07–CV–1001, 2010 WL 3724833, at \*7 (N.D.N.Y. March 18, 2010) (Treece, M.J.), *adopted,* 2010 WL 3724881 (N.D.N.Y. Sept.17, 2010) (Sharpe, J.); *Swindell v. Supple,* 02–CV–3182, 2005 WL 267725, at \*10 (S.D.N.Y. Feb.3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
(Cite as: 2012 WL 1098447 (N.D.N.Y.))

*Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action."); *Cruz v. Edwards,* 81–CV–7930, 1985 WL 467, at *4 (S.D.N.Y. Mar.25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

FN10. *See, supra,* note 9 of this Decision and Order; *see also Fletcher v. Goord,* 07–CV0707, 2008 WL 4426763, at *17 (N.D.N.Y. Sept.25, 2008) (Sharpe, J., adopting ReportRecommendation of Lowe, M.J.) ("[A] DOCS supervisor's adoption of a recommendation by a subordinate investigating officer does not by itself demonstrate that he failed to remedy known misconduct."); *Thompson v. New York,* 99–CV–9875, 2001 WL 636432, at *7 (S.D.N.Y.Mar.15, 2001) ("The superintendent's adoption of the recommendation by the investigating officer cannot by itself demonstrate that he failed to remedy known misconduct.").

Third, in any event, even if Defendants Nuttal and Wendland did somehow receive timely notice of the denial Plaintiff's kosher meals between January 24, 2005 and March 24, 2005, no rational facf-finder could conclude, based on the current record, that their responsive actions were taken with a state of mind that amounted to anything more than negligence, which indeed is not actionable under the First Amendment and 42 U.S.C. § 1983.[FN11]

FN11. *See Cusamano v. Sobek,* 604 F.Supp.2d 416, 498 (N.D.N.Y.2009) (Suddaby, J.) ("Negligence is not actionable

under the First Amendment ...."); *accord, Desmarat v. Artus,* 08–CV–0977, 2011 WL 1564605, at *6 (N.D.N.Y. March 25, 2011) (Treece, M.J.), *adopted,* 2011 WL 1557914 (N.D.N.Y. Apr.25, 2011) (Hurd, J.); *Chaney v. Koupash,* 04–CV–0136, 2008 WL 5423419, at *10 (N.D.N.Y. Dec. 30, 2008) (Homer, M.J.) ("However, these allegations are, at best, negligence on the part of defendants in losing Chaney's legal documents after his transfer. This is not enough to establish a First Amendment violation."); *Holmes v. Grant,* 03–CV–3426, 2006 WL 851753, at *12 (S.D.N.Y.Mar.31, 2006) ("Mere negligence resulting in the loss of legal papers ... does not state an actionable claim [as] plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts [under the First Amendment] ... [such as allegations] that the defendants deliberately stole his legal papers."); *Jones v. Salt Lake County,* 503 F.3d 1147, 1162–63 (10th Cir.2007) ("[N]egligence does not state a § 1983 [First Amendment] claim."); *Taylor v. Dretke,* No. 05–41738, 239 F. App'x 882, 883–84 (5th Cir. June 28, 2007) (dismissing prisoner's access-to-courts claim because negligence is not actionable under First Amendment); *Willis v. Washington,* No. 96–2385, 1999 U.S.App. LEXIS 532, at *2–3 (7th Cir. Dec. 16, 1998) (dismissing prisoner's interference-with-mail claim because negligence is not actionable under First Amendment); *cf. Daniels v. Williams,* 474 U.S. 327, 331–33 (1986) ("[I]njuries inflicted by governmental negligence are not addressed by the United States Constitution.").

Fourth, Defendants' motion for summary judgment is granted (with regard to Defendants Nutall and Wendland, as well as the other Defendants) on the

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

alternative ground that Plaintiff has failed to submit an adequate Rule 7.1 Response to Defendants' Rule 7.1 Statement, which was properly supported by accurate record citations and which-together with Defendants' memorandum of law-at the very least satisfied Defendants' threshold burden on their motion. (*Compare* Dkt. No. 122, Attach. 2 *with* Dkt. No. 124, Attach. 1.) The Court notes that Plaintiff (who was an experienced *pro se* civil rights litigant before opposing Defendants' motion for summary judgment) [FN12] received adequate advanced notice of his need to properly respond to Defendants' Rule 7.1 Statement. (Dkt. No. 122 [Notice of Motion and District's "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion"].) [FN13]

> FN12. *See, e.g., Tafari v. McCarthy,* 07–CV–0654, Defs.' Notice to Plaintiff Regarding Consequences of Failing to Respond to Summary Judgment Motion (N.D.N.Y. filed Nov. 13, 2008); *Tafari v. Annetts,* 06–CV–11360, Defs.' Notice to Plaintiff Regarding Consequences of Failing to Respond to Summary Judgment Motion (S.D.N .Y. filed Jan. 28, 2008).

> FN13. *See also* N.D.N.Y. 7.1(a)(3) (a copy of which was on file in Plaintiff's correctional facility during the time in question); Northern District's *Pro Se* Handbook, at 41 (a copy of which was on file in Plaintiff's correctional facility during the time in question).

**\*7** Fifth, to the extent that the dismissals recommended by the Report–Recommendation (regarding *any* of the Defendants) are pursuant to Fed.R.Civ.P. 12(b)(6) rather than Fed.R.Civ.P. 56, no further opportunity to amend is needed for each of the following two alternative reasons: (1) Plaintiff has already been granted two such opportunities; [FN14] and (2) any amendment would be futile due to the numerous substantive defects in his detailed claims.

> FN14. *See De Ponceau v. Bruner,* 09–CV–0605, 2012 WL 1014821, at \*4 & n. 9 (N.D.N.Y. March 23, 2012) (Suddaby, J.) (collecting cases).

Sixth, and finally, Plaintiff's claims for monetary relief against Defendants in their official capacities are dismissed on the alternative ground that they are barred by the Eleventh Amendment, for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 122, Attach. 1, at 6.)

For each of these numerous alternative reasons, Defendants' motion for summary judgment is granted in its entirety.

**ACCORDINGLY,** it is

**ORDERED** that the Magistrate Judge's Report–Recommendation (Dkt. No. 126) is *ACCEPTED* and *ADOPTED* **except** for its recommendation regarding the survival of Plaintiff's claim against Defendants Wendland and Nuttal for failing to provide him with kosher meals between January 24, 2005 and March 24, 2005; and it is further

**ORDERED** that Defendants' motion to revoke Plaintiff's *in forma pauperis* status as having been improvidently granted pursuant to 28 U.S.C. § 1915(g) ( Dkt. No. 118) is *DENIED;* and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 122) is *GRANTED* **in its entirety;** and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 38) is *DISMISSED* with prejudice; and it is further

**ORDERED** that the Clerk of the Court shall issue

Not Reported in F.Supp.2d, 2012 WL 1098447 (N.D.N.Y.)
**(Cite as: 2012 WL 1098447 (N.D.N.Y.))**

a Judgment for Defendants and close the file in this
action.

N.D.N.Y.,2012.
Tafari v. Brown
Not Reported in F.Supp.2d, 2012 WL 1098447
(N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

▶

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
InJah TAFARI, Plaintiff,
v.
William D. BROWN; Sheryl Butler; John W. Carvill;
Charles M. Devane; Roche Frank; Glenn S. Goord;
Peter Healy; Zvi Jacob; Karen LaPolt; Lucien J. Le-
Claire, Jr.; David L. Miller; Arthur Morgenstern; John
H. Nuttal; Thomas Poole; Richard Roy; Rosemarie
Wendland; Jean Yost; and S. Zenzen, Defendants.

No. 10–CV–1065 (GTS/DRH).
March 6, 2012.

InJah Tafari, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Charles J. Quackenbush, Esq.,
Assistant Attorney General, of Counsel, Albany, NY,
for Defendants.

**REPORT–RECOMMENDATION AND OR-
DER**[FN1]

> FN1. This matter was referred to the under-
> signed for report and recommendation pur-
> suant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.
**\*1** Plaintiff pro se InJah Tafari ("Tafari"), an
inmate in the custody of the New York State De-
partment of Corrections and Community Services
("DOCCS"), brings this action pursuant to 42 U.S.C. §
1983 alleging that defendants, eighteen DOCS em-

ployees, violated his constitutional rights under the
First, Eighth, and Fourteenth Amendments. Second
Am. Compl. (Dkt. No. 38). Presently pending is (1)
Tafari's motion to compel (Dkt. No. 117); (2) de-
fendants' motion to dismiss pursuant to 28 U.S.C. §
1915(g) (Dkt. No. 118); and (3) defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.
No. 122). Tafari opposes both of defendants' motions.
Dkt. Nos. 120, 124, 125. For the following reasons, it
is recommended that (1) Tafari's motion be denied, (2)
defendants' motion to dismiss be denied, and (3) de-
fendants' motion for summary judgment be granted in
part and denied in part.

**I. Background**
The facts are related herein in the light most fa-
vorable to Tafari as the non-moving party. *See* sub-
section II(A) *infra.*

Tafari initially filed this case in the Southern
District of New York. Dkt. entry dated 9/3/2010. The
Southern District severed and transferred Tafari's
claims against those defendants who were outside of
the Southern District, resulting in the present case.[FN2]
*Tafari v. Annets,* No. 06–CV–11360 (GBD/AJP) (Dkt.
No. 85) *adopted in its entirety* (Dkt. No. 88) (herein-
after *Tafari I* ). Additionally, on January 28, 2008,
Southern District defendants Annets, Jacobsen,
Lurenz, Kern, and Chill moved for summary judge-
ment. *Tafari I,* Dkt. No. 88 at 1. The Southern District
granted the motion, finding that Tafari had failed to
establish (1) the personal involvement of Rabbi Chill
or (2) claims that his First Amendment rights were
violated when he was denied meals during transports.
*Tafari I,* Dkt. Nos. 86, 88.

> FN2. The paragraphs in the second amended
> complaint relating to the defendants and in-
> cidents which occurred in the Northern Dis-
> trict of New York begin at paragraph 37.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

### A. Religious Meals

Tafari is Jewish [FN3] and received kosher meals, also known as the cold alternative diet ("CAD"), while incarcerated. Second Am. Compl. ¶ 13; *see also* Prack Decl. (Dkt. No. 122–4) ¶ 11 ("Jewish inmates requesting a kosher diet are provided meals known as the 'cold alternative diet.' "); Tafari Dep. (Dkt. No. 122–8) at 19 (stating that Tafari's religious designation to DOCCS was Jewish); Dkt. No. 124–6 at 3. The CAD was not a vegetarian diet. Schattinger Decl. (Dkt. No. 122–6) ¶ 43. Tafari requested to be provided with vegetarian kosher diet, or alternate food choices to the CAD menu, both of which were repeatedly denied. Second Am. Compl. ¶ 14; *see also* Dkt. No. 38 [FN4] at 24 (listing Tafari's suggestions for kosher vegetarian substitutions for the CAD), *Id.* at 27 (listing Tafari's suggestions for kosher vegetarian substitutions for Jewish holiday meals); Tafari Dep. at 10–11, 17 (explaining that the sect of Judaism that he followed adhered to the Torah which directed that followers should be vegetarians).

> FN3. Tafari identifies himself as a "Jewish/Hebre/Israelit/Ethiopian (Orthodox Jew-ism), Nayabinghi House of Jah Rastafari, a Rastarfarian sect of the line of Judah." Tafari Dep. (Dkt. No. 122–8) at 6–7; Dkt. No. 124–6 at 3. However, Tafari clarified that despite the name, this is no different than being Jewish. Tafari Dep. at 9–10. Accordingly, DOCCS records continue to identify Tafari as Jewish. Dkt. No. 124–6 at 3.

> FN4. Tafari has provided identical copies of these attachments throughout his submissions in response to defendants' motions. For the sake of brevity, these duplicate filings will not also be cited.

Defendants stated that this meal option was not offered to inmates. Second Am. Compl. ¶ 51; *see also* Schattinger Decl. ¶ 46 ("Over the years the DOCCS has considered the necessity and feasibility of a kosher vegetarian menu. Due to fiscal and practical considerations, and in light of the fact that there is no established Jewish dietary stricture requiring vegetarianism, [DOCCS] has determined that such a menu will not be provided."); Tafari Dep. at 54–58 (explaining that defendants McClary, Gore and Fischer all informed Tafari, in writing, that vegetarian kosher meals were not available). Instead, "[i]nmates who were vegetarian could partake in the meatless 'religious alternative diet' whether or not their vegetarianism had anything to do with a religious faith ." Prack Decl. ¶ 12.

**\*2** Tafari also requested vegetarian kosher holiday meals, which defendants also failed to provide. Second Am. Compl. ¶ 15. Further, Tafari requested to be provided with kosher bag lunches while being transported from one facility to another, and upon being received at facilities, which were also denied. *Id.* ¶¶ 18–19. As a result of receiving kosher meals, Tafari "has and continue[s] to suffer from stomac[h] cramps and pain, vomit[t]ing three ... to four ... times per week, and weight loss." *Id.* ¶ 23. In this action Tafari seeks, *inter alia,* injunctive relief to have kosher bagged lunches provided to inmates during transport as well as vegetarian kosher meals provided to inmates at all times. Second Am. Compl. ¶ B at p. 19.

### 1. January 24, 2005

On January 24, 2005, Tafari was transferred from Auburn Correctional Facility ("Auburn") to Eastern Correctional Facility ("Eastern"). Second Am. Compl. ¶ 37. Tafari immediately made requests, both verbally and in writing, for kosher meals to defendants Miller, Wendland and Butler, but those requests were denied until March 24, 2005. *Id.* ¶ 37. Tafari wrote to Miller requesting religious meals, specifically the CAD, on January 30, February 13 and 27, and March 13, 2005, and also to the Inmate Grievance Resolution Committee (IGRC) [FN5] on March 23, 2005. Dkt. No. 124–22 at 40–47. For those eight weeks, Tafari "only

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

[ate] dry cereal, bread, and drank water," due to defendants "denial to provide [Tafari] with vegetarian kosher meals." *Id.* ¶ 37.

> FN5. The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

On March 21, 2005, Tafari wrote to Goord complaining that he was being harassed and intentionally denied the CAD, which he had specifically requested. Dkt. No. 124–22 at 33–34. Defendant Nuttal responded on Goord's behalf, stating that an investigation was initiated regarding Tafari's complaints. *Id.* at 35. A grievance was also filed. *Id.* at 44–47. The grievance regarding the allegations of harassment was denied, and stated that "there is no evidence to substantiate the allegations ... in this complaint." *Id.* at 49. The decision was upheld by CORC. *Id.* at 50. Additionally, on April 15, 2005, Wendland wrote a memorandum to Tafari explaining that the allegations of harassment were being handled by the grievance committee and that his CAD meals were provided to him "as soon as proper notification was received from the facility Chaplain." *Id.* at 52.

## 2. July 13–15, 2005

On July 13, 2005, Wendland and Butler removed Tafari from the kosher meal list without Tafari's permission. Second Am. Compl. ¶ 38. Tafari filed a grievance, explaining that he was offered a regular meal, which he refused, which led to his removal from the kosher meal list. Dkt. No. 124–22 at 3. On July 14, 2005, defendant Rabbi Frank authored a letter explaining that he had received a call about Tafari's

request to terminate his CAD, so Frank initiated the paperwork for the CAD to be terminated as of July 15th. Dkt. No. 124–22 at 8. However, Frank was called again that day and told to reinstate Tafari on the CAD. *Id.* Frank agreed because there was an apparent miscommunication and Tafari only intended to refuse a single meal and this was Tafari's first request to terminate the CAD. *Id.* Ultimately, Tafari went without a kosher meal for two and a half days, drinking only water through July 15, 2004. Second Am. Compl. ¶ 38. Tafari's grievances and appeals regarding the incident were all denied. Dkt. No. 124–22 at 9–11.

## 3. Holiday Meals

**\*3** Defendants Healy, LaPolt, Wendland and Brown denied Tafari kosher holiday meals for Yom Kippur, from October 13 through October 26, 2005, due to his placement in the Special Housing Unit ("SHU") [FN6]. Second Am. Compl. ¶ 39. Defendants Healy, LaPolt, Wendland, and Brown denied Tafari his religious meals during Hanukkah between December 26, 2005 and January 2, 2006 because he was confined in SHU and receiving a restricted diet due to his disciplinary sentence imposed December 27, 2005. *Id.* ¶ 44.

> FN6. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301. Tafari has been placed in SHU or keeplock for a variety of disciplinary infractions. Prack Decl. (Dkt. No. 122–4) ¶ 7. Additionally, due to his disciplinary history, Tafari is slated to remain in SHU or keeplock through November 2016. *Id.;* see also Dkt. No. 122–5 (copy of Tafari's disciplinary

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

history).

Defendants Miller, Wendland, Butler, Healy, LaPolt and Brown also denied Tafari his religious meals during Passover from April 24 through May 1, 2005 because he was confined in SHU. Second Am. Compl. ¶ 45. Tafari claims he was also denied the Passover meals the following year, from April 12 through April 19, 2006, also because he was housed in SHU. *Id.* ¶ 45; Dkt. No. 124–22 at 67. Tafari received a memorandum from Brown during the 2006 Passover explaining that he would be provided with food from the State Passover menus, as he was. Dkt. No. 124–22 at 68.

Tafari grieved the denial of the 2006 Passover meals. Dkt. No. 124–22 at 25–28, 69–72. Tafari complained that he was provided only with the food items from the DOCCS menu and none of the additional foods which were brought "from the fund raiser and into the facility by Rabbi Frank...." Dkt. No. 122–24 at 25. Tafari stated that these were the same complaints he had in 2005 when he was denied the outside Passover foods. *Id.* at 26. The grievance was denied because Tafari "was provided with approved Passover meals from the statewide menu [and] ... is not entitled to any additional foods while housed in SHU." *Id.* at 30. The grievance denial was affirmed by both the Superintendent and CORC. *Id.* at 31–32. Defendant Brown also wrote Tafari a letter on April 27, 2006, advising that he was "not entitled to any additional foods while housed in SHU." *Id.* at 73.[FN7]

> [FN7]. While not alleged in the second amended complaint, Tafari made similar complaints about being denied special food during Passover in 2007. Dkt. No. 124–23 at 89. Nuttal responded, emphasizing that Tafari was given the holiday meal menu approved by DOCCS and that he was not allowed "to store kosher food items that were donated from the community," like the inmates in general population because, being in SHU, he did not "have the same privileges as general population inmates." *Id.*

While at Five Points Correctional Facility ("Five Points"), defendant Poole and Yost denied Tafari kosher holiday meals during Yom Kippur from October 1, 2006 through October 16, 2006 because of his SHU confinement. Second Am. Compl. ¶ 49. Tafari was also denied his holiday meals by Poole, Yost and Sensen for Hanukkah between December 16, 2006 through December 23, 2006. *Id.* ¶ 50. Tafari was again told that this was due to his confinement in SHU. *Id.* ¶ 50. Tafari wrote to LeClaire and filed multiple grievances, requesting that his religious beliefs be honored by providing him with vegetarian kosher holiday meals, vegetarian kosher daily meals, and transfer to Green Haven Correctional Facility. Dkt. No. 124–23 at 27–29, 32, 36–44. Moreover, Tafari's grievance stated that he was losing weight constantly and vomiting daily. *Id.* at 32. The grievance was denied. *Id.* at 33–34. Tafari appealed the denials unsuccessfully. *Id.* at 34–35. Tafari's grievance regarding the provision of special meals for Hanukkah were also denied because DOCCS did not provide special meals to anyone for Hanukkah and, instead, the CAD was provided per directive. *Id.* at 47–48. Tafari appealed, stating that there were multiple different kinds of special foods consumed by Jewish individuals during Hanukkah; however, CORC denied the appeal reiterating the fact that "here are no special meals prepared for Hanukkah. *Id.* at 48–49.

### 4. Vegetarian Kosher Meals

**\*4** "In the 1990s, after instituting the state-wide general confinement menu, the Office of Nutritional Services began to consider reasonable menus by which to accommodate other dietary preferences...." Schattinger Decl. ¶ 14. These menus were developed primarily for those with food allergies, religious considerations, and vegetarians. *Id.* ¶ 15; *see also* Dkt. No. 124–3 at 9 (DOCCS policy indicating that inmates may eat a diet consistent with their religious beliefs). In 1993, the religious alternative menu was enacted

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

which "is not a separate menu [but] ... an alternative entree added to the general confinement menu." Schattinger Decl. ¶¶ 17–18. Inmates in SHU or keeplock were required to submit a request for an alternative menu. *Id.* ¶ 21. If an inmate chose an alternate entree, of the twenty-one meals fed during the week, approximately nineteen of the meals included a meatless or vegetarian entree. *Id.* ¶¶ 23–26. However, "the alternative may or may not be kosher, depending on the particular food item and the way that it is prepared." *Id.* ¶ 43.

In addition, meals included side dishes, dessert, and a beverage so that an inmate who chose not to eat the entree, for whatever reason, would still have enough food to receive a nutritionally adequate diet. Schattinger Decl. ¶¶ 34–35. "Catering [any further] to the dietary preferences of each of the approximately 55,000 inmates in this State would pose an unreasonable financial burden on the taxpayers and an impossible administrative burden on DOCCS." *Id.* ¶ 27; *see also Id.* ¶¶ 29–33 (explaining that having a vegetarian alternative for every meal was explored but determined to be too administratively and financially burdensome); *but see* Tafari Decl. (Dkt. No. 124) ¶¶ 29–31 (contending that he created a vegetarian kosher meal by rotating menu options already on the CAD).

Jewish inmates were offered kosher meals; "[h]owever, most DOCCS correctional facilities do not have kosher kitchens or facilities to prepare on-site kosher meals ... [so] Jewish inmates who request a kosher diet are served the CAD." Schattinger Decl. ¶ 38.

A CAD meal typically consists of a sandwich made with kosher meat or cheese, condiments, chips, a cookie or cake, and juice. Some items for the CAD meals are prepared and packed at the FPC, in kosher compliant conditions, under rabbinical supervision. *i.e.* juices, salads, cold cuts and cheese. Some specific items *e.g.* canned fruits come through outside kosher suppliers. Such items come pre-packaged

and sent to individual correctional facilities for use in preparing the CAD meals.

*Id.* ¶ 39. Tafari received three CAD meals per day. Tafari Dep. at 79.

Tafari never received vegetarian kosher meals from defendants Miller, Wendland, Butler, Healy, LaPort or Brown while he was incarcerated at Eastern. Second Am. Compl. ¶ 47; *see also* Dkt. No. 124–22 at 76 (letter from LeClaire dated April 24, 2006 explaining that there were no vegetarian kosher diets but that Tafari could choose from either the CAD or religious alternative meal which was non-meat); Dkt. No. 124–22 at 81 (same yet dated May 19, 2006). As discussed above, vegetarian kosher meals were not provided by any of the facilities for a variety of reasons including cost, feasibility, and religious tenets which did not require vegetarianism. Schattinger Decl. ¶¶ 46–49.

**\*5** On May 23, 2006, Tafari was transferred to Five Points and requested that defendants Poole and Yost provide him with a vegetarian kosher diet. Second Am. Compl. ¶ 48. The defendants denied his request, so Tafari ate dry cereal and bread for eight and a half weeks until the normal kosher diet was regularly provided to him. *Id.* ¶ 48. Tafari made another request for vegetarian kosher meals on June 30, 2006, and his request was denied. *Id.* ¶ 51. Poole, Yost, and LeClaire denied this request stating that vegetarian kosher meals were not a meal option for inmates. *Id.* ¶ 51. Tafari also filed a grievance on June 30, 2006 about the denial of kosher foods (Dkt. No. 124–23 at 13) and was advised again that there was no vegetarian kosher diet and that he had also failed to designate the diet he wished, as that designation did not automatically occur based on an inmate's religious designation (Dkt. No. 124–23 at 14).

On April 6, 28, and May 3, 2006, Tafari sent Goord a letters requesting vegetarian kosher meals.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

Second Am. Compl. ¶ 52. Goord referred the letters to Nuttal for a response and Nuttal denied the requests on May 22, 2006. *Id.* ¶ 52. On June 30, 2006, Tafari again requested to Goord that he be provided with vegetarian kosher meals. *Id.* ¶ 58. Goord again directed Nuttal and DeVane to respond to Tafari on Goord's behalf. *Id.* ¶ 58. On July 24, 2006, Nuttal responded that "there [we]re no provision or plans to provide a vegetarian kosher diet [to inmates]." *Id.* ¶ 59. Additionally, on August 7, 2006, DeVane responded, denying Tafari's requests, stating that "[n]utritional services does not provide a vegetarian kosher diet." *Id.* ¶ 59.

"Absent an emergency, administrators at each facility have no authority to deviate from Departmental menus without the prior approval of the Office of Nutritional Services." Prack Decl. ¶ 15; *see also* Schattinger Decl. (Dkt. No. 122–6) ¶ 9 (same), Lempke Decl. ¶ 8 (Dkt. No. 122–3) (explaining that neither the Superintendent nor the Deputy Superintendent for Administration had the "authority to modify or deviate from the statewide menus which have been developed by the DOCCS Office of Nutritional Services."). Thus limiting an inmate to any menu other than those approved by the state, such as dry cereal, bread and water, "would be an unauthorized departure from DOCCS policy." Prack Decl. ¶ 15. Food services at Five Points was managed by the Deputy Superintendent for Administration. Lempke Decl. (Dkt. No. 122–3) ¶ 8.

Tafari also requested to defendant rabbis Frank, Jacob, Chill and Morgenstern to assist in obtaining vegetarian kosher meals. Second Am. Compl. ¶ 65. These requests were also denied allegedly due to racial discrimination. *Id.* ¶ 65; *see also* Tafari Dep. at 59–62 (stating that he was told that individuals of color were not allowed to participate in the program by various rabbis). Tafari lost weight because he was "not provided with a full nutritional balanced meal because [he is] not eating." Tafari Dep. at 66; *see also* Dkt. No. 124–23 at 68–69 (letter dated April 16, 2007 claiming that meals were making him vomit daily and lose

weight). The same day, defendant ZenZen responded to Tafari in a memorandum explaining that his requests for vegetarian kosher meals had already been addressed through the grievance program and that medical issues should be brought to the attention of Medical staff so that they could attend to Tafari's digestive problems. Dkt. No. 124–23 at 70.

### 5. Medical Records

**\*6** As previously discussed, Tafari contends that he suffered various physical ailments. Medical records indicate that when Tafari entered Doccs custody in 1989, he was to receive vegetarian meals. Dkt. No. 124–19 at 2–3. From 1994 through 1997, Tafari was provided a therapeutic diet for his allergy to meats. *Id.* at 4–17.[FN8] However, no clinical records indicate that, other than Tafari's subjective statements, he had any food allergies. Prior discovery in other cases which Tafari has filed in the Second Circuit indicate that medical documentation indicated that "there [wa]s no medical documentation of red meat allerg[ies] ...." and that requested diet changes during this time period were not medically indicated. *Tafari v. Weinstock,* No. 07–CV–693, 2010 WL 3420424, at \*6 (W.D.N.Y. Aug. 27, 2010) (Dkt. No. 122–1 at 133–41). Complaints regarding deliberate indifference based upon his diet and its impact on his alleged allergies were thus dismissed. *Id.*

> [FN8]. Tafari provided affidavits from other inmates with allergies to meats, fish, and dairy who also received the CAD and, instead of the meat or dairy options, were provided with other alternatives such as extra peanut butter and jelly packets or lunch meat. Dkt. No. 124–24 at 6–10.

In April and September, 2009 and February 2010, Tafari underwent radiological studies on his abdomen after experiencing symptoms of constipation and vomiting. Dkt. No. 124–19 at 18–20. All studies were unremarkable, showing stool in his bowels and arriving at a diagnosis of constipation. *Id.* In the Summer of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

2010, Tafari received a colonoscopy due to his chronic constipation and family history of cancer. *Id.* at 22. The results are unknown. *Id.*

### B. Kosher Food Program at Green Haven Correctional Facility

In the early 1980s, prior to the development of the CAD, "an experimental pilot program [was initiated at Green Haven whereupon] DOCCS build and began operating a kosher food service facility ... [where h]ot kosher meals are prepared...." Schattinger Decl. ¶ 40. The menu at Green Haven was created by the facility's food administrator and Jewish chaplain but was not a vegetarian menu. *Id.* ¶ 41. Tafari contends otherwise. Tafari Dep. at 68. Conversely, "[a]s closely as possible ... [it] parallels the menu offered to the general inmate population." Schattinger Decl. ¶ 41. Moreover, "[w]hile there is a non-meat alternative to the meat entrees on the general population menu, there is no such alternative to the meat entrees on the Green Haven hot kosher food menu." *Id.; see also Id.* ¶ 43 (clarifying that the menu provided at the Green Haven facility is not a vegetarian kosher menu). Expanding this program to other facilities would be "extremely expensive and administratively burdensome," so while the Green Haven food service continues it "cannot be provided statewide." *Id.* ¶ 42. Finally, "the Green Haven program [is limited] to Jewish inmates with good disciplinary records." *Id.; see also* Tafari Dep. at 62–63 (explaining that he was told the Green Haven program was an Honors Program for inmates who did not had been free of disciplinary sanctions for a period of years).

Tafari continually requested transfer to Green Haven Correctional Facility ("Green Haven") to participate in their kosher food program. Second Am. Compl. ¶ 17, Tafari Dep. at 70–71; *see also* Second Am. Compl. ¶ 51 (defendants Poole, Yost, and LeClaire denied request for the program). The requests were continually denied because Tafari did not meet the placement requirements. Second Am. Compl. ¶¶ 17, 51 (denied because "present placement was ap-

propriate."). During his twenty years in prison, Tafari was involved in approximately fifty-two Tier III disciplinary hearings and fifty-three Tier II disciplinary hearings.[FN9] Tafari Dep. at 74–75. Tafari was instructed that in order to be considered for the Green Haven program he needed to have one year free of convictions for either Tier II or Tier III disciplinary hearings. *Id.* at 75. Tafari contends that he went without a disciplinary charge between 2003 and 2004 for twenty months, but instead of granting his request for Green Haven, he was transferred to Eastern. *Id.* at 75–76.

> **FN9.** DOCCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier II hearing, or disciplinary hearing, is required whenever disciplinary penalties not exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a). A Tier III hearing, or Superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. *Id.*

**\*7** Tafari wrote to Goord requesting transfer to the Green Haven Kosher Food Program as well. Second Am. Compl. ¶ 54. On April 30, 2004, Goord referred the request to Nuttal for response and on May 13, 2004, Nuttal denied Tafari's request and directed him to take up his wishes to transfer facilities with his corrections counselor. *Id.* ¶ 54; Dkt. No. 124–21 at 5. Tafari also made a similar request to his corrections counselor, but the counselor never responded. Second Am. Compl. ¶ 55. On April 30, 2004, Tafari filed a grievance because he had failed to receive a response from his corrections counselor about his request. Dkt. No. 124–21 at 6–7. The grievance was denied because the Green Haven program was an honors program requiring that the inmate be free from disciplinary dispositions for a year "to even be considered for participation in the program[; thus,] ... Tafari [was] ... ineligible." Dkt. No. 124–21 at 8. Tafari appealed the

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

denial. *Id.* Tafari's appeal was denied by the Superintendent, so he again appealed to CORC. *Id.* at 9–11. Tafari disagreed with any religious program being designated as an Honors Program, citing equal treatment for all who practiced religion. *Id.* at 10–11. The appeal was again denied, stating that through the CAD Tafari's religious and dietary needs were being met. *Id.* at 12.

On July 6, 2004, Tafari's corrections counselor and the deputy superintendent approved his transfer to the Green Haven Kosher Food Program. Second Am. Compl. ¶ 57. Defendant Carvill then denied the transfer request, stating that due to Tafari's poor custodial adjustment, he was an inappropriate candidate for the program. *Id* . ¶ 57. On July 19, 2004, Tafari filed a grievance about the denial of his transfer. Dkt. No. 124–21 at 13–18. The grievance was denied, explaining that the transfer submission was on July 6, 2004 but that Tafari was projected to be in SHU through July of 2007. *Id.* at 19. This decision was not made at the facility level. *Id.* Tafari appealed, and the denial was upheld for the same reasons that the denial came not from the facility but from Classification and Movement. *Id.* at 19–20. Tafari again appealed, alleging that the real reason for his denial was racially motivated. *Id.* at 20. This appeal was again denied by CORC, citing Tafari's poor custodial adjustment as the reason for the denial and restating that all of Tafari's religious needs, including his diet, are currently being accommodated. *Id.* at 21. The grievance was also investigated and reached the same conclusion for the denials. *Id.* at 22–23.

On August 14, 2006, Tafari again requested to defendants Goord, Nuttall, Roy, and Carvill that he be transferred to Green Haven for the Kosher Food Program. Second Am. Compl. ¶ 60; Dkt. No. 124–23 at 55–56. Defendants denied Tafari's request. Second Am. Compl. ¶ 60; Dkt. No. 124–23 at 58 (memorandum from Deputy Superintendent of Program Services at Five Points explaining that due to letter trails it appears "that transfer to Green Haven is not an option at this time."); Dkt. No. 124–23 at 59 (letter from Classification and Movement explaining that Tafari is "not eligible for requested transfer due to [his] poor custodial adjustment [and the] ... present placement at Five Points ... is appropriate."). On September 7, 2006, Tafari received a letter from Nuttal explaining that:

> **\*8** [Tafari's] behavior was exemplary from January 2004 though January 2005 and the department considered [his] request for a transfer to the vicinity of the Green Haven Hub. Eastern is in close proximity to this area, so it seems [his] request was honored. When [Tafari was] at Green Haven in 1998 and 1999, [he] amassed several Tier 2 and Tier 3 reports and [he was] transferred due to [his] unsuitable behavior. It is unlikely that [Tafari] would be returned to that facility.

Dkt. No. 124–23 at 60. Tafari wrote to LeClaire regarding his denials to the Green Haven program. *Id.* at 61–65. Tafari was instructed by Nuttal to make all subsequent facility transfer requests to his Corrections Counselor. *Id.* at 66.

Tafari also requested defendant Rabbis Frank, Jacob, Chill and Morgenstern to assist him in obtaining transfer to the Green Haven meal program. Second Am. Compl. ¶ 65. These requests were also denied, Tafari contends, due to racial discrimination. *Id.* ¶ 65. Tafari alleges that all inmates who participated in the kosher food program at Green Haven were European while all African American and Hispanic inmates who were Jewish were incarcerated at other DOCCS facilities where they were served the CAD diet. *Id.* ¶ 67; *see also* Dkt. No. 124–24 at 11–16 (affidavits from three inmates claiming that at various times throughout the last three decades, black or hispanic inmates were not allowed to enter, work, or participate in the Green Haven hot food program). Grievances were subsequently filed which were denied finding that any allegations against defendant Rabbi Jacobs for making racial remarks or discriminating against Tafari were

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

unfounded. Dkt. No. 124–23 at 25–26, 51–52. However, Tafari has included an affidavit from another inmate asserting that the inmate overheard the rabbi make discriminatory statements to Tafari. Dkt. No. 124–24 at 20–21.

### C. Restricted Diet

On December 18, 2005, Tafari was placed on a pre-hearing restricted diet by defendants Healy and Brown as a result of disciplinary sanctions. Second Am. Compl. ¶¶ 21, 40. During this time, Tafari did not receive his kosher diet. *Id.* ¶ 21. Healy and Brown were aware that Tafari "adhe[arded] to a stric[t] vegetarian kosher diet." *Id.* ¶ 40. However, DOCCS records indicate that Tafari was not placed on a restricted diet until eleven days later, though disciplinary dispositions could have been overturned and the records destroyed. Prack Decl. ¶¶ 16–17. The restricted diet "consists of a single serving of loaf bread (high in fiber, made with vegetables and wheat flour), cabbage and water. While it is nutritionally adequate, it is designed to respond to specific types and circumstances of inmate misconduct." *Id.* ¶ 13. Loaf is utilized in "serious disciplinary situations [where the] interests of facility security must override considerations such as religious dietary preferences." *Id.*

On December 22, 2005 the restricted diet was suspended by defendant Healy. Second Am. Compl. ¶ 41. Between December 18 and 22 Tafari only drank water. *Id.* ¶ 41. The restricted diet was reinstated on December 27, 2005 by Healy and Brown until January 2, 2006, and then again from January 5 through January 9, 2006. *Id.* ¶ 42; *but see* Prack Decl. ¶ 16 (indicating that Tafari was on a restricted diet from December 27, 2005 through January 12, 2006), Tafari Dep. at 94 (indicating that he was on the non-kosher loaf diet for fourteen days). On December 31, 2005, an unidentified facility physician noted that Tafari "was suffering from weight loss, head pain, chest pain, dizziness, and hearing voices as a result of not eating during the restricted diet sanction ." Second Am. Compl. ¶ 43; *see also* Prack Decl. ¶ 18 (explaining that

medical staff examined inmates on the loaf diet every day). The statement from the doctor that examined Tafari on December 21, 2005 instead indicates that the doctor informed Tafari "that by not eating he was jeopardizing his pending surgery." Dkt. No. 124–22 at 23.

### D. Dreadlocks

**\*9** While Tafari has identified himself as Jewish, he also contends that due to his religious beliefs via "his 'Vow of Nazarite' ' his hair should grow into long braids known as dreadlocks. Second Am. Compl. ¶ 22; *see also* Tafari Dep. at 13–15 (explaining that Rastafarianism and Judaism are one and the same). On April 24, 2003, defendant LeClaire released a memorandum stating that dreadlocks were only appropriate for those of the Rastafarian faith. Dkt. No. 125–4 at 5 (copy of memorandum explaining that dreadlocks were only appropriate for Rastafarians because "dreadlocks do provide a potential hiding place for drugs, weapons and other contraband. Further the hairstyle makes it impossible ... to run ... fingers through [inmate's] hair as part of an authorized pat frisk."), Second Am. Compl. ¶¶ 22, 62, Tafari Dep. at 89. Because Tafari iwa not a Rastafarian according to DOCCS, defendants refused to allow him to wear his hair in dreadlocks. Second Am. Compl. ¶¶ 22, 63.

DOCCS initiated a policy on inmate grooming standards which outlined the length of hair and any exemptions thereto. Dkt. No. 124–4 at 2–4. Rules of inmate grooming, including regulations regarding hair, were enforced by line officers, including correctional officers, sergeants, and lieutenants. Lempke Decl. ¶ 9. Tafari was directed by defendant Poole to cut his hair or receive disciplinary sanctions. Second Am. Compl. ¶¶ 63–64. Tafari refused and was given disciplinary sanctions. *Id.* ¶ 64; *see also* Tafari Dep. at 90 (explaining that every thirty days he is given the choice to cut his hair or receive a Tier II disciplinary charge). However, there were no "particular displinary incident[s] ...." specified. Lempke Decl. ¶ 10.[FN10] Tafari included misbehavior reports written about his

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

failure to follow direct orders and have his hair cut on November 30, 2006 and February 22 and March 22, 2007. Dkt. No. 124–8. While Tafari received a thirty day disciplinary sanction for the first misbehavior reports, the subsequent reports resulted in Tafari being counseled and reprimanded. Dkt. no. 124–8 at 4, 6, 9.

> FN10. SHU records indicate that Tafari "has continuously been in keeplock or in SHU confinement since May of 2003[and b]ecause of many disciplinary violations, he is currently sentenced to remain in SHU or keeplock through to November of 2016." Prack Decl. (Dkt. No. 122–4) ¶ 7.

Tafari filed multiple grievances regarding this issue. Dkt. No. 124–23 at 112, 113–17. The grievances were denied because only members of the Rastafarian faith were allowed dreadlocks. *Id.* at 112, 115, 118, 119, 120. The denials were unsuccessfully appealed. *Id.* at 111, 115, 119, 121. A DOCCS directive allowed inmates to become exempted from the hair regulations via receiving a court order restraining DOCCS from enforcing the hair length requirements. Lempke Decl. ¶ 11; *see also* Dkt. No. 124–4 at 2–4 (copy of DOCCS directive on inmate grooming standards). Tafari was aware of this exemption as demonstrated by his request, and subsequent permission, to be exempted from the beard and mustache requirements in February 2001 because of his religious affiliation. Dkt. No. 124–5 at 2–4.

In 2007, Tafari challenged his prior disciplinary convictions and attempted to acquire an exemption for his hair as well, petitioning courts for clarification as whether he was Jewish, Rastafarian, or Orthodox Jew based upon his designation as a "Ethiopian Orthodox Jew and/or Jah Rastafari." Leonard Aff. (Dkt. No. 124–9) ¶¶ 7, 12; Dkt. No. 124–10. It was ultimately determined that Tafari was entitled to an exemption and that the prior two disciplinary determinations finding him guilty of failing to follow a direct order to cut his hair should be administratively reversed and

expunged. Tafari Decl. (Dkt. No. 124) ¶ 20; Dkt. No. 124–10 at 4–5. On July 22, 2010, the disciplinary convictions were reversed. Tafari Decl. ¶ 21; Dkt. No. 124–11 at 2–4.[FN11]

> FN11. These three convictions followed the misbehavior reports in 2006 and 2007 noted above. Dkt. No. 124–11 at 2 (reversing disposition from December 14, 2006 regarding incident which occurred on November 30, 2006), 3 (reversing disposition from March 1, 2007 regarding incident which occurred on February 22, 2007), 4 (reversing disposition from March 28, 2007 regarding incident which occurred on March 22, 2007).

## II. Discussion

**\*10** Tafari alleges violations of his First Amendment rights when defendants failed to provide him with kosher meals during distinct time periods, failed to provide him with holiday food, failed to provide him with a vegetarian kosher diet, refused to transfer him to Green Haven, and insisted that he cut his dreadlocks. Tafari also contends his Eighth Amendment rights were violated when defendants failed to provide him with a vegetarian kosher diet which affected his overall health and when they placed him on the restricted loaf diet. Defendants alternatively seek dismissal and summary judgment contending that Tafari has failed to allege personal involvement of the managerial defendants and does not have meritorious claims. Additionally, defendants contend that they are protected by qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c);

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Injunctive Relief**

*11 To the extent that Tafari requests injunctive relief, such requests are moot as he has been transferred from Eastern and Five Points and is now housed at Upstate Correctional Facility. *See Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.") (citations omitted). Accordingly, to the extent Tafari seeks injunctive relief, that claim for relief should be dismissed as moot.

**C. 28 U.S.C. § 1915(g)**

Defendants seek dismissal of the complaint under 28 U.S.C. § 1915(g) ( Dkt. No. 118), which bars prisoners from proceeding *in forma pauperis* (IFP) after three or more previous claims have been dismissed as frivolous, malicious, or for failing to state a claim. *See* 28 U.S.C. § 1915(g) (2006). [FN12] Frivolous claims "lack[ ] an arguable basis either in law or in fact." *Tafari v. Hues,* 473 F.3d 440, 442 (2d Cir.2007) (*quoting Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)). Malicious claims are filed with the intent to hurt or harm another. *Id.* (citations omitted). The failure to state a claim applies a parallel definition from Fed.R.Civ.P. 12(b)(6), but "it does not follow that a complaint which falls afoul of the [12(b)(6) motion to dismiss] standard will invariably fall afoul of the [§ 1915(g) standard]." *Neitzke,* 490 U.S. at 326; *see also Tafari,* 473 F.3d at 442 (citations omitted).

> FN12. The three-strikes provision was adopted as part of the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1995), which had as its principal purpose deterring frivolous prisoner litigation. *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997).

This "three-strikes" provision contains a narrow exception which permits suits, notwithstanding prior dismissals, when the prisoner is "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g); *see also Lewis v. Sullivan,* 279 F.3d 526, 531 (7th Cir.2002) (applying imminent danger exception "[w]hen a threat or prison condition is real and proximate, and when the potential consequence is 'serious physical injury.') In determining whether the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

imminent danger provision applies, the court must evaluate whether the claimed danger was still in existence when the complaint was filed and whether such danger was sufficiently serious in light of the liberal standards accorded to *pro se* plaintiffs, to require protection. *Chavis v. Chappius,* 618 F.3d 162, 169–70 (2d Cir.2010) (citations omitted). Additionally, dismissal is not precluded by the fact that Tafari has already been granted IFP status in this action. Dkt No. 2. When a court becomes aware of three prior strikes only after granting IFP status, it is appropriate to revoke that status and bar the complaint under § 1915(g). *See McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998).

Tafari does not dispute defendants contentions that he has received three strikes. Tafari Mem. of Law (Dkt. No. 120) at 1–2. In fact, Tafari agrees with the three strikes that the defendants have identified—(1) the first in May of 2000 with the dismissal of *Tafari v. Aidala et. al.,* 00–CV–405 (*Tafari II* ); (2) the second in April of 2002 with the dismissal of the appeal in *Tafari II;* and (3) the third in May of 2007 with the dismissal of the appeal in *Tafari v. France et. al.,* 01–CV–11. Defs. Mem. of Law (Dkt. No. 118–1) at 4–5; Quakenbush Decl. (Dkt. No. 118–2) ¶ 5; Tafari Mem. of Law at 1–2. There is also no dispute that this action was filed in the Southern District on October 25, 2006.

**\*12** Defendants claim that the three strikes provision applies, citing to other cases which Tafari has filed which have been dismissed on this basis during the pendency of the present case. *See* Dkt. No. 118–3 at 34–69. However, those cases were filed after 2007. The present action was filed in 2006, seven months prior to Tafari receiving his third strike. The three strikes provision expressly prevents inmates from bringing an IFP civil claim again **after** they have acquired three or more strikes on prior occasions. 28 U.S .C. § 1915(g) (emphasis added). Accordingly, "[d]ismissals that post-date the filing of the action in question may not count as 'strikes' under § 1915(g)."

*Zaire v. Welch,* No. 03–CV–629, 2008 WL 934426, at \*4 (N.D.N.Y. March 31, 2008) (citing cases) (attached to this Report–Recommendation as Ex. 1). As Tafari's third strike post-dated the filing of the present complaint, it cannot be used as a strike. While Tafari's subsequent requests for IFP have been properly denied, as demonstrated by defendants, his present status as IFP must be maintained since he had only acquired two strikes as of the filing of the instant suit.

Therefore, defendants' motion on this ground should be denied.

**D. First Amendment**

Tafari alleges that his First Amendment rights were violated when he was denied (1) religious meals from January 24 through March 24, 2005; (2) approximately two days of kosher meals due to a misunderstanding and change in meal designation preference; (3) holiday meals; (4) a vegetarian kosher diet; (5) transfer to the Green Haven program; and (6) the ability to wear dreadlocks.

The First Amendment protects the right to free exercise of religion. *See generally Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted); *see also Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation ... is reasonably related to legitimate penological interests.") (citations omitted).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

The *Turner* Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

**\*13** *Benjamin,* 905 F.2d at 574 (citing *Turner v. Safely,* 483 U.S. 78, 89–91 (1987).

### 1. Failure to Provide Meals

The Second Circuit has held "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). This includes providing kosher food to those of the Jewish faith. *Bass v. Coughlin,* 800 F.Supp. 1066, 1071 (N.D.N.Y.1991) (citing *Kahane,* 527 F.2d at 492). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). "Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin,* 905 F.2d at 579.

### a. January 24—March 24, 2005

In this case, Tafari's allegations that defendants Miller, Goord, Wendland, and Butler failed to respond to his repeated requests for a kosher diet succeed in establishing a question of material fact about why Tafari failed to receive his kosher meals for eight weeks after his arrival at Eastern. Tafari wrote four letters to Miller requesting the meals, all of which went without response. Tafari also wrote to Goord, who forwarded the letter to Nuttal, who responded that an investigation was commencing. Later, Tafari re-

ceived a letter from Wendland that his meals would begin after he appropriately notified the Chaplain. Defendants state that because Tafari continued to eat dry cereal, bread, and water, any self imposed restrictions on his diet were due to Tafari's actions and not defendants. Viewing the facts in the light most favorable to Tafari, it appears that while his diet was unrestricted after transferring to Eastern, it was not designated as kosher. Therefore, for eight weeks Tafari failed to receive his religious meals.

While not specified in the *Turner* factors, Second Circuit case law regarding inmate free exercise claims incorporates a "threshold [showing] that the disputed conduct substantially burdens his sincerely religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Accordingly, Tafari must allege or prove more than an inconsequential burden on his religious rights. *Salahuddin,* 467 F.3d at 275 (citations omitted). In this case, failing to provide Tafari with eight weeks of religious meals constitutes a heavy burden on his religious rights. Unlike cases where only a handful of meals were missed, Tafari was precluded from receiving his meals for weeks thus creating a First Amendment violation. *See Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (affirming summary judgment because "the unavailability of a non-pork tray ... at three meals out of 810 does not constitute more than a de minimis burden ... [as there] has [been] no[ ] alleg [ation of] a routine or blanket practice of denying him pork-free meals.").

**\*14** Accordingly, defendants' motion on this ground should be denied. [FN13]

> FN13. For the reasons stated *infra* in subsection II(F), such claims fail as Tafari has failed to establish the personal involvement of defendants Goord, Miller and Butler. Therefore, these claims remain only as to Wendland and Nuttall.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
(Cite as: 2012 WL 1085852 (N.D.N.Y.))

### b July 13–15

Conversely, for the same reasons stated above, Tafari has failed to establish a First Amendment claim against defendants Wendland, Butler, or Frank for stopping his kosher meals for two days.

The denial of two days worth of kosher food did not constitute more than a de minimus burden. *See McEachin,* 357 F.3d at 203 n. 6 (holding that, "[t]here may be inconveniences so trivial that they are most properly ignored ... [thus] the time-honored maxim *de minimis non curat lex*[FN14] applies."); *see also Rapier v. Harris,* 172 F.3d 999, 1006 n. 6 (7th Cir.1999) ("De minimis burdens on the free exercise of religion are not of constitutional dimension."); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at *6 n. 8 (S.D.N.Y. Ma.h 26, 2008) (finding that the denial of all kosher meals for one or two days was "not a sub-stantial burden" which was actionable) (attached to Report Recommendation as Ex. 2). Much like *Thomas,* Tafari was denied two days of meals, with no other complaints of meal problems thereafter. Furthermore, the cessation of the diet was based upon a miscom-munication between defendants and Tafari which, as soon as it was identified, was rectified so that Tafari would continue to receive kosher meals. This behavior was, at worst, negligence on behalf of the staff which is insufficient to establish liability under § 1983. *Da-vidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (holding "that § 1983 provides no remedy for the ... negligence found in this case ....") (internal quotation marks and citations omitted); *Poe v. Leonard,* 282 F.3d 123, 145 (2d Cir.2002) ("[M]ere negligence is insufficient as a matter of law to state a claim under section 1983."). Furthermore, such complications resulted in a de minimis burden on Tafari's religious practice. As such, he has failed to state a First Amendment claim.

FN14. This phrase translates as "the law does not concern itself with trifles." *Gottlieb Dev. LLC v. Paramount Pictures Corp.,* 590 F.Supp.2d 625, 632 (S.D.N.Y.2008).

Accordingly, defendants' motion as to this claim should be granted.

### c. Holiday Meals

Tafari claims that he was denied his 2005 and 2006 meals for Yom Kippur[FN15], Hanukkah, and Passover. Tafari specifically grieved the Passover and Hanukkah meals. Tafari was told that he was provided with the CAD meals for Passover and was not eligible for any additional foods donated to the inmates by the Jewish community due to his disciplinary conviction. Furthermore, Tafari was provided was the CAD meals during Hanukkah which, despite Tafari's arguments to the contrary, did not include any alternative, special menu.

FN15. The facts surrounding the alleged de-nial of the Yom Kippur meals are not further detailed. Accordingly, the conclusory alle-gations are insufficient to state a claim. Moreover, assuming that Tafari's complaints were similar to those advanced about either Passover or Hanukkah, such claims are also insufficient to establish a constitutional vio-lation for the reasons discussed *infra.*

First, Tafari's complaints do not concern meals which are part of a recognized religious service. The meal does not have singular importance as those rec-ognized to constitute a First Amendment deprivation. *See Ford v. McGinnis,* 352 F.3d 582, 594 n. 12 (2d Cir.2003) (holding that a meal associated with a large religious feast "is unique in its importance within [the religion] to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious die-tary restrictions was found to be a de minimis burden) (citations omitted).

**\*15** Instead, Tafari alleges that he did not receive additional or special food associated with these holi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

days. This claim fails to allege that he was not provided with appropriate religious meals, but only that he did not receive the religious meal that he desired. Thus, the failure to either provide additional, donated food from the community or a new menu for Hanukkah caused a disagreement between Tafari and staff about his choice of religious menus but not the deprivation of a meal which comported with his religious beliefs. Accordingly, this incident did not impose any cognizable burden on the free exercise of Tafari's religious rights.

Second, even if denial of additional food or an alternate menu constituted a cognizable burden, it was a de minimus one. *See* subsection (b) *supra.* Accordingly, viewing the evidence in the light most favorable to Tafari, he has still alleged and proven only a de minimus burden on his religious exercise which is insufficient to state a First Amendment claim.

Defendants' motion as to these claims should be granted.

### d. Vegetarian Kosher Diet

Tafari alleges that his religious strictures required a vegetarian kosher diet. Tafari contends that the failure of defendants to provide him with such meals led to physical harm.[FN16] Defendants argue that the provision of such a diet was extremely expensive and administratively burdensome and thus was not a feasible alternative. Moreover, defendants argue that there was a plethora of vegetarian choices provided, though not necessarily all kosher, in addition to the CAD, which was kosher. Additionally, if an inmate chooses to forego his entree, meals also came with side dishes, dessert, and a beverage to ensure a nutritionally adequate diet.

> FN16. In a previous case, Tafari alleged that he required a vegetarian diet due to his medical conditions that he was allergic to meat and fish. *Tafari v. Weinstock,* 2010 WL

3420424 (W.D.N.Y. Aug.27, 2010) (Dkt. No. 122–1 at 133–41). Due to the lack of clinical evidence supporting his alleged serious medical needs, Tafari's claims were dismissed. *Id.,* at \*6.

As previously stated, inmates have a right to receive diets consistent with their religious beliefs; however, courts have been reluctant to grant such accommodations where those dietary requests are cost prohibitive or not administratively feasible. *Benjamin,* 905 F.2d at 579 (citations omitted). In this case, provision of a special vegetarian kosher diet for Tafari is precisely the type of diet which courts are reluctant to order based upon the administrative difficulties faced by defendants.

In a prior, similar case in the Northern District, where defendants argued that despite an inmate's alleged physical health concerns, a low sodium diet which also complied with his religious tenets was overly burdensome, Judge Suddaby granted defendants' motion for summary judgment based upon an analysis of the *Turner* factors. *See Hamilton v. Smith,* No. 06–CV–805 (GTS/DRH), 2009 WL 3199520 (N.D.N.Y. Sept.30, 2009) (attached to Report Recommendation as Ex. 3). In that case, the inmate's need for a low sodium diet was established. Conversely, in the present case, Tafari's medical information fails to indicate that he had allergies or required a vegetarian diet based upon various health concerns. Even if that were the case, Tafari's claims would still be without merit.

**\*16** In *Hamilton,* the Court accepted defendants' argument that they "have a legitimate penological interest in carrying out their responsibility for daily preparation of meals for all inmates," and that imposing additional burdens for specialized meals represented an unreasonable demand on prison officials. *Id.,* 2009 WL 3199520, at \*4. The fact that meals were provided from standardized menus generated by the state, and that further deviation from those menus

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
(Cite as: 2012 WL 1085852 (N.D.N.Y.))

would represent a budgetary and administrative burden satisfied the first *Turner* factor and weighed in favor of the defendants. *Id.,* 2009 WL 3199520, at *4–*5. The same is true in the present case.

Moreover, the second *Turner* factor also weighs in the favor of defendants in the instant case. There is nothing in the record that indicates that Tafari was unable to exercise his rights to practice his religion. Tafari was provided the Kosher CAD meals three times a day. Thus, he was being provided with food that complies with his religious tenets. It is not the diet which Tafari feels would most fully have complied with his beliefs, but it was adequate nonetheless. Moreover, there is no evidence in the record indicating "that Defendants have prevented [Tafari] from studying, praying, ... or attending ceremonies and rituals." *Hamilton,* 2009 WL 3199520, at *5.

Furthermore, the third *Turner* factor also weighs in favor of defendants in the current action because, similar to the prison officials in *Hamilton,* the defendants argue that the impact of the accommodation of the vegetarian kosher menus would greatly affect the prison both financially and administratively. *Hamilton,* 2009 WL 3199520, at *6. Defendants examined the feasibility of providing additional or variant kosher programs after the implementation of the Green Haven program and determined that the difficulties and expense in preparing the food in facilities as well as the additional staffing which would be required prohibited the creation of additional programs.

Moreover, DOCCS statewide menu already offered both vegetarian and kosher options to inmates. Furthermore, with the provision of the side dishes, dessert, and drinks, an inmate could forego an entree option that was not palatable and still consume a nutritionally adequate meal. Requiring additional accommodations, particularly the vegetarian kosher diet, "could have a significant ripple effect on fellow inmates, in that such an accommodation would open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs." *Id.* (internal quotation marks and citations omitted). Accordingly, the Court should remain "deferential to the informed discretion of corrections officers." *Turner,* 482 U.S. at 90. Additionally, there is nothing in the record to indicate that defendants' position is unreasonable. *See Giano v. Senkowski,* 54 F.3d 1050, 10544 (2d Cir.1995) ("The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable."). If anything, defendants have advanced a multitude of reasonable arguments regarding administrative and financial concerns which led to the conclusion that additional alternative diets were not feasible.

**\*17** The fourth *Turner* factor requires the Court to consider the existence of alternative means of facilitating the right which imposes only a de minimus effect on the valid penological interests. Tafari has provided multiple alternative menus, using food products which are already available, as well as providing affidavits from inmates with verified food allergies who also substitute available food products for menu items which they could not safely consume. Accordingly, the final factor weighs in favor of Tafari.

Considering all factors together, it was not unreasonable for defendants to follow the state-approved menus and only offer Tafari the CAD as his kosher option, despite Tafari's complaints that the present kosher diet was insufficient for his religious and health needs. The CAD provided Tafari with a nutritionally adequate diet, even if he refused to eat the kosher meat that was provided during some meals. While it was not the diet of his choosing, it was still adequate and reasonable given the aforementioned application of the *Turner* test. Accordingly, defendants' motion as to these claims should be granted.

**e. Transfer to Green Haven Kosher Food Program**[FN17]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. Inmates do not have the right under either the Constitution or New York law to remain or be transferred to the facility of their choosing. *Montayne v. Haymes,* 427 U.S. 236, 242–43, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Meriwether v. Coughlin,* 879 F.2d 1037, 1045–46 (2d. Cir.1989). Therefore, Tafari did not have the right to be retained at Green Haven. Furthermore, Tafari's denials to the program were all based on his behavior regardless of the fact that he had no constitutional right to compel his transfer there. Because it was an Honor's Program, Tafari's repeated denials to Green Haven were based, in part, on his extensive disciplinary record. Additionally, Tafari was previously housed at Green Haven when he also amassed a large number of disciplinary sanctions and, therefore, making transfer back to the facility extremely unlikely. Finally, Tafari alleges that defendant Rabbis precluded his transfer to Green Haven due to racial bias and discrimination. All Tafari proffers to support these claims are conclusory arguments which are insufficient to withstand the present motion. Accordingly, defendants' motion should be granted as to all such claims.

Tafari claims that his First Amendment rights were being continually violated by the failure of DOCCS defendants to send him to Green Haven whereupon he could receive a vegetarian kosher meal which was consistent with his religious beliefs. However, it has been regularly stated that the Green Haven Kosher food program is not a vegetarian diet and thus does not represent a vegetarian alternative to the CAD. Therefore, the question returns to whether the failure to provide a vegetarian kosher diet is an infringement on Tafari's First Amendment. As discussed *supra,* it is not, thus defendants' motion on this ground is granted.

**2. Dreadlocks**

"A fundamental tenet of the religion is that a Rastafarian's hair is not to be combed or cut, resulting in rope-like strands known as 'dreadlocks.' " *Benjamin v. Coughlin,* 905 F.2d 571, 573 (2d Cir.1990). This circuit has held that requiring Rastafarians to cut their hair violates their right to the free exercise of religion. *Id.* at 576–77. Tafari claims to be a "Jewish/Hebrew/Israelit/Ethiopian (Orthodox Jew-ism), Nayabinghi House of Jah Rastafari, a Rastafarian sect of the line of Judah." *See supra* n. 3. However, Tafari also contends that, despite the name, he is Jewish. DOCCS also classified Tafari as Jewish, leading to its determination that Tafari could not wear dreadlocks.

Recently, the Western District of New York has determined that DOCCS policy regarding dreadlocks for those who are not identified as a Rastafarian violates the First Amendment.

[T]he fatal flaw of DOC[C]S' policy is that it is not neutral-it permits or denies dreadlocks based not upon the sincerity of the inmate's belief, but upon DOC[C]S' assessment of the validity of that religious belief. Even under a less stringent standard, however, this lack of neutrality renders the governmental objective suspect. Stated another way, there is no legitimate reason for DOC [C]S to afford members of only one religious denomination the opportunity to adhere to a sincerely held religious belief precluding cutting of hair. Requiring inmates to affiliate with that religious denomination in order to exercise their sincere religious belief in the wearing of dreadlocks is not an adequate alternative means for members of other denominations to exercise their religious beliefs and seems more likely to foster conflict within that religious population than permitting inmates to exercise that practice within their own denominations.

*18 *Amaker v. Goord,* No. 06–CV–490, 2010 WL 2595286, at *12 (W.D.N .Y. Mar. 25, 2010) (attached to Report Recommendation as Ex. 4); *see also *Pilgrim*

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

*v. Artus,* No. 07–CV–1001 (GLS/RFT), 2010 WL 3724883, at *11–*13 (N.D.N.Y. Mar.18, 2010) (denying summary judgment because there were questions of material fact as to the reasonableness of the DOCCS policy requiring all inmates to cut their dreadlocks unless they were Rastafarians) (Dkt. No. 122–1 at 46–61).

In this case, the same applies. DOCCS determined that Tafari was Jewish, despite the new designation he provided on his religious forms. Accordingly, DOCCS did not credit Tafari's sincerely held religious belief as being a member of the Jewish/Hebrew/Israelit/ Ethiopian (Orthodox Jew-ism), Nayabinghi House of Jah Rastafari, a Rastarfarian sect of the line of Judah. Based upon defendants' conclusions, Tafari was prohibited from wearing dreadlocks. This prohibition, at the least, raises a question of material fact as to whether defendants' actions impermissibly burdened Tafari's right to the free exercise of his religion.

Therefore, defendants' motion should be denied on this ground as to these claims.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1884). This includes the right to "receive adequate food, clothing, shelter, and medical care...." *Id.* (citations omitted).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d

Cir.1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted). As to restrictive diets, no constitutional violation will be found unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured [the inmate]...." *McEachin v. McGuinnis,* 357 F.3d 197, 199–201 (2d Cir.2004) (citations omitted).

**\*19** Tafari claims that the failure to provide him with a vegetarian kosher meal led to a host of digestive problems and weight loss. The limited medical information which Tafari provided, however, fails to demonstrate that he was suffering from any type of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

serious medical condition. Moreover, it is undisputed that the CAD was provided to Tafari every day, for three meals a day, and that he was eating the diet although he was dissatisfied with it. Thus, Tafari has failed to establish that he was not receiving an adequate diet or that prison officials were deliberately indifferent.

Tafari also contends that during the two weeks he was on the restricted, loaf diet, he was in danger. Similarly, these claims are insufficient to withstand the present motion. Tafari claims to have been suffering from various symptoms which were documented by medical staff. However, the record fails to include these references. Conclusory allegations of constitutional violations alone, without competent medical evidence, are insufficient to establish a significant risk to inmate health necessary to defeat a motion for summary judgment. *Llorente v. Rozeff, et. al.,* No. 99–CV–1799, 2001 WL 474261, at *3–*4 (N.D.N.Y. Apr.12, 2001) (explaining that plaintiff was required to present competent medical evidence of both the injury and the reaction to support claim of deliberate indifference to a serious medical need) (Dkt. No. 122–1 at 40–43). Moreover, the loaf diet came with cabbage and water in conjunction with the bread and it has been deemed nutritionally adequate. Tafari does not proffer evidence that this diet, though not kosher, remained nutritionally inadequate for him. Additionally, as discussed above, he also fails to establish that he was experiencing a serious risk to his health. Moreover, the denial of kosher food, in and of itself, is insufficient to establish an Eighth Amendment claim. *Modlenaar v. Liberatore,* No. 07–CV–6012, 2009 WL 2179661, at *5 (W.D.N.Y. July 22, 2009) (citing cases) (attached to Report Recommendation as Ex. 5).

Accordingly, defendants' motion as to these claims should be granted on this ground.

### F. Personal Involvement

" '[P]ersonal involvement of defendants in al-

leged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

**\*20** (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN18]

FN18. Various courts in the Second Circuit have considered how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept.30, 2010) (noting that although the Second Cir-

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

cuit has not yet addressed *Iqbal'* s impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monroe County,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

Defendants generally allege that all individuals, specially those who were managerial or supervisory officials, have not been shown to have been personally involved in the alleged constitutional violations. Given defendants vague assertion and the fact that the only constitutional violation which survived this Report–Recommendation involving managerial or supervisory officials was the January 24 through March 24, 2005 denial of kosher meals, only those defendants will be addressed.

### 1. Miller and Butler

Tafari continually wrote letters of complaint to Miller and Butler, voicing his displeasure that his kosher meals were still not being provided to him. Miller and Butler effectively ignored all of these letters. It is on these grounds which Tafari relies to establish personal involvement of these defendants.

Ignoring letters of complaint is insufficient to establish personal involvement. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted). Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases).

Accordingly, defendants' motion on this ground as to Miller and Butler should be granted.

### 2. Goord

Tafari also wrote letters of complaint to defendant Commissioner Goord during this time. Goord forwarded the letters to defendant Nuttal, who responded to Tafari on Goord's behalf. To the extent Goord's actions in referring these complaints to the appropriate correctional facility or Superintendents are alleged to render him personally involved, such contentions are meritless as such delegation is an appropriate prerogative of supervisory officials. *See Bodie,* 342 F.Supp.2d 193, 203 (citations omitted) (finding personal involvement where supervisory official received, reviewed, and responded to an inmate's complaint); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner not personally liable for ignoring plaintiff's letter of protest and request for an investigation). Accordingly, defendants' motion on this ground as to Goord should be granted.

### 3. Nuttal and Wendland

**\*21** Conversely, defendants Nuttal and Wendland are personally involved for the same reasons which relieved Goord of responsibility. Nuttal received Tafari's letter of complaint, assessed it, and decided to initiate an investigation in response to it. Similarly, Wendland received Tafari's letters and responded that allegations of harassment were being determined by the grievance program but that otherwise Tafari was required to engage in certain steps to notify the chaplain and facility properly prior to being able to receive kosher meals. Therefore, Nuttal and Wendland were more engaged than the other defendants in the instant action. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding per-

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

sonal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint). Accordingly, defendants' motion on this ground as to Nuttal and Wedland should be denied.

### G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached as to all claims because, as discussed *supra,* accepting all of Tafari's allegations as true, he has not shown that all of these defendants violated his constitutional rights.

However, with respect to Tafari's claims against (1) Wendland and Nuttal regarding the eight weeks he waited to receive kosher meals after transferring to Eastern and (2) Poole for issuing disciplinary charges

when Tafari failed to cut his hair, the second prong of the analysis need be considered. There is no question that it was well settled on October 25, 2006 that the First Amendment required that inmates are to be provided with the ability to exercise their religious beliefs, including the right to a diet which comports with their religious beliefs. As there is no dispute about this clearly established law with respect to providing a kosher meal, it cannot be said that defendants Wendland or Nuttal were unaware of the right. Accordingly, these claims cannot be dismissed on the basis of qualified immunity at this stage.

**\*22** Conversely, "[a]lthough the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protections." *Pilgrim,* 2010 3724883, at \*17 (citations omitted). Accordingly, "qualified immunity would apply to all those who participated in [the DOCCS dreadlocks policy] creation and enforcement." *Id.* Thus, defendants' motion as to Poole on this ground should be granted.

Accordingly, defendants' motion on this ground should be granted in the alternative as to all defendants except Nuttal and Wendland for the claims discussed above.

### III. Motion to Compel

Tafari filed a motion pursuant to Fed.R.Civ.P. 37 to compel defendants to provide discovery and revoke the previously entered court ordered extension providing defendants more time to produce their discovery. Dkt. No. 117. That motion was served before defendants filed their motion for summary judgment. Dkt. No. 122.

At the outset of the case, this Court filed a "Mandatory Pretrial Discovery and Scheduling Order

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)
**(Cite as: 2012 WL 1085852 (N.D.N.Y.))**

in Civil Rights Actions Brought by Inmates Pro Se." a standardized order filed in this district in all such cases. Dkt. No. 102. It required both the plaintiff and the defendants to serve an opposing party with certain discovery materials without the necessity of a discovery request. *Id.* Its stated purpose is "[t]o expedite the fair disposition of this action and to discourage wasteful pretrial activities...." *Id.* at 1. The order does not preclude a plaintiff or defendant from seeking additional discovery from an opposing party, but, given the order and its purpose, such additional discovery must not be cumulative, overbroad, or unduly burdensome, and must satisfy the requirements of relevance under Fed.R.Civ.P. 26. Defendants sought, and received, an extension to file their dispositive motions and discovery on June 16, 2011. Dkt. Nos. 115, 116. Immediately thereafter, Tafari filed the present motion to compel, arguing that he should have been given the opportunity to oppose it and seeking immediate reversal of the extension. Dkt. No. 117. On August 24, 2011, defendants filed their motion for summary judgment. Dkt. No. 122.

Defendants now having filed a motion for summary judgment, the threshold issue on Tafari's motion to compel is whether the additional discovery could reasonably alter the outcome of defendants' motion. Given the voluminous record which was reviewed in conjunction with determining these motions and the lack of specificity of Tafari's requests, granting any additional discovery would not. Moreover, because Tafari's claims are obtuse and overbroad, the information sought is unclear and, no matter its content, would not affect the outcome of defendants' motion.

Accordingly, Tafari's motion to compel is denied.

### IV. Conclusion

**\*23** For the reasons stated above, it is hereby:

1. **RECOMMENDED** that:

A. Defendants' motion to dismiss pursuant to § 1915(g) (Dkt. No. 118) be **DENIED;** and

B. Defendants' motion for summary judgment (Dkt. No. 122) be:

1. **DENIED** as to Tafari's First Amendment claims regarding the failure of defendants Wendland and Nuttal to provide Tafari a kosher meal between January 24 and March 24, 2005; and

2. **GRANTED** as to all other claims and defendants; and

2. **ORDERED** that Tafari's motion to compel (Dkt. No. 117) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2012.
Tafari v. Brown
Not Reported in F.Supp.2d, 2012 WL 1085852 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5831202 (D.Conn.)
**(Cite as: 2012 WL 5831202 (D.Conn.))**




Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Joe Burgos VEGA, Plaintiff,
v.
Theresa LANTZ et al., Defendants.

No. 3:04CV1215(DFM).
Nov. 16, 2012.

Charles D. Ray, Jordan D. Abbott, McCarter & English, Hartford, CT, for Plaintiff.

Lynn D. Wittenbrink, Steven R. Strom, Attorney General's Office, Hartford, CT, for Defendants.

*RULING ON MOTION FOR RECONSIDERATION*
DONNA F. MARTINEZ, United States Magistrate Judge.

**\*1** The plaintiff, a state prisoner, brings this action against officials of the Connecticut Department of Corrections ("DOC") pursuant to 42 U.S.C. § 1983 alleging violations of his rights under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. He also alleges violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. The remaining defendants are former DOC Commissioner Theresa Lantz and DOC Director of Religious Services Reverend Anthony J. Bruno. (*See* docs. # 95 at 34, # 188 at 33.) Pending before the court is the defendants' Motion for Reconsideration, doc. # 222. For the reasons that follow, the motion is granted.

I. *Procedural History*
The plaintiff, a practicing Muslim, commenced this action in July 2004 claiming that the defendants violated his right to exercise his religion.[FN1] (Doc. # 1.) After the court granted the defendants' motion for summary judgment in part (doc. # 188), they filed a Motion for Reconsideration with respect to the issue of qualified immunity. (Doc. # 190.) While the Motion for Reconsideration was pending, the case was administratively closed to facilitate settlement discussions.[FN2] (Doc. # 203.) After the parties reached a partial settlement, the case was reopened. (Doc. # 209.) With leave of the court, the defendants renewed their Motion for Reconsideration. (Doc. # 222.)

> FN1. The plaintiff filed his complaint *pro se* but has been represented by appointed counsel for all purposes relevant to this ruling. (*See* doc. # 102.)

> FN2. Magistrate Judge Joan G. Margolis generously devoted many hours to settlement discussions on six separate occasions spanning many months.

The three unresolved claims allege that the remaining defendants, former Commissioner Lantz and Reverend Bruno, unlawfully (1) denied the plaintiff's request to be circumcised, (2) denied him access to suitable Islamic prayer oils, and (2) frequently cancelled Friday congregate prayer. (Docs. # 209 and # 223.) The plaintiff seeks injunctive and declaratory relief from the defendants in their official capacities and monetary relief from them in their individual capacities. In the pending motion, defendants argue that they are entitled to qualified immunity from suit in their individual capacities.

II. *Reconsideration*
The standard for granting a motion for reconsideration "is strict, and reconsideration generally will be denied unless the moving party can point to control-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5831202 (D.Conn.)
**(Cite as: 2012 WL 5831202 (D.Conn.))**

ling decisions or data that the court over-looked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.,* Inc., 70 F.3d 255, 257 (2d Cir.1995) (citations omitted). A "motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478, at 790 (1981)).

**\*2** In this case, reconsideration is appropriate because of an intervening change of controlling law. At the time of the court's summary judgment ruling, the Supreme Court had mandated a two-step sequence for resolving government officials' qualified immunity claims, which required the court to determine first whether the facts as alleged amounted to a violation of a constitutional right and, only if so, to then determine whether the right was "clearly established." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The Supreme Court has since relaxed the *Saucier* mandate to permit the district courts and courts of appeal "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). In light of the change, reconsideration is granted for the purpose of examining the second *Saucier* prong to determine whether the defendants are entitled to summary judgment on the issue of qualified immunity.

*III. Standard of Review*

A party is entitled to summary judgment if the record, including pleadings, depositions, answers to interrogatories, admissions and affidavits, establishes that there is no genuine dispute as to any material fact

and that the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. In seeking summary judgment, a defendant has the initial burden of showing an absence of evidence to support an essential element of the plaintiff's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). To overcome this showing, a party opposing summary judgment "bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v.. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (quoting *Celotex,* 477 U.S. at 324). The court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000).

*IV. Undisputed Facts*

The following undisputed facts set forth in the court's summary judgment ruling are relevant here. The plaintiff, a practicing Muslim, is incarcerated at MacDougall Walker Correctional Institution in Suffield, Connecticut. The DOC offers various opportunities to Muslim inmates to practice and study their religion. They may attend Islamic study classes and Arabic language classes, and they have access to books and other study materials. Muslim inmates who choose to fast during the month of Ramadan are accommodated with meals served after sunset. Muslim inmates are able to attend two annual feasts known as the Eids. Inmates may purchase certain devotional accessories in the prison commissary, including oils for use in Muslim prayer. The plaintiff requested circumcision, and the defendants denied the request. There is weekly chaplain-led congregate prayer for Muslim inmates on Fridays but it has been cancelled frequently due to unavailability of a chaplain or volunteer to oversee it. Collective religious activity is permitted only under authorized supervision, and inmates are not permitted to lead collective religious activity. (Doc. # 188.)

**\*3** It is also undisputed that Defendant Bruno has

Not Reported in F.Supp.2d, 2012 WL 5831202 (D.Conn.)
**(Cite as: 2012 WL 5831202 (D.Conn.))**

asked the DOC's Islamic chaplains to help find volunteers to lead Friday congregate prayer in light of the "desperate need" for more Islamic prayer leaders. To prevent cancellations, Bruno has rotated chaplains and assigned them to lead Friday prayers at more than one facility. (Bruno Aff., doc. # 149, Ex. Q at 80–84.)

## V. Discussion

The plaintiff argues that the defendants violated his rights by denying his request to be circumcised, denying him access to suitable prayer oils, and frequently cancelling Friday congregate prayer. He seeks *inter alia* money damages from the defendants in their individual capacities under 42 U.S.C. § 1983.[FN3] The defendants assert that they are entitled to qualified immunity in their individual capacities.

> FN3. This ruling does not concern plaintiff's § 1983 claims against the defendants in their official capacities for injunctive and declaratory relief.

### A. *Qualified Immunity*

The Supreme Court has held that government officials generally are shielded from liability for civil damages unless (1) viewed in the light most favorable to the party asserting the injury, the facts as alleged amount to a violation of a constitutional or statutory right, and (2) the right was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan,* 555 U.S. 223 (2009) (court may consider *Saucier* prongs in any order). To determine whether a particular right was clearly established, courts in this circuit consider three things:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or

her acts were unlawful.

*Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)). If the record shows violation of a clearly established right, the court must ask whether " 'the evidence is such that, even when it is viewed in the light most favorable to the plaintiff [ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant [ ] to believe that [he][was] acting in a fashion that did not violate a clearly established right.' " *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (quoting *In re State Police Litig.,* 88 F.3d 111, 123 (2d Cir.1996)). In other words, officials are entitled to qualified immunity unless they are "plainly incompetent" or "knowingly violate the law." *Ashcroft v. al-Kidd,* ―― U.S. ――, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

### B. *Plaintiff's Claims*

### 1. *Denial of Circumcision*

The plaintiff alleges that since 2001 the defendants unlawfully have denied his requests for circumcision. The court can find no precedent that suggests—much less clearly establishes—that a prisoner has a constitutional or statutory right to a surgery that is not medically necessary. *Cf. Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976) (prisoner has Eighth Amendment right to treatment for "serious" medical needs). Because the plaintiff has no clearly established right to circumcision, the defendants are entitled to qualified immunity from this claim.

### 2. *Failure to Provide Suitable Prayer Oils*

**\*4** The plaintiff next alleges that since 2002 he has been prevented from obtaining oils suitable for Islamic devotional use. The court denied summary judgment on the merits of this claim because a mate-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5831202 (D.Conn.)
(Cite as: 2012 WL 5831202 (D.Conn.))

rial dispute exists as to whether the oils in the prison commissary contain chemicals prohibited by Islam. (Doc. # 188 at 32–33.) Nevertheless, for the narrower purposes of qualified immunity, it is undisputed that the commissary oils were reviewed and approved for devotional use by Imam AbdulMajid Karim Hasan, the DOC's Islamic advisor. (*See* Statement of Material Facts, doc. # 149, Ex. A and B.) Hasan's approval of the commissary oils was reinforced by a 2001 letter and a 2006 affidavit of purity from Imam Wali W. Rushdan, an Islamic advisor to corrections facilities in Pennsylvania and Delaware. (*Id.,* Ex. I.)

As the Supreme Court has cautioned, an inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). For an official to lose the protection of qualified immunity "the unlawfulness must be apparent" in light of preexisting law. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). *See, e.g., Breland v. Goord,* No. 94cv3696, 1997 WL 139533, at *7–8 (S.D.N.Y. March 27, 1997) (prison officials were entitled to qualified immunity from Free Exercise claim for confiscating literature they reasonably believed was not religious in nature). Here, even assuming without deciding that the plaintiff had a right to obtain suitable Islamic prayer oils, the defendants could not have imagined that they would violate the alleged right by restricting him to the imam-approved commissary oil. They therefore are entitled to qualified immunity from this claim as a matter of law.

### 3. Cancellation of Friday Congregate Prayer

Finally, as to the frequent cancellation of Friday congregate prayer, well-settled preexisting law establishes that inmates have a constitutional right to participate in congregate religious services. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). However, in some circumstances, administrative exigencies can outweigh an inmate's right to weekly congregate prayer, especially where other opportunities for religious exercise are available. *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) (prison officials were not required to excuse Muslim inmates from work details that sometimes prevented them from attending Friday congregate prayer). For example, in *Benjamin v. Coughlin,* 905 F .2d 571, 573–74 (2d Cir.1990), the Second Circuit held that a complete failure to provide congregate Rastafarian prayer was justified where the defendants made good faith but unsuccessful efforts to locate and obtain the services of a Rastafarian chaplain. Similarly, in *Persad v. Savage,* No. 02cv0336, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004), *adopted,* 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004), the district court held that prison officials were entitled to qualified immunity for twice cancelling Friday prayer when the regular Muslim chaplain could not find a vacation substitute.

**\*5** The record on summary judgment shows that the DOC assigned Islamic chaplains to conduct Friday congregate services but frequently cancelled Friday services when the assigned chaplains or volunteers were unavailable. To reduce such cancellations, the DOC rotated Islamic chaplains to cover shortages, assigned them to conduct Friday services at more than one facility and sought their assistance in recruiting more volunteers. Other opportunities for religious practice were available to Muslim inmates.

The plaintiff argues that this record does not establish that the cancellations were objectively reasonable, citing deposition testimony alleging that the DOC did not try hard enough to enlist more chaplains and volunteers and that it vetted potential volunteers too rigorously. (Doc. # 161 at 25–26, 63.) *See Salahuddin v. Goord,* 467 F.3d 263, 275–76 (2d Cir.2006) (declining to decide qualified immunity because record on summary judgment did not establish that it was objectively reasonable for defendant to believe that he did not violate clearly established right). However, in light of the DOC's undisputed efforts to rotate and recruit prayer leaders and to provide other opportunities for Islamic religious exercise, it would not have been apparent to a reasonable prison official that it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5831202 (D.Conn.)
**(Cite as: 2012 WL 5831202 (D.Conn.))**

might be unlawful to cancel Friday services due to the unavailability of assigned staff. Because the defendants were not "plainly incompetent" and did not "knowingly violate the law," *Ashcroft v. al-Kidd,* ——U.S. ——, 131 S.Ct. 2074, 2085 (2011), they are entitled to qualified immunity on this claim.

VI. *Conclusion*

For the foregoing reasons, the defendants' Motion for Reconsideration is granted. The court concludes that former Commissioner Lantz and Reverend Bruno are entitled to qualified immunity and grants summary judgment in their favor as to the remaining claims for money damages in their individual capacities. The case shall proceed on the plaintiff's official capacity claims for injunctive and declaratory relief with respect to circumcision, oils and congregate prayer.

This is not a recommended ruling. The parties have consented to trial before a magistrate judge pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P. 73. (*See* doc. # 27.)

SO ORDERED.

D.Conn.,2012.
Vega v. Lantz
Not Reported in F.Supp.2d, 2012 WL 5831202 (D.Conn.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Joe Burgos VEGA, Plaintiff,
v.
Theresa LANTZ, et al., Defendants.

No. 304CV1215DFM.
Sept. 25, 2009.

West KeySummary**Constitutional Law 92** 🖝1427

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(B) Particular Issues and Applications
        92k1421 Prisons and Pretrial Detention
          92k1427 k. Religious services and ceremonies; study and prayer groups. Most Cited Cases

**Prisons 310** 🖝155

310 Prisons
    310II Prisoners and Inmates
        310II(B) Care, Custody, Confinement, and Control
        310k151 Religious Practices and Materials
          310k155 k. Services, ceremonies, texts, study, and prayer. Most Cited Cases

    Prisoner's First Amendment rights were not violated by the Department of Corrections (DOC) prohibiting the prisoner from congregate prayer five times daily since the DOC provided evidence that allowing such activity would endanger security. The prisoner alleged that his religion required him to congregate with other Muslims five time daily for prayer. The DOC contended that it could not provide sufficient chaplains or custody staff to lead or supervise such prayer. Furthermore, it would endanger security by creating a perception of favoritism which could create strife among the inmates, because Muslim inmates would be out of their cells more frequently than other inmates. U.S.C.A. Const.Amend. 1.

Matthew A. Weiner, McCarter & English, Hartford, CT, for Plaintiff.

Steven R. Strom, Attorney General's Office, Hartford, CT, for Defendants.

*RULING ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT*
DONNA F. MARTINEZ, United States Magistrate Judge.

    **\*1** The plaintiff, a prisoner, brings this action against officials of the Connecticut Department of Corrections ("DOC") under the Free Exercise Clause of the First Amendment, the Equal Protection clause and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. He alleges that the defendant prison officials restricted him from practicing his religion. Pending before the court is the defendants' Motion for Summary Judgment, doc. # 146.[FN1] For the reasons that follow, the motion is granted in part and denied in part.

>     FN1. Also pending are four motions to preclude certain evidence. Because the court finds that none of this disputed evidence is required for a ruling on the instant summary judgment motion, the motions to preclude (docs.# 150, 154, 169, 171) are denied without prejudice to refiling at the time of trial.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

I. *Procedural Background*

The plaintiff commenced this action in July 2004, representing himself *pro se.* He filed the operative Amended Complaint, doc. # 62, on November 8, 2005.

The plaintiff, a practicing Muslim, is incarcerated at MacDougall Walker Correctional Institution, in Suffield, Connecticut. (Def's Local Rule 56(a)(1) Statement of Material Facts, doc. # 149, ¶ 1.) The remaining defendants are: Theresa Lantz, the Commissioner of the DOC [FN2]; Reverend Anthony Bruno, the DOC's Director of Religious Services; Robert DeVeau, the DOC's Director of Food Services; and Imam Abdul–Majid Karim Hasan, a contract chaplain for the DOC.

> FN2. Since the filing of the lawsuit, Theresa Lantz has retired. Brian K. Murphy is now the acting Commissioner of the Department of Correction.

In September 2006, the court partially granted the defendants' Motion for Judgment on the Pleadings, dismissing claims as to several defendants and reducing the scope of claims as to the remaining defendants. (Doc. # 95.) Among other things, the court dismissed all of plaintiff's official capacity damages claims. (Doc. # 95 at 22–23, 34–35.) Plaintiff's claims for injunctive or declaratory relief against the defendants in their official capacity survived the Motion for Judgment on the Pleadings, as did his individual capacity damages claims.

In November 2006, the court appointed counsel for the plaintiff. The parties have consented to trial before a magistrate judge pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P. 73. (*See* doc. # 27.)

II. *Plaintiff's Claims*

The plaintiff brings a series of religious exercise claims under the First Amendment, RLUIPA and the Equal Protection clause. He alleges that all of the defendants refused to provide him with Halal [FN3] meat as part of his diet (Am. Compl., Seventh Count). He alleges that defendants Lantz, Bruno and Hasan also (1) failed to provide or permit congregational prayer five times daily and did not allow him to lead other inmates in prayer (*id.,* Second Count and Eighth Count); (2) regularly cancelled weekly Muslim congregate prayer service (known as Jumah [FN4])(*id.,* Third Count); (3) denied his religiously-motivated request to be circumcised (*id.,* Ninth Count); (4) permitted correctional officers to mishandle inmates' copies of the Quran [FN5] (*id.,* Tenth Count); (5) deprived him of timely Eid-ulFitr congregational prayer during Ramadan [FN6] in 2002 (*id.,* Fourth Count); (6) failed to provide sufficient calories in Ramadan meals (*id.,* Fifth Count); and (7) effectively denied the purchase or possession of certain religious items conforming to Islamic requirements, such as a toothstick, prayer oils, a prayer clock, leather socks and a silver Islamic ring. (*Id.,* Sixth Count).[FN7]

> FN3. Halal is a "Quranic term used to indicate what is lawful or permitted." The Oxford Dictionary of Islam, 105 (John L. Esposito ed., 2004). When used in the context of dietary restrictions, the word often refers to "the meat of permitted animals that have been ritually slaughtered, hunted game over which the name and praise of God have been recited, and fish and marine life." *(Id.)* Halal food is contrasted with prohibited, or "haram," foods, which include "pork, blood, alcoholic beverages, scavenger animals, carrion and improperly sacrificed permitted animals." (*Id.*)

> FN4. "Salat al-Jumah" is the "Friday congregational prayer." It "is held in the mosque and performed in straight lines." The Oxford Dictionary of Islam, 276 (John L. Esposito ed., 2004).

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
(Cite as: 2009 WL 3157586 (D.Conn.))

FN5. The Quran is "the book composed of writings accepted by Muslims as revelations made to Muhammad by Allah and as the divinely authorized basis for the religious, social, civil, commercial, military and legal regulations of the Islamic world." Webster's Third New International Dictionary (Unabridged) 1255, 1868 (1993).

FN6. Ramadan is "the 9th month of the Muhammadan year observed as a sacred month on each day of which strict fasting is practiced from dawn to sunset." Webster's Third New International Dictionary (Unabridged) 1878 (1993). The Eid–ul–Fitr, also spelled Id-ulFitr, is "[t]he Feast of breaking the Ramadan Fast, or Lesser Bairam, celebrated on the 1st of the month of Shawwl: one of the two major festivals in Islam." Oxford English Dictionary (2d Ed.1989), *available at* http://dictionary.oed.com.

FN7. The complaint also alleges that the defendants "intentionally, systematically and discriminately physically and psychologically abused the Plaintiff because of his faith and his Islamic religion." *(Id.,* Eleventh Count.) The plaintiff's memorandum does not list this as one of his claims or point to evidence in support of it. This claim is dismissed in light of the plaintiff's *in forma pauperis* status. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)("complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights"); *Clark v. Levesque,* 2006 U.S. Dist. LEXIS 25917 (D.Conn. Mar. 17, 2006)(28 U.S.C. § 1915(e)(2)(B)(ii) requires the court to dismiss at any time allegations that fail to state a claim upon which relief may be granted), *aff'd Clark v. Levesque,* No. 06–2046–pr, 2009 U.S.App. LEXIS 14981

(2d Cir. July 8, 2009); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (internal citations omitted).

III. *Factual Background*

**\*2** The following facts are undisputed. Prison policy requires that collective religious activity be "conducted and supervised by a Department authorized Chaplain or religious volunteer who professes the same religion as the group gathering together." (Administrative Directive 10.8 ("A.D. 10.8" ¶ 6(B), attached as ex. F to doc. # 149.) Inmates are not permitted to lead collective religious activities and "can never exercise any authority over any other inmate." *(Id.,* ¶¶ 6(B), 6(D).) Inmates may not engage in "demonstrative public individual prayer that would disrupt the orderly operation of the institution, such as in the work or school area, recreation area, day room, etc." *(Id.,* ¶ 6(E).) Instead, "[a]ll such prayer must be done privately in one's cell or by one's bed." *(Id.)*

Congregate prayer is permitted once a week. Prison policy provides that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week, to the various religious denominations." *(Id.,* ¶ 6(A).) There is a weekly chaplain-led Jumah prayer for Muslim inmates, but it has frequently been cancelled due to the unavailability of a chaplain or volunteer to oversee it.

The DOC offers various opportunities to Muslim inmates to practice and study their religion. They may attend Islamic study classes and Arabic language classes, and they have access to books and other study materials. Muslim inmates who choose to fast during the month of Ramadan are accommodated with meals served after sunset. Muslim inmates are able to attend two annual feasts known as the Eids. Inmates may purchase certain religious items such as prayer rugs in the commissary, which also offers more than forty

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

Halal food items, including Halal meat sausage.

The plaintiff receives what is known as the "Common Fare" diet, an alternative to the regular prisoner diet. Common Fare includes no meat, meets the nutritional requirements of prisoners and does not contain items that are forbidden by Islam. It is available to members of other religions with dietary restrictions. It includes fish, cheese and other non-meat sources of protein, and DOC staff follow special preparation, storage and cleaning procedures to ensure that there is no cross-contamination with non-Common Fare foods. The DOC does not offer Halal or Kosher meat as part of any menu.

IV. *Standard of Review*

A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of showing the absence of any genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A party opposing a ... motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (quoting *Celotex,* 477 U.S. at 324).

**\*3** The court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). Moreover, because the plaintiff's Amended Complaint was filed while he represented himself *pro se,* the court reads its allegations liberally. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers")(internal citations and quotation marks omitted).

V. *Discussion*

A. *General Defenses to Plaintiff's Claims*

As an initial matter, the defendants raise several general defenses that they say preclude some of the plaintiff's claims as a matter of law. The court will address these before turning to plaintiff's substantive claims.

*1. Exhaustion*

The defendants move for summary judgment as to certain claims on the ground that the plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). (Defs' Mem., doc. # 148 at 33–34.)

Section 1997e(a) "mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions." *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2008 U.S. Dist. LEXIS 59098 (S.D.N.Y. Aug. 5, 2008) (citing *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001)).

The plaintiff does not dispute that he failed to exhaust his remedies as to certain of his claims prior to filing suit. Instead, he contends that the defendants waived this defense because the special defense set forth in their answer did not specify which claims were unexhausted.

Plaintiff is correct that failure to exhaust is an affirmative defense that may be waived if not raised. *See Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). However, the defendants did plead the defense in their Answer. (*See* Doc. # 30.) The plaintiff offers no authority in support of his argument that the defendants were required to specify which claims were unexhausted in order to preserve the defense.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

The defendants' motion for summary judgment is granted as to the following unexhausted claims: untimely prayer at the end of Ramadan in 2002, lack of adequate nutrition in the Ramadan meals, and lack of access to leather socks, a prayer clock, hygiene items and an Islamic silver ring.

2. *Physical Injury Requirement*

The defendants move for summary judgment as to all of plaintiff's damages claims on the grounds that he has not alleged a physical injury. They rely on 42 U.S.C. § 1997e(e), which provides that

[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

**\*4** This provision bars prisoner claims for compensatory damages "for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002). However, the provision "does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages." *Id.* at 418. Therefore, the defendants are not entitled to summary judgment as to plaintiff's damages claims on these grounds.[FN8]

FN8. The plaintiff argues that Section 1997e(e) does not apply to compensatory damages in First Amendment cases. Having found that the plaintiff is entitled to seek at least nominal damages, the court need not decide at this time whether he may also seek compensatory damages.

3. *Money Damages Under RLUIPA*

The defendants next argue that RLUIPA does not allow the plaintiff to seek money damages against a state official in his or her individual capacity.[FN9]

FN9. The court previously dismissed plaintiff's claims for damages against defendants in their official capacities. (Doc. # 95 at 22–23 .) The plaintiff's claims for injunctive and declaratory relief against defendants in their official capacities survived that ruling.

The statutory text permits a plaintiff to "obtain appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The term "government" is defined as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law." 42 U.S.C. § 2000cc–5(4). The Second Circuit has not considered whether this language permits for money damages against defendants in their individual capacities. However, other circuit courts that have considered this issue have held that it does not. *Smith v. Allen,* 502 F.3d 1255 (11th Cir.2007); *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316 (5th Cir.2009). *See also El Badrawi v. Dep't of Homeland Sec.,* 579 F.Supp.2d 249, 261 (D.Conn.2008); *Pugh v. Goord,* No. 00 Civ. 7279(RJS), 2008 WL 2967904 at \*22 (S.D.N.Y. July 31, 2008); *Sweeper v. Taylor,* No. 9:06–CV–379(NAM/GJD), 2009 U.S. Dist. LEXIS 27318 at \*27 (N.D.N.Y. March 27, 2009). The Fifth Circuit recently relied on a Spending Clause analysis in holding that RLUIPA does not create a cause of action for damages against defendants in their individual capacities:

RLUIPA was enacted pursuant to Congress's Spending Clause power, not pursuant to the Section 5 power of the Fourteenth Amendment. Accordingly, only the grant recipient—the state—may be liable for its violation. Spending Clause legislation is not legislation in its operation; instead, it operates like a contract, and individual RLUIPA defendants are not parties to the contract in their individual

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

capacities.

*Sossamon,* 560 F.3d at 328.[FN10] This court is persuaded by the logic of Sossamon and Smith and concludes that RLUIPA provides no cause of action for damages against state officials in their individual capacities. Therefore, the court grants the defendants' motion for summary judgment as to plaintiff's RLUIPA claims insofar as the plaintiff seeks money damages.

> FN10. Sossamon also held that official-capacity damages claims are barred by the doctrine of sovereign immunity, because RLUIPA did not unambiguously put states on notice that their acceptance of federal funds was conditioned on a waiver of immunity. *Id.* at 329–31. *See also Van Wyhe v. Reisch,* No. 08–1409, 2009 U.S.App. LEXIS 20235, *27–28 (8th Cir. Sept. 10, 2009); *Nelson v. Miller,* 570 F.3d 868, 884–85 (7th Cir.2009); *Cardinal v. Metrish,* 564 F.3d 794, 801 (6th Cir.2009). Because the plaintiff's official-capacity damages claims were previously dismissed, the court need not consider this issue.

4. *Lack of Personal Involvement*

Defendant Hasan moves for summary judgment based on his lack of personal involvement.[FN11] It is settled law in this circuit that in a civil rights action for monetary damages against a defendant in his individual capacity, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Where a defendant did not personally commit a wrong, courts have recognized that personal involvement can also be shown through evidence that the defendant failed to remedy a known wrong, that the defendant created a policy or custom under which unconstitutional practices occurred or continued, or that the defendant exhibited deliberate indifference by

failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN12]

> FN11. Defendant DeVeau also moves for summary judgment as to all claims based on lack of personal involvement. However, because the court grants the defendants' motion for summary judgment as to plaintiff's Halal meat claim, *see infra,* the only claim directed to DeVeau, it need not address his personal involvement argument.

> FN12. The *Colon* factors have recently been thrown into some doubt by the Supreme Court's ruling in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009), which discussed issues of supervisory liability. *See Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2009 U.S. Dist. LEXIS 54141 (S.D.N.Y. June 26, 2009)(under *Iqbal,* "a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate"); *Estate of Young v. N.Y. Office of Mental Retardation & Developmental Disabilities,* No. 07Civ. 6241(LAK), 2009 U.S. Dist. LEXIS 78049 (S.D.N.Y. Aug. 27, 2009). The court need not reach this unbriefed issue in this matter.

**\*5** Imam Hasan was formerly employed as a chaplain with the DOC, and, since his retirement in 2001, he has served as a contract chaplain. (Hasan Dep. Vol. I, Pl's Opp., doc. # 162 ex. M at 74.) He has no authority to make DOC policy. (Hasan Dep. Vol.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

II, Defs' Mem., doc. # 149 ex. L at 95.) The DOC's Director of Religious Services, Reverend Bruno, described Imam Hasan as "our Islamic religious expert who is my right hand man" and "the go-to person for Islamic issues." (Bruno Dep., Pl's Opp., doc. # 162 ex. F at 32.) The plaintiff's complaint does not allege that Imam Hasan personally acted to limit the plaintiff's rights; rather, it alleges that he acted as an advisor to the other defendants. In opposition to the motion for summary judgment, the plaintiff argues that "[a]s the lead Islamic voice in the DOC, Imam Hasan has created the customs and supported the policies under which the constitutional violations occurred in this case. Moreover, Imam Hasan has failed to remedy, or even advocate a remedy, to the constitution[al] violations alleged by Mr. Vega." (Pl's Mem., doc. # 161 at 65–66.)

In response to the summary judgment motion, the plaintiff has pointed to no evidence indicating that Hasan personally deprived the plaintiff of any rights, or that he personally had the power or authority either to deprive the plaintiff of any rights or to remedy any violation by others. The court concludes that the reliance on his advice by the other defendants or other DOC employees is insufficient to constitute personal involvement for purposes of constitutional liability. *See, e.g., Tafari v. Annetts,* 06 Civ. 11360(GBD)(AJP), 2008 U.S. Dist. LEXIS 45901, *35–42 (S.D.N.Y. June 12, 2008) (granting summary judgment for lack of personal involvement by a prison rabbi who was alleged to have influenced the denial of plaintiff's transfer request). The summary judgment motion is granted as to all claims against Imam Hasan.

That completes the discussion of the general defenses. The court now turns to the merits of the plaintiff's religious exercise claims under RLUIPA, the First Amendment and the Equal Protection clause. The remaining legal claims are those involving Halal meat, congregate prayer, cancellation of Jumah, circumcision, mishandling of Qurans, availability of toothsticks, and nonconforming prayer oils.

## B. *Claims Regarding Halal Meat*

The plaintiff alleges that the defendants' failure to include Halal meat in the Common Fare diet deprives him of a diet consistent with his religious beliefs.[FN13] The Common Fare diet is vegetarian. The plaintiff claims that his religion does not permit vegetarianism and requires him to eat Halal meat occasionally.[FN14] Plaintiff alleges that the lack of Halal meat is violative of the First Amendment, RLUIPA, and the Equal Protection Clause.

> FN13. The plaintiff's complaint alleges that the defendants permit cross-contamination between regular prison meals and the Common Fare meals. However, the plaintiff has abandoned this claim. In response to the summary judgment motion, plaintiff makes no argument about, and does not point the court to evidence of, such cross-contamination.

> FN14. The plaintiff adds that vegetarian meals have caused him gastrointestinal problems. He cites *Shakur v. Schriro,* 514 F.3d 878, 888 (9th Cir.2008) and suggests that his medical condition should be a part of the religious analysis. *Shakur* is distinguishable because it involved a prisoner's claims that the severe medical effects of the vegetarian diet impacted his ability to achieve the ritual purity required for Muslim prayer. There are no such allegations in this case.

## 1. *First Amendment*

The court begins with the plaintiff's First Amendment claim. "[A]lthough prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

our penal system." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).[FN15] "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner,* the Supreme Court identified the four factors to be considered in determining the reasonableness of a prison regulation: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmate has alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)(citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

> FN15. A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). The defendants' motion does not challenge the sincerity of plaintiff's belief. Their argument that the plaintiff has a flawed understanding of the requirements of Islam is irrelevant to the question of his sincerity. See *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). For purposes of this motion the court will assume, without deciding, that the plaintiff's sincere religious belief has been substantially burdened.

**\*6** The defendants bear the "relatively limited burden of identifying the legitimate penological in-

terests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin v. Goord,* 467 F.3d 263, 274–275 (2d Cir.2006)(internal citations and quotation marks omitted). In this analysis, courts must give deference to the defendants because "prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations in situations such as this." *Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). *See also Beard v. Banks,* 548 U.S. 521, 530, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006)(while court must draw inferences in favor of non-moving party at summary judgment stage as to disputed facts, the court's "inferences must accord deference to the views of prison authorities" as to "disputed matters of professional judgment.") "The burden [ ] is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Defendants need not show evidence of actual past disruptions. *See, e.g., Dixon v. Woodruff–Fibley,* No. 1:04–cv1374–DFH–VSS, 2006 U.S. Dist. LEXIS 65911 (S.D.Ind. Sept. 14, 2006) (rejecting plaintiff's argument that there was no evidence that his prayer outside his cell had caused disturbances in the past).

The defendants argue that they are entitled to summary judgment because the DOC's policy of not including Halal meat in the Common Fare diet is reasonably related to legitimate penological interests of security, cost and administrative burden.

First, the defendants argue that their policy serves the interest of prison security. Brian Murphy, Deputy Commissioner of the DOC, explains in his expert disclosure that perceptions of favoritism are a sensitive issue in a prison, and the dining hall is a particularly volatile environment due to inmates' relative freedom of movement and relatively low staff to inmate ratios. (Murphy expert report, doc. # 149, Ex. S at 7.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

Tensions brewing in the housing unit are often released in the group atmosphere of the dining hall, and there is greater potential for inmate violence. Such simmering inmate tensions can be ignited by feelings that the inmate is being deprived of food items he/she sees other inmates eating ... So long as some inmates were receiving cuts of meat that others were not, there is the strong potential for inmate unrest.

(*Id. See also* Robert E. Frank Deposition ("Frank Dep."), doc. # 149, Ex. O at 231–32 (opining as to tensions that might arise if Halal meat precisely equivalent to regular menu items could not be supplied) and Brian Murphy expert report, doc. # 149, Ex. S at 7–8 (stating that increasing the complexity of the Common Fare diet could lead to delays in serving meals, which could spark inmate unrest).)

The defendants also offer evidence that Halal meat would be more expensive than equivalent food items on the regular or Common Fare menus. (*See* Robert E. Frank Expert Report ("Frank Report"), doc. # 149, Ex. C.) Because Halal meat would have to be offered to all Muslim inmates systemwide [FN16], the extra cost would not be limited to the facility in which the plaintiff is incarcerated but would be incurred statewide.[FN17] (*See* Frank Report at 7.) In addition, because not all facilities have sufficient storage space (including freezers) to devote exclusively to Halal food, DOC would require expensive facility improvements in order to separately handle, store and prepare Halal meat in the quantities required. (*Id.,* Frank Dep., doc. # 149 Ex. P at 93; Frank Report, doc. # 149, Ex. C at 2.) The defendants contend that the only way to guarantee that Halal meat is consistently kept separate from other foods would be to use-and in some cases construct-separate kitchens. (*Id.* at 230–31.) Because Halal meat looks the same as regular meat, and the prison kitchen staffs are made up primarily of inmates with limited training, having both Halal meat and regular meat in the same kitchen could

lead to improper substitution of food items.[FN18] (*Id.* at 88–90.)

> FN16. DOC strives to ensure that all inmates in all facilities receive comparable foods in order to avoid resentment among inmates or the appearance of favoritism. (Frank Report at 7.) Therefore, if Halal meat were offered to Muslim inmates at one institution, it would have to be offered to all Muslim inmates systemwide. The defendants report that as of March 15, 2007, there were 1541 Muslim inmates within the DOC. (Bruno Expert Report, Doc. # 149 Ex. D at 1.)

> FN17. Although the plaintiff indicates that he would be satisfied with meat only once or twice a week, even that additional cost would be significant when considered in the context of more than 1500 Muslim prisoners statewide. This is particularly true in light of evidence that DOC's low food costs are a result of volume pricing. (Frank 4/4/07 Dep., doc. # 149, Ex. P at 26.)

> FN18. In addition to accidental substitutions, Mr. Frank notes that intentional sabotage is always a concern with inmate workers. (*Id* . at 90.)

**\*7** The defendants also identify additional administrative burdens. Halal meat would have to be ordered separately, brought in on different trucks, unloaded, handled and stored separately in the kitchens, and served separately. (*Id.* at 32–33, 91, 102, 120; Frank expert report, doc. # 149, Ex. C at 2.)

Applying the first *Turner* factor, the defendants have demonstrated that there is a rational relationship between the policy of not providing Halal meat and the asserted penological interests of security, cost and reducing administrative burden. As to the second

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

factor, alternative means of exercising the right, the record reflects that Halal meat sausage is available in the commissary, so the plaintiff has the ability to supplement his otherwise vegetarian diet with some Halal meat. *See Majid v. Fischer,* 07Civ.4584(NRB), 2009 U.S. Dist. LEXIS 71616 at *19 (S.D.N.Y. July 31, 2009)(second *Turner* factor supports defendant prison officials' position where plaintiffs had option to, and did, supplement their diet with Halal commissary items). In addition, the plaintiff has other opportunities to exercise his religious beliefs, such as Jumah services, accommodations for Ramadan, Arabic class and religion classes. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (where prisoners on outside work details were not able to attend Jumah services, Supreme Court found it significant for the second *Turner* factor that they were given other means of expression such as dietary accommodations and arrangements for Ramadan fasts). As to the third factor, the impact that accommodation of the right will have on the prison system, the defendants have demonstrated that accommodation of the right would have significant impact on the prison in terms of cost, administration and security. Finally, there are no ready alternatives to accommodate both the prisoner's religious needs and the prison's legitimate penological interests.[FN19]

FN19. The plaintiff argues that the defendants could accept donations of Halal food, but he has not borne his burden of demonstrating that this would be a workable alternative. The defendants present evidence that accepting donated food is not feasible because of the DOC's strict guidelines for food storage and temperature and the risk of serious illness if food has not been properly stored. (Bruno Report, doc. # 149, Ex. D at 6–7; Frank Dep., doc. # 149 Ex. O at 196–99; Ex. P at 49–52.) In fact, Reverend Bruno indicates in his expert report that DOC would accept donations of food in some limited circumstances; "[t]here must, however, be enough donated Halal meat for every Muslim inmate, and the meat must comply with all state health and safety codes." (Bruno Expert Report, doc. # 149, Ex. D at 9.)

The defendants have discharged their burden of demonstrating that the policy is reasonably related to legitimate penological interests. The plaintiff has not made a showing that the defendants' proffered reasons are irrational or that the policy is not reasonably related to legitimate penological interests. Therefore, summary judgment is granted as to the plaintiff's free exercise claim relating to Halal meat.[FN20]

FN20. This ruling is consistent with decisions by many other courts nationwide that have considered similar prisoner claims. *See, e.g ., Williams v. Morton,* 343 F.3d 212 (3d Cir.2003); *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807 (8th Cir.2008); *Phipps v. Morgan,* CV–04–5108, 2006 WL 543896 (E.D.Wash. Mar.6, 2006); *Spruel v. Clarke,* No. C06–5021RJB, 2007 WL 1577729 (W.D.Wash. May 31, 2007). *But see Hudson v. Dennehy,* 538 F.Supp.2d 400 (D.Mass.2008)(policy of providing non-Halal vegetarian meals violated plaintiffs' religious rights).

2. *RLUIPA*

The analysis under RLUIPA is slightly different. RLUIPA provides in relevant part that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). RLUIPA "imposes a more exacting standard on prison officials" than does the First Amendment analysis, "requiring that any substantial burden on an inmate's exercise of religion be warranted by a compelling governmental interest, and be the least restrictive means of accomplishing that interest." *Rahman v. Goord,* No. 04–CV–6368 CJS, 2007 U.S. Dist. LEXIS 32680, *15 (W.D.N.Y. May 3, 2007)(internal quotation marks omitted). However, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter,* 544 U.S. at 722. Moreover, courts should accord "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.*

**\*8** Even assuming that the plaintiff can show a substantial burden on his religious belief, the defendants have demonstrated, as discussed in Section V(B)(1) *supra,* that the regulation is in furtherance of compelling governmental interests including prison security, controlling costs and maintaining workable administrative procedures. *See also Spruel v. Clarke,* No. C06–5021RJB, 2007 WL 1577729 (W.D.Wash. May 31, 2007); *Phipps v. Morgan,* CV–04–5108, 2006 WL 543896 (E.D.Wash. Mar.6, 2006). The court is persuaded that the defendants' policies represent the least restrictive means of furthering those compelling governmental interests. The plaintiff receives nutritious vegetarian meals that include fish, cheese and other non-meat protein sources, and it is undisputed that these meals do not include items forbidden by his religion. Moreover, he is able to supplement his meals with many Halal items from the commissary, including Halal sausage. Therefore, summary judgment is granted as to the plaintiff's RLUIPA claim relating to Halal meat.

**3.** *Equal Protection*

Construing plaintiff's Amended Complaint liberally, he also alleges that the denial of Halal meat is an Equal Protection violation.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To prove an equal protection violation, a plaintiff "must demonstrate that he was treated differently than others similarly situated as a result of the intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). However, it is not the case that "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Graham v. Mahmood,* No. 05 Civ. 10071(NRB), 2008 WL 1849167, at *14 (S.D.N.Y. Apr.22, 2008), citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The Second Circuit has determined that the *Turner* standard applies to equal protection claims involving prisoner religious exercise. *See Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, even if a plaintiff can demonstrate that two groups are similarly situated, different treatment might still be warranted if the state can demonstrate that the distinctions are "reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 574.

The plaintiff has not presented any evidence that members of other religions are treated differently with regard to diet. All inmates receive either the regular diet or the Common Fare diet. The plaintiff argues that Common Fare accomodates the religious scruples of inmates whose religions do not require meat, while

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

failing to accomodate the plaintiff's religious need for Halal meat. Even if this could be viewed as evidence of different treatment of similarly situated groups, the defendants have demonstrated that their decision to offer a vegetarian Common Fare diet but not to offer Halal meat is reasonably related to legitimate penological interests. The defendants are therefore entitled to summary judgment as to this equal protection claim.

C. *Daily Congregate Prayer*

**\*9** The plaintiff alleges that the defendants impermissibly bar him from engaging in daily congregate prayer. He believes that his religion requires him to congregate with other Muslims five times daily for prayer.[FN21] Relatedly, he also contends that the defendants should permit inmates to lead prayer when a chaplain is not available, which would make it possible for congregate prayer to occur more often. Once again, he claims violations of the First Amendment, RLUIPA and the Equal Protection Clause.

> FN21. The defendants dispute plaintiff's understanding of Islam, arguing that it permits individual prayer as a substitute for congregate prayer when a Muslim is prevented by certain circumstances (such as incarceration) from attending congregate prayer. The defendants do not challenge the sincerity of the plaintiff's belief. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003)(plaintiff bringing a free exercise claim need not show that the practice is required by a particular religion, but only that the beliefs professed are sincerely held and, in the individual's own scheme of things, religious.)

1. *First Amendment*

The defendants argue that they are entitled to summary judgment as to plaintiff's First Amendment claim on this issue because the DOC's policy supports the penological interests of prison security and administration.

As for chaplain-led prayer, the defendants contend that DOC cannot provide sufficient chaplains to lead prayer five times daily in every housing unit. (Murphy Expert Report, Doc. # 149, Ex. S at 1–2.) In addition, DOC cannot provide sufficient custody staff to supervise such prayer. (*Id.* at 1.) Permitting daily congregate prayer would also endanger security by creating a perception of favoritism, which can create strife among inmates, because Muslim inmates would be out of their cells more frequently than other inmates. (*Id.* at 3.) In addition, the defendants present evidence that congregate prayer "would critically interfere with daily operations, denying others use of common rooms and other areas ." (*Id.*) It would burden prison administration because programs such as meals, work, school, recreation and visits all would have to be scheduled around congregate prayer. (*Id.*)

As to plaintiff's claim that more frequent congregate prayer would be possible if inmates were permitted to lead it in the absence of a chaplain, the defendants submit evidence that the policy of forbidding inmates from leading group prayer is necessary for prison security, because inmate leadership of any sort tends to create "an alternate authority structure within the prison system." (Murphy Expert Report, Doc. # 149, Ex. # S at 2–3.) The DOC cites its experience of inmate religious groups being overtaken by gangs and being used as covers for gangs. (*Id.* at 3–4.) In addition, they point to evidence of violent incidents among DOC inmates belonging to different Muslim sects. (*Id.; see also* DOC incident reports, Doc. # 149, ex. T.)[FN22] The DOC's decision to combine all Muslim collective activity in one Jumah instead of permitting collective activities by various different sects has led to "significantly improved security conditions and enormous reductions in violence amongst Muslim groups." (*Id.* at 5.)

> FN22. As an example, defendants cite an incident at Osborn Correctional Institute. A

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

Muslim inmate was trying to enter the dining hall during Ramadan, and other Muslim inmates claiming to be "gatekeepers" attempted to keep him out. In the ensuing violence, a correctional officer was seriously injured. *(Id.)*

Applying the first *Turner* factor-whether there is a rational relationship between the regulation and the legitimate government interests asserted-the defendants have pointed to serious and legitimate penological concerns associated with unsupervised inmate religious activities and daily congregational prayer. Their policies are logically related to those penological concerns of security and administration. In this vein, the Second Circuit has broadly upheld a so-called "free-world sponsor" requirement requiring that a chaplain or volunteer be present for congregate religious activities "to ensure that the meeting is convened for religious purposes and not to hold kangaroo courts, foster extortion, or provide a venue for the dissemination of conspiratorial information." *Benjamin v. Coughlin,* 905 F.2d 571, 577–578 (2d Cir.1990).

**\*10** The second *Turner* factor-whether the inmate has alternative means to exercise the right-also supports the defendants' position. The plaintiff is free to pray individually in his cell, and, as discussed above, he has many other opportunities to practice his religion. Applying the third factor, the impact that accommodation would have on the prison, the defendants have submitted adequate evidence that daily congregate prayer would have a substantial effect on the administration and management of the prison and on security arrangements.

The fourth factor is the existence of ready alternatives which accommodate the right and satisfy the governmental interest. The plaintiff offers several alternatives. For example, he argues that he would be satisfied with just one congregate prayer per day. Plaintiff also argues that if an Islamic chaplain is at the

prison during a time when Muslim inmates are out of their cells, and it is time to pray, then the chaplain should go to the common room to lead prayers.[FN23] Both of these proposals would necessitate the presence of security guards and/or chaplains, as well as the administrative burdens associated with scheduling and the use of prison facilities, and they do not address the defendants' security concerns about other inmates' perception of favoritism.[FN24] The defendants' governmental interest is not satisfied by these alternatives. The defendants' motion for summary judgment is therefore granted as to this First Amendment claim.

> FN23. Plaintiff's other suggestion, that inmates who happen to be out of their cells at the same time could simply gather to pray together, does not address the security concerns backing the prison's policy that prisoners cannot gather to pray unless a chaplain is present.

> FN24. Moreover, despite plaintiff's willingness to accept congregate prayer only once per day or whenever a chaplain happens to be present, the availability of congregate prayer necessarily impacts other Muslim prisoners, who might have stricter views.

2. *RLUIPA*

The court next considers the plaintiff's demand for daily congregate prayer under RLUIPA. Assuming for purposes of this motion that the plaintiff's religious exercise is substantially burdened, *see supra* section V(B)(2), the court concludes that the regulation is in furtherance of compelling government interests of prison security and order and is the least restrictive means of furthering that compelling government interest. The defendants permit the plaintiff to pray in his cell, and their policy provides that weekly congregate prayer be held for each religion. RLUIPA does not require officials to make the burdensome alterations to prison scheduling and facility use that the plaintiff seeks, particularly in light of the security

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

concerns that the defendants identify. The defendants' motion for summary judgment is granted as to this RLUIPA claim.

### 3. *Equal Protection*

Construed liberally, the plaintiff's complaint alleges that the defendants' refusal to permit congregate prayer is an Equal Protection violation. In particular, his complaint alleges that "[t]he Plaintiff has witnessed inmates of other Religions leading their Religious congregations in prayers all throughout the Connecticut Department of Corrections" and that the policy against inmate leadership of prayer is applied only to Muslims. (Am.Compl., doc. # 62–2, ¶ 130.) The defendants move for summary judgment as to this claim.

In response to the motion, the burden is on the plaintiff to present evidence of different treatment of similarly situated religious groups with regard to daily congregate prayer. This he has not done. Despite the allegations made in his complaint, the plaintiff has submitted no evidence that the defendants permit inmates of other religions to lead prayer or that any religious group has daily congregate prayer.[FN25] Therefore, the defendants are entitled to summary judgment as to plaintiff's equal protection claim.

> FN25. The only example plaintiff identifies is the DOC's accommodation of the daily Native American "smudging" ceremony. The record demonstrates that this is not an example of congregate prayer but an example of individual prayer. Participating Native American inmates are taken outdoors as a group because the ceremony involves fire that would be dangerous to use in a cell, but they pray individually.

### D. *Cancellation of Jumah*

**\*11** The plaintiff's complaint alleges that Friday Jumah services are frequently cancelled due to the unavailability of a chaplain to lead the services. He believes that participating in a weekly Jumah is a requirement of his religion. He points to evidence that lack of staffing for Jumah has been a regular problem for more than four years. (Pl's Opp., Doc. # 161 at 54.) The plaintiff alleges that this practice violates the First Amendment, RLUIPA and the Equal Protection Clause.

The defendants seem to concede that Jumah is frequently cancelled but say that cancellation is necessary when there is no chaplain available or in case of a security lockdown.[FN26] In opposing the plaintiff's request for daily prayer, the defendants argue that every religion is provided with a weekly congregate prayer, and that the plaintiff's need for congregate prayer is satisfied by the offering of Jumah. DOC policy expressly provides that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week, to the various religious denominations." [FN27] (A.D. 10.8 ¶ 6(B), ¶ 6(A).) The defendants also present evidence touting the involvement and attentiveness of their Islamic chaplains. Yet they provide no explanation for the alleged frequent cancellation of Jumah, or for the insufficient and unequal staffing that allegedly underlies it.

> FN26. The defendants argue that Jumah must sometimes be cancelled due to a lockdown or other security issue, but there is no evidence that this security concern explains all cancellations. The parties have not directed the court's attention to any evidence in the record regarding cancellation on any particular dates.

> FN27. The plaintiff argues there is a disparity in staffing. "Protestants have over 300 approved volunteers while Muslim[s] have 12 approved volunteers." (Pl's Mem., doc. # 161 at 61.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

The defendants have failed to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest (under the First Amendment and Equal Protection Clause) or in furtherance of a compelling governmental interest (under RLUIPA). Therefore, the defendants' motion for summary judgment is denied as to these claims.

### E. *Other Religious Exercise Claims*

#### 1. *Mishandling of Quran*

The plaintiff alleges that DOC employees regularly mishandle the Quran. He gives evidence of Qurans being thrown on the floor and handled roughly, and says his own Quran was damaged due to mishandling. (Pl's Opp., doc. # 161 at 59; Pl's Aff., doc. # 163, ¶ 110–11.) The plaintiff concedes that Qurans must sometimes be searched but alleges that the disrespectful handling is a violation of the First Amendment and RLUIPA. Plaintiff also claims that it is an Equal Protection violation, because other inmates' religious items are more respectfully handled.[FN28]

> **FN28.** The plaintiff points to evidence that the medicine bags of Native American inmates are searched in a more respectful manner. (Pl's Opp., doc. # 161 at 29.) DOC officials are not permitted to touch the bags or the contents and instead have the inmates empty the bags themselves. (*Id.*)

The defendants have failed to address this claim in any way in their motion for summary judgment or to direct the court's attention to evidence about DOC policies for handling of inmates' religious materials. The defendants have not borne their burden of demonstrating that they are entitled to summary judgment on this claim.

#### 2. *Circumcision*

The plaintiff alleges that the defendants' denial of his request to be circumcised for religious reasons violates the First Amendment and RLUIPA. He believes that Islam requires male converts to be circumcised.[FN29] The defendants' motion does not explain why they denied plaintiff's request, nor does it provide any analysis of the plaintiff's First Amendment and RLUIPA claims. The defendants have failed to provide the court with any explanation of their decision. The defendants have not borne their burden of demonstrating that they are entitled to summary judgment on this claim.

> **FN29.** The complaint alleges that, in response to plaintiff's grievance on this issue, defendant Bruno wrote that it was being denied based on advice from Imam Hasan "that circumcision is optional for adult male Islamic converts" and because circumcision "is not done by an Imam." (Am.Compl., doc. # 62, ¶ 87.)

#### 3. *Purchase of Toothstick*

**\*12** The plaintiff claims that the DOC restricts him from purchasing a miswak, or toothstick. The plaintiff claims to have a sincere belief that miswaks are required for the practice of Islam and alleges that this restriction violates the First Amendment and RLUIPA. The defendants' motion fails to address this issue in any way and is therefore denied as to this claim.

#### 4. *Commissary Prayer Oils*

Although it is undisputed that the DOC's commissary offers certain prayer oils, the plaintiff points to evidence that the prayer oils sold in the DOC commissary contain chemicals that are prohibited by Islam. (Pl's Opp, doc. # 161 at 31.) He alleges that the failure to offer prayer oils conforming with Islamic requirements is a violation of the First Amendment

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
**(Cite as: 2009 WL 3157586 (D.Conn.))**

and RLUIPA.

Reverend Bruno's expert report represents that "the DOC has obtained affidavits of purity and acceptance with regards to the oils sold in commissary." (Bruno Report, doc. # 149, Ex. D at 10.) A copy of such a certificate has been submitted. (Doc. # 149, Ex. I .) However, the defendants' motion does not otherwise address the plaintiff's claim that the oils contain improper chemicals. There appears to be a dispute of material fact as to the contents of these oils, and the defendants' motion is therefore denied as to this claim.

VI. *Conclusion*

For all the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part.

The motion is granted as to all claims against defendants DeVeau and Hasan. The motion is granted as to any claim under RLUIPA for money damages against the remaining defendants, Bruno and Lantz.

Summary judgment is also granted as to plaintiff's claims regarding Halal meat and daily congregate prayer. In addition, the defendants' motion is granted as to plaintiff's claims of untimely prayer at the end of Ramadan in 2002, lack of adequate nutrition in the Ramadan meals, lack of access to leather socks, lack of access to a prayer clock, lack of access to hygiene items and the confiscation of a silver ring. The plaintiff's claim that he was physically and psychologically abused because of his faith in violation of the Equal Protection Clause is dismissed. *See supra,* n. 7.

The motion is denied as to the following claims, all of which are directed to defendants Bruno and Lantz in their official capacities for injunctive and declaratory relief under RLUIPA, the First Amendment and the Equal Protection clause and in their individual capacities for damages and injunctive and declaratory relief under the First Amendment and the

Equal Protection clause:

(1) claims regarding cancellation of Jumah;

(2) claims regarding denial of circumcision request;

(3) claims regarding mishandling of Qurans;

(4) claims regarding availability of toothsticks; and

(5) claims regarding nonconforming prayer oils.

The four pending Motions *in limine* (docs.# 150, 154, 169, 171) are denied without prejudice to refiling at the time of trial. As to those motions that seek to preclude only certain statements or opinions rather than an entire witness or report, if the motions are refiled they should specify in detail (and with pinpoint citations) the statements or opinions that the moving party seeks to preclude.

**\*13** SO ORDERED at Hartford, Connecticut this 25th day of September, 2009.

D.Conn.,2009.
Vega v. Lantz
Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Albert WEATHERS, Plaintiff,
v.
David ROCK, et al., Defendants.

No. 9:12–CV–1301 (NAM/ATB).
Signed Sept. 23, 2014.

Albert Weathers, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Cathy Y. Sheehan, Esq., Assistant Attorney General, of counsel, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on the 6th day of August 2014. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

Such Report–Recommendation, which was mailed to plaintiff's last known address, was returned to the Court as "unclaimed."

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The defendants' motion for summary judgment (Dkt. No. 64) is granted, and the complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case. Plaintiff shall be served by certified mail, return receipt requested.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants have violated his First Amendment right to practice his religion and his rights under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc–1(a) by denying him two Seder meals during Passover on April 6, 2012 and April 7, 2012, in part, because inmates confined to the Special Housing Unit ("SHU") were not allowed to "congregate." (Compl.¶¶ 10–12, 27–32, 41) (Dkt. No. 1). In his complaint, plaintiff sought declaratory and monetary relief. (Compl.¶¶ 69–73). However, at his deposition, plaintiff asserted that he seeks only monetary relief. (Deposition Transcript ("DT") at 44) (Dkt. No. 64–6).

On December 10, 2012, defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), to which plaintiff responded in opposition. (Dkt.Nos.23, 29,

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

34). On May 16, 2013, District Judge Norman A. Mordue approved my April 23, 2013 report, recommending that the defendants' motion be granted in part, and denied in part. (Dkt. No. 35, 37). Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 with respect to the remaining issues. (Dkt. No. 64). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.75, 77). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

### DISCUSSION

**I. Facts and Contentions**

For clarity, I will briefly repeat the facts as alleged by plaintiff. Plaintiff states that he is Jewish, and that on March 26, 2012, he wrote to defendants Superintendent Rock; Food Service Administrator, D. Haug; Mr. Lira;[FN1] and Rabbi Friedmann, informing them that plaintiff wished to participate in the Seder during Passover. (Compl.¶ 2). Plaintiff states that, because food served for Passover is specially ordered, inmates must inform the staff ahead of time so that the correct amount of food may be purchased. (*Id.*) Plaintiff alleges that although he never received a response to his letters, plaintiff assumed that the Seder meal would be provided in accordance with Department of Corrections and Community Supervision ("DOCCS") Directive # 4202, governing religious policies. (Compl.¶¶ 3–6).

> FN1. As stated in my previous Report, Mr. Lira is not a defendant in this action. (Dkt. No. 35 at 2 n. 1. Mr. Lira is a defendant in another case, filed by this plaintiff shortly after this action, discussing some of the same facts that plaintiff raises here and raising claims regarding subsequent denials of appropriate meals for the Jewish inmates. *See Weathers v. Rock, et al.,* 9:13–CV–195 (FJS/DEP). *Weathers v. Rock* is currently pending, and no dispositive motions have been filed.

*2 Plaintiff states that when Passover began on April 6, 2012 at sundown, plaintiff and other[FN2] Jewish inmates who were confined in SHU, asked defendant Officers Patterson and Forbes about the Seder meal.[FN3] (Compl.¶¶ 10–11). These were the two officers who were in charge of serving dinner to the inmates that evening. Plaintiff had obtained the Seder menu from Albany, so he knew what should have been on the menu. Plaintiff claims that he showed the menu to defendants Patterson and Forbes, but that these defendants only made disparaging remarks to plaintiff. (Compl.¶¶ 11, 13). Plaintiff spoke to defendant Sergeant Debya about the situation, and defendant Debya told plaintiff to write to the mess hall "to correct the issue of Passover." (Compl. ¶ 20). Plaintiff sates that defendant Debya failed to address any of the problems that were faced by the Jewish inmates during Passover, and he failed to contact anyone else who could address those problems. (Compl.¶ 25).

> FN2. Although plaintiff references "other" Jewish inmates, this case is only about plaintiff's own issues. There are no other plaintiff's in this action.

> FN3. Plaintiff did receive a Passover meal. He did not receive the additional items required for the Seder. The court will use plaintiff's terminology and will refer to the "Seder meal."

Plaintiff alleges that on April 7, 2012, defendant officers R. Demers and Mr. Kroeger were in charge of serving the evening meals, and the Jewish inmates again began to complain to them about the lack of a Seder meal. (Compl.¶ 27). Plaintiff states that when these two officers arrived at plaintiff's cell, he attempted to explain that he was supposed to get a Seder meal, but they told plaintiff it was not their fault that the appropriate items were not provided. (Compl.¶¶ 28–29). They refused to call the mess hall to notify the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

sergeant. (Compl.¶ 30). Plaintiff states that when defendant Sergeant Debya finally made his rounds on April 7th, and plaintiff explained what had happened, defendant Debya told plaintiff "that despite what the Memo states, no inmates in 'SHU' are allowed to participate in the Seder because inmates [have] to congregate." (Compl.¶ 32). Plaintiff then told defendant Debya the story behind the Seder meal and how important this meal is in the Jewish religion. (Compl.¶ 35). Plaintiff states that defendant Debya told plaintiff there was nothing he could do about it, because it was the Superintendent's determination, and plaintiff should file a grievance. (Compl.¶ 36).

Plaintiff states that he filed a grievance that was denied by the Inmate Grievance Resolution Committee ("IGRC") on May 1, 2012, stating that "per D. Haug (FSA) SHU inmates are not allowed the Seder meals." (Compl.¶ 38). Plaintiff appealed to the Superintendent. On May 15, 2012, the Superintendent's response stated that "the Passover Menu was followed to assure all inmates received all required items and portions," and that this meal was served to the general population inmates who requested it. (Compl.¶ 39, 41). However, due to the fact that the "event" took place in the Chapel, the inmates who were in SHU status could not participate.

Plaintiff claims that there is nothing in DOCCS policy stating that Jewish inmates cannot participate in the Seder because they are in SHU. (Compl.¶¶ 41–42). Plaintiff states that most of the Upstate population is in SHU. The only "general population" inmates are those who are in the "Cadre Program" and are responsible for cleaning the buildings and grounds keeping. (Compl.¶ 48). Plaintiff argues that inmates confined to Fishkill Correctional Facility's SHU are allowed to get Seder meals so they may perform Seder ceremonies in their cells.[FN4] (Compl.¶ 49).

> FN4. Plaintiff states that Fishkill has a general population of 1500 inmates. (Compl.¶ 49).

**\*3** Plaintiff then states that this denial of a Seder meal is "just another issue with ... Upstate ... that directly affects the Jewish population."[FN5] (Compl.¶ 51). Plaintiff claims that the DOCCS calendar has the incorrect dates for Jewish holidays, resulting in mistakes serving special meals, and the staff does not handle Kosher food properly. (Compl.¶¶ 54–55). Plaintiff claims that Rabbis do not make rounds once a week as they should, and the Rabbis seldom write back to inmates when they write letters. (Compl.¶ 57). Finally, plaintiff states that the grievances were "past the 30 day time limit that C.O.R.C. [Central Office Review Committee] is to completely render a decision." (Compl.¶ 59).

> FN5. In *Weathers v. Rock*, mentioned above in footnote 1, plaintiff specifically raises the additional claims that are mentioned in passing in paragraph 51 of this complaint. *Weathers v. Rock*, 9:13–CV195. In 13–CV–195, plaintiff states that the "[i]ssues began on April 6th & 7th, when all Jewish members was [sic] denied the Seder meal ...." (Dkt. No. 1 in 13–CV–195 at ¶ 27). Plaintiff then discusses the erroneous dates listed for Jewish holidays (*Id.* ¶¶ 27–40), the improper handling of kosher food (¶ 45), and the failure of Rabbis to make regular rounds of the facility (*Id.* ¶ 117). Plaintiff states that mentioning the Seder issue in *Weathers v. Rock* was merely by way of "background" and was meant to clarify that there were multiple religious issues for Jewish inmates of DOCCS. (*Id.* ¶ 28).

Defendants' motion to dismiss for failure to state a claim made some of the same arguments that the defendants make herein. I recommended granting the motion as to some issues and some defendants.[FN6] (Dkt. No. 35). The difference is that the defendants are now moving for summary judgment, and the court may consider material outside the complaint, includ-

ing plaintiff's deposition that was taken on September 17, 2013, and which has been filed in support of the defendants' motion. (Dkt. No. 64–6). The remaining issues in this case are whether plaintiff's First Amendment rights and rights under RLUIPA were violated when he was not allowed to have the Seder meal in his cell on April 6 and 7, 2012, and if so, whether any of the defendants were personally involved or were entitled to qualified immunity. The remaining defendants are Superintendent Rock, CO Patterson, Sergeant Debya, CO Demers, Mr. Kroeger, and Rabbi Friedmann.

> FN6. As the result of my recommendation and Senior Judge Mordue's order, plaintiff's claims (both First Amendment and RLUIPA) that he should have been allowed to attend the congregate services for the Seder were dismissed. The claims against defendants Uhler and Forbes were also dismissed. (Dkt.Nos.35, 37). Defendant Forbes was dismissed because plaintiff's claim was only that she verbally harassed plaintiff about his religion. Plaintiff's equal protection claims were also dismissed. (Dkt. No. 35 at 22).

## II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## III. *Religion Claims*

### A. Legal Standards

#### 1. First Amendment

**\*4** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a con-

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

stitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has very recently examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord,* No. 13–2694, 2014 WL 3360615, at *4–7 (2d Cir. July 10, 2014). In *Holland,* the court discussed the degree of burden required for a First Amendment claim. *Id.* The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs ." *Id.* (citing *Salahuddin, supra* at 274–75; *Ford, supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly. [FN7] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid.

FN7. This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland,* 2014 WL 3360615 at *4.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

## 2. Religious Land Use and Institutionalized Persons Act

**\*5** RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(A) is in furtherance of a compelling governmental interest; and

(B) is theleast restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial.[FN8] *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

governmental interest **and** that it is the **least restrictive** means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

> **FN8.** RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex'* "). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

**B. Application**

**1. RLUIPA**

Plaintiff has been released from incarceration, thus, injunctive relief is no longer possible and any claim for injunctive relief would be dismissed as moot. Additionally, at plaintiff's deposition, he spe-

cifically stated that he was seeking only monetary damages. (DT at 44–45). However, only injunctive relief is available under RLUIPA, and money damages are not available against state defendants, either in their individual or official capacities. *Loccenitt v. City of New York,* No. 12 Civ. 948, 2013 WL 1091313, at *6 (S.D.N.Y. March 15, 2013) (citing *Pugh v. Goord,* 571 F.Supp.2d 477, 506–507 (S.D.N.Y.2008) (citing cases)). Thus, plaintiff's RLUIPA claim may be dismissed.

**2. First Amendment**

While plaintiff may no longer obtain injunctive relief (either under RLUIPA or the First Amendment), based upon his transfer out of Upstate and his release from prison, further analysis is required with respect to a First Amendment claim for damages. Defendants do not dispute either that (1) they failed to provide plaintiff the food required to celebrate the Seder portion of his Passover meal on the first two days of Passover (April 6 and 7) of 2012 or (2) that the Seder has a great deal of religious significance. Case law supports this finding. *See e.g. Riehl v. Martin,* No. 9:13–CV439, 2014 WL 1289601 at *10 n. 18 (N.D.N.Y. March 31, 2014) (Passover Seder has been recognized as being greatly significant to Jewish adherents) (citing *Whitney v. Brown,* 882 F.2d 1068, 1074 (6th Cir.1989)). Rather, they argue that none of the named defendants were personally involved in the policy which supported the denial of this portion of the meal, and that in any event, qualified immunity would prevent the assessment of damages.

**a. Personal Involvement**

**\*6** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of the named defendants so that any damages may be assessed against them.

Defendants state that plaintiff was not served his Seder meals because the Seder is only celebrated in a congregate service, by "call-out" only, and inmates who are housed in SHU may not participate in congregate services. [FN9] Thus, those inmates may not participate in the Seder, which includes being provided with the appropriate food in their SHU cells. Defendants argue that the policy is dictated by the Central Office, that none of the named defendants participated in making the policy, nor could they override or change the policy.

> FN9. Plaintiff is not challenging the policy which prohibits SHU inmates from participating in congregate services. The district court adopted my recommendation, dismissing any claim that plaintiff was not allowed to attend the Seder. (Dkt. No. 37 at 2). The issue is only whether his rights were violated when he was not provided with the appropriate food to celebrate the Seder in his SHU cell.

The court would first note that plaintiff is correct when he states that the "policy itself" does not state that SHU inmates will not be provided with the Seder food in their cells. (Morris Decl. Ex. A). Exhibit A is entitled "Protocols for Passover 2012," and states that "[o]n the first two evenings, Passover is observed by a Seder service and meal.... *Attendance* at the Seders will be by call-out only." (*Id.*) (emphasis added). The protocol also states that "Nutritional Services has distributed the menu for Passover. With the exception of the Seder meals, the Passover menu will be served at regular meal times." (*Id.*) There is no discussion of inmates who are in disciplinary housing and no specific prohibition on affording inmates in SHU the appropriate food in their cells. This "prohibition" is an interpretation of the protocol, based upon the belief that the Seder may only be celebrated with a congregate service, and that only those inmates who could "attend" the Seder were entitled to the appropriate meal. The protocol was issued by Jeff McCoy, Deputy Commissioner for Program Services in Albany, New York (DOCCS Central Office), who is not a defendant in this action.

**\*7** Personal involvement requires that the indi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

vidual who is, or becomes aware of, the violation, have the ability to take action to correct the problem. See *Conklin v. City of Suffolk,* 859 F.Supp.2d at 441–42 (personal involvement requires knowledge and the ability to take action). In this case, defendants CO Paterson and CO Forbes were only involved in serving plaintiff's Passover meal on April 6th. (Compl.¶¶ 10–17). CO Demers and CO Kroeger were the officers who served the Passover meals on April 7th. (DT at 35–37). Plaintiff acknowledged this at his deposition. (DT at 16–17). Although these four defendants were obviously involved in failing to provide plaintiff with the food that he claims was necessary,[FN10] none of these corrections officers would have had the ability to change the policy or provide plaintiff with any food that was not given to them to serve.

> **FN10.** In the complaint, plaintiff mentions that the Passover meal was also missing hot water, and that the hot water was never provided to him. (Compl.¶¶ 15–17). It does not appear that the hot water was part of the Seder, nor did it appear that this issue was significant.

Plaintiff alleges that he spoke to Sergeant Debya when he "eventually made a gallery walk through," and defendant Debya told plaintiff to write to the mess hall to correct the issue." (Compl.¶¶ 18–20). Defendant Debya allegedly refused to contact anyone who might be able to help, even after plaintiff explained that no letter would reach the appropriate individuals in time for the April 7th meal.[FN11] Defendant Debya told plaintiff that there was nothing he could do for plaintiff. (Compl.¶ 22). On April 7th, plaintiff claims that he asked defendant Debya again about the Seder meal, and defendant Debya stated that no inmates in SHU were allowed to participate in the Seder because "inmates has [sic] to congregate." (Compl.¶ 32). Plaintiff states that defendant Debya told plaintiff that the Superintendent ordered this policy, and defendant Debya told plaintiff to write a grievance about it.[FN12] (Compl. ¶ 33, 36). None of

these officers, including Sergeant Debya, were involved in formulating the policy, or the interpretation of the protocol, that was responsible for plaintiff missing his two Seder meals. None of these officers would have been able to give plaintiff the food that he was requesting, either on April 6th or 7th of 2012. Thus, any claim for damages may be dismissed as against defendants Paterson, Forbes, Demers, Kroeger, and Sergeant Debya.

> **FN11.** Plaintiff appears to have an issue with the April 7th Passover meal itself (rather than just with the extra food for the Seder). He states that he was missing both hot water and non-iodized salt. (Compl.¶ 28). These defects appear to be minor issues, while the central issue in this case is the policy itself.

> **FN12.** Plaintiff also states that defendant Debya stated that "he was Christian and we have certain beliefs as well. But, unfortunately I can't do anything for you because if the Superintendent say [sic] you can't have it, then you can't have it." (Compl.¶ 36).

Defendant Haug is the Food Service Administrator. Plaintiff has named defendant Haug because, after plaintiff filed a grievance about missing the two meals, defendant Haug responded to the grievance investigation. (Compl.¶ 38). Plaintiff's Exhibit D is a page from the grievance response, dated May 1, 2012 which states "Per D. Haug FSA SHU inmates were not allowed the Seder meals." (Pl.'s Ex. D) (Dkt. No. 1–1 at 16). At the time that defendant Haug became aware of plaintiff's complaint, the 2012 Seder was over, and defendant Haug had nothing to do with depriving plaintiff of the required meal. At that time, although defendant Haug explained the policy to the grievance committee,[FN13] defendant Haug had no ability to rectify the situation, and thus, as a supervisor, was not "personally involved" in the alleged constitutional deprivation. Thus, any remaining claim for damages may be dismissed as against defendant Haug.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

FN13. The term "per" does not necessarily indicate (as plaintiff believes), that defendant Haug had any responsibility for formulating the policy. It is now clear that he did not have any such responsibility. The language in the grievance response only indicates that he answered the investigator's question regarding the policy.

**\*8** Plaintiff has also sued Superintendent Rock. Even though defendant Debya presumed that the Superintendent had the ability to change the meal that was served to plaintiff, it does not appear that defendant Debya was correct, and the policy was created and implemented by the DOCCS Central Office in Albany. In addition, there is no indication that Superintendent Rock became aware of the issue at any time when he could have changed the situation even if he was authorized or wished to do so. At plaintiff's deposition, he testified that he spoke to defendant Rock about the issue on his next executive "walk through," which was apparently during Passover, but after the Seder meals had already been missed. Thus, defendant Rock was not "personally responsible" for any alleged constitutional violations. Any claim for damages may be dismissed as against defendant Rock.

The same is true for Rabbi Friedmann. It is unclear when he became aware that plaintiff complained about not getting the Seder meals on April 6th and 7th, but Cheryl Morris states in her declaration that Rabbi Friedmann did not take part in the decision to refuse plaintiff his Seder meal on those two dates, and that he was also not authorized to override the Central Office policy. (Morris Decl. ¶ 8). Thus, Rabbi Friedmann was not personally involved in any alleged constitutional violation.

**b. Qualified Immunity**

Even assuming that some or all of the defendants were personally involved in the alleged constitutional

violation, they would be entitled to assert the defense of qualified immunity with respect to plaintiff's claim. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)).

In this case, in 2012, it was well settled that inmates retained religious rights under the First Amendment and under RLIUPA, and that prison inmates had a "clearly established right 'to a diet consistent with [their] religious scruples.' " *Holland,* 2014 WL 3360615, at \*4. This right has been recognized " 'as early as 1975.' " *Id.* (citing *McEachin v. McGuinnis,* 357 F.3d at 203 (citing *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975) (kosher meals)). In 2004, the Second Circuit found that an inmate's free exercise rights would be substantially burdened when prison officials denied his request for a meal to celebrate the Eid ul-Fitr feast. *Ford,* 352 F.3d at 593–94.

**\*9** In *Ford,* the court also determined that an individual's sincerely held belief was entitled to constitutional protection, notwithstanding disagreement

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

over the belief among other members of that religion. 352 F.3d at 589. In *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984), the Second Circuit held that "[t]he freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." In *Jackson v. Mann,* 196 F.3d 316, 321 (2d Cir.1999), the court held that the question of whether Jackson's beliefs were entitled to Free Exercise protection turned only on whether those beliefs were "sincerely held," not on the "ecclesiastical question" of whether Jackson was, in fact, a Jew under Jewish law. In *Ford,* the court stated that "the opinion of DOCS religious authorities cannot trump the plaintiff's sincere belief." 352 F.3d at 590–91. The court found that "any perceived lack of objective validity to Ford's belief [that the Eid ul Fitr feast was critical to his observance as a Muslim] did not entitled defendants to summary judgment. *Id.* at 591.

In this case, defendants argue that the Seder must be celebrated in a congregate service, "by call-out" only.[FN14] Since plaintiff was in SHU, he could not *attend* the Seder, and therefore, could not get the Seder meal. [FN15] Plaintiff strenuously argues that he did not have to *attend* the service in order to obtain the appropriate food and celebrate the Seder in his cell. He also states that when he was at Fishkill, the officials allowed another inmate to have the Seder meal in his cell.[FN16] Based on *Ford* and *Jackson,* it was well-established that the fact that defendants, including the Rabbi, believed that the Seder could only be celebrated in a congregate service, did not affect plaintiff's claim that he sincerely believed that he could have celebrated the Seder in his own cell. Thus, plaintiff's right was well-established.

FN14. As stated above, the 2012 Protocol did not even mention SHU. The prison officials have interpreted the protocol as preventing plaintiff from obtaining Seder meals in his cell. The protocol only states that participation in the Seder was by "call out" only.

FN15. While the Second Circuit has determined that *keeplock* status does not automatically deprive inmates of the opportunity to attend congregate services, it has been determined that inmates in SHU do not have that right. *Compare Salahuddin,* 993 F.2d at 308 (keeplock), with *Smith v. Artus,* 2010 WL 3910086 at \*20–21 (SHU status at Upstate a disciplinary facility).

FN16. This apparently occurred before plaintiff changed his religious affiliation to Jewish.

This does not end the inquiry into qualified immunity. The court must still examine whether it was "objectively reasonable" for the defendants to believe that their acts did not violate plaintiff's rights. With respect to the individuals who served plaintiff his Passover meals on April 6th and 7th, (even assuming that they were "personally involved"), there was no way that they could have known they were violating plaintiff's religious rights. They were only allowed to deliver the food that they were given to deliver, and plaintiff was getting a meal that was kosher for Passover, notwithstanding that it was lacking a portion of the meal that plaintiff believed was critical.

The supervisory officials were basing their actions on their interpretation of the protocol, issued by the Central Office. As stated by Cheryl Morris, these individuals did not have the authority to change the protocol. The court would also point out that plaintiff includes the letters that he wrote to defendants Haug, Rabbi Friedmann, and Superintendent Rock prior to Passover. (Dkt. No. 1–1 at 1–3; Pl.'s Ex. A). Each letter states that plaintiff would like to "participate" in the Seder. Plaintiff **never** mentioned that he wished to have the meal in his cell. The letter to defendant Haug states: "I would like to observe and participate in the Ceder [sic] meal." (Pl.'s Ex. A at 1). The letter to Rabbi Friedmann states that "Passover begins in a little over a week and I would like to participate in

Slip Copy, 2014 WL 4810309 (N.D.N.Y.)
**(Cite as: 2014 WL 4810309 (N.D.N.Y.))**

Ceder during this Passover." (*Id.* at 2). The letter to Superintendent Rock states that "Passover is in approximately 1 week. As the Rabbi have [sic] been notified, Im [sic] also notifying your office to participate in the Ceder for Passover." (*Id.* at 3).

**\*10** It would certainly have been reasonable for each of these individuals to believe that plaintiff was requesting that he be allowed to *attend* the meal, because to these defendants, "participation" in the Seder meant attendance. While plaintiff's belief that he could participate in the Seder by having the food brought to his cell may certainly have been "religious" in his view and entitled to protection, the defendants who had a different view, would not have understood that the failure to provide the Seder meal in plaintiff's cell was inconsistent with his religious beliefs, particularly based on the letters that he wrote and his failure to specifically request this accommodation. As stated above, there was no constitutional violation in refusing plaintiff's *attendance* at the Seder. Plaintiff does not argue otherwise. It would have been reasonable for each of these defendants, including Rabbi Friedmann, to refuse such a request or even to ignore such a request. Until plaintiff spoke to the officers who served his meal on April 6th and 7th, there was no indication that plaintiff may have been requesting that he be allowed to participate by having the appropriate food brought to his cell. By then, the defendants were not in a position to remedy the situation.

Thus, although plaintiff may have had a well-established right to have the Seder meal brought to his cell, based on his individual belief that he could celebrate the Seder by himself, it was objectively reasonable for all the defendants to believe that they were not violating plaintiff's rights, based on his letters and based on their reasonable interpretation of the 2012 protocol from DOCCS Central Office. Thus, any remaining claim for damages may be dismissed as against all the defendants.

**WHEREFORE,** based on the findings above, it

is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Aug. 6, 2014.

N.D.N.Y.,2014.
Weathers v. Rock
Slip Copy, 2014 WL 4810309 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
George WHITE, Plaintiff,
v.
L. SEARS, Doctor Cholom, Doctor Ali, and Nurse
Montroy, Defendants.

No. 9:10–CV–0721 (MAD/GHL).
June 20, 2011.

George White <sup>FN1</sup>, Locus Grove, VA, pro se.

> **FN1.** Plaintiff has been released from incar-
> ceration. Dkt. No. 19; 12/6/10 Text Entry.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq.,
of Counsel, Albany, NY, for Defendants.
George White, Locus Grove, VA, pro se.

Christina L. Roberts–Ryba, New York State Attorney
General, Albany, NY, for Defendants.

### *REPORT–RECOMMENDATION–ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, com-
menced pursuant to 42 U.S.C. § 1983, has been re-
ferred to me for Report and Recommendation by the
Honorable Mae A. D'Agostino, United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). Plaintiff George White alleges that he was
denied adequate medical care in deliberate indiffer-
ence to his serious medical needs in violation of his
Eighth Amendment rights under the United States
Constitution. Currently pending before the Court is
Defendants' motion to dismiss for failure to state a
claim pursuant to Federal Rule of Civil Procedure
12(b)(6). Dkt. No. 16. The Court granted Plaintiff two
extensions of time in which to submit a response. Dkt.
Nos. 17, 18, 19, Text Order 10/28/10. No response
was submitted. Defendants also submitted a supple-
mental request to dismiss. Dkt. No. 20. For the reasons
that follow, I recommend that Defendants' motion to
dismiss and supplemental request to dismiss be
granted. In addition, I recommend that Plaintiff be
permitted leave to amend his complaint.

### I. BACKGROUND

### A. Summary of the Complaint

The complaint and the documents <sup>FN2</sup> attached to
Plaintiff's complaint provide the following:

> **FN2.** When determining whether a complaint
> fails to state a claim, a court may review ex-
> hibits attached to the complaint and any
> documents incorporated into the complaint
> by reference. *Rothman v. Gregor,* 220 F.3d
> 81, 88 (2d Cir.2000) (citing *Cosmas v. Has-
> sett,* 886 F.2d 8, 13 (2d Cir.1989)).

On May 8, 2007, prior to being incarcerated,
Plaintiff injured his right shoulder and arm at work
when a glass window fell on his arm, severing ten-
dons. Dkt. No. 1–2 at 29. Plaintiff underwent surgery
and physical therapy. Dkt. No. 1–2.

On June 4, 2008, Baburao Doddapaneni, M.D.,
recommended that based on her year-long observa-
tion, Plaintiff required "symptomatic treatments" two
times per week during exacerbations of his symptoms.
Dkt. No. 1–2 at 3. She indicated that his prognosis was
"guarded" and that he had a "permanent disability."

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

*Id.* at 4.

On July 18, 2008, Plaintiff was sentenced to a period of 2 1/2 to 5 years of incarceration after pleading guilty to committing burglary. Dkt. No. 1 at ¶ 11; Dkt. No. 1–1 at 10. The sentencing judge noted on Plaintiff's commitment papers that medical attention was required. *Id.;* Dkt. No. 1–1 at 10.

**1. Allegations Regarding Dr. Cholom and Dr. Ali**

On July 28, 2008, at Ogdensburg Correctional Facility ("Ogdensburg C.F."), Dr. Cholom and Dr. Ali began treating Plaintiff for his right shoulder and arm issues. Dkt. No. 1 at ¶ 12. After eight physical therapy sessions, Dr. Cholom and Dr. Ali concluded that Plaintiff no longer needed to attend physical therapy. *Id.* at ¶ 31.

In addition, Dr. Cholom prescribed Naproxen [FN3] to Plaintiff for pain relief. Dkt. No. 1 at ¶ 39. Plaintiff claims that this medication is known to cause internal bleeding. *Id.* Plaintiff alleges that this medication caused him to experience stomach pain. *Id.*

> FN3. Naproxen is a nonsteroidal an-ti-inflammatory drug used to relieve in-flammation, swelling, stiffness, and joint pain. *The PDR Pocket Guide to Prescription Drugs* 914 (7th ed.2005).

On February 23, 2010, Plaintiff filed an inmate grievance. Dkt. No. 1–1 at 1–2. In the grievance, he stated the following:

> I have chronic ongoing medical problems with my right shoulder and arm. I have a court ordered medical required[.] [T]he medical staff here at Og-densburg CF have neglected to continue my [physical therapy] or schedule a specialist consult. My injury is getting worse everyday[.] [I]t's to the point where I can bar[ely] lift the arm or use it without pain.

*2 Dkt. No. 1–1 at 2.

On March 9, 2010, the Inmate Grievance Reso-lution Committee ("IGRC") recommended that the grievance be denied. Dkt. No. 1–1 at 5. On March 17, 2010, the Superintendent concurred with the recom-mendation of the IGRC. Dkt. No. 1–1 at 2. On May 12, 2010, the Central Office Review Committee ("CORC") upheld the determination of the Superin-tendent. Dkt. No. 1–2 at 31.

Plaintiff also stated that in the interim, on or about April 13, 2010, he filed another grievance "with sim-ilar (but not the same) concerns involving his medical conditions." Dkt. No. 1 at ¶ 51 (citing Dkt. No. 1–2 at 30). The IGRC recommended that the grievance be denied. *Id.*

**2. Allegations Regarding Nurse Montroy**

First, Plaintiff appears to allege that in response to the initial grievance, Nurse Montroy reviewed his medical records and incorrectly concluded that his grievance was unfounded. Dkt. No. 1 at ¶ 18.

Second, Plaintiff alleges that on April 5, 2010, he "dropped a sick call slip to inform [a] physician that the medication prescribed [sic] w[as] causing stomach problems." Dkt. No. 1 at ¶ 40. In response, Plaintiff saw Nurse Montroy, who "simply told [P]laintiff to stop taking" the medication. *Id.* Plaintiff also informed Nurse Montroy that he was experiencing shoulder pain. *Id.* at ¶ 45. Plaintiff claims that Nurse Montroy "once again told [P]laintiff that he was scheduled to see a doctor;" however Plaintiff has been waiting for more than two months to see a doctor. *Id.* at ¶ 40.

**3. Allegations Regarding Defendant Superinten-dent L. Sears**

Plaintiff has named Superintendent L. Sears, who was the superintendent of the facility at the relevant time, as a defendant. Dkt. No. 1 at ¶ 4. Plaintiff alleges

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

that Defendant Sears denied Plaintiff's grievance. *Id.* at ¶ 51.

**B. Defendants' Response**

Defendants argue that the deliberate indifference claim should be dismissed against Dr. Cholom, Dr. Ali, and Nurse Montroy because Plaintiff fails to meet the standard for deliberate indifference. Dkt. No. 16–2. Defendants also argue that the Court should dismiss Superintendent Sears because Plaintiff failed to allege his personal involvement, which is required in order to succeed on a § 1983 claim. *Id.*

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

**\*3** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all rea-

sonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## III. ANALYSIS

### A. Eighth Amendment

Plaintiff alleges that Dr. Cholom, Dr. Ali, and Nurse Montroy insufficiently treated his condition despite having copies of reports from his prior physician and despite the notation made on his sentencing report that medical attention was required. Dkt. No. 1 at ¶¶ 24, 31, 35, 45. Plaintiff also alleges that Dr. Cholom and Dr. Ali improperly discontinued physical therapy and denied Plaintiff access to medical specialists. *Id.* at ¶ 13.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

As noted, Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim against Dr. Cholom, Dr. Ali, and Nurse Montroy. Dkt. No. 16–2 at 2–4.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*4** There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, *i.e.,* an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.'% 7D' *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.") However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

**1. Serious Medical Conditions**

Regarding the objective component, the complaint alleges that Dr. Cholom, Dr. Ali, and Nurse Montroy provided Plaintiff with inadequate or no medical care after learning of Plaintiff's arm and shoulder pain, and liberally construing the complaint, after Nurse Montroy learned of Plaintiff's "stomach problems." Dkt. No. 1. Defendants failed to address whether Plaintiff's shoulder, arm, and stomach problems are serious medical conditions.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

**\*5** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. This "inquiry must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

**a. Right Shoulder and Arm**

As noted, prior to incarceration, Plaintiff injured his right shoulder and arm when a glass window fell on his arm, severing tendons and requiring surgery and further treatment. Dkt. No. 1–2 at 29. His physician found that Plaintiff's prognosis was guarded and that he had a permanent disability, and recommended that he continue to receive physical therapy. Dkt. No. 1–2.

Once at Ogdensburg C.F., Plaintiff was seen by Dr. Cholom and Dr. Ali, who referred Plaintiff to physical therapy, which he attended in 2008 and 2009. Dkt. No. 1; Dkt. No. 1–1 at 9. Dr. Cholom also prescribed a pain reliever. Dkt. No. 1 at ¶ 39. Nurse Montroy indicated that the physical therapist reported that Plaintiff's symptoms had decreased and his condition was much improved. *Id.* She also indicated that Plaintiff saw a doctor on twelve occasions from July 9, 2009, to February 25, 2010, and that an x-ray showed that the services of an orthopedist were not required.[FN4] *Id.*

FN4. Plaintiff claims that he never underwent x-ray testing while at Ogdensburg C.F. Dkt. No. 1 at ¶ 15.

However, Plaintiff alleges that once physical therapy was discontinued, he experienced "excruciating pain," tightening of the muscles, and loss of range-of-motion. Dkt. No. 1 at ¶ 5; *see* ¶¶ 27, 37. Plaintiff claims that he has become "lame with a lot of discomfort" and that he experienced severe pain in his shoulder and collarbone as a result of having to wait for more than two months to see a physician. *Id.* at ¶¶ 28, 34, 36, 40. Plaintiff asserts that his condition also was exacerbated by the work he performed as part of the "lawns and ground crew" and as a gym porter. *Id.* at ¶¶ 48, 49.

In light of the foregoing, I find that Plaintiff's arm and shoulder pain was a serious medical condition.[FN5] Plaintiff complained to Dr. Cholom, Dr. Ali, and Nurse Montroy about his shoulder and arm pain. *See* Dkt. No. 1 at ¶¶ 12, 39, 45. He attended "numerous" physical therapy sessions. Dkt. No. 1–1 at 9. Later, he was prescribed pain medication, which he continued to take despite resulting stomach problems. Dkt. No. 1 at ¶ 39.

FN5. *See Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility" in the shoulder are sufficient to raise a material issue of fact as to a serious medical need); *Goros v. Cent. Office Review Comm.,* No. 03 Civ. 407, 2006 WL 2794415, at \*6 (N.D.N.Y. Sept. 26, 2006) (plaintiff's allegations of "worsening pain" in his left shoulder and legs may establish a sufficiently serious medical need); *Guarneri v. Bates,* 05 Civ. 444(GLS)(DRH), 2008 WL 686809, at \*5 (N.D.N.Y. Mar. 10, 2008) (shoulder injury constitutes a serious medical need where

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

plaintiff contends that his alleged rotator cuff tear left him in severe pain and that he could not move his arm).

**b. Stomach Pain**

*6 Plaintiff states that he "is having *a lot* of pain in his stomach due to [his] medication," yet he continues to take the medication because "it is the only relief" he can find for his shoulder and arm pain and because he is unable to change medications until a physician will see him. Dkt. No. 1 at ¶¶ 39, 40 (emphasis added). Liberally construing the complaint, I find that Plaintiff has alleged a serious medical condition.[FN6] Plaintiff alleged that he experiences "a lot" of pain in his stomach, which suggests that this condition is somewhat urgent or serious.

> FN6. *See Pender v. McClellan,* No. 94–CV–413S, 1996 WL 343253, at *4 (W.D.N.Y. Feb.5, 1996) (dismissing Eighth Amendment claims based on stomach pain when there was *no* allegation that plaintiff's condition was urgent or otherwise serious).

**2. Deliberate Indifference**

Plaintiff alleges that Dr. Cholom, Dr. Ali, and Nurse Montroy were aware that Plaintiff had a serious medical need, but refused to provide sufficient medical treatment. Dkt. No. 1. Defendants argue that Plaintiff "has not alleged or established that [D]efendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed,' nor did [D]efendants draw the inference and ignore it." Dkt. No. 16–2 at 3 (citation omitted).

Plaintiff has failed to establish that Dr. Cholom, Dr. Ali, and Nurse Montroy acted with deliberate indifference in treating Plaintiff's right shoulder, arm, and stomach pain. Dr. Cholom and Dr. Ali saw Plaintiff and referred him to physical therapy. Dkt. No. 1 at ¶ 12. Nurse Montroy noted that Plaintiff's physical

therapist indicated that Plaintiff's condition improved. Dkt. No. 1–1 at 9. Nurse Montroy also indicated that Plaintiff was seen by a doctor on twelve different occasions from July 9, 2009, to February 25, 2010. *Id.* In addition, Dr. Ali prescribed pain medication to Plaintiff and upon Plaintiff's subsequent complaints of resulting stomach pain, Nurse Montroy saw Plaintiff and advised him to discontinue taking the medication. Dkt. No. 1 at ¶ 39, 40. Rather than showing a "conscious disregard" to Plaintiff's serious medical needs, the record demonstrates that medical staff appropriately responded to Plaintiff's complaints. Even if prescribed treatments were not successful in alleviating Plaintiff's pain, it cannot be said that Dr. Cholom, Dr. Ali, and Nurse Montroy acted with deliberate indifference. *See Williams v. Koenigsmann,* No. 03 Civ. 5267, 2004 WL 315279, at *6 (S.D.N.Y. Feb. 18, 2004).

Although Plaintiff disagrees with judgments made by Dr. Cholom, Dr. Ali, and Nurse Montroy, "mere disagreement over proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703.

The complaint also indicates that Plaintiff has been waiting to see a physician for more than two months. Dkt. No. 1 at ¶ 36. This delay does not rise to the level of an Eighth Amendment violation as a "delay in medical treatment does not necessarily invoke the Eighth Amendment." *Morrison v. Mamis,* No. 08 Civ. 4302(PAC)(AJP), 2008 WL 5451639, at *7 n. 19 (S.D.N.Y. Dec. 18, 2008) (Peck, M.J.). Delayed treatment amounts to deliberate indifference when "officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Id.* (citing *Demata v. New York State Corr. Dep't of Health Servs.,* No. 99–0066, 198 F.3d 233 (table), (published in full-text

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

format at 1999 U.S.App. LEXIS 22955, at *5, 1999 WL 753142, at *2 (2d Cir. Sept.17, 1999)). Here, any delay in treatment does not rise to the level of deliberate indifference. In fact, when Plaintiff "dropped his sick call slip," Nurse Montroy responded to Plaintiff's concerns. Dkt. No. 1 at ¶¶ 39, 40.

**\*7** To the extent that Plaintiff claims that Dr. Cholom erred by prescribing Naproxen because this medication is known to cause internal bleeding, Dkt. No. 1 at ¶ 39, this accusation is speculative and unsupported. Without more, it cannot be said that Dr. Ali's actions amounted to deliberate indifference. *See Bryant v. Wright,* No. 09 Civ. 2456, 2010 WL 3629443, at *8 (S.D.N.Y. Aug. 31, 2010) ("The mere fact that the generic medication has 'side effects,' ... is certainly insufficient to state a deliberate indifference claim ..."). Moreover, "[d]ifferences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." Wright, 694 F.Supp.2d at 160 (citing cases).

Accordingly, I recommend that the deliberate indifference claims against Dr. Cholom, Dr. Ali, and Nurse Montroy be dismissed.

**2. Personal Involvement**

Defendants argue that Superintendent Sears should be dismissed because Plaintiff fails to set forth specific allegations against him. Dkt. No. 16–2 at 4–5. Defendants argue that "it appears that [D]efendant Sears is being sued solely because he is the Superintendent of Ogdensburg." *Id.* at 5.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a

1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (*i.e.,* under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*8** Here, Plaintiff simply states that Superintendent Sears was the superintendent of the facility at the relevant time, and that he denied Plaintiff's grievance. Dkt. No. 1 at ¶¶ 4, 51.

To the extent that Superintendent Sears is named as a defendant simply because he allegedly was the superintendent during the relevant time, as noted, supervisory officials may not be held liable merely because they held a position of authority. *Black,* 76 F.3d at 74.

To the extent that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

establish personal involvement. *See Hatzfeld v. Eagen,* No. 9:08–CV–283 (LES/DRH), 2010 WL 5579883, at *5 (N.D.N.Y. Dec.10, 2010) (Homer, M.J.) ("Merely denying a prisoner's grievance 'is insufficient to establish personal involvement.' ") (quoting *Mercer v. Benson,* No. 08–cv–537 (DNH/DRH), 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009) (Homer, M .J.) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). There are no allegations that Superintendent Sears did anything more than concur with the conclusion of the IGRC. Therefore, Plaintiff has failed to establish personal involvement. *Joyner,* 195 F.Supp.2d at 506 (finding no personal involvement where the complaint "merely states that [the superintendent] affirmed the denial of [the plaintiff's] grievance"). Moreover, it is not alleged that Superintendent Sears is a doctor, or that he personally provided (or was capable of providing) Plaintiff with medical care. Further, there are no allegations that Superintendent Sears created an unconstitutional policy or custom, or was grossly negligent in supervising others. Thus, Plaintiff has failed to establish personal involvement.

I note that Plaintiff claims that the Program Committee at the facility assigned Plaintiff to work on the "lawn and grounds crew" and as a "gym porter," which exacerbated his condition. Dkt. No. 1 at ¶¶ 48, 49. There is no indication that Superintendent Sears was involved in the decisions of the Program Committee. Therefore, Superintendent Sears cannot be deemed personally involved in the decisions of the Program Committee.

Accordingly, I recommend that the claims against Defendant Sears be dismissed due to his lack of personal involvement.

### 3. Leave to Amend

As noted, where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any

indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Here, Plaintiff has not yet amended his complaint. Moreover, nothing on the face of the complaint suggests that amendment would be futile. Therefore, I recommend that Plaintiff be granted leave to amend.

**\*9 ACCORDINGLY,** it is

**RECOMMENDED,** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be **GRANTED;** and it is further

**RECOMMENDED,** that Defendants' supplemental request to dismiss (Dkt. No. 20) be **GRANTED;** and it is further

**RECOMMENDED,** that Plaintiff may file an amended complaint **within thirty (30) days** of the filing date of any Order adopting this Report and Recommendation; and it is further

**RECOMMENDED,** that if Plaintiff fails to timely file an amended complaint, the Clerk enter judgment dismissing this action without further order of this Court due to Plaintiff's failure to comply with the terms of any Order adopting this Report and Recommendation; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only decisions cited herein on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2728443 (N.D.N.Y.)
**(Cite as: 2011 WL 2728443 (N.D.N.Y.))**

***OBJECT TO THIS REPORT WITHIN FOUR-
TEEN DAYS WILL PRECLUDE APPELLATE
REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d
Cir.1993) (citing *Small v. Secretary of Health and
Human Services,* 892 F.2d 15 (2d Cir.1989)); 28
U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.
White v. Sears
Not Reported in F.Supp.2d, 2011 WL 2728443
(N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Richard WILLIAMS, Plaintiff,
v.
Mark LEONARD, Imam Khalil Abdul Kabir, T. La-
valley, Joe Haskell, Defendants.

No. 9:11–CV–1158.
Sept. 30, 2013.

Richard Williams, Comstock, NY, pro se.

Cathy Y. Sheehan, New York State Attorney General,
Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42
U.S.C. § 1983 was referred by this Court to the Hon.
Thérèse Wiley Dancks, United States Magistrate
Judge, for a Report and Recommendation pursuant to
28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).
In her Report–Recommendation [dkt. # 20], Magis-
trate Judge Dancks recommends that Defendants'
motion to dismiss for failure to state a claim [dkt. # 12]
be granted in part and denied in part. Specifically, she
recommends that the retaliation claim regarding meal
prices be dismissed with leave to amend, and that the
following claims be dismissed without leave to
amend: (1) the claims for monetary damages against
Defendants in their official capacities; (2) any claim
asserted on behalf of other inmates and/or their guests;
(3) the First Amendment and Religious Land Use and
Institutionalized Persons Act ("RLUIPA") claims for

monetary damages regarding the length of Plaintiff's
pants; (4) the First Amendment, RLUIPA, and Equal
Protection Clause claims for monetary damages re-
garding Plaintiff's family's participation with him
during the Eid el-Adha holy day; and (5) any claim
asserting a generalized right to visitation. Dkt. # 20 at
32–33. In addition, Magistrate Judge Dancks recom-
mends that Defendants be directed to answer the fol-
lowing claims: (1) the First Amendment claim for
injunctive relief regarding the length of Plaintiff's
pants; (2) the RLUIPA claim for injunctive relief
regarding the length of Plaintiff's pants; (3) the First
Amendment claim for injunctive relief regarding
family participation in Eid el-Adha; (4) the RLUIPA
claim for injunctive relief regarding family participa-
tion in Eid el-Adha; (5) the equal protection claim for
injunctive relief regarding family participation in Eid
el-Adha; and (6) the equal protection claim for dam-
ages and injunctive relief regarding meal prices. *Id.* at
33. Plaintiff has filed an objection to Magistrate Judge
Dancks' report. Dkt. # 21.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report
and recommendation are lodged, the district court
makes a "*de novo* determination of those portions of
the report or specified proposed findings or recom-
mendations to which objection is made." *See* 28
U.S.C. § 636(b); *see also United States v. Male Juve-
nile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must
make a *de novo* determination to the extent that a party
makes specific objections to a magistrate's findings.).
"[E]ven a *pro se* party's objections to a Report and
Recommendation must be specific and clearly aimed
at particular findings in the magistrate's proposal, such
that no party be allowed a second bite at the apple by
simply relitigating a prior argument." *Machicote v.
Ercole,* no 06 Civ. 13320(DAB)(JCF), 2011 WL
3809920, at \* 2 (S.D.N.Y., Aug. 25, 2011) (citations
omitted) (interior quotation marks omitted); *DiPilato*

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

*v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same).

**\*2** General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); see *Frankel v. N.Y.C.,* Nos. 06 Civ. 5450(LTS)(DFE), 07 Civ. 3436(LTS)(DFE), 2009 WL 465645 at \*2 (S.D.N.Y. Feb. 25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

### III. DISCUSSION

#### a. Plaintiff's Objections to the Report–Recommendation

Plaintiff's sole objection to Magistrate Judge Dancks' Report–Recommendation is with respect to the application of qualified immunity. *See generally* dkt. # 21. Specifically, Plaintiff objects to the recommendation that the First Amendment and RLUIPA claims for monetary damages concerning Plaintiff's request to wear his pants above his ankles, and Plaintiff's First Amendment, RLUIPA, and Equal Protection Clause claims for monetary damages concerning his family's participation in the Eid El–Adha holy day at the correctional facility, be dismissed on account of qualified immunity. Dkt. # 20 at 17–18, 24–27. Plaintiff contends that in determining "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ...," *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (internal quotation marks omitted),[FN1] Magistrate Judge Dancks framed the federally protected rights at issue too narrowly. Dkt. # 21 at 2–3.

FN1. This is the second prong of the two prong qualified immunity test. The first prong requires the court to consider "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation...." Dkt. # 20 at 15 (citing *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004)). Magistrate Judge Dancks concluded that this first prong was satisfied on all five claims at issue in this objection. See Dkt. # 20 at 15–16, 18, 23–26.

#### 1. Plaintiff's Request to Wear his Pants Above his Ankles

Plaintiff asserts that his religious beliefs require him to wear his pants rolled above his ankles at all times, but alleges that Defendants initially refused to allow this practice at all, and then, sometime in 2009, allowed the practice but only while engaged in religious observations. It also appears that sometime in 2010, Defendants allowed Plaintiff to wear his pants at ankle length at all times, purportedly because of advice given by a nondefendant imam and the Office of Ministerial Services.

There is no dispute that Magistrate Judge Dancks correctly determined that Plaintiff pleaded legally plausible First Amendment and RLUIPA claims related to pants length, see dkt. # 20 pp. 14–15, 18, and set forth the proper standard for determining whether Defendants should be granted qualified immunity. *See id.* at pp. 15–17.

As to the application of qualified immunity, Magistrate Judge Dancks concluded:

[T]he right at question here is the right for Muslim inmates to wear their pants above their ankles at all times. The decisional law of the Supreme Court and the Second Circuit does not support the existence of the right in question. At the time of the Defendants' actions there were no cases dealing substantively

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

with the issue of the length of Muslim inmates' pants. Under preexisting law a reasonable Defendant would not have understood that his or her acts were unlawful. Further, it was objectively reasonable for Defendants at the time of the challenged action to believe their acts were lawful. Defendants conferred with the Great Meadows Imam and outside Imams regarding the policy and apparently received their support. Thus, it would not be clear to a reasonable officer that his conduct was unlawful at the time.

**\*3** *Id.* at 17.

Magistrate Judge Dancks recommended that "the Court find that Defendants are entitled to qualified immunity from the First Amendment [and RLUIPA claims] against them for civil damages regarding the length of Plaintiff's pants and dismiss that claim accordingly. Because better pleading would not cure this defect, I recommend that the Court dismiss the claim without leave to amend." *Id.* pp. 17–18. Plaintiff argues that Magistrate Judge Dancks framed the right at issue too narrowly, and, therefore, the Court should reject the recommendation.

Before addressing whether the right in issue was too narrowly framed, it is imperative to recognize that Magistrate Judge Dancks found two bases to apply qualified immunity–1) that the right in issue was not recognized by the Second Circuit or the Supreme Court; and 2) that the facts presented to Defendants would have not lead reasonable officers to believe their conduct was unlawful in the situation they confronted. The second of these alone is a proper and sufficient basis for the grant of qualified immunity, but the facts alleged in the Complaint are unclear as to when Defendants were advised that the practice of at-ankle-length pants outside of religious observations and above-ankle-length pants during religious observations was in keeping with Plaintiff's religious beliefs. Moreover, the allegations in the Complaint indicate that before Defendants were purportedly ad-

vised of the propriety of the at-ankle-length/above-anklelength protocol, they were advised by an iman that Muslims who practiced Islam should be allowed to wear their pants above the ankle at all times. See dkt. # 20, p. 6. Thus, due to the conflicting factual issues regarding the propriety of different pant lengths for Muslim inmates, qualified immunity cannot be granted on this issue at this time.

Turning to whether the right in issue was clearly established, Magistrate Judge Dancks correctly indicates that "courts must avoid 'framing the constitutional right at too broad a level of generality .' " Dtk. # 20 at 16 (citing *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010)). However, while *Redd* requires that the constitutional issue be framed with "reasonable specificity," *Redd,* 597 F.3d at 536, the right must not be framed too narrowly. "Describing the right at issue overly broadly eviscerates the protections of qualified immunity; describing it too narrowly negates the possibility of redress." *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011).

In order to prevent the margin of immunity from overshadowing our interests in recovery ... the right in question must not be restricted to the factual circumstances under which it has been established. Thus, the Supreme Court has declined to say that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," and has, instead, chosen a standard that excludes such immunity if "in the light of pre-existing law the unlawfulness [is] apparent." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 129 (2d Cir.2004) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)); *see also Zagaja v. Village of Freeport,* No. 10–cv–3660 (JFB) (WDW), 2013 WL 2405440, at \*15 (E.D.N.Y. June 3, 2013) (same).

**\*4** It is well established in the Second Circuit that "prison officials may not substantially burden inmates'

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

right to religious exercise without some justification...." *Salahuddin v. Goord,* 467 F.3d 263, 275–76 (2d Cir.2006); *see also Redd,* 597 F.3d at 537. Magistrate Judge Dancks correctly indicates that "the facts viewed in the light most favorable to Plaintiff establish a constitutional violation" as to the pants length issue, dkt. # 20 at 16, and that "Defendants ... have not identified [at this stage of the litigation] any legitimate penological reason for their refusal to allow Plaintiff to wear his pants at the length mandated by his religion." *Id.* at 15. Absent a legitimate penological interest for the belowankles requirement (which, on this Rule 12(b) (6) motion, the Court must assume did not exist), Defendants could have reasonably anticipated before that their refusals to allow Plaintiff to wear his pants above his ankles at all times substantially burdened his right to religious exercise without justification. *See Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."). Thus, in light of pre-existing law, see e.g. *Salahuddin,* 467 F.3d at 275–76, the unlawfulness of the conduct would be apparent. This is so even though there are no cases from the Second Circuit or Supreme Court that specifically address whether a Muslim inmate may wear his pants at a particular length. Accordingly, qualified immunity on this claim must be denied at this time.

Because rights under RLUIPA are addressed substantially the same as rights under the First Amendment, the same conclusion is reached as to the RLUIPA claim based upon pants length. *See* RLUIPA, 42 U.S.C. § 2000cc–1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.").

To be clear, the Court is not saying that Defendants may not be entitled to qualified immunity on these claims, but only that, at this stage of the litigation, existing factual questions impacting the pants length rule prohibits the application of this immunity. *See McKenna v. Wright,* 386 F.3d 432, 436 (2d. Cir.2004); FN2 *Walker v. Mendoza,* No. 00–CV–93(JG), 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000) ("[I]t is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).") (citing *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983)).

> FN2. The Second Circuit noted in *McKenna,*
>
> a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route. Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.
>
> 386 F.3d at 436 (citations and internal quotation marks omitted).

**2. Plaintiff's Request for Family Participation in Eid El–Adha**

**\*5** Plaintiff alleges that his religious beliefs require him to observe the Eid el-Adha holy day with his family but has been denied the ability to do so. Plaintiff also alleges that Native American inmates are

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

allowed to participate with family members during nine religious holy days whereas Muslims are limited to one holy day that is not Eid el-Adha. Dkt. # 20 at 19. Plaintiff argues that Magistrate Judge Dancks framed the right at issue too narrowly when applying qualified immunity to Plaintiff's First Amendment, RLUIPA, and Equal Protection Clause claims for monetary damages resulting from Defendants' actions in prohibiting Plaintiff's family from participating during Eid el-Adha.[FN3]

> **FN3.** With respect to the First Amendment claim for damages, Magistrate Judge Dancks concluded that Defendants were entitled to qualified immunity because " 'there was no clearly established decisional law of the Supreme Court or of the Second Circuit that ... allowed family visitation during the Eid prayer festival.' " Dkt. # 20 at 24 (quoting dkt. # 12–1 at 10). Similarly, with respect to the RLUIPA claim for damages, Magistrate Judge Dancks concluded that Defendants were entitled to qualified immunity because "[t]here is no authority from the Second Circuit or the Supreme Court supporting the right of Muslim inmates to have family present at all religious events." *Id.* at 25. With respect to the Equal Protection Clause claims, Magistrate Judge Dancks concluded that "[f]or the reasons discussed above regarding the First Amendment and RLUIPA, Defendants are entitled to qualified immunity from Plaintiff's equal protection claim for damages regarding family participation in Eid el-Adha." Dkt. # 20 at 26–27.

On the First Amendment claim, Magistrate Judge Dancks correctly observed that "[t]he face of the complaint pleads facts plausibly suggesting that Defendants substantially burdened Plaintiff's sincere religious belief that family participation is required at Eid elAdha ...," and that Defendants have failed to identify a legitimate penological interest justifying

this policy. Dkt. # 20 at 23. However, for the reasons discussed above with regard to the application of qualified immunity on the pants length claim, the Court cannot conclude at this stage of the litigation that Defendants are entitled to qualified immunity. The absence in the record of a legitimate penological interest justifying the exclusion of family members from this particular religious holiday-but not others-creates a question of fact preventing the application of immunity on this claim at this time.

With respect to the RLUIPA claim, Magistrate Judge Dancks correctly concluded:

> Plaintiff has alleged facts plausibly suggesting that Defendants have placed a substantial burden on his religious exercise. Moreover, Defendants have not, at this point in the litigation, demonstrated what governmental interest supports the policy regarding family participation in Eid el-Adha. Defendants have thus failed to establish that the burden on Plaintiff was in furtherance of a compelling government interest or that it was the least restrictive means of furthering this compelling government interest. Therefore, Plaintiff has alleged facts plausibly suggesting that Defendants violated his rights under RLUIPA.

> Dkt. # 20 at 25.

For the same reasons as discussed above, it is premature to award Defendants qualified immunity on this claim.

On the Equal Protection Clause claim, Magistrate Judge Dancks correctly concluded that the Equal Protection Clause " 'bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

faith intent to injure a person.' " Dkt. # 20 at 26 (quoting *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (internal quotation marks omitted); *see also LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980) (same). On the present record, it is unclear the basis for the alleged disparate treatment between Islamic prisoners and those of other religious faiths as to the number of holy days that family members may participate with a prisoner. Assuming that a disparity exists on the basis of an impermissible consideration, as the Court must at this stage of the litigation, reasonable officers could anticipate that their actions violated Plaintiff's Equal Protection Clause rights even without a case precisely on point. *See .e.g. Bizzarro,* 394 F.3d at 86. Thus, qualified immunity on this claim must be denied as premature.

### b. Remainder of the Report–Recommendation

**\*6** With respect to all other findings in Magistrate Dancks' Report–Recommendation, neither party has lodged any objections and the time for doing so has expired. After examining the record, this Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice on any of these recommendations. findings. Therefore, the Court adopts these portions of the Report–Recommendation.

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Dancks' Report–Recommendation [dkt. # 20] in part. The Court **GRANTS** Defendants' motion to dismiss [dkt. # 12] with respect to: (1) the retaliation claim regarding meal prices; (2) the claims for damages against Defendants in their official capacities; (3) any claim asserted on behalf of other inmates and/or their guests; and (4) any claim asserting a generalized right to visitation. The (1) retaliation claim regarding meal prices is **DISMISSED with leave to amend,** and the (2) claims for damages against Defendants in their official capacities; (3) claims asserted on behalf of other inmates and/or their guests; and (4) any claim asserting a generalized right

to visitation are **DISMISSED without leave to amend.**

The Court **DENIES** Defendants' motion to dismiss [dkt. # 12] with respect to (1) the First Amendment claim for injunctive relief regarding the length of Plaintiff's pants; (2) the RLUIPA claim for injunctive relief regarding the length of Plaintiff's pants; (3) the First Amendment claim for injunctive relief regarding family participation in Eid el-Adha; (4) the RLUIPA claim for injunctive relief regarding family participation in Eid el-Adha; (5) the Equal Protection Clause claim for injunctive relief regarding family participation in Eid elAdha; (6) the Equal Protection Clause claim for damages and injunctive relief regarding meal prices; (7) the First Amendment and RLUIPA claims for damages regarding the length that Plaintiff may wear his pants while in general population; and (8) the First Amendment, RLUIPA, and Equal Protection Clause claims for damages regarding family participation in the Eid el-Adha observation at the correctional facility.

**Defendants are ordered to answer each of the remaining claims within thirty (30) days from the date of this Decision and Order.**

**IT IS SO ORDERED.**

N.D.N.Y.,2013.
Williams v. Leonard
Slip Copy, 2013 WL 5466191 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.